IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CESAR ANDUJAR,

                    Petitioner,      Civil Action No.
                                       9:18-CV-0521 (GLS/DEP)

     v.

SUSAN KICKBUSH,

                    Respondent.

_____

APPEARANCES:                      OF COUNSEL:

FOR PETITIONER

CESAR ANDUJAR, *Pro Se*
15-A-3467
Gowanda Correctional Facility
P.O. Box 311
Gowanda, NY 14070

FOR RESPONDENT:

HON. LETITIA JAMES           DENNIS A. RAMBAUD, ESQ.
New York State Attorney General   Assistant Attorney General
28 Liberty Street
New York, NY 10005

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Petitioner Cesar Andujar, a New York State prison inmate as the result of his 2015 conviction from Albany County for the sale of a controlled substance, has commenced this proceeding pursuant to 28 U.S.C. § 2254, requesting habeas relief from this court. In his petition, Andujar argues that his due process rights were violated when prosecuting officials failed to honor an agreement under which he agreed to cooperate with law enforcement officers investigating others engaged in criminal activity, in return for not being prosecuted for his own unlawful conduct. Petitioner also asserts that he received ineffective assistance of counsel when his attorney failed to file a motion to dismiss the indictment against him in the interest of justice, based upon his cooperation agreement, and erroneously advised him that the trial court had promised a sentence of three years of incarceration, followed by one and one-half years of post-release supervision when, in fact, he received a lengthier sentence. For the reasons set forth below, I recommend that the petition be denied and dismissed.

I.    BACKGROUND

Petitioner was arrested on February 28, 2014, and charged with the sale of a controlled substance. Dkt. No. 16 at 158. Petitioner claims that,

following his arrest, he asked Albany City police officers what he could do in order to avoid going to jail for selling heroin. Dkt. No. 16 at 158. After conferring with representatives of the New York State Police, an Albany City detective inquired concerning petitioner's knowledge of illegal gun sales. *Id.* Petitioner thereafter began cooperating with law enforcement officials in March 2014. *Id.*

On or about February 15, 2015, an Albany County grand jury returned a single count sealed indictment charging petitioner with third-degree criminal sale of a controlled substance, in violation of N.Y. Penal Law § 220.39(1). Dkt. No. 16 at 24-25. That indictment was based upon petitioner's alleged sale of ten bags of heroin to an undercover police officer in Albany, New York on February 28, 2014. *Id*; *see also* Dkt. No. 15-1 at 3. Petitioner ceased cooperating with law enforcement officers when he learned of the indictment on March 3, 2015. Dkt. No. 16 at 158.

II.    PROCEDURAL HISTORY

A.    Proceedings in State Court

Petitioner was arraigned in connection with the indictment returned against him on March 3, 2015, before Albany County Court Judge Stefan W. Herrick. Dkt. No. 16-1 at 1-7. At that time, a not guilty plea was entered

on petitioner's behalf, and the Office of the Albany County Public Defender was assigned to represent him. *Id.* at 2-4.

Petitioner again appeared before County Court Judge Herrick on March 17, 2015, for the purpose of entering a plea to the pending, single count indictment, charging him with third-degree criminal sale of a controlled substance, in violation of N.Y. Penal Law § 220.39(1). Dkt. No. 16-1 at 8-30. During the course of the ensuing plea proceedings, petitioner stated that he understood the plea agreement, which did not call for a specified sentence, and confirmed that he had an adequate opportunity to discuss the matter with his counsel, with whom he was satisfied. *Id.* at 13-15. Petitioner acknowledged that no threats had been made, and no coercion or pressure had been exerted, to convince him to plead guilty; confirmed for the court that no promises had been made to induce his plea; and stated that his plea was entirely voluntary. *Id.* at 12, 14, 18, 21.

In discussing the issue of sentencing, the trial court informed petitioner of the maximum and minimum sentences that could be imposed based upon his plea as a second felony offender,[1] and stated that the

---

[1]    Criminal sale of a controlled substance in the third degree, a class B felony, carries a potential determinate sentence of between two and twelve years of imprisonment with an additional period of one and one-half to three years' post-release supervision for nonviolent predicate felony offenders. N.Y. Penal Law §§ 70.45(2)(d), 70.70(3)(c); *see also* Dkt. No. 16 at 36-37.

sentence to be imposed would be entirely dependent on what occurred between the time of his plea and the date of sentencing. Dkt. No. 16-1 at 11-12, 19. Significantly, petitioner was informed by the court that in pleading guilty he was relinquishing his right to challenge the criminal prosecution against him, including to move to set aside his conviction. *Id.* at 19-21. Petitioner's plea was in satisfaction not only of the indictment against him, but of multiple charges pending in other courts. *Id.* at 10-11.

During his plea allocution petitioner admitted, under oath, to having knowingly and unlawfully possessed and sold heroin on February 28, 2014. Dkt. No. 16-1 at 26-27. Following the entry of his plea, petitioner was released with the directive that he was to return to court for sentencing, and a warning that he must remain free of arrests during the intervening time between the entry of his plea and the time of sentencing. *Id.* at 24, 27-28.

Petitioner appeared before County Court Judge Herrick on August 17, 2015 for sentencing. Dkt. No. 16-1 at 31-44. During that proceeding Judge Herrick noted that despite his admonition that petitioner remain free of arrests while on post-plea release, Andujar was re-arrested on August 5, 2015 in the Town of Menands and charged with unlawful possession of marijuana, aggravated unlicensed operation of a vehicle, driving while

5

intoxicated, and driving while ability impaired by drugs and alcohol. *Id.* at 33.

According to the prosecutor who appeared at the time of sentencing, petitioner did in fact cooperate with both state and local law enforcement officials, resulting in the arrest of at least seven other individuals, the issuance of two search warrants, the seizure of two handguns and two rifles, and the confiscation of marijuana, heroin and cocaine. Dkt. No. 16-1 at 35-36. The prosecutor further characterized petitioner's cooperation as leading to the return of indictments against individuals of "great value or interest to the Albany Police Department." *Id.* at 36.

Petitioner's cooperation was discussed at length during sentencing. *See generally* Dkt. No. 16-1 at 31-44. As a counterbalance, however, the court noted that petitioner had been arrested on fourteen prior occasions, resulting in nine previous convictions. *Id.* at 39. At the conclusion of the hearing, Judge Herrick sentenced petitioner to five and one-half years of incarceration plus an additional three-year period of post-release supervision. *Id.* at 41-42.

On or about August 22, 2017, prior to perfecting a direct appeal, petitioner filed a motion to set aside his conviction, pursuant to N.Y. Criminal Procedure Law § 440.10. Dkt. No. 16 at 175-86. In that motion,

he complained of a deprivation of his due process rights arising under both the New York State Constitution and the Fourteenth Amendment to the United States Constitution, based upon an alleged breach by law enforcement officers of the agreement entered into for his cooperation. *Id.* That motion was denied by a decision and order issued by County Court Judge William A. Carter on November 8, 2017. *Id.* at 193-95. In his decision, Judge Carter concluded that the grounds for the motion were fully disclosed by the record, and that petitioner's section 440.10 motion was therefore being improperly used by petitioner as a substitute for a direct appeal. *Id.* Petitioner's application for leave to appeal the denial of his section 440.10 motion, pursuant to N.Y. Criminal Procedure Law § 460.15, was denied on January 30, 2018. *Id.* at 225.

Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Third Judicial Department. Dkt. No. 16 at 6. In connection with that appeal, his assigned appellate counsel submitted an *Anders*[2] brief stating that, based upon a conscientious and good faith review of the record on appeal, counsel found no non-frivolous grounds for reversal or modification of the petitioner's conviction or sentence, and asking to be relieved of the assignment. Dkt. No. 16 at 87-96. Petitioner

---

[2]     *Anders v. California*, 386 U.S. 738 (1967).

thereafter filed a *pro se* supplemental brief, in which the sole ground raised for reversal was that petitioner received ineffective assistance of counsel, in violation of his rights under the Sixth Amendment to the United States Constitution, based upon his attorney's alleged representation that Judge Herrick promised that on a plea of guilty, petitioner would receive a sentence of two years of incarceration with an additional one and one-half year period of post-supervised release if he continued to work with law enforcement officers, which he did. *See generally id.* at 155-65. Petitioner also argued that his counsel should have moved to dismiss the indictment against him in the interest of justice, based upon his cooperation with law enforcement officials. *Id.* at 160.

By memorandum and order decided and entered on December 14, 2017, a five-justice panel of the Third Department unanimously affirmed petitioner's conviction. *People v. Andujar*, 156 A.D.3d 1060 (3d Dep't 2017) (mem.); *see also* Dkt. No. 16 at 167-168. In its decision, the Appellate Division succinctly noted its agreement with the opinion of petitioner's appellate counsel, to the effect that there were no non-frivolous issues to be raised by direct appeal by petitioner. *Id.*

On December 19, 2017, petitioner applied to the New York State Court of Appeals for leave to appeal his conviction to that court, pursuant

to N.Y. Penal Law § 460.20. Dkt. No. 16 at 169-173. In that application he argued, *inter alia*, that his rights under the due process clause of the Fourteenth Amendment were violated based upon the breach of his cooperation agreement by law enforcement and prosecution officials. *Id.* By order dated March 21, 2018, petitioner's application for leave to appeal was denied. *People v. Andujar*, 31 N.Y.3d 980, 77 N.Y.S.3d 758 (2018) (table); *see* Dkt. No. 16 at 174.

On or about February 2, 2018, petitioner applied to the Third Department for the issuance of a writ of error *coram nobis*. Dkt. No. 16 at 226-230. In his petition for that relief, Andujar argued that the trial court's failure to honor the agreed upon plea bargain violated his rights to equal protection and due process. *Id.* at 229. That application was summarily denied in a decision and order issued by the Third Department on April 12, 2018. *Id.* at 236.

B.    Proceedings in this Court

Petitioner commenced this proceeding on April 30, 2018. Dkt. No. 1. In his petition, Andujar asserts three grounds for habeas relief, alleging (1) violation of his Fourteenth Amendment right to due process; (2) a claim under the Sixth Amendment alleging ineffective assistance of counsel; and

(3) a due process of law violation.[3] *See generally id.* On September 28,

2018, respondent filed an answer to the petition, accompanied by a

compilation of the relevant state court records, helpfully organized and

indexed for the convenience of the court and parties. Dkt. Nos. 15, 16.

Plaintiff followed with the submission of a reply brief, or "traverse," on

October 22, 2018. Dkt. No. 18. This matter, which is now fully briefed, has

been referred to me for the issuance of a report and recommendation,

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Standard of Review

    Before turning to the merits of petitioner's claims, I will first address

the standard of review under which those claims must be analyzed. Under

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.

L. No. 104-132, 110 Stat. 1214 (1996) a federal court may grant habeas

corpus relief with respect to a claim adjudicated on the merits in state

court only if, based upon the record before the state court, the adjudication

of the claim (1) was contrary to, or involved an unreasonable application

---

[3]    Although Andujar's petition contains three grounds, I am unable to discern any distinction between grounds one and three, both of which assert due process violations. *Compare* Dkt. No. 1 at 5-7 *with id.* at 8-9.

of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.). The AEDPA " 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.' " *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)); *accord, Cullen*, 563 U.S. at 181. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.' " *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting 28 U.S.C. § 2254(e)(1)); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro*, 550 U.S. at 473 (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 563 U.S. at 181; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001); *see Willson v. Sellars*, 138 S. Ct. 1188, 1192 (2018) (holding that a federal habeas court reviewing an unexplained state-court decision on the merits "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," but that "the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision").

B.    Exhaustion of Remedies

As a threshold matter, I must first determine whether the petitioner is procedurally barred from raising the grounds supporting his request for

12

habeas relief, based on his alleged failure to present them to the state courts for determination. Dkt No. 15-1 at 9-14. In her opposition to the petition, respondent argues that petitioner's due process claim was never fairly presented to the state courts, and as a result remains unexhausted. *Id.*

1.    <u>The Exhaustion Doctrine Generally</u>

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838,

844-45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been " 'fairly present[ed]' " to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

Significantly, "[t]he exhaustion doctrine 'requires only that a petitioner present his claim once on direct or collateral review.' " *Salahuddin v. Strack*, No. 97-CV-5789, 1998 WL 812648, at *5 (E.D.N.Y. Aug. 12, 1998) (quoting *Sanford v. Senkowski*, 791 F. Supp. 66, 69 (E.D.N.Y. 1992)); *see Fielding v. LeFevre*, 548 F.2d 1102, 1106 (2d Cir. 1977) ("In order to meet the exhaustion requirement, a petitioner must have presented his claim to the state courts at least once, on direct or collateral review."). "Therefore, even if a claim is not raised at trial or on

direct appeal, a claim pursued throughout a full round of state post-conviction proceedings is exhausted." *Salahuddin*, 1998 WL 812648, at *5 (citing, *inter alia*, *Castille v. Peoples*, 489 U.S. 346, 350-51 (1989)); *see also Harvey v. Portuondo*, No. 98-CV-7371, 2002 WL 2003210, at *5 (E.D.N.Y. Aug. 5, 2002).

>        2.    Analysis

While acknowledging that petitioner's ineffective assistance of counsel claim is fully exhausted, respondent argues that his due process ground is not. Dkt No. 15-1 at 9-14. Respondent therefore urges that the court find Andujar's petition to be a mixed petition, and either dismiss it without prejudice in order to permit Andujar to exhaust the claim or, alternatively, find that it is patently meritless. *Id.* at 13-17.

Careful review of both the counseled and *pro se* briefs filed in connection with petitioner's direct appeal confirm that the due process issue now presented to the court was not raised before the Third Department in his direct appeal. Dkt. No. 16 at 87-96, 155-65. His claim that his due process rights were violated when the cooperation agreement that he reached with law enforcement officials was breached by the prosecution of drug charges against him was first argued following the Third Department's decision and order and in connection with his motion

for leave to appeal to the New York State Court of Appeals pursuant to

N.Y. Criminal Procedure Law § 460.20. Dkt. No. 16 at 169-73. In that

application, petitioner stated the following:

> As one of the Justices review my records,
> they will see for themselves that my Due Process
> of law were violated along with my Fourth
> Amendment My Sixth, and my Fourteenth
> amendment.

> My Fourth Amen[d]ment and my Fourteenth
> Amendment as well as the Due Process were
> violated when the State Police officer breached our
> Cooperation Agreement that was made on the day
> I was arrested for the Sale that I caught on
> February 28, 2014 by filing an indictment against
> me.

*Id.* at 171 (errors in original). Unfortunately for petitioner, it is well-

established that presentment of a claim for the first time on an application

for discretionary review, such as in a motion for leave to appeal to the

New York Court of Appeals, is insufficient to exhaust the claim unless

discretionary review is granted and the claim is addressed on the merits.

*St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004); *see also*

*McQueen v. Superintendent, Franklin Corr. Facility*, No.15-CV-00077,

2015 WL 6449138, at *6 (N.D.N.Y. Oct. 23, 2015) (Singleton, J.);

*Mercedes v. Superintendent*, No. 12-CV-0687, 2014 WL 2711803, at *5

(N.D.N.Y. June 16, 2014) (Hurd, J.). Here, petitioner's application for

leave to appeal to the New York Court of Appeals was denied and, thus, his claim was not addressed on the merits. Dkt. No. 16 at 174.

This, however, does not end the court's inquiry because exhaustion requires that the petitioner present is claim to the state courts "at least once, on direct or collateral review." *Fielding*, 548 F.2d at 1106; *see Picard*, 404 U.S. at 275. In contrast to his direct appeal, in his motion pursuant to section 440.10 of N.Y. Criminal Procedure Law, which was filed before his direct appeal was perfected or decided, petitioner refers, albeit in general terms, to a due process claim. Dkt. No. 16 at 175-86. Respondent argues that in the motion, petitioner did not adequately present the due process claim now being raised in this proceeding, since the motion was unduly vague. Dkt. No. 15-1 at 10-11.

I disagree. Although it is true that "a generalized and catch-all allusion to the Constitution is insufficient to alert the state court to the existence of a federal constitutional claim," *Chaplin v. Kirkpatrick*, No. 9:17-CV-0718, 2018 WL 6613359, at *12, n.9 (Oct. 2, 2018) (Peebles, M.J.) (citing *Grey v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guaranty as broad as due process to present the 'substance' of such a claim to a state court.")), *report and recommendation adopted by* 2018 WL 6605917 (Dec. 17,

17

2018) (D'Agostino, J.), affording the petitioner the lenity to which he is entitled as a *pro se* litigant, I conclude that the section 440.10 motion did adequately apprise the state courts that he was raising the due process claim now advanced in his habeas petition. Dkt. No. 16 at 175-86. His motion refers to both due process and the formation of a cooperation agreement in March 2014, as well as an alleged breach of that agreement by law enforcement personnel. *See, e.g.*, *id.* at 178. In the "WHEREFORE" portion of the motion, defendant stated the following:

> [T]he defendant, respectfully requests that his conviction be vacated on the ground(s) that: Due Process Right were violated, and so was my one 4th Amendment, when the State Police breached the cooperation agreement we made on February 28, 2014, when I was released to inform for them so I can stay out of prison, before I was indicted on February 13, 2015.

*Id.* at 180 (errors in original). In his reply submission, moreover, Andujar added the following:

> [Petitioner] argues that he worked for both agencies for eleven months before the State Police breached our Cooperation Agreement and violated defendant Due Process Rights.

*Id.* at 192 (errors in original). While the state lower court did not address the merits of this claim, instead finding that the issues raised were based upon matters within the record and should have been raised on appeal,

petitioner did attempt to fairly present the claim to the state courts.[4] *Id.* at 194-95; *see Klein v. Harris*, 667 F.2d 274, 283-84 (2d Cir. 1981) ("[N]o appeal to the New York Court of Appeals lies from an order denying a motion for leave to appeal to the Appellate Division.") (citing *People v. Williams*, 342 N.Y.S.2d 75, 76 (2d Dep't 1973)).

Based upon the foregoing, I conclude that both grounds of Andujar's petition have been fully exhausted. *See, e.g.*, Desrosiers v. Phillips, No. 05-CV-2941, 2006 WL 2092481, at *9 (E.D.N.Y. July 27, 2006) ("A habeas petitioner can exhaust a claim through a 440 motion."); *Tenace v. Artus*, No. 04-CV-29, 2005 WL 1397139, at *2 (May 27, 2005) (Homer, M.J.) ("The exhaustion doctrine requirement is 'that a petitioner must have presented his [or her] claim to the state courts at least once, on direct or collateral review.' " (quoting *Fielding*, 548 F.2d at 1106)).

C.    Ineffective Assistance of Counsel

---

[4]    In his decision and order, Judge Carter stated that "[i]t appears the [petitioner] has not appealed his conviction," nor consequently, had he raised the two grounds asserted in his section 440.10 motion on appeal. Dkt. No. 16 at 193-95 (citing N.Y. CPL § 440.10(2)(c)). The statement that petitioner had not by then appealed his conviction, of course, was not correct. Judge Carter's decision was rendered on November 8, 2017. *Id.* at 195. By that time, both counsel's *Anders* brief and Andujar's *pro se* supplemental brief had been submitted to the Third Department in connection with petitioner's direct appeal, and the prosecution had submitted a responsive letter, dated August 10, 2017, requesting that the conviction be affirmed. *Id.* at 87-96, 155-65, 166. The Third Department's memorandum and order was issued approximately one month later on December 14, 2017. *Andujar*, 156 A.D.3d at 1060.

In his petition, Andujar asserts that he received ineffective assistance from his trial counsel. Dkt. No. 1 at 7-8. That claim was implicitly found to be frivolous by the Third Department in response to petitioner's direct appeal. *Andjuar*, 156 A.D.3d at 1060. The court must therefore determine whether the Third Department's determination, in rejecting the ineffective assistance of counsel claim, was either contrary to or an unreasonable application of clearly established Supreme Court law.

    1.    Ineffective Assistance of Counsel

Under the well-established standard governing ineffective assistance of counsel claims,

> the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Wash.*, 466 U.S. 668, 687 (1984); *accord, Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007).

To be constitutionally deficient, the attorney's conduct must fall "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690; *accord, Rivas v. Fischer*, 780 F.3d 529, 547

(2d Cir. 2015). An attorney's performance is judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort made to "eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689; *see also Rivas,* 780 F.3d at 547 (noting the court's "scrutiny of counsel's performance must be 'highly deferential' " (quoting *Strickland*, 466 U.S. at 689)).

Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that, but for the attorney's deficient conduct, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *see also Murden*, 497 F.3d at 198 ("Under *Strickland*, a defendant must show that . . . there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation marks omitted)).

2.    Analysis

The focus of petitioner's ineffective assistance ground is upon two discrete issues—whether his attorney should have moved to dismiss the pending indictment based upon his cooperation agreement, and whether counsel mistakenly advised him regarding a promised sentence. Dkt. No.

1 at 7-8. Respondent argues that the first prong of petitioner's ineffective assistance of counsel argument, involving the failure of petitioner's trial attorney to move for dismissal of the indictment against him, has been waived. Dkt. No. 15-1 at 19-20.

a.    <u>Waiver</u>

It is well-established that a voluntary guilty plea that is knowingly, intelligently, and voluntarily entered constitutes a waiver of non-jurisdictional defects occurring prior to entry of the plea. *See United States ex-rel. Glenn v. McMann*, 349 F.2d 1018, 1019 (2d Cir. 1967). As the Supreme Court has explained, "a guilty plea represents a break in the chain of events which has preceded it in the criminal process." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). In this case, petitioner's guilty plea effectively waived all ineffective assistance of counsel claims relating to events prior to entry of the plea. *See United States v. Coffin*, 76 F.3d 494, 497-98 (2d Cir. 1996) ("A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of the guilty plea."); *see also Morris v. Smith, No.* 13-CV-1441, 2015 WL 13745077, at *5 (Jul. 29, 2015) (Treece, M.J.), *report and recommendation adopted by*, 2016 WL 4532160 (N.D.N.Y. Aug. 30, 2016) (Sharpe, J.); *Conyers v. McLaughlin*, 96-CV-

1743, 2000 WL 33767755, at *7 (N.D.N.Y. Jan. 27, 2000) (Sharpe, J.).
This includes any argument that petitioner's trial attorney should have
moved to dismiss the indictment against him in the interest of justice
based on his cooperation agreement.

b.   <u>Merits</u>

In the first prong of petitioner's ineffective assistance of counsel
argument, he claims that his trial attorney's performance was deficient
based upon her failure to move to dismiss the indictment against him in
the interest of justice. Dkt. No. 1 at 4-8. Pivotal to that argument is his
contention that law enforcement officials entered into a binding agreement
with him under which he would avoid incarceration based upon his
cooperation. *See id.*

Though arising under federal law, the First Circuit's decision in
*United States v. Flemmi*, 225 F.3d 78 (1st Cir. 2000) is instructive
regarding this issue. In *Flemmi*, the court examined a prosecution
following an alleged promise of immunity by law enforcement
representatives, in that case from agents of the Federal Bureau of
Investigation ("FBI"). *Id.* 81-82. The court concluded that absent a showing
of authorization by prosecuting authorities, those authorities could not be
bound by a promise made by FBI agents. *Id.* at 91.

In New York, it is well-established that in order to obtain dismissal of an indictment based upon a cooperation agreement, a defendant "must demonstrate, by a preponderance of the evidence, 'a clear and specific promise from the authorities [and] services performed by the defendant involving a significant degree of risk or sacrifice[.]'" *People v. Andrades*, 119 A.D.3d 951, 951 (2d Dep't 2014) (quoting *People v. Trombley*, 72 A.D.3d 1402, 1403 (3d Dep't 2010)); *see People v. Fournier*, 77 A.D.3d 1201, 1202 (3d Dep't 2010); *People v. Reed*, 184 A.D.2d 536, 537 (2d Dep't 1992); *People v. Rittenhouse*, 37 A.D.2d 866, 897 (3d Dep't 1971) ("Our courts have previously held that the [prosecution] must authorize the promise of immunity." (citations omitted)).

Petitioner appears to claim that such a binding agreement was entered into and was authorized, and that a motion to dismiss in the interest of justice on the basis of an alleged breach of that agreement should have been made, and would have succeeded. *See, e.g.*, Dkt. No. 1 at 7; Dkt. No. 18 at 3. In New York, a motion to dismiss in the interest of justice is directed to the trial court's discretion, which must be exercised "sparingly" and "only in that 'rare' and 'unusual' case where it 'cries out for fundamental justice beyond the confines of conventional considerations.' " *People v. Insignares*, 109 A.D.2d 221, 234 (1st Dep't 1985). In this case,

petitioner advances only his self-serving assertions to support the claim that he entered into a cooperation agreement with law enforcement officials and performed pursuant to that agreement. There is no independent evidence of such an agreement, nor is there any indication that it was either endorsed or authorized by prosecuting authorities. Under the circumstances, petitioner cannot demonstrate that a motion to dismiss in the interest of justice would have succeeded. The Third Department's rejection of this portion of petitioner's ineffective assistance argument was therefore neither contrary to nor an unreasonable application of Supreme Court law, including standard articulated in *Strickland*.

With respect to the second prong of the ineffective assistance argument, claiming that petitioner's counsel erroneously told him that he had been promised a moderate sentence, this claim, too, is both waived and belied by the petitioner's own responses during his plea allocution. During the plea proceeding, the court advised the petitioner as to the potential penalties associated with his plea, and stated "[s]o basically you're pleading guilty to a B [felony] with no promises." Dkt. No. 16-1 at 11-12. The point was reiterated further on in the proceeding when the court asked the following:

> And you understand basically it's a plea to the
> indictment, no promises? That's what the plea
> bargain is; do you understand that?

*Id.* at 14. To that inquiry, petitioner responded "yes, sir." *Id.* The court also

assured itself that no one was forcing petitioner to plead guilty or

threatening, coercing or pressuring him. *Id.* at 18. The closest the trial

court came to making a promise with respect to sentencing came in the

form of the following colloquy:

> THE COURT . . . . Other than the Court's intention
> on sentence, which there is no plea agreement
> other than it's up to you in how you perform, has
> anyone made any promises or representations to
> you in order to get you to plead guilty?
>
> THE DEFENDANT: No, Sir.

*Id.* at 24. By pleading guilty under those circumstances, petitioner

effectively waived any argument he received ineffective assistance of

counsel, and contradicted his present claim that he was promised a more

lenient sentence by the trial court, through his counsel.

The circumstances surrounding petitioner's claims are in many ways

similar to those presented in *Flores-Mendez v. United States*, No. 17-CV-

2767, 2018 WL 357311 (S.D.N.Y. Jan. 10, 2018). In that case the court

noted the following:

> Petitioner claims that his counsel informed him that
> he would receive a sentence of no more than ten

> years. However, at his plea hearing, petitioner
> explicitly swore under oath that no person had
> made him a promise regarding a specific sentence.
> This fact alone is enough to demonstrate that
> neither his guilty plea or his sentence were the
> result of unreasonable action by his counsel, who,
> according to petitioner's statement to the Court, did
> <u>not</u> promise a specific sentence.

*Id.* at *3 (emphasis in original).

In sum, the rejection of this second portion of petitioner's ineffective assistance of counsel argument by the Third Department was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

D.    Due Process Claim

Although petitioner did present the due process claim now raised to the trial court in his motion pursuant to section 440.10 of N.Y. Criminal Procedure Law, Dkt. No. 16 at 175-86, the state court did not address the merits of his claim. *Id.* at 193-95. As a result of the lack of state court adjudication, " 'the federal habeas court applies the pre-AEDPA standards, and reviews *de novo* the state court disposition of the petitioner's federal claims.' " *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)); *see Cone v. Bell*, 556 U.S. 449, 472 (2009); *Morrishaw v. Rock*, No. 12-CV-00748, 2015 WL 5750151, at *3 (N.D.N.Y. Sept. 30, 2015) (D'Agostino,

J.). Accordingly, this court must determine *de novo* whether there is merit to plaintiff's due process claim.

Undeniably, the failure of prosecuting authorities to honor a legally binding agreement for immunity for favored treatment based upon a cooperation agreement would represent a violation of the defendant's right to due process arising under the Fourteenth Amendment. *See Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."). As a threshold matter, however, for the reasons stated above, I find that petitioner's guilty plea also resulted in a waiver of his due process claim. *See Whitehead v. Senkowski*, 943 F.2d 230, 233 (2d Cir. 1991) ("Generally a knowing and voluntary guilty plea precludes federal habeas corpus review of claims relating to constitutional rights at issue prior to the entry of the plea."). Throughout the colloquy, petitioner and his experienced counsel made no mention on the record of any purported cooperation agreement, even though petitioner belatedly later asserted at the sentencing phase that such a promise existed. *See generally* Dkt. No. 16-1 at 8-44. Indeed, petitioner's sworn testimony during the plea hearing shows that his plea was knowing and voluntary, and the petitioner has not

presented evidence to suggest otherwise. *Id.* The petitioner entered his plea in open court, where he stated that nobody had offered him any inducements, threatened him, or forced him to plead guilty. *Id*. Simply stated, his guilty plea represented "a break in the chain of events which has preceded it in the criminal process." *Tollett*, 411 U.S. at 267.

In the alternative, even if petitioner had not waived his due process claim by the entry of his knowing, voluntary, and intelligent guilty plea, his claim nonetheless lacks merit. As was also discussed above, government officials retain the discretion to enter into agreements involving a defendant's cooperation in return for immunity from prosecution or favorable consideration in connection pending or prospective criminal action. *United States v. Aleman*, 286 F.3d 86, 89-90 (2d Cir. 2002); *United States v. Resto*, 74 F.3d 22, 25 (2d Cir. 1996); *United States v. Kourani*, No. 17-CR-417, 2018 WL 1989583, at *3 (S.D.N.Y. Apr. 26, 2018). Such agreements are interpreted by the courts in accordance with ordinary principles of contract law. *Kourani*, 2018 WL 1989583 at *3; *United States v. Doumanis*, No. 17-CR-0087, 2018 WL 623551, at *1 (S.D.N.Y. Jan. 29, 2018). Petitioner bears the burden of proving the existence of an authorized and binding cooperation agreement. *United States v. Rosario*, 237 F. Supp. 2d 242, 245 (E.D.N.Y. 2002) (collecting cases).

In this case, petitioner has failed to carry his burden. *See Rosario*, 237 F. Supp. 2d at 245. Petitioner alleges that he entered into a cooperation agreement with an Albany City detective or the New York State Police. *See, e.g.*, Dkt. No. 1 at 2; Dkt. No. 16 at 171-72. Dkt. No 18 at 1. As evidence of this cooperation agreement with law enforcement, petitioner points to his sentencing hearing, wherein the following colloquy occurred:

> THE COURT:     And, [petitioner], do you wish to be heard?
>
> [PETITIONER]:     Yes, Your Honor. Your Honor, when I caught this case, I was released, and I was told that as long as I do everything I was supposed to do, everything would be okay. And like she said, I worked for Albany and the State Police so when I was working with the Albany Police, the State Police come in here and violate me. Like, I'm confused. If I am still working for both agencies, how can I still get violated, if I am still working for Albany County? That's like - -
>
> THE COURT:     I don't think "violate - - "
>
> MS. SODHI:     Judge, what he's referring to is that he was working with

<table>
<tr><td></td><td>one agency and I think the other agency pushed for him to get indicted, so that's what he was confused with.</td></tr>
<tr><td>THE COURT:</td><td>Oh, I remember that, yes, okay. I'm aware of that.</td></tr>
<tr><td>THE DEFENDANT:</td><td>So I am confused. I'm doing everything I'm supposed to do. Like, even though I'm not saying I'm right for selling marijuana, I am not saying I'm right for that, I'm doing everything I'm supposed to do. Like, why would one agency, for whatever disagreement, come here and indict me while I'm still doing what I'm supposed to do with the other agency? I'm not saying it's right or wrong and what I did was right or wrong, but it's, like, I'm confused about that, like, just for whatever reason.</td></tr>
<tr><td>THE COURT:</td><td>Well, I think we're well beyond that because you did get indicted and you pled guilty to a B felony with no promises.</td></tr>
</table>

Dkt. No. 16-1 at 37-38. Petitioner does not allege, at any point, that his

purported agreement with law enforcement officials was either ratified by

or entered into with prosecutors.

Petitioner's assertions present several issues. First, the court has not found any precedent that provides that a cooperation agreement entered between an individual and a law enforcement agent has a corresponding binding effect on a prosecutor. Moreover, to the extent that the Supreme Court concluded in *Santobello* that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled[,]" it appears that *Santobello* has been construed narrowly by the courts to only apply to the circumstances present in that case.[5] *See e.g. Curtis v. United States*, No. 98-CV-4245, 1998 WL 34304660, at *3 (E.D.N.Y. 1998) (holding that because "*Santobello* did not address the inter-district binding force of a plea agreement . . . it [wa]s distinguishable from the present case and d[id] not assist . . . petition[er.]"); *Farrell v. Inserra*, No. 10-CV-434, 2011 WL 1870240, at *6 (N.D.N.Y. 2011) (Baxter, M.J.) ( "There is no Supreme Court precedent that extends [*Santobello*] . . . to a 'promise' allegedly made by the court with regard to a subject over which the court has no control.").

---

[5]    In *Santobello*, the prosecutor ignored the terms of a prior plea agreement and recommended a more severe sentence than was promised at the time the plea deal was struck. *See generally Santobello*, 404 U.S. at 257. The Supreme Court held that, where a guilty plea is induced by a promise by the prosecutor, that promise must be kept, or the defendant must be given the privilege to withdraw the plea. *See generally id.*

Second, even assuming that a promise by law enforcement officials could effectively bind prosecutors, the off-the-record promise "may not serve as [a] basis for federal habeas review." *Gomez v. Duncan*, No. 02-CV-0846, 2004 WL 119360, at *26, n.26 (S.D.N.Y. Jan. 27, 2004); *compare Siegel v. New York*, 691 F.2d 620, 626-27 (2d Cir. 1982) (concluding that neither New York law nor federal due process requires a prosecutor to fulfill off-the-record promise made in plea bargaining negotiations); *White v. Keane*, No. 00-CV-6202, 2001 WL 699053, at *3 (S.D.N.Y. Jun. 21, 2001) ("[I]t is well settled in this Circuit that federal due process does not require a state prosecutor to honor an off-record promise made in exchange for a plea"); *People v. Hood*, 62 N.Y.2d 863 (1984) ("[T]here is no basis for judicial recognition of a plea bargain until it is concluded by entry on the record"); *People v. Frederick*, 45 N.Y.2d 520 (1978) ("A defendant will not be heard to challenge his guilty plea when the minutes of the plea are unequivocal and refute any contention of an off-the- record promise."); *People v. Selikoff*, 35 N.Y.2d 227 (1974), *with Williams v. Spitzer*, 246 F. Supp. 2d 368, 382, n.12 (S.D.N.Y. 2003) (rejecting the Second Circuit's decision in *Siegel* and concluding that the New York "policy of refusing to enforce off-the-record prosecutorial

promises is not permissible under the Supreme Court's decision in *Santobello*.").

Third, beyond pointing to his self-serving statements during sentencing, petitioner has not otherwise proffered evidence of an off-the-record cooperation agreement with either law enforcement or prosecutors.[6] *Rosario*, 237 F. Supp. 2d 242 at 245. The sentencing judge did acknowledge petitioner was apparently cooperating with one agency, while another agency was responsible for the indictment against him. *See generally* Dkt. No. 16-1 at 31-44. However, Judge Herrick's acknowledgment of cooperation does not lead the court to conclude that petitioner's present argument is true. In fact, the record makes it extremely difficult, if not impossible, to conclude that the content of the alleged cooperation agreement was what petitioner presently asserts it to be. This is primarily because petitioner was specifically asked during his plea colloquy if any other promises were made in exchange for his guilty plea. Dkt. No. 16-1 at 24-25. Petitioner indicated that there were not any other promises made to him, failing to include any of the terms provided for in the presently disputed cooperation agreement. However, if petitioner was

---

[6]     Although there was no written agreement, the lack of such a writing is not necessarily dispositive. *Aleman*, 286 F.3d at 89 ("Interpretation of the alleged immunity agreement in this case is more difficult because it is oral. Courts have considered unwritten immunity agreements in the past."); *Kourani*, 2018 WL 1989583, at *3.

truly relying on the promise not to subsequently indict him—provided by law enforcement via the alleged cooperation agreement—petitioner did not present that reliance in writing or orally during his plea colloquy, after the alleged promise was purportedly breached by petitioner's indictment. Instead, and in the face of what petitioner contends to be a clear violation of said agreement, he elected to plead guilty.

Petitioner's failure to share any of the information surrounding a purported cooperation agreement was recognized during the sentencing when Judge Herrick stated, "I think we're well beyond that because you did get indicted and you pled guilty to a B felony with no promises." Dkt. No. 16-1 at 38-39. Petitioner's failure is not only telling, but fatal to his due process claim. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.")

Based upon the foregoing, I recommend that petitioner's due process claim for habeas relief be denied.

E.    Certificate of Appealability

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio*, 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler*, 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[7] *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted).

---

[7]    A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue . . . if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

In this instance, I find that jurists of reason would not find it debatable as to whether the petition in this matter is meritorious. Accordingly, I recommend against the issuance of a COA.

IV.    SUMMARY AND RECOMMENDATION

The petition in this matter raises two grounds for habeas relief, both of which, I conclude, have been exhausted. With regard to the first, alleging ineffective assistance of counsel, I find that by pleading guilty, petitioner waived the claim, and further find that the Third Department's determination rejecting that argument was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Turning to petitioner's due process claim, I conclude that he has failed to satisfy his burden of demonstrating the existence of a binding, oral cooperation agreement under which he would not be prosecuted in connection with several potential charges against him, and additionally that his guilty plea effectively precludes him from pursuing that ground for habeas relief. Accordingly, it is hereby respectfully

RECOMMENDED that the petition (Dkt. No. 1) in this matter be DENIED and DISMISSED, and that a certificate of appealability not be issued to the petitioner.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[8] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       June 10, 2019
             Syracuse, New York

---

[8]       If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2018 WL 6613359
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Scott CHAPLIN, Petitioner,
v.
Michael KIRKPATRICK, Superintendent of
Clinton Correctional Facility, Respondent.

Civil Action No. 9:17-CV-0718 (MAD/DEP)
|
Signed 10/02/2018

**Attorneys and Law Firms**

FOR PETITIONER: SUOZZI LAW OFFICE, OF
COUNSEL: THERESA M. SUOZZI, ESQ., 480
Broadway, Suite 218, Saratoga Springs, NY 12866.

FOR RESPONDENT: HON. BARBARA D.
UNDERWOOD, OF COUNSEL: MARGARET A.
CIEPRISZ, ESQ., Assistant Attorney General, New York
State Attorney General, 120 Broadway, New York, NY
10271.

<u>REPORT AND RECOMMENDATION</u>

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 *1  Petitioner Scott Chaplin, a New York State prison
inmate as a result of his 2012 conviction for murder in the
second degree from Rensselaer County, has commenced
this proceeding pursuant to 28 U.S.C. § 2254 seeking
habeas review of his conviction. In a combined petition
and memorandum prepared by his counsel, petitioner
asserts seven grounds for habeas relief, in reliance
principally upon New York decisional authority. For
the reasons set forth below, I recommend that Chaplin's
petition be denied and dismissed.

I. BACKGROUND
On the morning of March 24, 1994, the bloodied
body of Rosemary Crosier, a part-time counselor for
ARC of Rensselaer County, a not-for-profit organization
that assists developmentally-disabled adults living in an
apartment building run by that agency and located in
Troy, New York, was discovered by a co-worker in a
staff apartment at the facility. Dkt. No. 10-10 at 410;
Dkt. No. 10-12 at 101-07; Dkt. No. 10-13 at 133. When
Crosier's body was discovered, police officers observed
lacerations on her eye and forehead and in her hairline.
Dkt. No. 10-10 at 498. An autopsy conducted revealed
that Crosier died from "a massive head injury due to blunt
force trauma." Dkt. No. 10-11 at 232-33.

From the condition of the apartment, blood splatters, and
a gouge in the wall, it appeared that a struggle between
Crosier and her killer(s) began in the bedroom, continued
to the front door of the apartment, and ended in the living
room where her body was discovered. Dkt. No. 10-10
at 495-98. There was no evidence of a forced entry into
the staff apartment where the murder took place. Id. at
500-01; Dkt. No. 10-11 at 308.

When Crosier's body was discovered her purse which, her
daughter testified, she was never without, was not found
in the apartment, and was never recovered. Dkt. No. 10-11
at 77, 249-50; Dkt. No. 10-13 at 167. According to the
victim's daughter, her mother possessed no credit cards
and paid for everything in cash, and consequently had
a habit of carrying cash, often in large amounts, in her
purse. Dkt. No. 10-11 at 249-50; Dkt. No. 10-13 at 167.

At trial significant evidence was presented linking
petitioner to both the victim and the apartment in which
the murder took place. Both petitioner and Crosier
worked in the mailroom of a local newspaper, *The Troy
Record.* Dkt. No. 10-11 at 172; Dkt. No. 10-13 at 137.
Shortly before the murder, Crosier told her sister that
she was having an extramarital affair with someone with
whom she worked at the newspaper. [1] Dkt. No. 10-13 at
137-38.

At 7:39 p.m. on the night of the murder, someone made a
telephone call to the staff apartment from a pay telephone
located across the street from petitioner's home. Dkt. No.
10-13 at 100-03. An employee who worked at the garage
where the payphone was located testified that he knew
petitioner, and had seen petitioner in March 1994 use the
garage pay phone at least once daily. Dkt. No. 10-12 at
88-90.

 *2  The victim's sister, Shirley Grey, spoke with her sister
by telephone several times on the night of March 23, 1994.
Dkt. No. 10-13 at 139-40, 157. When Grey telephoned
Crosier at the staff apartment at approximately 8:00 p.m.

on that evening, someone sounding like a man answered, stated "I got it," and abruptly hung up. *Id.* at 140-41.

When the murder was discovered, law enforcement officers found two rolls of paper towels on the kitchen counter of the staff apartment. Dkt. No. 10-10 at 494. One of the rolls had been used and had an obvious bite mark impression on the remaining papers towels. *Id.*; Dkt. No. 10-11 at 266. In 2004, DNA testing of the saliva found at the site of the bite mark impression matched petitioner's DNA profile. Dkt. No. 10-12 at 293-95, 300-02. In addition, a forensic odontologist testified that the impression matched petitioner's bite pattern. Dkt. No. 10-11 at 471-77.

In addition to the paper towel rolls, investigators found a piece of paper towel wrapped around the door knob inside the bedroom of the ARC staff apartment. Dkt. No. 10-10 at 493-94; Dkt. No. 10-11 at 266-67. DNA testing in 2001 yielded a "mixture profile" showing that the DNA was consistent with at least two donors, at least one of whom was a male. Dkt. No. 10-12 at 194-97; *see also* Dkt. No. 10-2 at 99. Testimony at the trial revealed that petitioner could not be excluded as one of the donors, and the probability of someone other than petitioner contributing to this mixed DNA profile was determined to be one in twenty. Dkt. No. 10-12 at 194-97

Petitioner was also linked to the victim by his friend, Lawrence Chamberlain. Dkt. No. 10-11 at 113. Shortly before the Crosier murder, petitioner made comments to Chamberlain including "the bitch is ugly, she has mad money" and "she buys me anything I want, like pot." Dkt. No. 10-11 at 117, 122-23, 147-48.

As will be discussed in more detail, petitioner gave two written statements to law enforcement in 1994, and additionally made oral statements in 2011 at the time that he underwent a polygraph exam. Dkt. No. 10-1 at 28-31. In a written statement given on April 1, 1994, petitioner acknowledged that he worked in the mailroom at *The Troy Record,* but denied having a relationship with the victim, denied ever having been to the staff apartment where she was murdered, and further stated that on March 23, 1994, he returned home at approximately 9:45 p.m. and immediately prior to arriving home, he was with his friend, Kevin Hall, smoking marijuana behind a school. Dkt. No. 10-11 at 171-74. Kevin Hall was interviewed after that statement was given and denied being with petitioner on

the night of March 23, 1994. Dkt. No. 10-11 at 327-28, 428.

In a second written statement, given on May 11, 1994, petitioner denied making telephone calls to the ARC staff apartment, ever speaking with Crosier on the phone or calling her, and ever using a pay telephone at the garage across the street from his house. Dkt. No. 10-2 at 69-70. Petitioner also again denied ever having been to the ARC staff apartment where the murder occurred, and denied having any relationship with Crosier other than working with her in the mailroom of *The Troy Record. Id.*

In January 2011, at his request, petitioner was administered a polygraph exam by State Police Investigator James McCrum. Dkt. No. 10-13 at 73-79; *see* Dkt. No. 1-1 at 113-14. During questioning that preceded the polygraph exam, petitioner denied having any relationship with Crosier, platonic or sexual, denied that he had ever been to the staff apartment where she was murdered, and stated that he had no idea how his DNA was recovered from the roll of paper towels at the murder scene. *Id.*

**\*3**  In his defense, petitioner attempted to establish an alibi for the time in question. [2] Dkt. No. 10-1 at 13-14. According to petitioner's mother and sister, Chaplin had a 10:00 p.m. curfew in 1994, and on the evening of March 23, 1994, was home by 9:45 p.m. and remained there until the next morning. [3] Dkt. No. 10-14 at 5, 11-12, 44, 47-48. The defense also offered the testimony of John Libolsi, who had known the victim's son, Steven Crosie, for thirty years. Libolsi testified that he saw Steven Crosier on the morning of March 24, 1994, between the hours of 12:40 p.m. and 1:40 a.m., "burst out of" a wooded area located approximately three tenths of a mile from the ARC staff apartment. Dkt. No. 10-13 at 320-27.

## II. PROCEDURAL HISTORY

### A. Proceedings in State Court
On June 6, 2011, a Rensselaer County grand jury returned an indictment charging petitioner and a co-defendant, George Mott, III, [4] with three counts of second degree murder, including intentional murder, depraved indifference murder, and felony murder, all stemming from the March 1994 murder of Rosemary Crosier. Dkt. No. 10-1 at 8-12. Following the return of the indictment

the trials against the two defendants were severed and, on motion of the prosecution, the counts charging petitioner with intentional murder and depraved indifference murder were dismissed. Dkt. No. 10-1 at 16, 22, 35.

A jury trial was convened on July 9, 2012, in Rensselaer County Court, with County Court Judge Andrew Ceresia presiding, to address the remaining charge against petitioner. Dkt. Nos. 10-9 at 347 through 10-14 at 468. At the close of trial, the jury returned a verdict convicting petitioner of the remaining count of the indictment, second degree felony murder, in violation of New York Penal Law § 125.25(3). Dkt. No. 10-14 at 455-56. On September 10, 2012, petitioner was sentenced, based upon the jury's verdict, to a period of incarceration of between twenty-five years and life. Dkt. No. 10-14 at 469-94.

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Third Department. In that appeal, in a one-hundred page brief prepared by the same attorney who now represents him in this proceeding, petitioner advanced several arguments, claiming that (1) the verdict was against the weight of the evidence and not supported by sufficient evidence; (2) the trial court abused its discretion in failing to include among its jury instructions a circumstantial evidence charge requiring proof of guilt to a "moral certainty;" (3) petitioner was denied a fair trial due to the admission into evidence of oral and written statements allegedly procured in violation of his Fifth and Sixth Amendment rights; (4) the trial court abused its discretion in allowing into evidence petitioner's written statements in violation of the best evidence rule; (5) petitioner was denied due process and a fair trial by the prosecution's failure to disclose exculpatory material; (6) petitioner was denied his right to a speedy trial; and (7) the trial court abused its discretion and denied petitioner a fair trial by allowing into evidence statements concerning his alleged prior bad acts. Dkt. No. 10-5 at 19-49; Dkt. No. 10-6 at 1-34; Dkt. No. 10-7 at 1-38.

*4  In a decision issued on December 3, 2015, a five judge panel of the Third Department rejected each of petitioner's arguments and unanimously affirmed his conviction. People v. Chaplin, 134 A.D.3d 1148 (3d Dep't 2015). In its opinion, the appellate court first addressed petitioner's speedy trial argument, finding that his constitutional right to a speedy trial was not violated and that the prosecution offered ample explanation for the seventeen-year delay between the

victim's murder and the return of an indictment against Chaplin. Chaplain, 134 A.D.3d at 1149-50. Turning to petitioner's claims regarding his statements, the Third Department concluded that "[c]onsidering the totality of circumstances surrounding each of [the three interviews in question] none of defendant's statements was made while he was in custody." Id. at 1150-51 (citations omitted). Based upon that finding, the court concluded that the trial court properly denied petitioner's request for suppression of those statements. Id. at 1151.

The Appellate Division next addressed the weight and sufficiency arguments raised by petitioner and, after summarizing the evidence adduced at trial, concluded that the conviction was not against the weight of the evidence and was supported by legally sufficient evidence. Chaplin, 134 A.D.3d at 1151-52. Addressing the bad acts contention, the Appellate Division concluded that petitioner failed to preserve the claim for appeal. Id. at 1152. With respect to the best evidence rule claim, the court held that the trial court did not err since carbon copies of petitioner's written statements introduced at trial were considered to be originals for purpose of the best evidence rule. Id.

Turning to petitioner's arguments regarding exculpatory materials, the appellate court concluded that mere speculation as to whether the evidence at issue even existed was insufficient to establish a Brady [5] violation. Chaplin, 134 A.D.3d at 1152. Lastly, the Third Department found that petitioner's argument regarding the failure to administer a proper circumstantial evidence charge was both unpreserved and in any event without merit. Id. at 1152-53. The Appellate Division concluded its decision by stating that "[t]o the extent not already discussed herein, defendant's remaining contentions are without merit." Id. at 1153.

Petitioner's motion for leave to appeal the Third Department's determination to the New York State Court of Appeals was denied on May 10, 2016. See People v. Chaplin, 27 N.Y.3d 1067 (2016) (table). There is no indication in the record that petitioner initiated any collateral challenges to his conviction in state court.

B. Proceedings in this Court
Petitioner commenced this proceeding on July 2, 2017. Dkt. No. 1. Appropriately named as the respondent in his

petition is Michael Kirkpatrick, the Superintendent of the Clinton Correctional Facility, the prison facility in which petitioner was confined at the time of commencement. *Id.*

On December 5, 2017, the respondent, represented by the Office of the New York State Attorney General, submitted an answer to the petition, a memorandum in support of his answer, and a compilation of the state court records associated with petitioner's prosecution helpfully organized, paginated, and indexed for the benefit of the court and petitioner's counsel. Dkt. Nos. 8, 9, 10.

The petition in this matter, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III. DISCUSSION

A. Standard of Review
Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-1032, 110 Stat. 1214 (1996), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing 28 U.S.C. § 2254(d) ); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (Sotomayor, J.). The AEDPA " 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.' " *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) ); *accord, Cullen*, 563 U.S. at 181. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.' " *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting § 2254(e)(1) ); *see also Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher

threshold." *Schriro*, 550 U.S. at 473 (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ).

**\*5** As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen*, 563 U.S. at 181; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

B. Weight of the Evidence and Legal Sufficiency
In the first ground of his petition, Chaplin argues that "the jury verdict was against the weight of the evidence, and must be reversed." *See* Dkt. No. 1 at 3 *et seq.* However, in support of this ground, Chaplin cites exclusively New York law and appears to use the terms legal sufficiency and weight of the evidence interchangeably. *Id.* at 3-26.

Legal sufficiency and weight of the evidence, although related, are separate standards of intermediate appellate review and require discrete analyses. In *People v. Bleakley*, 69 N.Y.2d 490 (1987), the New York State Court of Appeals observed that attacks on a verdict based on the weight of the evidence are different from those that are based on the legal sufficiency of the conviction. *See also Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012) (observing that a "weight-of-the-evidence claim requires more exacting review than an insufficiency claim, because it entails a weighing of the evidence and an assessment of the credibility of the State's witnesses.").

Petitioner's claim that the verdict was against the weight of the evidence is derived from New York Criminal Procedure Law ("CPL") § 470.15(5), a statute permitting a state appellate court to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." As a result, section 470.15(5) does not implicate constitutional considerations or federal law and it is not cognizable on habeas review. 28 U.S.C. § 2254; see *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law [.]"); *McClelland v. Kirkpatrick*, 778 F. Supp. 2d 316,

335 (W.D.N.Y. 2011) ("Since a 'weight of the evidence claim' is purely a matter of state law, it is not cognizable on habeas review."). *Pucci v. Smith*, No. 08-CV-6092, 2010 WL 2869480, at *11 (W.D.N.Y. July 20, 2010). Accordingly, to the extent that ground one of the petition can be read as presenting a claim regarding the weight of the evidence, I recommend that the claim be dismissed. *See, e.g., Mobley v. Kirkpatrick*, 778 F. Supp. 2d 291, 311 (W.D.N.Y. 2011).

Although the court lacks authority to entertain petitioner's weight of the evidence claim upon habeas review, it is nonetheless required to insure that his conviction is supported by legally sufficient evidence, and thus satisfies due process. *Mobley,* 778 F. Supp. 2d at 311-12. It should be noted, however, that a convicted defendant seeking federal habeas review based upon the sufficiency of evidence to support his conviction bears a heavy burden, given the considerable deference owing to a jury's verdict at both the state and federal levels. *Coleman v. Johnson,* 566 U.S. 650, 656 (2012) (per curiam); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 811 (2d Cir. 2000); *United States v. Brewer,* 36 F.3d 266, 268 (2d Cir. 1994). A petitioner invoking this ground is entitled to relief only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324 (1979); *see also Coleman,* 566 U.S. at 654; *Cavazos v. Smith,* 565 U.S. 1, 2 (2011) (per curiam). When making its analysis concerning sufficiency of the evidence, a court is required to "consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." *Fama,* 235 F.3d at 811. In response to a habeas petition, a federal court may overturn a state appellate court's finding of evidence sufficiency only if, when judged against this standard, the decision was objectively unreasonable, even though if considering the matter *de novo* the federal court might have reached a different result. *Coleman,* 566 U.S. at 651.

**\*6** In its decision, in addition to addressing petitioner's weight of the evidence argument, the Third Department concluded that his conviction for murder in the second degree "was based on legally sufficient evidence[.]" *Chaplin,* 134 A.D.3d at 1151. This court must therefore determine whether the Third Department's decision was objectively unreasonable. However, when the evidence is considered in the light most favorable to the prosecution,

I conclude that there was sufficient evidence to support Chaplin's conviction.

As petitioner correctly argues, to convict him of the remaining second degree murder charge, the prosecution was required to prove that he, "[acting] either alone or with one or more persons ... [committed] or [attempted] to commit robbery, ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant ... cause[d] the death of a [non-participant]." N.Y. Penal Law § 125.25(3). In connection with the underlying felony of robbery, the prosecution was simply required to prove that petitioner either committed or attempted to commit robbery, a crime which is committed when a person "forcibly steals property." N.Y. Penal Law § 160.00.

As was described in more detail above, the evidence at trial revealed that the victim was beaten to death and that her purse, in which she often carried large amounts of cash, was missing when her body was found. The jury was therefore permitted to reasonably infer that the victim died due to injuries inflicted during a robbery.

In addition, there was also significant evidence regarding petitioner's participation in the robbery. Telephone records established that a telephone call was placed to the staff apartment from a payphone located across the street from petitioner's home during the time of the victim's shift. Based upon this fact and testimony that petitioner used that phone on a daily basis, the jury could properly have inferred that petitioner called the victim to arrange to meet her at the staff apartment that evening.

The evidence presented at trial also definitively established that petitioner was present at the staff apartment on the night of the murder. A paper towel roll, which was found on the kitchen counter when the victim's body was discovered, contained bite mark impression with petitioner's DNA. A forensic odontologist testified that the bite markings on the roll matched petitioner's bite pattern. In addition, a paper towel found hanging on a bedroom door knob in the apartment contained DNA that is consistent with petitioner's DNA.

At trial, the prosecution adduced evidence of statements by petitioner to Lawrence Chamberlain before the murder concerning his relationship with Crosier and his knowledge that she had significant amounts of cash.

Evidence was also offered showing that petitioner lied to law enforcement officers, denying that he was involved in a relationship with the victim, and additionally denying that he was ever present in the apartment where the murder occurred.

In sum, the Third Department's conclusion that the conviction was supported by legally sufficient evidence was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Accordingly, I recommend that ground of the petition be dismissed.

C. Jury Instruction: Circumstantial Evidence Charge

Characterizing the prosecution's case against him as entirely circumstantial, in the second ground of his petition Chaplin argues that the trial court erred in failing to instruct the jury that the circumstantial evidence must establish his guilt to a "moral certainty." Dkt. No. 1 at 27-36. In its decision, the Third Department addressed this argument and concluded that because petitioner supplied the language that was used by the court in its circumstantial evidence instruction, the claim was unpreserved for review. *Chaplin,* 134 A.D.2d at 1152. The court went on to conclude that in any event the claim lacked merit, since under New York law the court was not required to include the phrase "moral certainty" in its circumstantial evidence instruction. *Id.* at 152-53 (citing *People v. Sanchez,* 61 N.Y.2d 1022, 1024 (1984); *People v. Gonzalez,* 54 N.Y.2d 729, 730 (1981) ).

**\*7** Petitioner first raised this issue during a preliminary jury charge conference conducted by the trial court. Dkt. No. 10-14 at 80-85. During that conference, the court announced its intention to administer a circumstantial evidence charge taken directly from an online version of the accepted criminal pattern jury instructions. Dkt. No. 10-14 at 85. Petitioner's counsel objected and requested inclusion of "moral certainty" language in the instruction. *Id.* at 86-87. Arguing that there was some direct evidence of petitioner's guilt, in the form of his statements to Lawrence Chamberlain, the prosecution objected to inclusion of the phrase "moral certainty" in the circumstantial evidence charge that the court intended to render. *Id.* at 87-95.

The following day, petitioner's counsel submitted a proposed circumstantial evidence instruction that did not include the words "moral certainty." Dkt. No. 10-14

at 116-18. When asked if he had changed his position, petitioner's counsel responded that after researching the issue he was withdrawing his request for inclusion of the "moral certainty" language, but requesting substitute language approved by the New York State Court of Appeals. *Id.* at 117-18 (citing *Sanchez,* 61 N.Y.2d at 1022; *Gonzalez,* 54 N.Y.2d at 730). The court then reiterated its intention to give a circumstantial evidence charge drawn from a criminal pattern jury instructions manual. *Id.* at 118-19. Petitioner did not object to use of the proposed circumstantial evidence instruction, either during the charge conference or following the court's instructions to the jury. Dkt. Nos. 10-14 at 118-20, 416.

As a matter of both comity and in keeping with the principles of federalism, a federal court ordinarily will not review a federal claim presented in a habeas petition if it has been rejected by the state courts on a ground which is both independent of the federal question presented and adequate to support the resulting judgment. *Cone v. Bell,* 556 U.S. 449, 465 (2009) (citing *Coleman v. Thompson,* 501 U.S. 722, 736 (1991); *Lee v. Kemna,* 534 U.S. 362, 375 (2002) ); *Downs v. Lape,* 657 F.3d 97, 101 (2d Cir. 2011); *Monroe v. Kuhlman,* 433 F.3d 236, 240-41 (2d Cir. 2006); *Brown v. Greiner,* 409 F.3d 523, 532 (2d Cir. 2005).

When confronting this doctrine, the court examines both whether the state court's ruling is wholly independent of any federal question presented, and whether the claim has been rejected based upon an adequate ground—that is, whether the rule relied upon by the state court is firmly established and regularly followed. *Downs,* 657 F.3d at 102 (citations omitted). The habeas court's function is "to determine only whether the state ruling falls within the state's usual practice and is justified by legitimate state interests, not whether the state court ruling was correct." *Id.* (citing *Whitley v. Ercole,* 642 F.3d 278, 286 (2d Cir. 2011) ).

Addressing the issue of adequacy, the Second Circuit has observed that

> a procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question. When a federal court finds that the rule is inadequate under this

test the rule should not operate to bar federal review. Nonetheless, the principles of comity that drive the doctrine counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law.

*Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal citations and quotation marks omitted). As may be self-evident, a state court determination is sufficiently independent for purposes of this rule if it is divorced from and bears no relation to the merits of the federal law claim presented. *See Brown*, 409 F.3d at 532. When addressing the question of procedural forfeiture, a court should presume that there is no independent and adequate state ground for a state court decision when the decision " 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion[.]' " *Coleman*, 501 U.S. at 733 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983) ).

**\*8** For a federal court to deny habeas review based on the independent and adequate state ground doctrine, it must be clear that the state court actually relied upon the procedural bar as an independent basis for its disposition of the claim. *Fama*, 235 F.3d at 809. In a case where both procedural and substantive arguments have been advanced by the parties but no opinion is issued by the state court explaining its rejection of a claim, a federal court may properly assume that the state court based its decision on state procedural grounds absent Agood reason@ to believe the state courts' silence represents a decision to deny the claim on its merits. *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993). Where a state court has expressly found both a failure to preserve the argument for appellate review and alternatively Ain any event@ that the argument lacks merit, the procedural bar applies. *Fama*, 235 F.3d at 810 n.4 (citing *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996); *Velasquez v. Leonardo*, 989 F.2d 7, 9 (2d Cir. 1990) ). If there is ambiguity, however, as in "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal

review." *Fama*, 235 F.3d at 810; *see also Coleman*, 501 U.S. at 735.

Under New York law, a timely objection must be interposed in order to preserve a claimed error for appellate review. N.Y. CPL § 470.05(2); *see People v. Robinson*, 35 N.Y.2d 224, 228 (1975). The failure to comply with this contemporaneous objection rule has consistently been found to constitute an adequate and independent state law ground precluding habeas review. *See, e.g., Downs*, 657 F.3d at 102; *Whitley*, 642 F.3d at 286.

In this case, not only did petitioner's counsel fail to object to the circumstantial evidence instruction, but indeed he withdrew his request for the "moral certainty" language now advocated in his habeas petition. Dkt. No. 10-14 at 117-18. Under these circumstances, this court's review of that claim is precluded by the adequate and independent ground doctrine. *Coleman*, 501 U.S. at 726; *Harris v. Reed*, 489 U.S. 255, 261-63 (1989); *accord Gonzalez v. Sullivan*, 934 F.2d 419, 421 (2d Cir. 1991). I therefore recommend that this claim be rejected on this procedural ground.

Even if this court were to overlook this procedural basis for rejecting the claim, it nonetheless lacks merit. The question of whether a proper jury instruction has been administered ordinarily presents a matter of state law. *See, e.g., Hunt v. Superintendent*, No. 9:09-CV-934, 2010 WL 5149279, at *11 (N.D.N.Y. Nov. 17, 2010) (Baxter, M.J.) ("Generally, challenges to jury instructions involve errors of state law.") (citing *Tucker v. Bennett*, 219 F. Supp. 2d 260, 269 (E.D.N.Y. 2002) ). As is the case with regard to evidentiary rulings, errors regarding jury instructions are cognizable on habeas review only if they so infect the trial as to deny a criminal defendant his right to due process. *Sams v. Walker*, 18 F.3d 167, 171 (2d Cir. 1994). A petitioner seeking habeas relief based upon the failure to administer a requested instruction bears a heavy burden. *Ricketts v. Mazzuca*, 250 F. Supp. 2d 131, 134 (E.D.N.Y. 2003); *Williams v. Bennett*, No. 00-CV-6164, 2001 WL 849746, at *10 (S.D.N.Y. Jul. 27, 2001) (*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977) ) ("An omission, or an incomplete instruction, is less likely to be prejudicial than is an actual misstatement of the law.").

As the New York State Court of Appeals has found, and as was noted by the Third Department in this case, the words "moral certainty" are not necessary to a circumstantial evidence charge, provided that the jury

is instructed, in substance, "that it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence." *Sanchez*, 61 N.Y.2d at 1024 (citations omitted). In this case, the trial court followed the New York criminal pattern jury instruction regarding circumstantial evidence, which did not include the words moral certainty. A trial court's denial to administer a circumstantial evidence jury instruction that includes the moral certainty language now advocated by petitioner does not offend due process under the federal constitution. *Parson v. Superintendent of the Fishkill Corr. Facility*, No. 12-CV-2358, 2013 WL 1953181, at *1 (S.D.N.Y. May 13, 2013) (citing *Friedman v. Conway*, No. 09-CV-6326, 2011 WL 3608109, at *4 (W.D.N.Y. Aug. 12, 2011) ). Accordingly, even assuming the evidence at trial against petitioner is viewed as having been wholly circumstantial, the trial court did not commit error in providing instructions to the jury.

### D. Failure to Suppress Petitioner's Statements

**\*9** In the third ground of his petition, Chaplin argues that statements provided by him to law enforcement, including two written and one oral, were not voluntary and were given in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution. Dkt. No. 1 at 37-45. In opposition to this ground, respondent argues that the Sixth Amendment does not apply since the right to counsel did not attach at the time of statements were given, and that there was no Fifth Amendment violation since the statements, all of which were non-custodial, were voluntary. [6] Dkt. No. 8 at 32-40.

Petitioner's suppression argument centers upon three statements he provided to law enforcement officers. The first statement was given on April 1, 1994, during an interview at petitioner's home conducted by Troy Police Detective Sergeant John Waters and in the presence of petitioner's father and Troy Police Department Investigator Jim Mantello. Dkt. No. 10-9 at 13-42. Petitioner was not under arrest at the time, and the interview lasted no more than thirty minutes. *Id.* at 18, 35.

The second statement was given on a May 11, 1994, during an interview initiated at the police station by petitioner and his father, who appeared together with Troy Police Department Investigator Mahoney,

unannounced, desiring to "clear the air." Dkt. No. 10-9 at 48. Captain Paul, who conducted the interview, was not expecting petitioner, and had no intention of arresting him. *Id.* at 48-49. Petitioner left the police station with his father following the interview, which lasted approximately ninety minutes. *Id.* at 50.

The third statement occurred in the context of a January 20, 2011 polygraph examination conducted at the behest of petitioner by New York State Police Investigator James McCrum. Dkt. No. 10-9 at 104-118; *see also* Dkt. No. 10-1 at 113-14. In connection with that process, petitioner appeared at the police station of his own volition and, prior to the examination, conferred privately with his counsel. Dkt. No. 10-9 at 105-07. Before the examination began, Investigator McCrum advised petitioner of his *Miranda* rights, and petitioner executed a *Miranda* rights acknowledgment and a consent form agreeing to the examination. *Id.* at 132-146. Petitioner was not under arrest at the time of the examination, nor was he taken into custody following its conclusion. *Id.* at 150-51.

Based upon these facts, which were adduced during a *Huntley* [7] suppression hearing, the Third Department concluded that "[c]onsidering the totality of circumstances surrounding each of the aforementioned interviews, none of defendant's statements was made while he was in custody." *Chaplin*, 134 A.D.3d at 1150-51 (citations omitted). This finding of fact must be accepted by this court when reviewing petitioner's suppression argument. *Milton v. Racette*, No. 1:14-CV-06001, 2016 WL 67800, at *6 (W.D.N.Y. Jan. 5, 2016) ("the factual findings are presumed correct under AEDPA") (citing *Whyte v. Brown*, 2011 WL 7100558, *17-18 (S.D.N.Y. May 3, 2013), *report and recommendation adopted by*, 2012 WL 234424 (S.D.N.Y. Jan. 26, 2012) ).

**\*10** Given the foregoing circumstances, petitioner has failed to establish a basis to conclude that his three statements were not voluntary and were taken in violation of his Fifth Amendment rights. The two written statements, from April 1, 1994 and May 11, 1994, were given at points in time when petitioner was not a prime suspect, and was not in custody. Nothing presented to the trial court during the *Huntley* hearing suggested any degree of improper coercion or other basis to conclude that the statements were not voluntarily. Turning to the oral statement presented at trial, by requesting the polygraph exam, petitioner initiated the interrogation and

waived his right to be free of contact with law enforcement authorities in the absence of an attorney, and to be free from questioning regarding the crime of which he was suspected. *Wyrick v. Fields*, 459 U.S. 42, 47 (1982). Accordingly, I recommend deference to the state appellate court's conclusion regarding the suppression issue, there being no basis to conclude that it was either contrary to or an unreasonable application of clearly established Supreme Court law. *Milton*, 2016 WL 67800, at *6; *Whyte*, 2011 WL 7100558 at *14-18.

### E. Evidentiary Rulings

In his petition, Chaplin complains of two evidentiary rulings made by the trial court during the course of his trial. The first relates to testimony of one of the prosecution's witnesses and petitioner's friend, Lawrence Chamberlain, concerning petitioner's alleged drug use and partying. Dkt. No. 1 at 63-68. The second involves petitioner's claim that the best evidence rule was violated when carbon copies of his written statements were admitted into evidence during the course of the trial. *Id.* at 45-52.

Habeas jurisdiction is conferred on a court to determine whether "a person [is] in custody pursuant to the judgment of a State Court ... on the ground that he is in custody in violation of a Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241, the general habeas corpus provision). When engaging in habeas review a federal court is not empowered to pass on state law questions. *Estelle*, 502 U.S. at 67-68; *see also Freeman v. Kadien*, 684 F.3d 30, 34 (2012) ("As a question of state law *in toto*, it is not subject to federal habeas review."). It is well-established that a trial court's evidentiary ruling is not reviewable in a habeas proceeding unless it can be said that the ruling deprived the petitioner of due process under the Fourteenth Amendment, meaning that the evidentiary ruling was so egregious as to have denied petitioner a fundamentally fair trial. *Dowling v. United States*, 493 U.S. 342, 352 (1990); *Zarvella v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004); *see also Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012); *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983).

Against this backdrop, the two evidentiary rulings in question will be addressed below.

#### 1. Prior Bad Acts

Petitioner maintains that by allowing Lawrence Chamberlain to testify concerning his alleged drug use, the evidentiary rule in New York established in *People v. Molineux*, 168 N.Y. 264 (1901) and its progeny was violated. [8] Under that rule, evidence of uncharged crimes and bad acts is properly excluded unless relevant to show motive, intent, absence of mistake or accident, a common scheme or plan, or identity. *Id.*

**\*11** Petitioner's *Molineux* argument was presented to the Third Department. The appellate court concluded, however, that the claim was unpreserved for review. *Chaplin*, 134 A.D.3d at 1152. Based upon that determination, respondent argues that petitioner is precluded from pursuing a claim based upon that evidentiary ruling since it was resolved at the state court level on an adequate and independent state procedural ground.

In this instance, petitioner's trial counsel failed to object to Chamberlain's testimony concerning petitioner's alleged drug use. Accordingly, under New York Law he was procedurally barred from raising that claim on appeal. *See* CPL § 470.05; *see, e.g., People v. Williams*, 163 A.D.3d 1160 (3d Dep't 2018) ("Defendant failed to preserve his appellate claim ... as he made no objection on that ground at trial."). Since the Third Department specifically relied on this bar in declining to review the *Molineux* argument, the adequate and independent ground doctrine precludes this court from entertaining that claim. Accordingly, I recommend that the claim be rejected.

#### 2. Best Evidence Rule

The thrust of petitioner's best evidence argument is focused upon his written statements that were offered into evidence at trial. During a pretrial suppression hearing conducted in the case, petitioner's trial counsel objected on best evidence grounds to the admission of photocopies of written statements given by Chaplin to law enforcement officials on April 1, 1994 and May 11, 1994. Dkt. No. 10-9 at 57-64. After that objection was interposed, the prosecution located and offered carbon copies of the originals of both statements in lieu of the proffered photocopies. *Id.* at 191-92. At trial,

the carbon copies of petitioner's two statements were admitted into evidence over defense counsel's objection. Dkt. No. 10-11 at 164-70; 318-22. Addressing petitioner's best evidence argument, the Third Department found that the evidentiary rule was not violated since for purposes of the rule, carbon copies are considered as originals. *Chaplin*, 134 A.D.3d at 1152 (citing *People v. Sims*, 127 A.D.2d 712, 713 (2d Dep't 1987); *People v. Kolp*, 49 A.D.2d 139, 141 (3rd Dep't 1975) ).

A careful reading of the portion of petitioner's appellate brief addressing this issue reflects that nowhere does it signal to the Third Department the existence of a constitutional claim surrounding the best evidence rule argument. *See* Dkt. No. 10-7 at 14-20. Based upon this fact, respondent argues, that petitioner's best evidence rule claim remains unexhausted. Dkt. No. 8 at 40-42.

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1) ); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982); *see also Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez*, 394 F.3d at 72 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999) ). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

**\*12** This exhaustion requirement is satisfied if the federal claim has been " ' fairly present[ed]' " to the state court. *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) ). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191.

Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

After a court determines that a claim is unexhausted, it next considers whether it is procedurally defaulted. In the event an exhausted claim is "barred by state law and ... its presentation in the state forum would [therefore] be futile[,] ... [the federal habeas court] theoretically has the power to deem the claim exhausted." *Aparicio*, 269 F.3d at 90. As the Second Circuit candidly noted, however,

> [t]his apparent salve ... proves to be cold comfort to most petitioners because ... when 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted.'

*Id.* (quoting *Coleman*, 501 U.S. at 735 n.1). Once a claim has been deemed procedurally defaulted, it is subject to dismissal unless the petitioner can demonstrate "cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio*, 269 F.3d at 90 (citing *Coleman*, 501 U.S. at 748-50); *Fama*, 235 F.3d at 809.

To establish cause sufficient to excuse a procedural default, a petitioner must show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753; *accord, Maples v. Thomas*, 565 U.S. 266, 281 (2012). When a petitioner has failed to establish adequate cause for his procedural default, the court need not examine the issue of prejudice because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

In this case, as was previously noted, petitioner failed to raise a federal constitutional claim regarding the best evidence rule to the Third Department.[9] Moreover, it is clear that the Appellate Division addressed petitioner's claim only under state law. *Chaplin*, 134 A.D.3d at 1152. Accordingly, since petitioner did not afford the state

court's an opportunity to address any alleged federal constitutional claim growing out of the best evidence argument, the claim is unexhausted.

**\*13** In addition to being unexhausted, petitioner's best evidence claim is now deemed procedurally defaulted, since he is no longer eligible to raise it in any state forum. *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991). Petitioner has already availed himself of the one appeal permitted under the New York Criminal Procedure Law. In addition, because the argument is based upon matters in the trial record, and the Appellate Division has already rejected the merits of an argument presented to it regarding the best evidence rule, *Chaplin*, 134 A.D.3d at 1152, the claim cannot now be raised in a motion to vacate petitioner's conviction. *See* New York CPL § 440.10(2)(b). I note further that petitioner has offered no basis to excuse his procedural default with respect to the constitutional claim surrounding his best evidence rule argument. Accordingly, the claim is forfeited.

Notwithstanding the exhaustion argument, even assuming the court were to review the evidentiary ruling at issue, there is no basis to conclude that it was erroneous. As the Second Circuit has noted, to establish that an erroneous application of a state rule of evidence violates the federal guaranty of due process, a petitioner must also demonstrate that the state court's erroneous conclusions about New York evidence rules were so egregious as to implicate the Fourteenth Amendment's guarantee of due process. *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013).

Under New York's best evidence rule, when a party seeks to prove the contents of a writing, the original must be produced unless there is a satisfactory explanation for its absence. *Prince*, RICHARDSON EVIDENCE § 10-101; *see Schozer v. William Penn Life Ins. Co. of N.Y.*, 84 N.Y.2d 639, 643 (1994). The rule is primarily designed to insure against mistakes in copying or transcribing an original writing. *Schozer*, 84 N.Y.2d at 643-44 (citing *Fisch*, New York Evidence § 81, at 50 (2d ed.) ). As the Third Department correctly noted, the best evidence rule was not violated by the introduction of carbon copies of plaintiff's written statements which, for purposes of the rule, are properly considered as originals. *Chaplin*, 134 A.D.3d at 1152; *see also People v. Simms*, 127 A.D.2d 712, 713 (2d Dep't 1987). Accordingly, even if the court were to address the merits of this argument, I would conclude that the Third Department's determination regarding this issue

was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

#### F. Exculpatory Evidence Claim

Chaplin next asserts that a constitutional violation occurred when the prosecution failed to disclose a material piece of exculpatory evidence. Dkt. No. 1 at 52-57. Specifically, while having no definitive information as to whether such evidence actually (1) exists, and (2) was within the possession of the prosecution at the time of trial, he argues that there may have been testing performed on the victim's fingernail scrapings to see if they matched petitioner's DNA. He speculates that such evidence may exist based upon a newspaper report from 1994 in which, citing confidential sources, the author asserted that fingernail scrapings were taken from the victim and sent to a laboratory for testing. *Id.* The Third Department disposed of that argument in a single sentence, stating the following:

> Defendant's assertions that *Brady* materials were improperly withheld from him is without support in the record, and his speculation that such evidence exists is insufficient to establish a *Brady* violation ...

*Chaplin*, 134 A.D.3d at 1152 (citations omitted).

A habeas petitioner may be entitled to relief upon a showing that the government violated his or her right to due process by failing to turn over "material exculpatory evidence" before trial. *Giglio v. United States,* 405 U.S. 150, 153-54 (1972); *Brady v. Maryland,* 373 U.S. 835 (1963); *Strickler v. Greene,* 527 U.S. 263 (1999). Under *Brady* and its progeny, prosecutors must disclose information that is favorable to the defense, either because it is exculpatory, relating to the factual innocence of the defendant, or because it serves to impeach a prosecution witnesses. *Strickler,* 527 U.S. at 280; *United States v. Bagley,* 473 U.S. 667, 676 (1985). Evidence that is favorable because of its impeachment value may be material where the witness has supplied the only evidence linking a defendant to the crime at issue, or where the witness has supplied the only support for an essential element of the crime. *United States v. Avellino,* 136 F.3d

249, 256-57 (2d Cir. 1998). There are three essential elements to a *Brady* prosecutorial misconduct claim: (1) the evidence in question must have been favorable to the defendant, either as exculpatory or impeaching; (2) the evidence must have been in possession of and suppressed by the prosecution; and (3) prejudice must have resulted. *Banks v. Dretke,* 540 U.S. 668, 690 (2004).

**\*14** A petitioner bears the burden of proving that the prosecution has withheld material information. *Harris v. United States,* 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998). "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief." *Id.* (quotations omitted); *see Strickler,* 527 U.S. at 286 ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."); *Van Gorden v. Superintendent,* No. 03-CV-1350, 2007 WL 844901, at \*8 (N.D.N.Y. Mar. 19, 2007) (Mordue, C.J.) (unsupported, unspecified *Brady* claim dismissed); *Mallet v. Miller,* 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) (*Brady* claim dismissed where supported only by conjecture); *Skinner v. Duncan,* No. 01-CV-6656, 2003 WL 21386032, at \*25 (S.D.N.Y. Jun. 17, 2003) (*Brady* claim failed because petitioner provided no evidence in support of it); *Ferguson v. Walker,* No. 00-CV-1356, 2002 WL 31246533, at \*13 (S.D.N.Y. Oct. 7, 2002) (Petitioner's "claim of withheld *Brady* material is without evidence and speculative and must be rejected.").

In this case, as the Third Department noted, petitioner's *Brady* claim is entirely speculative. *Chaplin,* 134 A.D.3d at 1152. Kristen Thompson, the investigative reporter who authored the article in question, testified during the trial. Dkt. No. 10-13 at 269-78. The reporter stated that during an investigation, it was learned that scrapings were taken from beneath the victim's fingernails and submitted for DNA testing. *Id.* at 274-75. On cross-examination, however, the reporter could not recall the source of that information, and stated that in any event he would refuse to identify the source if known to him. *Id.* at 277, 292-95. Thompson's testimony was ultimately stricken in its entirety as inadmissible hearsay and based upon the reporter's exercise of his privilege not to identify his sources. *Id.* at 281-86, 305-11.

In this case, petitioner has failed to carry his burden of establishing both that exculpatory evidence existed at the time of trial, and that the prosecutor was in possession

of that evidence. His *Brady* claim is therefore legally deficient.

Moreover, even assuming that petitioner could surpass these hurdles, he cannot show prejudice. In the event, as petitioner would hope, that the fingernail scrapings collected from the victim were found to contain DNA belonging to someone other than petitioner and the victim, petitioner would not necessarily have been eliminated as a suspect since there was at least one other participant, George Mott, alleged to have been involved in the murder.

Since petitioner has not demonstrated that the exculpatory evidence at issue exists and was in the possession of the prosecution at the time of trial, and that the failure to disclose the evidence resulted in prejudice to him, his *Brady* claim lacks merit. *Pucci,* 2010 WL 2869480, at \*9. Accordingly, I recommend a finding that the Third Department's determination rejecting petitioner's *Brady* claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

### G. Speedy Trial

The murder for which petitioner was convicted occurred between the approximate hours of 10 p.m. on March 23, 1994 and 7:00 a.m. on March 24, 1994. As was set forth above, petitioner was not charged in connection with Crosier's death until June 6, 2011, when an indictment was returned by a Rensselaer County Grand Jury, accusing him of three counts of murder. Dkt. No. 10-1 at 8-12. At no time between those two dates was petitioner under arrest or charged in connection with the 1994 murder. In his combined petition and memorandum, Chaplin argues that his rights were violated as a result of this delay, citing principally New York CPL § 30.20. Dkt. No. 1 at 58-62.

**\*15** Petitioner's speedy trial argument was presented to the Third Department.[10] Dkt. No. 10-7 at 27-31. In its decision, the Third Department rejected his argument, concluding, based upon the explanations provided by the prosecution for the inordinate delay, that petitioner's speedy trial rights were not violated. *Chaplin,* 134 A.D.3d at 1149-50.

Petitioner's speedy trial claim to this court is predicated, in part, upon the Sixth Amendment, which requires that

"[i]n all criminal prosecutions, the *accused* shall enjoy the right to a speedy ... trial." U.S. Const. Amend. VI (emphasis supplied). That amendment, however, does not apply in this instance, since petitioner was not an "accused" until the return of an indictment against him on June 6, 2011.[11] *United States v. Lovasco,* 431 U.S. 783, 788-89 (1977); *see also United States v. MacDonald,* 456 U.S. 1, 6 (1982); *Archer v. Comm'r of Corr.*, 646 F.2d 44, 48 (2d Cir. 1981). A delay in prosecution does not implicate the speedy trial guarantee. *See United States v. Elsbery,* 602 F.2d 1054, 1058-59 (2d Cir. 1979). "[I]t is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the Sixth Amendment." *United States v. Marion,* 404 U.S. 307, 320 (1971). Until then, "a citizen suffers no restraints on his liberty and is not the subject of public accusation." *Id.* at 321. The statute of limitations is "the primary guarantee against bringing overly stale criminal charges." *Id.* at 322 (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966) ); *United States v. Cornielle,* 171 F.3d 748, 721 (2d Cir. 1999).

Although petitioner's speedy trial argument does not implicate the Sixth Amendment, there is an overarching obligation under the due process clause of the Fourteenth Amendment that is called into play in this proceeding. While noting that the statute of limitations acts as the primary guard against undue delay in bringing criminal charges, in *United States v. Cornielle,* the Second Circuit observed that due process may nonetheless be offended even where a criminal prosecution is brought within the applicable statute of limitations if the delay in prosecuting a defendant prejudices presentation of a defense and is the result of improper motivation. 171 F.3d at 751-52. To prevail on such a due process claim, "[a] defendant bears 'heavy burden' of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose." *Id.* at 752 (emphasis in original) (citing *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990); *United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987) ); *see also Lovasco,* 431 U.S. at 790. In this case, as the Third Department found, petitioner cannot establish either of these two essential elements of a due process claim.

**\*16** Petitioner has failed to establish prejudice as a result of the delay. To merit dismissal, a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself. *United States v. Delacruz,* 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013) (citing *United States v. Long,* 697 F. Supp. 651, 657 (S.D.N.Y. 1988) ). The "standard for actual prejudice is fairly stringent." *United States v. Gonzalez,* No. 00-CR-447, 2000 WL 1721171, at *1 (S.D.N.Y. Nov. 17, 2000). The proof offered must be definite and not speculative. *See Delacruz,* 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013).

A defendant claiming actual prejudice due to a pre-indictment delay must particularize his claims in order to overcome the presumption of legitimacy that attaches to an indictment brought within the applicable statute of limitations period. *United States v. Castellano,* 610 F. Supp. 1359, 1385 (S.D.N.Y. 1985) ("The passage of time, and the attendant loss of evidence and dimming of witness' memories, is insufficient by itself to show prejudice."). Despite petitioner's rank speculation concerning witnesses that may have moved or lost recall of the relevant events, in this case, there is no indication of any witnesses who could not be located or sufficiently recall the critical events from 1994. Indeed, at trial, petitioner offered an alibi defense supported by his mother, sister and a third individual, Roberta Duke, and none of those witnesses claimed any failure of recollection concerning the night in question.

As the Appellate Division noted, there were compelling reasons offered by the prosecution for the delay in this matter. The prosecution established that DNA technology in 1994 was such that testing at that time would have required the destruction of the two samples of biological material collected at the murder scene. *Chaplin,* 134 A.D.3d at 1149. By contrast, when the samples were tested in 2004 and 2011, such destruction was not required. *Id.* In addition, the case against petitioner was greatly enhanced when a witness materialized in May 2011 to implicate Chaplin in the murder. *Id.*

Even in cases where actual prejudice is shown, the delay must have been "a course intentionally pursued by the government for an improper purpose." *United States v. Baptiste,* 84 F. App'x. 153, 154-55 (2d Cir. 2004); *see United States v. Scarpa,* 913 F.2d 993, 1014 (2d Cir. 1990); *Cornielle,* 171 F.3d at 752. Against the stated reasons for the delay, there is no evidence in the record now before the court to suggest an improper motive in the delay of petitioner's prosecution for the 1994 murder.

Based upon the foregoing, I recommend a finding that the Third Department's determination regarding petitioner's speedy trial claim was not contrary to or an unreasonable application of clearly established Supreme Court law.

#### H. Certificate of Appealability

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b)(1) ("[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio,* 726 F.3d 144, 152 (2d Cir. 2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler,* 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; ... a court could resolve the issues in a different manner; or ... the questions are adequate to deserve encouragement to proceed further." [12] *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983) (quotation marks omitted). In this instance, I conclude that petitioner has not made a substantial showing of the denial of a constitutional right, and therefore recommend against the issuance of a COA.

### IV. SUMMARY AND RECOMMENDATION

**\*17** Based upon the foregoing it is hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it is further hereby

RECOMMENDED, based upon my finding that Chaplin has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not issue with respect to any of the claims in his petition.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Slip Copy, 2018 WL 6613359

---

Footnotes

1    Although Crosier did not reveal the identity of her boyfriend, her sister later learned it was the petitioner that she was seeing. Dkt. No. 10-13 at 137-39.

2    The medical examiner who conducted an autopsy of the victim testified that he was unable to determine the exact time of Crosier's death. Dkt. No. 10-13 at 197. The prosecution and defense later stipulated that it was impossible to determine the precise time of the victim's death, but agreed that it "occurred between the approximate hours of 10 p.m. on March 23rd, 1994 and 7:00 a.m. on March 24th, 1994." Dkt. No. 10-14 at 57-58.

3    According to one resident of the ARC facility, Crosier was seen leaving the facility in her car on March 23, 1994, but returned at approximately 10:00 p.m. that night. Dkt. No. 10-13 at 253, 265.

4    George Mott was ultimately acquitted following a jury trial commencing in January 2012. Dkt. No. 10-3 at 52.

5    *Brady v. Maryland,* 373 U.S. 83 (1962).

6    Plaintiff's Sixth Amendment claim lacks palpable merit. It is well established that "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 687(1972) (plurality opinion); *see also Moore v. Illinois,* 434 U.S. 220, 226-27 (1977). Since none of the three statements in question was made after the initiation of criminal proceedings against the petitioner through the filing of an indictment, his Sixth Amendment right to counsel was not implicated at the relevant points in time. *Kirby,* 406 U.S. at 689; *see William v. Artus,* 691 F. Supp. 2d 515, 523 (S.D.N.Y. 2010) (holding that "no formal

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    14

proceedings were initiated against the petitioner at the time of the lineup" and that "[t]herefore, the petitioner had no Sixth Amendment right to counsel at that time").

7   *People v. Huntley*, 15 N.Y.2d 72 (1965).

8   During his testimony, Chamberlain stated that he and the petitioner "used to party together" meaning to "[s]moke marijuana." Dkt. No. 10-11 at 115. He also testified that on the day following the murder, petitioner went to his house "to get high," *id.* at 116-117, and that the victim would buy marijuana for the petitioner. *Id.* at 122. Following direct examination of Chamberlain, the court issued a limiting instruction advising the jury that they should consider that the testimony concerning petitioner's drug use only as background information and that they should not infer from that testimony that petitioner had any propensity or predisposition to engage in criminal conduct or to commit crimes. *Id.* at 126.

9   It is true that in the last paragraph of his best evidence argument to the Third Department petitioner claimed that the best evidence rule violation "was a violation of due process and denied Appellant a Fair trial." Dkt. No. 10-7 at 20. Such a generalized and catch-all allusion to the Constitution is insufficient to alert the state court to the existence of a federal constitutional claim. *Grey v. Netherland*, 518 U.S. 152, 163 (1996) ("[I]t is not enough to make a general appeal to a constitutional guaranty as broad as due process to present the 'substance' of such a claim to a state court."); *see also Grant v. Bradt*, No. 10 Civ. 0394, 2011 WL 8897634 at, *10 n.7 (S.D.N.Y. July 8, 2011).

10  Although in his brief to the Third Department petitioner similarly relies heavily upon New York CPL § 30.20, it does also assert that his right to a speedy trial as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution were violated. *See* Dkt. No. 10-7 at 30. Accordingly, petitioner's constitutional speedy trial claim is preserved.

11  In his petition, Chaplin does not argue that he was denied a speedy trial based upon the amount of time that passed between the return of the indictment on June 6, 2011 and the commencement of the jury trial on July 9, 2012. *See generally* Dkt. No. 1.

12  A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel,* 529 U.S. 473, 478 (2000) ("[A] COA should issue ... if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6605917
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Scott CHAPLIN, Petitioner,
v.
Michael KIRKPATRICK, Superintendent of
Clinton Correctional Facility, Respondent.

9:17-cv-00718 (MAD/DEP)
|
Signed 12/17/2018

**Attorneys and Law Firms**

SUOZZI LAW OFFICE, OF COUNSEL: THERESA
M. SUOZZI, ESQ., 480 Broadway, Suite 218, Saratoga
Springs, New York 12866, Attorneys for Plaintiff.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, OF COUNSEL: MARGARET A.
CIEPRISZ, AAG, 120 Broadway, New York, New York
10271, Attorneys for Respondent.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

**\*1** Petitioner Scott Chaplin ("Petitioner") filed this
petition on July 2, 2017 for a writ of habeas corpus to
vacate his conviction of second-degree felony murder,
New York Penal Law ("N.Y.P.L.") § 125.25(3), pursuant
to 28 U.S.C. § 2254. *See* Dkt. No. 1. Petitioner asserts
seven grounds for habeas relief, and alleges that these
errors deprived him of a fair trial and due process of law
in violation of his fundamental constitutional rights under
the Sixth and Fourteenth Amendments. *Id.* at 2-63. In
a Report and Recommendation, Chief Magistrate Judge
Peebles recommended denial and dismissal of the petition
in its entirety. *See* Dkt. No. 12. Petitioner has not objected
to the Report and Recommendation.

**II. BACKGROUND**

**A. Factual Background**

On the morning of March 24, 1994, the victim was found
bludgeoned to death inside of a staff apartment of a
residence for the developmentally disabled, the victim's
place of employment. *People v. Chaplin*, 134 A.D.3d 1148,
1149 (3d Dep't 2015). Interviews with the victim's family
members revealed that Petitioner, who was seventeen
years old at the time, had been sexually involved with the
victim. *Id.* As noted in Chief Magistrate Judge Peebles's
Report and Recommendation, Petitioner and the victim
both worked in the mail room of a local newspaper, *The
Troy Record*, and the victim's sister was aware of the
victim having an affair with someone who worked at the
newspaper. Dkt. No. 12 at 3-4.

On the night of March 23, 1994 at 7:39 p.m., someone
made a telephone call to the staff apartment from a pay
telephone at a garage across the street from Petitioner's
home. *Id.* at 4. An employee of the garage testified that
he knew Petitioner and had seen him use the garage pay
telephone at least once per day in March 1994. *Id.* At
approximately 8:00 p.m. that night, the victim's sister
called the staff apartment and noted that someone who
sounded like a man answered, stated "I got it," and
abruptly hung up. *Id.*

There was no evidence of forced entry at the location
of the murder. *Id.* at 3. The victim's body was found in
the living room and her purse could not be located. *Id.*
According to the victim's daughter, her mother was never
without her purse, and carried no credit cards, only large
amounts of cash. *Id.* When the murder was discovered,
law enforcement officers found two rolls of paper towels
on the kitchen counter of the staff apartment, one of
which had been used and had a bite mark impression
on the remaining paper towels. *Id.* at 4. In 2004, the
saliva at the site of the bite mark impression was matched
to Petitioner's DNA profile, and a forensic odontologist
testified that the impression matched Petitioner's bite
pattern. *Id.* at 4-5. Additionally, investigators found a
piece of paper towel wrapped around the door knob inside
the bedroom of the apartment. *Id.* at 5. DNA testing
conducted in 2001 yielded a "mixture profile," indicating
that the DNA was consistent with at least two individuals,
one of whom was a male. *Id.* At trial, testimony revealed
that the probability of someone other than Petitioner
contributing to the mixed DNA profile was determined to
be one in twenty. *Id.*

**\*2** Shortly before the murder, Petitioner had made comments to his friend, Lawrence Chamberlain, regarding the victim, stating that "the bitch is ugly, she has mad money," and "she buys me anything I want, like pot." *Id.* Petitioner had also given two written statements to law enforcement in 1994, and made oral statements in 2011 when he voluntarily underwent a polygraph exam. *Id.* at 5-6.

In a written statement given on April 1, 1994, Petitioner admitted that he worked in the mail room at *The Troy Record*, but denied having any relationship with the victim, including having ever been to the staff apartment where she was murdered. *Id.* at 6. Petitioner stated that, on the night of the murder, he returned home at approximately 9:45 p.m. after smoking marijuana with his friend, Kevin Hall. *Id.*

A second written statement was given on May 11, 1994, in which Petitioner denied making telephone calls to the staff apartment, ever speaking with the victim on the phone, ever calling the victim, and ever using a pay telephone at the garage across the street from his home. *Id.* at 6. Additionally, Petitioner again denied having ever been to the staff apartment where the murder occurred, and denied having any relationship with the victim other than being coworkers. *Id.*

Upon Petitioner's request in January 2011, Petitioner was administered a polygraph exam by State Police Investigator James McCrum. *Id.* During questioning that preceded the polygraph exam, Petitioner again denied having any relationship with the victim, and denied that he had ever been to the staff apartment where the victim was murdered. *Id.* at 6-7. Petitioner also stated that he did not know how his DNA was recovered from the roll of paper towels at the murder scene. *Id.* at 7.

Following Petitioner's written statement given on April 1, 1994, Kevin Hall was interviewed and denied being with Petitioner on the night of March 23, 1994. *Id.* at 6. As part of Petitioner's defense and in an attempt to establish an alibi, Petitioner's mother and sister stated that Petitioner had a 10:00 p.m. curfew in 1994, and on the evening of March 23, 1994, he was home by 9:45 p.m. and remained there until the next morning. *Id.* at 7. Additionally, the defense offered the testimony of John Libolsi who had known the victim's son for thirty years. *Id.* Libolsi testified that he saw the victim's son, Steven Crosier, on the morning of March 24, 1994, between the hours of 12:40 p.m. and 1:40 a.m. "burst out of" a wooded area located approximately three-tenths of a mile from the apartment where the murder took place. *Id.*

**B. Procedural History**

Petitioner and co-defendant George Mott, III were indicted on June 6, 2011, by the Rensselaer County Grand Jury for three counts of second degree murder, including intentional murder, depraved indifference murder, and felony murder. *See* Dkt. No. 1 at 2. Following a jury trial in January 2012, Mott was acquitted. *See* Dkt. No. 8 at 5. Prior to Petitioner's trial, the court granted the prosecutor's motion to dismiss the intentional murder and depraved indifference murder counts. *Id.* On May 15, 2012, the Honorable Andrew G. Ceresia conducted a *Huntley* [1] hearing on Petitioner's motion to suppress his statements made to the police in 1994 and 2011, and found that his statements were voluntarily made. *Id.* at 6-8. Following a jury trial, Petitioner was convicted of second-degree felony murder under section 125.25(3) of the New York State Penal Law. *Id.* at 5. On September 10, 2012, Petitioner was sentenced to a term of incarceration of twenty-five years to life. *Id.* Petitioner's conviction was affirmed by the Appellate Division, Third Department, and leave to appeal was subsequently denied by the New York Court of Appeals on May 10, 2016. *See Chaplin*, 134 A.D.3d at 1152-53.

**\*3** On July 10, 2017, Petitioner timely filed a counseled habeas petition challenging his conviction. *See* Dkt. No. 1. Petitioner has asserted seven grounds for habeas relief: (1) the evidence was insufficient and the jury's verdict was against the weight of the evidence; (2) the trial court abused its discretion in failing to instruct the jury with the circumstantial evidence charge requiring a finding of "moral certainty;" (3) Petitioner was denied a fair trial due to failure to suppress Petitioner's statements procured in violation of his constitutional rights; (4) the trial court abused its discretion when it admitted evidence in violation of the best evidence rule; (5) Petitioner was denied due process and a fair trial by the prosecutor's failure to disclose *Brady* [2] material; (6) denial of Petitioner's constitutional right to a speedy trial; and (7) improper admittance of alleged prior bad acts. *See id.* at 3-63. In a Report and Recommendation dated October 2, 2018, Chief Magistrate Judge Peebles recommended

that Petitioner's petition be denied and dismissed in all respects. *See* Dkt. No. 12 at 49-50.

## III. DISCUSSION

### A. Standard of Review

#### *1. AEDPA*

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254. In discussing this deferential standard, the Second Circuit noted in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006), *cert. granted, judgment vacated and cases remanded on other grounds by,* 549 U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d) ) (footnote omitted); *see also DeBerry v. Portuondo*, 403 F. 3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has observed that

> a state court's decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent on the application of a legal rule, or addresses a set of facts "materially indistinguishable" from a Supreme Court decision but nevertheless comes to a different conclusion than the Court did. [*Williams v. Taylor*, 529 U.S. 362] at 405-406, 120 S. Ct. 1495 [ (2000) ]; *Loliscio v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) .... [A] state court's decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the case before it. *Williams*, 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F. 3d 100, 108-09 (2d Cir. 2000) ).

Significantly, a federal court engaged in habeas review is not charged with determining whether a state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2009); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts have interpreted "objectively unreasonable" in this context to mean that "some increment of incorrectness beyond error" is required for the habeas court to grant the application. *Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quotation omitted).

As the Second Circuit has further instructed, the necessary predicate for a federal habeas court's deferential review is that a petitioner's federal claim has been 'adjudicated on the merits' by the state court. *Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003). "If a state court has not adjudicated the claim 'on the merits,' " the federal habeas court applies the pre-AEDPA standards, and reviews *de novo* the state court disposition of the petitioner's federal claims. *Id.* (quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) ). "[A] state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment.' " *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir. 2001) ). To determine whether a state court has disposed of a claim on the merits, a court will consider: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Aparicio*, 269 F.3d at 93 (quoting *Sellan*, 261 F.3d at 314).

#### *2. Review of a Report and Recommendation*

**\*4** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006).

When a party files general objections, however, the court reviews those recommendations for clear error. *See O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point") (citation omitted). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 958 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## B. Weight of the Evidence and Legal Sufficiency

Petitioner argues that the verdict was against the weight of the evidence and the evidence presented was insufficient to support the jury's verdict. Dkt. No. 1 at 3-26; Dkt. No. 12 at 14. Respondent argues that Petitioner's legal insufficiency claim lacks merit, and his weight of the evidence claim is not cognizable on habeas review because it is a claim under state law. Dkt. No. 8 at 21-27.

Review of a conviction as against the "weight of the evidence" is a product of New York state statute and, therefore, merely a state-law issue. *See Ward v. Herbert*, 509 F. Supp. 2d 253, 264 & n.3 (W.D.N.Y. 2007) (citations omitted). Since federal habeas corpus review is not available to remedy mere errors of state law, *see Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991), no cognizable federal issue is presented by a habeas claim challenging the weight of the evidence adduced at trial, *see Ward*, 509 F. Supp. 2d at 264 & n.3 (citations omitted). As

such, Magistrate Judge Peebles correctly determined that the Court should reject the petition insofar as it alleges that Petitioner's conviction was against the weight of the evidence.

A challenge to the sufficiency of the evidence is, however, amenable to federal habeas review. *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993) ). To analyze the sufficiency of the evidence of a state conviction, " '[a] federal court must look to state law to determine the elements of the crime.' " *Ponnapula*, 297 F.3d at 179 (quotation omitted). A habeas petition challenging the sufficiency of the evidence supporting a state-court conviction fails if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard places a " 'heavy burden' " on a habeas petitioner. *See United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (quotation and other citations omitted). When making its determination, the court is required to "consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

**\*5** To convict Petitioner of the remaining second degree murder, the prosecution was required to prove that Petitioner,

> [a]cting either alone or with one or more other persons ... commit[ted] or attempt[ed] to commit robbery ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, cause[d] the death of a person other than one of the participants[.]

N.Y. Penal Law § 125.25(3). To show that Petitioner committed or attempted to commit a robbery, the prosecution was required to prove that Petitioner forcibly stole, or attempted to forcibly steal, property of another. *See* N.Y. Penal Law § 160.00.

Contrary to Petitioner's assertions, the Third Department correctly determined that his conviction was supported by the evidence. As discussed in more detail in Magistrate Judge Peebles' Report and Recommendation, the evidence at trial revealed that the victim was beaten to death and that her purse, in which she carried large amounts of cash, was missing when her body was found. Therefore, the jury was permitted to reasonably infer that the victim died due to injuries inflicted during a robbery.

Additionally, there was significant evidence regarding Petitioner's participation in the robbery, including telephone records which established that a telephone call was placed to the staff apartment from a payphone located across the street from Petitioner's home during the victim's shift, along with the evidence that Petitioner used that telephone on a daily basis. Additionally, a paper towel roll, found on the kitchen counter when the victim's body was discovered, contained a bite mark impression that matched Petitioner's bite pattern and contained Petitioner's DNA. Further, a paper towel found hanging on a bedroom door know in the apartment contained DNA that was consistent with Petitioner's DNA.

Moreover, at trial the prosecution introduced evidence of statements made by Petitioner to Lawrence Chamberlain before the murder concerning his relationship with the victim and his knowledge that she had significant amounts of cash. Additional evidence demonstrated that Petitioner lied to police about his relationship with the victim and that he was ever present in the apartment where the murder occurred.

As such, Magistrate Judge Peebles correctly determined that the Third Department's conclusion that the conviction was supported by legally sufficient evidence was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. As such, this aspect of the petition is denied.

### C. Jury Instruction: Circumstantial Evidence Charge

Petitioner argues that the trial court erred in failing to instruct the jury that, in the absence of direct evidence, circumstantial evidence must establish guilt to a "moral certainty." Dkt. No. 1 at 27-36; *see* Dkt. No. 12 at 19-20. Respondent argues that Petitioner's jury instruction claim is barred on an independent and adequate state law ground, not cognizable on habeas review, and is otherwise without merit. *See* Dkt. No. 8 at 27-32.

Federal habeas review of a state-court conviction is prohibited if a state court rested its judgment on a state law ground that is "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). "This rule applies whether the state law ground is substantive or procedural." *Id.* (citation omitted). Thus, if the state court "explicitly invokes a state procedural bar rule as a separate basis for decision[,]" the federal court is precluded from considering the merits of the federal claim in a habeas petition. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

**\*6** Instead, the federal court's scope of review is limited to the adequacy of the state law basis to bar federal habeas review. *See Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) ("Our task is not to determine whether [the state] ruling was correct, but to determine its adequacy to preclude federal habeas review"). The Second Circuit has typically assessed the adequacy of a "state ground of decision by examining whether the rule upon which the state court relied is firmly established and regularly followed." *Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011). However, in exceptional cases where a state court has engaged in an "exorbitant application of a generally sound rule," the independent state law grounds will be rendered inadequate to prevent review by the federal habeas court. *Id.* "To determine whether [a] case involves an exorbitant misapplication of a state rule, [a court will] look to see if the state's application serves a legitimate state interest." *Id.* "In evaluating the state interest in a procedural rule against the circumstances of a particular case," the Second Circuit has adopted three criteria which serve as guideposts in a court's evaluation:

"(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given the realities of trial, and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest."

*Kozlowski v. Hulihan*, 511 Fed. Appx. 21, 25 (2d Cir. 2013) (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) ).

New York's circumstantial evidence jury instruction must only be given, at the request of a defendant, when the charges against him are supported solely by circumstantial evidence. *See Norwood v. Artus*, 487 F. Supp. 2d 321, 333 (W.D.N.Y. 2007); *Lee v. Ricks*, 388 F. Supp. 2d 141, 157 (W.D.N.Y. 2005); *People v. Daddona*, 81 N.Y.2d 990, 992 (1993). When there is both direct and circumstantial evidence to support the charges against a defendant, New York's circumstantial evidence instruction does not apply and need not be given. *See Norwood*, 487 F. Supp. 2d at 333 (citations omitted); *Lee*, 388 F. Supp. 2d at 157. A court is not required to include the phrase "moral certainty" in its circumstantial evidence instructions provided that the jury is instructed, in substance, "that it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excluded beyond a reasonable doubt every reasonable hypothesis of innocence." *People v. Sanchez*, 61 N.Y.2d 1022, 1024 (1984) (citations omitted); *see People v. Gonzalez*, 54 N.Y.2d 729, 730 (1981); *see also People v. Wlasiuk*, 136 A.D.3d 1101, 1104 (3d Dep't 2016) ("[A] review of the jury instructions reveals that County Court correctly instructed the jury with respect to circumstantial evidence ... County court instructed that the jury 'must always be satisfied that the surrounding collateral facts have been proven beyond a reasonable doubt' and any inference made 'must flow reasonably and naturally from the facts proven [and] be consistent with all such facts proven' ").

Under New York law, a timely objection must be interposed in order to preserve a claimed error for appellate review. *See N.Y. C.P.L. § 470.05(2); see also People v. Robinson*, 35 N.Y.2d 224, 228 (1975). The failure to comply with this contemporaneous objection rule has consistently been found to constitute an adequate and independent state law ground precluding habeas review. *See, e.g., Downs*, 657 F.3d at 102; *Whitley*, 642 F.3d at 286.

During a preliminary jury charge conference, the trial court announced its intention to administer a circumstantial evidence charge taken directly from the criminal pattern jury instructions, and Petitioner's counsel objected and requested the inclusion of "moral certainty" language. *See* Dkt. No. 12 at 20-21. When Petitioner's counsel submitted a proposed circumstantial evidence instruction the following day that did not include the words "moral certainty," counsel told the court that after

researching the issue, he was withdrawing his request for the inclusion of "moral certainty" language, and instead was requesting substitute language approved by the New York State Court of Appeals. *See id.* at 21. When the court reiterated its intention to instead give the circumstantial evidence charge from a criminal pattern jury instructions manual, Petitioner's counsel did not object either at the charge conference or following the court's instructions to the jury. *Id.*

**\*7** Petitioner's counsel not only failed to object to the jury instructions both during the charge conference and following the court's instructions to the jury, but also withdrew his request for "moral certainty." Dkt. No. 12 at 20-1. Chief Magistrate Judge Peebles correctly found that Petitioner's claim is precluded by the adequate and independent ground doctrine due to his failure to object in order to preserve the claimed error for appellate review. *Id.* at 24-25; *see N.Y. C.P.L. § 470.05(2); see Robinson*, 35 N.Y.2d at 228. Additionally, the Court agrees with Chief Magistrate Judge Peebles' finding that, in the alternative, Petitioner's claim lacks merit because a court is not required to include the phrase "moral certainty" in its circumstantial evidence instructions, and Petitioner's counsel removed such language from his own proposed instructions. *See Sanchez*, 61 N.Y.2d at 1024; *see also Gonzalez*, 54 N.Y.2d at 730.

Accordingly, the Court denies the petition on this ground.

## D. Failure to Suppress Petitioner's Statements

Petitioner argues that his statements made to law enforcement on April 1, 1994, May 11, 1994, and January 20, 2011 were involuntarily made, depriving him of his Fifth and Sixth Amendment rights. *See* Dkt. No. 1 at 39-45. Respondent argues that Petitioner's Fifth and Sixth Amendment rights were not violated because the statements in question were made prior to Petitioner's arrest, and the Appellate Division properly rejected these claims on the merits. Dkt. No. 8 at 32-40.

The Fifth Amendment of the United States Constitution provides, in relevant part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Governments ... are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not b[y] coercion prove a charge against an accused out of his own mouth." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

The statements given on April 1, 1994 and May 11, 1994 were in the presence of Petitioner's father, with the former taking place in Petitioner's own home, and the latter during an interview that was initiated by Petitioner. *See* Dkt. No. 12 at 27-28. Specifically, Petitioner's April 1, 1994 statement was made in the presence of Troy Police Detective Sergeant John Waters and Troy Police Department Investigator Jim Mantello and lasted approximately thirty minutes. *Id.* Petitioner's May 11, 1994 statement occurred when Petitioner went to the Troy Police Station, unannounced, with a desire to "clear the air." Dkt. No. 10-9 at 48. Captain Paul, who conducted the interview, was not expecting Petitioner and Petitioner left the station with his father immediately following the interview. *See id.* at 48-50. Finally, the third statement occurred in the context of a January 20, 2011 Polygraph examination conducted at Petitioner's behest by a New York State Police Investigator. *See id.* at 104-18; Dkt. No. 10-1 at 113-14. This statement occurred when Petitioner appeared at the police station of his own volition and, prior to the examination, conferred privately with his counsel and was advised of his *Miranda rights by the investigator. See* Dkt. No. 10-9 at 105-07.

As Magistrate Judge Peebles correctly determined, given these circumstances, Petitioner has failed to establish a basis to conclude that his Fifth Amendment rights were not voluntary and were taken in violation of his Fifth Amendment rights. Further, there is no basis to conclude that the Third Department incorrectly determined that Petitioner was not "in custody" when each of Petitioner's statements was made. *See Milton v. Racette*, No. 1:14-cv-6001, 2016 WL 67800, *6 (W.D.N.Y. Jan. 5, 2016) (citation omitted). As such, the Court finds that the Third Department's conclusion regarding the suppression of Petitioner's statements was neither contrary to nor an unreasonable application of clearly establish Supreme Court precedent.

**\*8** Additionally, Petitioner's Sixth Amendment claim must be denied because "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time of adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 687 (1972). Since none of the statements at issue were made after the initiation of criminal proceedings against Petition through the filing of an indictment, his Sixth Amendment right to

counsel was not implicated. *See id.* at 689; *see also William v. Artus*, 691 F. Supp. 2d 515, 523 (S.D.N.Y. 2010).

### E. Evidentiary Rulings

Petitioner argues that evidentiary rulings made by the trial court during the course of his trial, regarding the testimony of Lawrence Chamberlain and the production of carbon copies of Petitioner's written statements, were made in error. *See* Dkt. No. 1 at 45-52, 63-68.

"The Constitution requires that criminal defendants be afforded 'a meaningful opportunity to present a complete defense.' " *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L.Ed. 2d 636 (1986) ). "However, '[t]he power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled.' " *Id.* (quoting *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003) ). "Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.' " *Id.* (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) ).

#### 1. Prior Bad Acts

Petitioner contends that the admission of testimony by Lawrence Chamberlain concerning Petitioner's alleged drug use was against the evidentiary rule established in *People v. Molineux*, 168 N.Y. 264 (1901). Dkt. No. 1 at 63-68; Dkt. No. 12 at 32. Respondent argues that this claim is barred on an adequate and independent state law ground and is not cognizable on habeas review because the Appellate Division held that this claim was unpreserved. *See* Dkt. No. 8 at 53-57.

Under the *Molineux* rule, evidence of uncharged crimes and bad acts is properly excluded unless relevant to show motive, intent, absence of mistake or accident, a common scheme or plan, or identity. *Molineux*, 168 N.Y. at 264. Lawrence Chamberlain testified that he and Petitioner "used to party together" and would smoke marijuana. Dkt. No. 12 at 32 n.8. He further testified that on the day following the murder, Petitioner went to his house "to get high." *Id.* The trial court then issued a limiting instruction to the jury, advising that they should consider the testimony regarding Petitioner's drug use only as background information, and they should not infer from that testimony that Petitioner had any propensity or

predisposition to engage in criminal conduct or to commit crimes. *Id.*

When Petitioner presented his *Molineux* argument to the Third Department, the court concluded that the claim was not preserved for review because his trial counsel failed to object at trial. *See Chaplin*, 134 A.D.3d at 1152. Since Petitioner's trial counsel failed to object to Lawrence Chamberlain's testimony regarding the alleged drug use, Petitioner was procedurally barred from raising that claim on appeal. N.Y. C.P.L. § 470.05; *see also People v. Williams*, 163 A.D.3d 1160, 1164 (3d Dep't 2018) ("Defendant failed to preserve his appellate claim ... as he made no objection on that ground at trial") (citation omitted). As Chief Magistrate Judge Peebles correctly found, "[s]ince the Third Department specifically relied on this bar in declining to review the *Molineux* argument," review of the claim is precluded by the adequate and independent state law ground doctrine. *See* Dkt. No. 12 at 33; *see also* N.Y. C.P.L. § 470.05(2); *Robinson*, 35 N.Y.2d at 228. Therefore, the Court rejects Petitioner's claim that the testimony of Lawrence Chamberlain was admitted in error and denies the petition on this ground.

### 2. Best Evidence Rule

**\*9** Petitioner argues that the admission of his written statements into evidence at trial was in violation of the best evidence rule because the prosecution produced carbon copies of the documents, not the originals. *See* Dkt. No. 1 at 45-52. Respondent argues that Petitioner's best evidence claim is unexhausted, procedurally defaulted, and does not otherwise state a claim that is cognizable on federal habeas review. *See* Dkt. No. 8 at 40-42.

An application for a writ of habeas corpus may not be granted until a petitioner exhausts all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(A), (B)(I), (ii). The exhaustion requirement "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings[.]" *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982) ).

To properly exhaust his claims, petitioner must do so both procedurally and substantively. Procedural exhaustion requires that he raise all claims in state court prior

to raising them in a federal habeas corpus petition. Substantive exhaustion requires that the petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). The petitioner must also use the proper procedural vehicle so that the state court may pass on the merits of his claims. *See Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985).

If a court determines that a claim is unexhausted, it considers whether the claim is procedurally defaulted. *See Aparicio v. Artuz*, 269 F.3d 78, 89-90 (2d Cir. 2001). Once a claim has been deemed procedurally defaulted, it is subject to dismissal unless the petitioner can demonstrate "cause for the default and prejudice, or that failure to consider the claim will result in a miscarriage of justice." *Id.* at 90 (citing *Coleman*, 501 U.S. at 735 n.1). To establish cause for the default and prejudice, a petitioner must show that some "objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ); *accord, Maples v. Thomas*, 565 U.S. 266, 281 (2012). On a writ for habeas relief, the court need not examine the issue of prejudice if a petitioner fails to establish adequate cause for his procedural default because habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Carrier*, 477 U.S. at 496.

In his Report and Recommendation, Chief Magistrate Judge Peebles correctly found that Petitioner's best evidence claim is procedurally defaulted because he is no longer eligible to raise it in any state forum. *See Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991) (holding that the petitioner met his statutory exhaustion requirement because he no longer had "remedies available" in New York). Here, Petitioner has already appealed under the New York Criminal Procedure Law, and he failed to apprise the Appellate Division of any constitutional violation resulting from the claimed violation of the best evidence rule. *Chaplin*, 134 A.D.3d at 1152. Petitioner cannot now raise this argument in a motion to vacate his conviction, because the argument is based upon matters in the trial record. *See* N.Y. C.P.L. § 440.10(2)(b). Additionally, Petitioner has not offered a basis to excuse his procedural default with respect to the constitutional

claim surrounding the alleged best evidence rule violation. Dkt. No. 12 at 38. Accordingly, Petitioner's best evidence claim is forfeited.

**\*10** Moreover, even if the Court were to review the merits of the evidentiary ruling at issue, Petitioner would still not be entitled to relief. "[T]o establish that an erroneous application of state rules of evidence violates the federal guarantee of due process, [the petitioner] must also demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process." *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013). Under New York's best evidence rule, when a party seeks to prove the contents of a writing, the original must be produced unless there is a satisfactory explanation for its absence. *Prince*, RICHARDSON EVIDENCE § 10-101; *see also Schozer v. William Penn. Life Ins. Co. of N.Y.*, 84 N.Y.2d 639, 643 (1994) ("The ... best evidence rule simply requires the production of an original writing where its contents are in dispute and sought to be proven") (citations omitted). As correctly noted by the Third Department, carbon copies are considered originals under the best evidence rule. *Chaplin*, 134 A.D.3d at 1152; *see also People v. Kolp*, 49 A.D.2d 139, 141 (3d Dep't 1975) ("On such multicopy forms, all duplicates or counterparts are regarded as originals and any such duplicate copies are admissible as originals"); *People v. Sims*, 127 A.D.2d 712, 713 (2d Dep't 1987) ("There is no error in the use of a copy ... instead of the original, as this was a multi-copy form"). Accordingly, the Court finds that the Third Department's determination on this issue was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

**F. Exculpatory Evidence Claim**

Petitioner asserts that a constitutional violation occurred when the prosecution failed to disclose DNA testing that was allegedly performed on the victim's fingernail scrapings to test if Petitioner's DNA was a match. *See* Dkt. No. 1 at 52-57. Respondent argues that this claim is without merit because the Appellate Division denied Petitioner's *Brady* claim on the merits. Dkt. No. 8 at 45-49.

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution is required to make timely disclosures of all exculpatory evidence to the defense. A habeas petitioner may be entitled to relief upon a showing that the government violated his or her right to due process

by failing to turn over "material exculpatory evidence" before trial. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Strickler v. Greene*, 527 U.S. 263, 280 (1999). "Under *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment.' " *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (quoting *United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003) ). "To establish a *Brady* violation, a [petitioner] must show (1) that the evidence at issue is 'favorable to [him], either because it is exculpatory', or because it is impeaching; (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice must have ensued.' " *Id.* (quoting *Strickler*, 527 U.S. at 281-82).

In assessing whether a *Brady* violation has occurred, "[e]vidence is not 'suppressed' if the defendant either knew, ... or should have known, ... of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (internal citations omitted); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976). The government is not required to disclose evidence to a defendant "who is 'on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony he might furnish.' " *Id.* (quoting *United States v. Stewart*, 513 F.2d 957, 600 (2d Cir. 1975) ). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *Id.* at 619 (citation omitted).

Petitioner speculates that DNA laboratory evidence may exist based upon a 1994 newspaper report which cited confidential sources for the information. *See* Dkt. No. 1 at 53-54; Dkt. No. 12 at 39-40. During the trial, Kristen Thompson, the investigative reporter who authored the article, testified that scrapings were taken from beneath the victim's fingernails and submitted for DNA testing during the investigation. Dkt. No. 12 at 42; Dkt. No. 10-13 at 269-78. On cross-examination, Thompson could not recall the source of that information, and stated that he would refuse to identify the source regardless. *See* Dkt. No. 10-13 at 277, 292-95. Thompson's testimony was stricken in its entirety as inadmissible hearsay for

exercising his privilege not to identify his sources. *See id.* at 281-86, 305-11.

**\*11** Both the Third Department and Chief Magistrate Judge Peebles correctly found that Petitioner's *Brady* claim is entirely speculative, and Petitioner has failed to carry his burden of establishing that the exculpatory evidence existed at the time of trial, and that the prosecutor was in possession of that evidence. *See Chaplin*, 134 A.D.3d at 1152; Dkt. No. 12 at 42. Additionally, Chief Magistrate Judge Peebles correctly found that, even if Petitioner did meet his burden, he cannot show prejudice because even if the fingernail scraping had contained DNA belonging to someone else, Petitioner would not necessarily have been eliminated as a suspect because there was at least one other participant, George Mott, alleged to be involved in the crime. *See* Dkt. No. 12 at 43.

Accordingly, the Court finds that the Third Department's decision rejecting Petitioner's *Brady* claim was neither contrary to nor an unreasonable application of Supreme Court precedent.

**G. Right to a Speedy Trial**
Petitioner argues that he was denied his Sixth Amendment right to a speedy trial because the murder occurred in March 1994, and Petitioner was not charged with the crime until June 2011. *See* Dkt. No. 1 at 58-63. Respondent argues that this claim is barred because the Appellate Division rejected Petitioner's claim on the merits. Dkt. No. 8 at 49-53.

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." U.S. Const. Amend. VI. "[I]t is readily understandable that it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion*, 404 U.S. 307, 320 (1971); *accord, United States v. Lovasco*, 431 U.S. 783, 788-89 (1977); *United States v. MacDonald*, 456 U.S. 1, 6 (1982); *see also Archer v. Comm'r of Corr.*, 646 F.2d 44, 48 (2d Cir. 1981). "[T]he Sixth Amendment speedy trial right does not accrue until a defendant is accused and that pre-accusation delay short of the period of limitations affords ground for constitutional relief only on a showing of

actual prejudice amounting to a denial of due process." *Archer*, 646 F.2d at 48 (citing *Marion*, 404 U.S. at 313-20). Until an individual is formally accused, "a citizen suffers no restraints on his liberty[.]" *Marion*, 404 U.S. at 320.

The statute of limitations is "the primary guarantee against bringing overly stale criminal charges." *Id.* at 322 (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966) ); *United States v. Cornielle*, 171 F.3d 748, 721 (2d Cir. 1999). When an indictment is brought within the time constraints of the statute of limitations, it "may nevertheless violate due process where pre-indictment delay has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused.' " *Cornielle*, 171 F.3d at 752 (quoting *Marion*, 404 U.S. at 324). "A defendant bears the 'heavy burden' of proving both that he suffered actual prejudice because of the alleged pre-indictment delay," and that the delay "was a course intentionally pursued by the government for an improper purpose." *Id.* (citing *United States v. Scarpa*, 913 F.2d 993, 1014 (2d Cir. 1990) ).

In the present matter, the Court finds that Magistrate Judge Peebles correctly determined that Petitioner has failed to establish prejudice as a result of the delay. Petitioner provides nothing more than speculation that there may have been potential witnesses, who Petitioner fails to identify, who may have moved or lost recall of the relevant events in this case. At trial, Petitioner offered an alibi defense supported by three witnesses, none of whom claim any failure to recall the events of the night in question.

**\*12** Additionally, as Magistrate Judge Peebles and the Appellate Division noted, the prosecution offered compelling reasons for the delay in this matter. Specifically, advances in DNA technology and a witness materializing in May 2011 greatly enhanced the case against Petitioner. *See Chaplin*, 134 A.D.3d at 1149. Therefore, even assuming Petitioner had demonstrated the requisite prejudice (which he has not), the petition would still be denied because he has still failed to establish that the delay was " 'a course intentionally pursued by the government for an improper purpose.' " *United States v. Baptiste*, 84 Fed. Appx. 153, 154-55 (2d Cir. 2004) (quoting *Cornielle*, 171 F.3d at 752).

Accordingly, the Court denies the petition on this ground.

## H. Certificate of Appealability

28 U.S.C. § 2253(c)(1) provides, in relevant part, that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from – (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" [3] 28 U.S.C. § 2553(c)(1). A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2553(c)(2).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court declines to issue a Certificate of Appealability in this matter. *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted). Further, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum-Decision and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' October 2, 2018 Report and Recommendation is **ADOPTED in its entirety** for the reasons set forth herein; and the Court further

**ORDERS** that the petition for a writ of habeas corpus is **DENIED and DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Respondent's favor and close this case; and the Court further

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 6605917

## Footnotes

1   *People v. Huntley*, 15 N.Y.2d 72 (1965).

2   *Brady v. Maryland*, 373 U.S. 83 (1962).

3   Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed in such actions "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1).

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 33767755
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clifford CONYERS, Petitioner,
v.
Herbert MCLAUGHLIN, Superintendent,
Hudson Correctional Facility, Respondent.

No. 96CV1743NAMGLS.
|
Jan. 27, 2000.

**Attorneys and Law Firms**

Clifford Conyers, Ulster Correctional Facility, Napanoch, New York, pro se.

Hon. Eliot Spitzer, New York State Attorney General, Department of Law, The Capitol, Albany, New York, for the Respondent.

Darren O'Connor, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.

**\*1** This matter has been referred to the undersigned by the Hon. Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Petitioner filed his habeas corpus petition on November 4, 1996. [1] An order was issued pursuant to the rules governing Section 2254 cases in the United States District Courts, 28 U.S.C. foll. § 2254, granting petitioner leave to proceed *in forma pauperis,* ordering service of the petition on respondent, and requiring an answer. Respondent filed his answer, the pertinent state court records, and a memorandum of law. [2] Petitioner filed a traverse on May 12, 1997. (*Dkt.Nos.11-12* ).

Petitioner complains of a December 23, 1994, Rensselaer County Court judgment entered after his plea to criminal possession of a controlled substance in the fifth degree. He was sentenced as a second felony offender to a prison term of three to six years.

The Appellate Division, Third Department, affirmed the conviction on May 16, 1996. *People v. Conyers,* 227 A.D.2d 793, 642 N.Y.S.2d 450 (3rd Dep't 1996). The New York Court of Appeals denied leave to appeal on August 23, 1996. *People v. Conyers,* 88 N.Y.2d 982, 672 N.E.2d 615, 649 N.Y.S.2d 389 (1996).

Liberally interpreting petitioner's claims, he raises two issues: (1) his guilty plea was involuntary because it was coerced by his attorney, because he was not adequately advised of the consequences of his plea, and because he was not permitted to select a minority juror; and, (2) he was denied the effective assistance of counsel because he was misled concerning the filing of motions and because substituted counsel was not afforded sufficient time to prepare for trial.

Respondent seeks dismissal of the petition, asserting that: (1) petitioner waived his right to collateral review when he voluntarily waived his appellate rights as a plea bargain condition; (2) petitioner procedurally defaulted on his ineffective assistance claims; and, (3) petitioner's ineffective assistance claims are without merit. For the reasons that follow, the petition should be denied.

## II. *BACKGROUND*

On December 30, 1993, petitioner, a second felony offender, was indicted for three counts of assault, resisting arrest, and criminal possession of a controlled substance in the third and fourth degree. (*A.3-7, 54-55* ).

On January 7, 1994, his attorney, Assistant Public Defender Cholakis, served discovery demands and requested a bill of particulars. (*A.17-27* ). On September 28, 1994, Cholakis filed an omnibus motion seeking dismissal of the indictment, suppression of drugs seized from petitioner, and permission to file additional motions. (*A.32-46* ). In an accompanying affidavit, he stated that the motions followed conversations with petitioner. (*A.36* ).

On November 28, 1994, trial was scheduled to begin. (*A.65-66* ). Cholakis then moved to withdraw, citing strategy conflicts and motion practice arguments that resulted in petitioner's refusal to engage in trial preparation during the preceding week. (*A.66-67* ).

Questioned by the court, petitioner alleged that he had asked counsel to seek a change of venue and recusal of the trial judge, motions counsel indicated he still intended to make, having reserved his right to do so. (*A.67-70* ). In fact, both defense counsel and petitioner, the latter acting *pro se,* made the motions which were denied. (*A.70, 78-79* ).[3]

 **\*2** Expressing dissatisfaction with assigned counsel, petitioner also criticized his attorney's failure to file a suppression motion. (*A.71* ). However, defense counsel had filed a suppression motion which was denied. (*A.50-51* ). Cholakis stated that he had been unable to communicate with petitioner since the preceding Friday because petitioner would not talk to him. (*A.72* ). Cholakis further stated that he had been prepared to proceed to trial, but that petitioner refused to cooperate. (*A.73* ).

At the court's request, Public Defender Wollowitz then appeared, informing the court that she had met with petitioner the preceding Friday and that he had also refused to cooperate with her. (*A.75-76* ). During a subsequent colloquy, petitioner stated that there were no witnesses to call in his defense. (*A.76* ). After informing petitioner that he would permit a change of attorney at petitioner's request, the judge discharged Cholakis and appointed Wollowitz. (*A.78, 80* ). When Wollowitz informed the court that she was unprepared to select a jury, the court adjourned the trial until the next day. (*A.81* ).

On the next day, Wollowitz informed the court that petitioner objected to proceeding, that he wished to fire her, and that she felt it would be a derogation of his right to counsel to compel him to proceed. (*A.83-84* ). Petitioner requested that the trial court assign private counsel, questioning the competency of the Public Defender's Office. (*A.84-85* ). He did not object to the trial itself, only the attorney who would represent him. (*A.85-89* ). The court ordered jury selection to proceed, but first ascertained that Wollowitz had read petitioner's grand jury testimony so that she knew about his version of events, and that she had reviewed the transcript of the prior preliminary hearing. (*A.93-94* ). Furthermore, the court ordered the prosecution to provide early disclosure of grand jury testimony and impeachment material. (*A.94-96* ).

During the jury selection process, petitioner was represented by Wollowitz and Cholakis, the latter apparently acting as stand-by counsel. (*A.98, 104* ). During the voire dire, petitioner engaged in disruptive behavior. (*A.101-104* ). Furthermore, he accused Wollowitz of incompetence and sought once again to "fire" her because she did not select certain jurors he had identified as favorable to his case, including a minority juror. (*A.101-104* ). When the court explained that those jurors had not been reached with the selection process, petitioner still accused his attorney of incompetence. (*A.103-104* ). Following jury selection, the court adjourned the commencement of trial until the following day. (*A.105-106* ).

The next day, petitioner informed the court that he wished to enter a guilty plea. (*A.107* ). In exchange for a charge reduction from criminal possession of a controlled substance in the third degree to fifth degree, and in satisfaction of all remaining counts in the indictment as well as other unrelated, pending charges, petitioner agreed to plead as a second felony offender. (A.107). The third degree charge was a class B felony while the fifth degree charge was a class D felony. (*A.3, 107* ). As a result of his reduced plea, petitioner significantly reduced his sentencing exposure. Rather than a maximum, indeterminate sentence of twelve and one-half to twenty-five years, he received a judicial commitment of three to six years. (*A.107); see also* N.Y. Penal Law § 70.06(2)(3). Furthermore, he agreed to waive his right to appeal. (*A.107* ).

 **\*3** In a thorough plea colloquy, petitioner told the court that he fully understood his rights and the consequences of his plea. Under oath, he stated that he had ample opportunity to discuss the matter with his attorney, that he was satisfied with her representation, and that he was relinquishing all of his prior motions and his right to appeal. (*A.109-114* ). He also provided a full factual admission concerning his commission of the crime. (*A.114-115* ).

On December 23, 1994, the day of sentencing, petitioner sought to withdraw his plea. He did so in a written motion filed the same day, and verbally during his sentencing colloquy. (*A.56-64, 119-123* ). Reciting a litany of allegations involving police conduct and his arrest, he asserted his innocence and resurrected his ineffective assistance claim, alleging that his attorney failed to file

his motions. *(A.59)*. He also alleged that counsel had misled him concerning the terms of the plea agreement. *(A.60)*. Other than the bald assertion that he was misled, petitioner's rather incoherent statements were devoid of facts supporting how he was misled or otherwise deceived. *(A.60)*. He stated that he was coerced into pleading because he was told his motions had been made when, in fact, they had not. *(A.59 )*. Referring to the plea colloquy, the court found that petitioner's plea was voluntary, knowledgeable and intelligent. *(A.120-122 )*. Accordingly, petitioner's motion to withdraw his plea was denied.

On December 27, 1994, petitioner filed a Notice of Appeal with the New York State Supreme Court, Appellate Division, Third Department. Michael J. Hutter was assigned as new appellate counsel. *See* Notice of Appeal and Appellant's Br. (*Dkt. No. 8* ). On appeal, petitioner argued that his appellate waiver did not preclude review of his motion to withdraw his involuntary and coerced plea, and that the county court abused its discretion in denying his motion. *See* Appellant's Br. (*Dkt. No. 8* ). Although he argued that his former counsel's failure to make certain motions lead to the demise of their relationship, petitioner did not raise the substance of the motions. Appellant's Br. at 4.

In a May 16, 1996, decision, the Appellate Division affirmed the conviction. Regarding the ineffective assistance claim and given the appellate waiver, the court limited its review to the impact of representation on the voluntariness of the plea. Other claims, including effective assistance of counsel in the non-plea context, were procedurally barred. *People v. Conyers,* 227 A.D.2d 793, 642 N.Y.S.2d 450, 451 (3d Dep't.1996). The court then found that petitioner's trial preparation problems were a self-induced by-product of his recalcitrant behavior, not the incompetence of counsel. The court further held that defense counsel's favorable plea bargain reflected effective competence, and the plea colloquy demonstrated that petitioner's plea was voluntary. *Id.* at 794, 642 N.Y.S.2d at 451.

**\*4** On June 25, 1996, petitioner sought permission to appeal to the Court of Appeals. *See* Letter Application (*Dkt. No. 8)*. In his application, petitioner argued only that the county court had abused its discretion in refusing to permit an involuntary plea to be withdrawn, and specifically rejected any claim that trial counsel was ineffective. *Id.* On August 23, 1996, the New York Court

of Appeals issued a Certificate Denying Leave to Appeal. *People v. Conyers,* 88 N.Y.2d 982, 672 N.E.2d 615, 649 N.Y.S.2d 389 (1996).

## III. *DISCUSSION*

"A plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent' ' ', *Bousley v. United States,* 523 U.S. 614, 618, 118 S.Ct. 1604, 1609, 140 L.Ed.2d 828 (1998) (citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970)), and collateral review is limited to whether the plea was voluntary, intelligent and entered with the advice of counsel. *United States v. Broce,* 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989); *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1607-08, 36 L.Ed.2d 235 (1973); *see also, United States v. Coffin,* 76 F.3d 494, 497-98 (2d Cir.1996). A defendant may also execute an appellate waiver as a plea condition. *United States v. Pipitone,* 67 F.3d 34, 39 (2d Cir.1995). That waiver is valid, however, only if voluntary, intelligent and executed with the advice of counsel. *Bello v. People,* 886 F.Supp. 1048, 1054 (W.D.N.Y.1995); *Magee v. Romano,* 799 F.Supp. 296, 299 (E.D.N.Y.1992). Although pleas and appellate waivers preclude appeals on most grounds, they do not prevent challenges to voluntariness. If voluntary, however, they preclude a defendant from asserting independent claims relating to prior, nonjurisdictional events. *Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608; *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997); *Coffin,* 76 F.3d at 496-98; *Hayle v. United States,* 815 F.2d 879, 881 (2d Cir.1987); *Hogan v. Ward,* 998 F .Supp. 290, 293 (W.D.N.Y.1998); *Pryor v. McCoy,* 1997 WL 436809 (N.D.N.Y. July 25, 1997); *Gayle v. Lacey,* 1997 WL 610654 (N.D.N.Y. Oct. 1, 1997); *Bello,* 886 F.Supp. at 1054. Ineffective assistance claims are waived except as they directly relate to voluntariness. *Tollett* at 258, 93 S.Ct. at 1608; *Coffin,* 76 F.3d at 497-98; *Pryor,* 1997 WL 436809. Thus, if ineffective assistance impacts the voluntary and intelligent character of the plea or waiver, the issue is jurisdictional and survives. However, if the ineffectiveness claims relate to pre-plea assistance, those claims are nonjurisdictional and do not survive. *Coffin,* 76 F.3d at 497-498. [4]

The test of validity is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d

162 (1970). If voluntary, " 'a plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their very nature improper as having no proper relationship to the prosecutor's business ...' ' *Brady,* 397 U.S. at 754, 90 S.Ct, at 1472 (quoting *Shelton v. United States,* 246 F.2d 571 (5th Cir.1957)). Voluntariness hinges on an assessment of all of the relevant circumstances, including the possibility of a heavier sentence following trial, the defendant's prior contact with the criminal justice system, the extent to which the trial court explained the defendant's options to him, and the competency of counsel's advice. *Id.,* at 748-749, 90 S.Ct., at 469-470; *see also, Magee v. Romano,* 799 F.Supp. 296, 300 (E.D.N.Y.1992); *Willbright v. Smith,* 745 F.2d 779, 781 (2d Cir.1984). The knowledge component addresses the defendant's competence and control of his mental faculties, his awareness of the nature of the charges against him, and his reliance upon the competent advice of counsel. *Bousley,* 523 U.S. at 619, 118 S.Ct., at 1609.

**\*5** Effective assistance depends on whether legal advice "was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). A defendant who pleads guilty upon the advice of counsel "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann." *Hill v. Lockhart,* 474 U.S. 52, 56-57, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985). This same test obviously applies to an appellate waiver.

In *Hill,* the Court held that the standard developed in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) was applicable to ineffective assistance claims arising out of the plea process. That standard is whether the attorney provided reasonably effective assistance when considering the totality of the circumstances, and there is a two-part test to assess the assistance. First, a defendant is required to establish that counsel's performance was deficient, and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. In order to show a deficient performance by counsel, the defendant must

demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct., at 2064. In relation to pleas, the second prong of the test "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill,* 474 U.S. at 59, 106 S.Ct., at 370. In order to satisfy this requirement, a defendant must show that counsel gave unreasonable advice and that, but for this advice, the defendant would not have plead guilty or would have received a lighter sentence at trial. *Id.,* at 56-57, 59, 106 S.Ct. at 369-370.

*Strickland's* standard, while not insurmountable, is highly demanding. *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986). Furthermore, the reviewing court begins with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ..." *Strickland,* 466 U.S. at 669, 104 S.Ct., at 2055. Additionally, the solution of the prejudice inquiry "is closely related to the objective prediction of whether the defense could succeed if the case went to trial." *Chukwurah v. United States,* 813 F.Supp. 161, 165 (E.D.N.Y.1993). A petitioner's assertion that his guilty plea was involuntary because of his attorney's erroneous advice "affords an all too [sic] easy avenue for the invalidating of a conviction on pleas of guilty." *Hernandez v. United States,* 839 F.Supp. 140, 143 (E.D.N.Y.1993) (quoting *United States v. Horton,* 334 F.2d 153, 154 (2d Cir.1964)). "[A] defendant's testimony after the fact 'suffers from obvious credibility problems.' ' *Panuccio v. Kelly,* 927 F.2d 106, 109 (2d Cir.1991).

**\*6** Accordingly, the validity of petitioner's plea and appellate waiver requires an assessment of whether he intelligently understood the nature and consequences of his actions, whether his choice was voluntary, whether there was ineffective assistance and, if so, whether there was an adverse impact caused by that assistance. As to knowledge, there is no doubt that petitioner understood the consequences of his plea and appellate waiver. The record is devoid of any suggestion that petitioner, twenty-eight years old at the time, was mentally or intellectually incompetent, and he makes no such claims now. (*See Pet., Dkt. No. 1; A. 109-110* ). As a second felony offender with at least sixteen prior arrests, he was fully conversant with the criminal justice system and the plea process. (*A.54-55, 89* ). During his plea colloquy, he expressly stated his understanding that: his plea was to fifth degree

2000 WL 33767755

possession, a two level reduction from the top count in the indictment; he was receiving a sentencing commitment of three to six years as a second felony offender, a reduced exposure from twelve and one-half to twenty-five years; his plea was in full satisfaction of all remaining charges in the indictment and of other unrelated, pending charges; he was relinquishing all of his constitutional rights associated with trial; he was waiving his right to appeal which counsel had fully explained to him; he had ample opportunity to discuss his plea with counsel and was satisfied with her advice; no one had threatened, coerced or forced his decision; he was acting freely and voluntarily; and, he understood that he was withdrawing all prior motions, including his suppression motion which had been denied. (*A.107*-114). Petitioner also provided a full factual admission that he had possessed cocaine and threw it to the ground when the police approached him. (*A.114-115* ).

Petitioner asserts that his plea and appellate waiver were coerced because he would have done neither had he known his attorney had not filed motions, had his attorney explained the consequences of the plea and waiver to him, had he been allowed to select a minority juror during voire dire, and had his attorney been afforded more time for trial preparation. First of all, petitioner's assertions suffer from obvious credibility problems. *Pamuccio* at 109. Not only did his plea specifically relinquish future appellate rights regarding motions, but the motions were made and denied in the first instance. Assistant Public Defender Cholakis filed motions before trial, and both Cholakis and the petitioner, the latter acting *pro se,* renewed the motions at the time of trial. (*A.17-27, 32-46, 50-51, 59, 67-71, 78-79* ). So too, his claim that he did not understand the plea terms is contradicted by his sworn statements during the colloquy. (*A.107-114* ). Not only did the trial court fully explain the terms, but petitioner admitted that trial counsel had done so. Again, petitioner's current claims, like his claims at the time, are the by-product of incoherent and bald conclusions without factual support. *See Pet., Dkt. No. 1; (A.59-60* ).

 **\*7** As with his other claims, petitioner's ineffective assistance allegation is without merit, and accordingly, had no impact on the voluntariness of his plea and appellate waiver. [5] Counsel can hardly be faulted for failing to do what he had already done. The motions for suppression and for recusal were made and denied. (*A.17-29, 50-51, 70, 78-79* ). Counsel is under no

obligation to pursue frivolous motions. *Medina v. Herbert,* 1998 WL 799173 (S.D.N.Y.1998). Although petitioner's pretrial preparation claim is waived, counsel was not ineffective in that regard either. Wollowitz had participated in pretrial preparation with Cholakis, petitioner himself admitted that he intended to produce no trial witnesses, and the court ascertained that Wollowitz had reviewed prior testimony and transcripts, ordered early prosecution disclosure of impeachment materials, and adjourned the effective commencement of trial for two days. (*A.75-81, 83-89, 93-96* ). So too, Cholakis remained as standby counsel. (*A.98, 104* ). Nonetheless, the focus is on the competency of Wollowitz's advice to accept the plea and appellate waiver. Having reviewed the pretrial transcripts of the grand jury testimony and the preliminary hearing, she clearly understood the strength of the prosecution's case. Confronted with an obstreperous client refusing to assist with additional preparation, it is difficult to imagine what more she could have done. There is nothing deficient in the performance of either Holowitz or Cholakis.

Furthermore, petitioner fails on the second prong of the test since there is no evident prejudice. The prosecution's cocaine possession case was based on police observations of petitioner removing cocaine from his pocket and throwing it to the ground. (*A.114-115* ). Confronted with that evidence, counsel's advice to plead and waive appeal in exchange for a minimum three instead of a twelve and one-half year sentence and in exchange for the dismissal of other related and unrelated charges can hardly be challenged as unsound. Beyond petitioner's bald assertions, there is little support in the record that he would have been treated more leniently after trial.

Because his plea and appellate waiver were knowing, voluntary and based on competent legal advice, petitioner has waived his right to collaterally attack his claims regarding the failure to file motions, the selection of a minority juror, and his counsel's lack of trial preparation. Those claims are nonjurisdictional and preceded the plea and waiver. *Tollett,* 411 U.S. at 258, 267, 93 S.Ct., at 1602, 1608; *Torres,* 129 F.3d at 715; *Coffin,* 76 F.3d at 496-98; *Hayle,* 129 F.2d at 881; *Hogan,* 998 F.Supp. at 293; *Pryor,* 1997 WL 436809; *Gayle,* 1997 WL 610654; *Bello,* 886 F.Supp. at 1054. Even had he not waived them, however, those claims are without merit.

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 70 of 201
Conyers v. McLaughlin, Not Reported in F.Supp.2d (2000)
2000 WL 33767755

A judge's failure to recuse for bias, when warranted, may be jurisdictional. *See United States v. Brinkworth,* 68 F.3d 633 (2d Cir.1995); *Martuzas v. Reynolds,* 983 F.Supp. 87 (N.D.N.Y.1997); *Sassower v. Mangano,* 927 F.Supp. 113 (S.D.N.Y.1996). In order to establish a constitutional violation, however, petitioner would have to demonstrate that the court abused its discretion in refusing to recuse. *Martuzas,* 983 F.Supp. at 91 (*quoting Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)). Although Judge McGrath may have known petitioner and presided over an earlier preliminary hearing and bail application, the record reflects no bias, as amply demonstrated by Judge McGrath's acceptance of the plea and the favorable sentence. So too, the systematic exclusion of minority jurors is unconstitutional. *See Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed .2d 69 (1986). However, as the trial court explained to petitioner, the minority juror was a member of the jury pool, but never reached the actual selection process. In other words, there never was a challenge to the juror because he was not reached. (*A.101-104* ).

**\*8** WHEREFORE, based on the findings in the above Report, it is

RECOMMENDED that the petition be DENIED and DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e), and it is

ORDERED that the state court records herein be returned directly to the office of the Assistant Attorney General at the conclusion of these proceedings. He has agreed to make them available for any appellate review.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 33767755

---

Footnotes

1    This case was originally assigned to former Magistrate Judge Hurd, and reassigned to this court on January 20, 1998. (*Dkt. No. 14* ).
     Also, petitioner was paroled on November 21, 1997, but his application is not moot because there are collateral consequences associated with his contested felony conviction and his conditional release. *See Evitts v. Lucey,* 469 U.S. 387, 391 n. 4, 105 S.Ct. 830, 833 n. 4, 83 L.Ed.2d 821 (1985) (citing *Carafas v. LaVallee,* 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) and *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)) (conviction could be used to subject petitioner to persistent felony prosecution); *Jones v. Cunningham,* 371 U.S. 236, 241-243, 83 S.Ct. 373, 376, 9 L.Ed.2d 285 (1963) (prisoner on parole remains "in custody"); *Martin v. Luther,* 689 F.2d 109, 112 (7th Cir.1982) ( "validity of conviction remains justiciable even after petitioner is discharged from imprisonment due to collateral consequences of a criminal conviction"). Furthermore, petitioner is currently incarcerated although the record is unclear whether that incarceration is a by-product of a new conviction or a parole revocation.
2    Designated as an appendix, the state court records are listed in the first paragraph of respondent's answer, and unless otherwise noted, are hereinafter referenced as "A." (*See Dkt No. 8* ).
3    Characterized as requests for a change of venue and recusal, petitioner's motions sought the disqualification of the Honorable Patrick J. McGrath, County Court Judge. Petitioner asserted that Judge McGrath had presided over his bail and preliminary hearings while a "police court" judge. After informing petitioner that his motion was really one for recusal, and not a change of venue, Judge McGrath told petitioner that his having presided during preliminary matters formed no basis for his recusal.
4    The standard is the same in New York, and governed petitioner's state appellate claims. *See People v. Seaburg,* 74 N.Y.2d 1, 541 N.E.2d 1022, 543 N.Y.S.2d 968 (1989); *Conyers,* 227 A.D.2d at 793, 642 N.Y.S.2d at 451.
5    Represented by new appellate counsel in his state appeals, petitioner raised only the voluntariness of his plea and the county court's denial of his withdrawal motion, and none of the other claims he currently asserts. *See Notice of Appeal, Appellant's Br., Letter Application to Court of Appeals (Dkt. No. 8).* He did not raise his claims regarding judicial bias and

2000 WL 33767755

the failure to empanel a minority juror, and he specifically stated that he was *not* raising ineffective assistance claims unrelated to his plea. *Id.* Therefore, those claims would be further procedurally barred absent cause and prejudice since they were not raised on direct appeal. *United States v. Frady,* 456 U.S. 152, 167-68, 102 S.Ct. 1584, 1594-95, 71 L.Ed.2d 816 (1982). And, petitioner cannot establish cause because he had new appellate counsel and his claims are based solely on the trial record. *Douglas v. United States,* 13 F.3d 43, 47 (2d Cir.1993).

To the extent petitioner raises claims concerning pre-plea ineffective assistance, minority juror impanelment and the failure to file motions, he has mixed exhausted and unexhausted claims. Mindful that this court has liberally interpreted the petition, even if petitioner has included unexhausted issues, dismissal of the entire petition would not be mandated. On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132. Prior to the enactment of this Act, the Court was required to dismiss mixed petitions containing both exhausted and unexhausted claims. *Rose v.. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Levine v. Commissioner of Correctional Servs.,* 44 F.3d 121, 125 (2d Cir.1995). The AEDPA now gives the Court discretion to deny on the merits those habeas petitions containing unexhausted claims. 28 U.S.C. § 2254(b)(1)-(2).

Although § 2254(b)(2) "does not provide a standard for determining when a court should dismiss a petition on the merits rather than require complete exhaustion," *Cowans v. Artuz,* 14 F .Supp.2d 503, 506 (S.D.N.Y.1998)(quoting *Lambert v. Blackwell,* 134 F.3d 506, 514 (3d Cir.1998)), several district judges have referred to a "patently frivolous" standard. If the court finds an unexhausted claim patently frivolous, and that it would be futile to send it back to state court, it may summarily dismiss that claim on the merits and pass onto the exhausted claims. *Edkin v. Travis,* 969 F.Supp. 139, 141 (W.D.N.Y.1997); *Cowans* at 506; *Rodrigues v. Miller,* 1997 WL 599388 at *3 (S.D.N.Y. Sept. 29, 1997). "Apparently, the issues of comity and federalism are better served by addressing the merits, thereby avoiding useless state court litigation followed by additional meritless federal court litigation ." *Edkin* at 142. Thus, even if this court were to consider these issues as unexhausted grounds for relief, they would be dismissed on the merits as patently frivolous.

---

**End of Document**                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Curtis v. U.S., Not Reported in F.Supp.2d (1998)
Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 72 of 201
1998 WL 34304660

1998 WL 34304660
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Grant CURTIS, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

No. 98–CV–4245 (ILG).
|
Oct. 30, 1998.

**Attorneys and Law Firms**

Grant Curtis, FCI Lompoc, Lompoc, CA, pro se.

MEMORANDUM & ORDER

GLASSER, J.

**\*1** In a motion dated June 9, 1998 and filed in this court
on June 15, 1998, the petitioner, Grant Curtis ("Curtis"),
seeks an order, pursuant to 28 U.S.C. § 2255, that would
vacate, set aside or correct a sentence imposed on May
5, 1998. The primary assertion upon which his motion
is based is that he was ineffectively assisted by counsel
because she failed to realize that there was a legal ground
on which to move for a dismissal of the charges.

*Background*

On June 23, 1993, Curtis pled guilty to a one-count
information in the Northern District of Texas (Solis,
J.) charging him with conspiracy to commit bank fraud
in violation of 18 U.S.C. § 371. That plea was the
result of a long-term investigation into bank fraud in
the Texas "savings and loan" industry during the 1980's.
Specifically, Curtis was discovered to have been involved
in the issuance of dozens of invalid letters of credit as well
as the receipt of several fraudulent loans, resulting in losses
to the Federal Deposit Insurance Corporation of close to
$2 million.

In connection with his plea, Curtis entered into a
cooperation agreement with the government (the "Plea
Agreement"). That agreement specifically gave Curtis

assurance that he would not be prosecuted for any
other financial crimes related to banking transactions
in the Northern and Eastern Districts of Texas, the
Eastern District of North Carolina, the Western District
of Oklahoma, and the Central District of California. Plea
Agreement at 4.

As a result of that cooperation agreement, Curtis began
providing confidential information to the office of the
U.S. Attorney for the Central District of California. At
the time of Curtis' sentencing in Texas, the prosecutors
there sought a term of incarceration for Curtis. Andrew
Pitt ("Pitt"), Assistant U.S. Attorney for the Central
District of California, appeared on Curtis' behalf and
requested that the district court sentence Curtis to a term
of probation based upon his statement regarding Curtis'
cooperation with his office. On June 29, 1994, the district
court sentenced Curtis to five years probation and ordered
him to pay $413,112 in restitution and a special assessment
of $50.

Pitt, who was purportedly investigating securities
violations in the Central District of California, was
actually providing confidential information to Curtis
enabling him to perpetrate a fraudulent securities scheme
in the Eastern District of New York ("EDNY").[1]
The United States Attorney's office for the EDNY
commenced its own investigation and indicted Curtis on
securities fraud charges in September, 1996 (the "New
York Indictment"). Curtis pled guilty to the New York
Indictment on March 7, 1997, admitting to conspiring to
engage in securities fraud with the other parties named
in the indictment, as well as to two other counts in the
indictment.

On May 5, 1998, this Court sentenced Curtis to 51 months
imprisonment, three years supervised release and a $300
special assessment. On September 9, 1998, while Curtis'
§ 2255 petition was pending in the EDNY, Judge Solis
revoked Curtis' probation based on Curtis' plea to the New
York Indictment and sentenced Curtis to an additional
45–month term of incarceration.

*Discussion*

**\*2** Petitioner's claim of ineffective assistance of counsel
at and prior to his plea of guilty here is that his
counsel erred by failing to move for a dismissal of the

Curtis v. U.S., Not Reported in F.Supp.2d (1998)
Case 9:18-cv-00521-GLS-ML   Document 23   Filed 06/10/19   Page 73 of 201
1998 WL 34304660

New York Indictment. Curtis contends that the New York Indictment violated the Plea Agreement with the Northern District of Texas. Specifically, he claims that the EDNY was bound by the Plea Agreement, that the Plea Agreement immunized him from prosecution for the crimes to which he pled guilty in the EDNY, and that he relied upon such immunity from prosecution when he signed the Plea Agreement.

In challenging his conviction and sentence on the ground of ineffective assistance of counsel, the petitioner must successfully carry a heavy burden. First, he must show that counsel's performances "fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In making this evaluation, great deference must be given to counsel's judgment:

> Because of the difficulties inherent in making an evaluation [of effectiveness], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; ...

*Strickland,* 466 U.S. at 689.

Second, the petitioner "must show that there is a reasonable probability that, but for counsel's alleged ineffectiveness, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. Both prongs of the *Strickland* test must be satisfied to establish ineffective assistance of counsel. *See Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993).

In this case, petitioner is unable to satisfy either prong of *Strickland,* because his contention that his attorney should have moved to dismiss the indictment is wholly specious. Although Curtis claims that the Plea Agreement provided immunity for crimes committed and prosecuted in the EDNY, a cursory examination of that document reveals that it did not bind this district.

As a threshold matter, this Court notes that a "plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *United States v. Annabi,* 771 F.2d 670, 673 (2d Cir.1985) (per curiam) (citations omitted). The jurisdictional limits set forth in the Plea Agreement are precise:

> This Plea Agreement *does not bind any United States Attorney outside* the Northern District of Texas, the Eastern District of North Carolina, the Western District of Oklahoma, and the Central District of California, nor does it bind any state or local prosecutor.

Plea Agreement at 2 (emphasis added). Petitioner argues that, despite the lucidity with which the jurisdictional limitations are delineated in the Plea Agreement, the EDNY was bound by that agreement. In support of this argument Curtis relies on several cases, a review of which is warranted.

**\*3** Petitioner cites *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), for the proposition that an agreement in one district that forbids prosecution in another district is binding and enforceable. Pet. Mem. at 2. Curtis' reading of *Santobello* is flawed. In *Santobello,* a district attorney's office ignored the terms of a plea agreement by recommending a more severe sentence than the one promised by it at the time of the plea. 404 U.S. at 262. In "the interests of justice," the Court remanded the case to the state court to reconsider whether specific performance of the plea agreement was necessary. *Id.* at 262–63. *Santobello* did not address the inter-district binding force of a plea agreement. As such, it is distinguishable from the present case and does not assist Curtis' petition.

Likewise, *Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286 (2d Cir.1976), on which petitioner also relies, is equally unavailing. In *Palermo,* the defendants pled guilty in reliance on promises made by the prosecutor. When the prosecutor failed to carry out his promise, the defendants sued for specific performance. The Second

Curtis v. U.S., Not Reported in F.Supp.2d (1998)
Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 74 of 201
1998 WL 34304660

Circuit, relying on *Santobello,* concluded that defendants who plead guilty based on prosecutorial promises have a right to have those promises fulfilled. 545 F.2d at 296. The *Palermo* Court did not address the factual situation of this case. Curtis was not promised that he would not be prosecuted in New York.

Finally, petitioner points to *United States v. Lieber,* 473 F.Supp. 884 (E.D.N.Y.1979), in support of his claim that the EDNY was bound by the Plea Agreement. *Lieber* is similarly unhelpful to Curtis. In *Lieber,* the defendants sought specific performance of a plea agreement made prior to the formal offer and acceptance of the plea. *Id.* at 890. The indictment, which was initially brought in the District of New Jersey, was subsequently transferred to the EDNY. The court found the New Jersey prosecutor's agreement binding because both parties erroneously believed the prosecutor had the authority to bind the EDNY to the terms of the agreement. In the present case, the Texas prosecutors were under no such illusion. *Lieber,* in making its fact-specific holding, was careful to point out that it still adhered to the general rule that "a promise of immunity made by a United States Attorney in one district cannot bind a United States Attorney in another district." 473 F.Supp. at 892 (citation omitted). Accordingly, *Lieber* is plainly inapplicable.

Curtis also argues that the New York Indictment was barred by the Plea Agreement because the securities fraud schemes underlying the New York Indictment were "related to" and "made known to" the parties at the time they entered into the agreement. Pet. Decl. at 2. Petitioner's representation of the facts is inaccurate. On its face, the Texas Agreement limits Curtis' immunity as follows:

> [The government will] bring no prosecutions for any other financial crimes related to banking transactions in the Northern District of Texas, the Eastern District of Texas, the Eastern District of North Carolina, the Western District of Oklahoma, and the Central District of California, to the extent such activities have been disclosed to the Government or were known by the

Government as of the date this agreement is signed....

**\*4** Plea Agreement at 4.

The Plea Agreement does not preclude prosecution for the crimes charged in the New York Indictment because those crimes continued to be committed after Curtis signed the Plea Agreement and are therefore not "related to" the Texas bank fraud crimes. *See Annabi,* 771 F.2d 670, 673 (2d Cir.1985) (criminal activity engaged in by defendant after the date of the plea agreement was not related to initial conduct for the purposes of mounting double jeopardy claim). In addition, the Plea Agreement provided that if Curtis were to knowingly violate any Federal, State or local laws, the immunity conferred by the Agreement would be revoked. Plea Agreement at 3, 6–7. Accordingly, even assuming *arguendo* a relationship between the New York and Texas conduct could be found, Curtis' immunity would have been revoked by his subsequent criminal conduct.

Based on this Court's review of the record and applicable case law, it is clear that Curtis' claim of ineffective assistance of counsel fails to satisfy the *Strickland* standard. It was objectively reasonable for petitioner's trial counsel not to move to dismiss the indictment, as such a motion would have been frivolous and would not have changed the outcome of the proceeding.

Finally, petitioner seeks a hearing to which he is not entitled. Pet. Mem. at 3. The language of § 2255 states that "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief, the court ... shall grant a prompt hearing ." 28 U.S.C. § 2255. As a result, this circuit looks "with disfavor on summary rejection of a habeas petition when it is supported by a 'sufficient affidavit.' " *United States v. Aiello,* 814 F.2d 109, 113 (2d Cir.1987). However, the Second Circuit reminds us that:

> Not every application that is supported by a set of facially meritorious allegations will survive a motion to deny the writ. To warrant plenary presentation of evidence, the application must contain assertions

of fact that a petitioner is in position to establish by competent evidence. *See Machibroda v. United States,* 368 U.S. 487, 495–96, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Dalli v. United States,* 491 F.2d 758, 761 (2d Cir.1974).* Whether there is a genuine issue of material fact depends upon the sufficiency of those factual allegations. *Airy generalities, conclusory assertions and hearsay statements* will not suffice because none of these would be admissible evidence at a hearing.

*Aiello* at 113–14 (emphasis added).

In this case, Curtis does not even make "facially meritorious allegations." With respect to his declaration,

it is no "more than a bare, unsubstantiated, thoroughly self-serving, and not too plausible statement...." *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir.1994) (quotation omitted). Accordingly, as petitioner has done no more than present "conclusory assertions" an evidentiary hearing is not required.

## CONCLUSION

**\*5** For the foregoing reasons, petitioner's motion is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 34304660

Footnotes

1    Pitt was subsequently indicted in the Central District of California and pled guilty to wire fraud and conflict of interest charges there in May of 1997. Pitt acknowledged receiving funds from someone on Curtis' behalf in connection with Pitt's appearance at Curtis' sentencing in Texas.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2092481
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Petrix DESROSIERS, Petitioner,
v.
William PHILLIPS, Superintendent, Green
Haven Correctional Facility, Respondent.

No. CV-05-2941(CBA)(JMA).
|
July 27, 2006.

**Attorneys and Law Firms**

Petrix Desrosiers, Otisville, NY, Pro Se Petitioner.

Ellen C. Abbot, Queens County District Atty's Office,
Queens, NY, for Respondent.

*REPORT AND RECOMMENDATION*

AZRACK, United States Magistrate Judge.

 *1 By Order dated February 3, 2006, the Honorable
Carol B. Amon referred the above captioned matter
to me, pursuant to 28 U.S.C. § 636(b), for a
report and recommendation to determine Petrix
Desrosiers' ("petitioner") petition for a writ of habeas
corpus. Petitioner brings this action pursuant to 28 U.S.C.
§ 2254 challenging his plea of guilty to Robbery in the First
Degree (N.Y. Penal Law § 160.15) in the Supreme Court
of the State of New York, Queens County. Following his
plea of guilty, petitioner was sentenced to a determinate
prison term of twelve years and a five-year term of
post-release supervision, and is currently incarcerated
at Otisville Correctional Facility. Specifically, petitioner
alleges that his constitutional right to due process was
violated because his plea was not knowingly or voluntarily
made, but rather the result of duress. Additionally,
petitioner seeks to amend his petition to add a claim that
his plea was not knowing or voluntary, alleging that the
court failed to inform him of the post-release supervision
term.

Having carefully examined the entire record, I respectfully
recommend that petitioner's motion to amend his petition

be denied and his application for a writ of habeas
corpus be denied. I further recommend that a certificate
of appealability not be issued because petitioner has
failed to make a substantial showing of the denial of a
constitutional right.

## I. BACKGROUND

### A. Petitioner's Plea and Sentence

On the evening of October 26, 2000, petitioner and four
other individuals robbed a barber shop located at 225th
Street and Linden Boulevard in Queens, New York (Dkt
No. 8 (2): 02/13/03 Plea Mins. 21:1-17). At the time, the
barber shop served as a front for an illegal gambling
operation (Dkt No. 8 (2): Aff. in Opp'n to Def.'s Mot.
to Set Aside Sentence (hereinafter "D.A. Aff.") (01/06/05)
¶ 2). Petitioner, along with an accomplice, entered the
barber shop while the others remained outside (Plea Mins.
21:18-23). With knowledge that his accomplices were
carrying weapons, petitioner opened the locked door to
allow the others to enter the barber shop (*Id.* at 21-22).
Petitioner and his accomplices then robbed the individuals
inside (*Id.* 22:6-9). During the course of the robbery, one
of the accomplices fired a gun, killing one of the robbery
victims (*Id.* 22:10-15).

Petitioner and his co-defendants were indicted for Murder
in the Second Degree (N.Y. Penal Law § 125.25(3)),
Robbery in the First Degree (N.Y. Penal Law § 160.15(1),
(2)), Burglary in the Second Degree (N.Y. Penal Law §
140.25(1)(a), (1)(b)), Criminal Possession of a Weapon
in the Second Degree (N.Y. Penal Law § 265.03(2)), and
Conspiracy in the Fourth Degree (N.Y. Penal Law §
105.10(1)) (D.A.Aff.¶ 3).

On February 13, 2003, petitioner, with counsel and
family present, appeared before Justice Robert Hanophy
in Supreme Court, Queens County. After extensive
discussions with the court and his counsel, petitioner pled
guilty to Robbery in the First Degree in satisfaction of the
indictment. The court announced that the sentence would
likely be a prison term of twelve years in exchange for
his plea (*See* Plea Mins. 2-12). During the plea, petitioner
affirmed that he had fully discussed the meaning and
consequences of the plea with his attorney (*Id.* at 13:5-24).
He acknowledged the rights he was waiving as a result
of the plea, including the right to appeal (*Id.* at 14-15).
He declared that no one coerced or threatened him into

pleading guilty and that he received no promises other than an estimate of a twelve year prison sentence from the court (*Id.* at 15-18). Finally, petitioner acknowledged that the court informed him of the mandatory post-release supervision term included in his sentence (*Id.* at 23:11-18). Pursuant to the plea agreement, petitioner received a twelve year prison sentence on March 13, 2003 (Dkt No. 8 (2): 03/13/03 Sentencing Mins. 4:7-11).

**B. Subsequent Procedural History**

**1. Notice of Appeal**

**\*2** On May 30, 2003, petitioner filed a notice of appeal (D.A.Aff.¶ 10). Instead of perfecting his appeal, however, petitioner filed a motion pursuant to N.Y.Crim. Proc. Law 440.[1]

**2. Petitioner's First Collateral Attack**

Petitioner moved on November 19, 2003 in Supreme Court, Queens County, to vacate his conviction, pursuant to N.Y.Crim. Proc. Law § 440.10. Petitioner alleged that his plea was entered under duress. He claimed that the trial judge threatened him with a sentence of twenty-five years to life if he refused to take the plea (Dkt No. 8 (5): Def.'s Mem. of Law (11/19/03) at 2). In addition, petitioner alleged that the prosecutor introduced material evidence she knew to be false and that a police detective beat him (*Id.* at 1-2).

On February 9, 2004, the court denied petitioner's motion. The court held that the motion was procedurally barred with respect to the duress claim, finding that this was an issue for direct appeal, since it involved on-the-record conduct (Dkt No. 8 (5): Opinion of Hanophy, J. (02/09/04) at 2). Moreover, the claim was without merit since the record indicated that the court only stated that the petitioner could have received a sentence of twenty-five years to life (*Id.*). The remaining claims were procedurally barred and deemed unsupported by the record and lacking in factual basis (*Id.* at 1-2). Petitioner moved for leave to appeal to the Appellate Division, Second Department on March 9, 2004 (Dkt No. 8 (5): Notice of Application for Leave to Appeal (03/09/04)). Leave to appeal was denied on April 27, 2004 (Dkt No. 8 (5): Decision & Order (04/27/04)).

**3. Petitioner's Direct Appeal**

Petitioner moved in Appellate Division, Second Department on April 7, 2004 for an order to reduce his sentence (*Id.* ¶ 18). This motion served as petitioner's direct appeal.[2] Petitioner argued that his waiver of his right to appeal, as part of his plea agreement, was not knowing or voluntary and additionally, that the twelve-year sentence was excessive (*See* Dkt No. 8 (3): Appellant's Mem. of Law (04/07/04) at 1, 4). Although petitioner raised the subject of post-release supervision, it was done only in conjunction with the argument that the sentence was harsh and excessive. At that time, petitioner made no assertion that his plea was not knowing or voluntary as a result of the post-release supervision (*See id.* at 4). The Appellate Division, Second Department affirmed petitioner's sentence on October 12, 2004, without opinion (Dkt No. 8 (2): Decision & Order (10/12/04)). On November 30, 2004, the New York Court of Appeals denied leave to appeal (Dkt No. 8 (1): Decision & Order (11/30/04)).

Petitioner moved to reargue the denial of his motion to reduce his sentence on August 26, 2005 (Dkt No. 11: Aff. in Opp'n to Mot. to Amend the Writ of Habeas Corpus (12/16/05) ¶ 28). The basis for this motion was the court's alleged failure to advise petitioner of the term of postrelease supervision in light of the recent decision in *People v. Catu,* 4 N.Y.3d 242 (2005) (requiring trial courts to inform defendants of post-release supervision before a guilty plea). The Appellate Division, Second Department denied the motion on November 3, 2005 (*Id.* ¶ 30).

**4. Petitioner's Second Collateral Attack**

**\*3** Following his April 7, 2004 motion to reduce his sentence, petitioner made a motion to the trial court on October 25, 2004 to set aside his sentence, pursuant to N.Y.Crim. Proc. Law § 440.20. Here, petitioner alleged that his sentence was excessive relative to the sentences imposed on his co-defendants (Dkt No. 8 (7): Notice of Mot. to Set Aside Sentence (10/25/04) at 2). Moreover, petitioner claimed, for the first time, that the court never informed him of the mandatory period of post-release supervision (*Id.* at 3).

On January 25, 2005, Justice Hanophy denied petitioner's motion. The court held that it could only alter a sentence with respect to § 440.20, if the sentence was unauthorized, illegally imposed, or otherwise invalid as a matter of law (Dkt No. 8 (7): Opinion of Hanophy, J. (01/25/05) at 2).

The claim regarding post-release supervision was found to be procedurally barred pursuant to § 440.20(2), "since the merits of that claim have been previously rejected by an appellate court." (*Id.*). Petitioner had raised the subject of post-release supervision in his motion to reduce his sentence on April 7, 2004. [3] Petitioner moved for leave to appeal to the Appellate Division, Second Department on February 21, 2005 (Dkt No. 8 (6): Mot. for Leave to Appeal (02/21/05)). Leave to appeal was denied on April 15, 2005 (Dkt No. 8 (6): Decision & Order (04/15/05)).

### C. The Instant Habeas Proceeding

On June 1, 2005, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Specifically, petitioner argues that his plea was not knowing or voluntary since he pled guilty under duress. The prosecutor, he claims, allegedly coerced petitioner into his plea by threatening him with the testimony of an accomplice, should a trial occur. Furthermore, petitioner claims that the judge threatened him with a sentence of twenty-five years to life if he was convicted at trial (Dkt No. 1: Pet. for Writ of Habeas Corpus (hereinafter "Pet.") (06/01/05) at 4). The petition was originally filed in the Southern District of New York and was transferred to the Eastern District since a substantial part of the events giving rise to the claim occurred in this Court's jurisdiction (Dkt No. 2: Transfer Order (06/01/05)).

On November 22, 2005, petitioner made a motion to amend his petition pursuant to Fed.R.Civ.P. 15(a). Petitioner wishes to add a claim that his plea was not knowing or voluntary since the sentencing judge failed to inform him of the post-release supervision term included in his sentence (Dkt No. 10: Aff. of Pet'r in Supp. of Mot. to Amend Pet. (11/22/05) 7).

## II. DISCUSSION

### A. Standard of Review-AEDPA
Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim:

**\*4** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1177 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (citation and internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002) (holding that the Supreme Court opinion in question "must be read as not only prohibiting certain specific actions, but also as creating a *broad standard or principle* that the courts must, in reason, follow") (emphasis added); *see also Yung v. Walker,* 341 F.3d 104, 111 (2d Cir.2003) (amended

opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of a "well-settled and clearly established" Supreme Court precedent. *Torres v. Berbary,* 340 F.3d 63, 72 (2d Cir.2003).

**\*5** Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B. Timeliness of Habeas Petition

Generally, a petitioner must file an application for a writ of habeas corpus in federal court within one year of the date on which petitioner's state court conviction became final. *See* 28 U.S.C. § 2244(d)(1). Petitioner's conviction became final on February 28, 2005, the date on which his time to seek a writ of certiorari from the United States Supreme Court expired.[4] *See McKinney v. Artuz,* 326 F.3d 87, 96 (2d Cir.2003) (citing Sup.Ct. R. 13(1) ( "A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review.")). Therefore, petitioner had one year, or until February 28, 2006, to file his application for a writ of habeas corpus. Petitioner filed his application on June 1, 2005 and it is therefore timely.

### C. Motion to Amend

Petitioner seeks to amend his petition for a writ of habeas corpus pursuant to Fed.R.Civ.P. 15(a). Once a responsive pleading has been a filed, a party may only amend its pleading "by leave of the court or by the written consent of the adverse party; and leave shall be freely given as justice requires." Fed.R.Civ.P. 15(a). According to the Second Circuit, a motion to amend a petition for a writ of habeas corpus is governed by this rule, and not the "more stringent standard of 28 U.S.C. 2244(b)(2)," which prohibits second or successive habeas corpus applications. *Littlejohn v. Artuz,* 271 F.3d 360, 362-63 (2d Cir.2001). An amended petition does not constitute a successive petition

because "there has been no federal adjudication on the merits." *Id.* at 363. A "habeas petitioner, like any civil litigant, is entitled to amend his petition...." *Zarvela v. Artuz,* 254 F.3d 374, 382 (2d Cir.2001).

The district court, however, retains discretion to grant or deny leave to amend. This discretion allows the district courts to avoid "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment...." *Foman v. Davis,* 371 U.S. 178, 182 (1962). "Where it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v.. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (Per curiam).

Although petitioner is entitled leave to amend as justice requires, the amendment would be futile and unproductive in this case. The claim that Justice Hanophy did not inform the petitioner of post-release supervision is without merit. Furthermore, the claim is likely barred from federal habeas review on the grounds of a state procedural default.

### 1. Merits of the Post-Release Supervision Claim

**\*6** Petitioner's amendment would be futile since the claim is without merit. Although the substance of the claim involves clearly established federal law, there is no factual basis for petitioner's allegation.

A court's failure to inform a defendant of post-release supervision is a violation of clearly established federal law. Although petitioner incorrectly relies on *People v. Catu,* 4 N.Y.3d 242 (2005), to advance a federal claim, the Second Circuit recently held that a court's failure to inform defendant of mandatory post-release supervision violated clearly established Supreme Court precedent. *See Earley v. Murray,* 451 F.3d 71, 73-75 (2d Cir.2006) (holding that the court's failure to inform petitioner of post-release supervision at plea negotiations, allocution, or sentencing violated the clearly established Supreme Court precedent that the only sentence known to the law is the sentence or judgment entered upon the records of the court) (quoting *Hill v. United States ex rel. Wampler,* 298 U.S. 460 (1936)).

Thus, although petitioner has a claim under clearly established federal law, there is no evidence to support his allegation. To be constitutionally valid, a plea must be entered into knowingly and voluntarily, with an understanding of its consequences:

> It is beyond dispute that a guilty plea must be both knowing and voluntary. The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. That is so because a guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination.

*Parke v. Raley,* 506 U.S. 20, 28-29, (1992) (citations and internal quotation marks omitted).

Petitioner's plea minutes demonstrate explicitly that petitioner was advised that the sentence imposed by the court would include a period of post-release supervision (*See* Plea Mins. 23:11-18). Indeed, petitioner answered affirmatively when asked if he understood that post-release supervision was one of his plea penalty provisions: [THE COURT]: Sir, do you realize and I am advising you that your sentence includes a period of post-release supervision? During the period of post-release supervision if you violate a condition of the release then you can be subjected to a further period of incarceration; do you understand?

DEFENDANT DESROSIERS: Yes, sir.

(Plea Mins. 23:11-18).

### 2. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of

the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> **\*7** (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (quoting *Lee v. Kemna,* 534 U.S. 362, 381-85 (2002)).

For federal habeas review to be barred on the grounds of a state procedural default, "[t]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Harris v. Reed,* 489 U.S. 255, 261-62 (1989) (citation and internal quotation marks omitted). If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris,* 489 U.S. at 264 n. 10 ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

In the instant case, it is likely that the claim regarding post-release supervision is procedurally barred. Petitioner brought this claim in a collateral attack, pursuant to N.Y.Crim. Proc. Law § 440.20. A movant may not bring a claim in a § 440.20 motion that was previously adjudicated by the Appellate Division. *See* N.Y. Crim Proc. Law 440.20(2). Although it is not clear if the Appellate Division actually considered the merits of this

Case 9:18-cv-00521-GLS-ML     Document 23     Filed 06/10/19     Page 81 of 201

claim on direct appeal, as discussed in the procedural history above, the trial court clearly held that the post-release supervision claim was dismissed on procedural grounds (Dkt No. 8 (7): Opinion of Hanophy, J. (01/25/05) at 2). Therefore, petitioner failed to comply with the procedural requirements of 440.20 in bringing his claim regarding post-release supervision.

Petitioner also fails to satisfy the cause and prejudice test. A petitioner can overcome a state procedural default, for purposes of federal habeas review, if he can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman,* 501 U.S. at 750. Cause, in this context, is "something external to the petitioner, something that cannot fairly be attributed to him," which impedes petitioner's ability to comply with the state procedural rule. *Id.* at 753. Petitioner's application for habeas corpus is devoid of any facts giving rise to a cause for the default.

Although it is not necessary to consider if actual prejudice resulted from the alleged violation of federal law, *see Engle v. Isaac,* 456 U.S. 107, 134 n. 43 (1982) ("Since we conclude that these respondents lacked cause for their default, we do not consider whether they also suffered actual prejudice."), the alleged violation of federal law did not prejudice petitioner. Prejudice exists where, but for the alleged violation, petitioner might not have been convicted. *See Reed v. Ross,* 468 U.S. 1, 12 (1984). Since petitioner pled guilty, he cannot make this assertion. Moreover, the court's refrainment from considering this claim will not result in a fundamental miscarriage of justice. Petitioner must demonstrate that "the constitutional error in his plea colloquy 'has probably resulted in the conviction of one who is actually innocent.' " *Bousley v. United States,* 523 U.S. 614, 623 (1998) (quoting *Murray v. Carrier,* 477 U.S. 478, 496 (1986)). Actual innocence is established where "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted [petitioner]." *Id.* at 623 (quoting *Schlup v. Delo,* 513 U.S. 298, 327-28 (1995) (internal quotation marks omitted)).

**\*8** Although petitioner offered sworn affidavits from friends attesting to his innocence (Dkt No. 8 (5): Aff. of Nathaniel Martin, dated 08/25/03 & Aff. of Marc Charles Paul, dated 10/21/03 (11/19/03)), he has failed to establish his actual innocence. Generally, such exculpatory affidavits do not establish actual innocence,

as they are not reliable. *See Deoleo v. Miller,* No. 02-CV-6436, 2003 WL 23199522, at *8 (E.D.N.Y. Dec 2, 2003) ("[T]he recantation and affidavit evidence from petitioner's co-perpetrators does not establish that petitioner is actually innocent of the crimes of conviction" since they "are not reliable" because "recantation evidence is not uncommon after trials are complete and little or no risk attends a prisoner who may be motivated to assist a friend."). Moreover, petitioner entered a plea of guilty under oath, giving a factual allocution satisfying each element of the charge. Thus petitioner cannot satisfy the standard of actual innocence. In light of his guilty plea, petitioner is hard-pressed to show that it is more likely than not that no reasonable juror would have convicted him. *See Schlup,* at 327-30. Accordingly, this claim is likely precluded from federal habeas review.

Petitioner's claim that the court did not inform him of the post-release supervision term is without merit, and likely procedurally barred from federal habeas review. Therefore, petitioner's amendment would be futile. Accordingly, I respectfully recommend that petitioner's motion to amend be denied.

### D. Petitioner's Duress Claim

The sole remaining claim in petitioner's application for habeas relief is that his plea was not knowing or voluntary and produced as a result of duress. Petitioner alleges that the prosecutor threatened him with the testimony of an accomplice and that the judge threatened him with a sentence of twenty-five years to life if convicted at trial. Although petitioner properly exhausted this claim at the state level, the claim is barred from federal habeas review due to a state procedural default. Moreover, the claim is without merit.

#### 1. Exhaustion of State Remedies

A petitioner has the procedural burden of proving that he has exhausted his claims in state court. "An application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b). In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust all available state remedies for each federal claim alleged in the petition for habeas corpus. *See Rose v. Lundy,* 455 U.S. 509, 522 (1982). "This

exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman,* 501 U.S. at 731. Exhaustion requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

*9 Here, petitioner has exhausted his claim that his plea was a result of duress. Petitioner raised it in a 440.10 motion to vacate judgment of conviction, as opposed to direct appeal. (*See* Dkt No. 8 (5): Mot. to Vacate Judgment (11/19/2003) at 1). A habeas petitioner can exhaust a claim through a 440 motion. *See e.g., Armstrong v. Duncan,* No. 03 Civ. 930, 2003 WL 22339490, at *8 (S.D .N.Y. Oct. 14, 2003) (holding that a petitioner's claim was unexhausted since it was not included in his 440.10 motion); *Sanford v. Senkowski,* 791 F.Supp. 66, 69 (E.D.N.Y.1992) (noting that the exhaustion doctrine requires only that a petitioner present his claim once on direct or collateral review). After the motion was denied by the trial court, petitioner moved for leave to appeal the denial of this motion (*See* Dkt No. 8 (5): Notice of Application for Leave to Appeal Denial of 440.10 Mot. (03/09/04)). Leave to appeal was denied on April 27, 2004 (Dkt No. 8 (5): Decision & Order (04/27/04)). Petitioner has exhausted his claim at the state level, since the Appellate Division denied him leave to appeal regarding the 440.10 motion. *See People v. Williams,* 342 N.Y.S.2d 75, 76 (App.Div.1973) ("No appeal lies from an order denying a motion for leave to appeal to [the Appellate Division].").

### 2. Procedural Bar

Petitioner's duress claim, however, is procedurally barred. Petitioner brought this claim in a collateral attack, pursuant to N.Y.Crim. Proc. Law § 440.10. A movant may not bring a claim in a § 440.10 motion where sufficient facts appear on the record to permit review of the issue on direct appeal and movant failed to do so. *See* N.Y. Crim Proc. Law 440.10(2)(c). Petitioner was required to bring this claim on direct appeal, not in a collateral attack, since the alleged duress occurred during petitioner's plea. The trial court clearly indicated that the duress claim was dismissed on this ground (Opinion of Hanophy, J. (02/09/04) at 2). "Federal courts have continuously held that the failure to comply with Criminal Procedure L. § 440.10 is an independent and adequate state ground to

dismiss a writ of federal habeas corpus." *Gaiter v. Lord,* 917 F.Supp. 145, 149 (E.D.N.Y.,1996).

Petitioner cannot satisfy the cause and prejudice test with respect to this claim. His petition does not address cause for the default. Moreover, nothing in the application suggests an external reason for the advancement of petitioner's duress claim through an improper procedural vehicle.

The court's refrainment from considering this claim will not result in prejudice or a fundamental miscarriage of justice. The alleged duress during the plea negotiation must have "resulted in the conviction of one who is actually innocent." *Bousley,* 523 U .S. at 623 (quoting *Murray v. Carrier,* 477 U.S. 478, 496 (1986)). For the reasons stated above, petitioner cannot satisfy the standard of actual innocence. Accordingly, this claim is precluded from federal habeas review.

### 3. Merits of the Duress Claim

*10 Even if this Court could review petitioner's claim of duress, the claim would ultimately fail on the merits. Under oath, in open court, petitioner stated that no one threatened him into accepting the plea offer:

THE COURT: Has anybody threatened you?

DEFENDANT DESROSIERS: No, sir.

THE COURT: No. Listen to what I'm saying. No one's threatened you to take this plea, right?

DEFENDANT DESROSIERS: No, sir.

THE COURT: Are you entering this plea voluntarily of your own free will?

DEFENDANT DESROSIERS: Yes.

(Plea Mins. 16:5-13). "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 74 (1977). Although such declarations are not an insurmountable barrier to a habeas claim, *see id.* at 74-75, the record in this case-coupled with this declaration-demonstrates that petitioner's duress claim is without merit.

Petitioner's allegation that the prosecutor threatened him with the testimony of an accomplice at trial does not amount to duress. Plea offers are not *per se* coercive; plea bargaining is constitutional. *See, e.g., Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'-and permissible-'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' " (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 31 (1973))). The fact that the prosecutor made petitioner aware that an accomplice would likely testify at trial was an inevitable reality of the government's case and one which rightly helped inform petitioner's decision to plead, not coerce it. When a prosecutor openly presents a defendant with such realities, due process has not been violated. *See id.* at 364-65.

Petitioner's claim regarding the conduct of the trial court is also without merit. Under New York law, " 'a trial judge is permitted to participate in plea negotiations with criminal defendants.' " *McMahon v. Hodges,* 382 F.3d 284, 289 n. 5 (2d Cir.2004) (quoting *People v. Fontaine,* 28 N.Y.2d 592, 593 (1971)). The judge may even form opinions about petitioner's likely guilt. *See id.* at 290 (" 'opinions formed by the judge on the basis of facts introduced or events occurring in the course of ... prior proceedings[ ] do not constitute a basis for a bias or partiality motion.' " (quoting *Liteky v. United States,* 510 U.S. 540, 555 (1994))). The record clearly indicates that Justice Hanophy merely informed the petitioner of the maximum sentence he could receive if convicted of the charges in the indictment. The judge did not threaten petitioner with the maximum sentence if he did not accept the plea offer or in any other way coerce petitioner into accepting the plea (*See* Plea Mins. 6:4-10).

Petitioner's claim that his plea was not knowing or voluntary because of duress is barred from federal habeas review and, in the alternative, is without merit.

Accordingly, I respectfully recommend that petitioner's application for habeas corpus be dismissed.

### E. Certificate of Appealability

**\*11** A habeas petitioner who has been denied relief by the district court on a claim may not appeal the denial to a federal court of appeals except by permission. The district court may grant a certificate of appealability with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell,* 537 U.S. 322 (2003). Any claims for which a certificate of appealability is granted will be reviewed *de novo* by the Court of Appeals. As discussed above, petitioner has failed to make a substantial showing of the denial of a constitutional right with respect to his claims. Accordingly, I respectfully recommend that a certificate of appealability not be issued.

### III. CONCLUSION

For the foregoing reasons, I respectfully recommend that petitioner's motion to amend be denied and his petition for a writ of habeas corpus be dismissed. Furthermore, I recommend that a certificate of appealability not be issued.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 2092481

Footnotes

1    Under N.Y. Crim Proc. Law, a defendant has the ability to make a number of postconviction motions to the trial court. A defendant can seek to have the judgement of conviction vacated or the sentence set aside by making such motions, known as "collateral attacks" or "440 motions." These motions are separate from a defendant's right to appeal to the Appellate Division (direct appeal). Direct appeal allows a defendant to challenge decisions of the trial court. Grounds for a collateral attack include: lack of jurisdiction, judicial misconduct, newlyfound exculpatory evidence that could not be located with due diligence, and a judgment obtained through a violation of Constitutional rights. A trial judge must deny a

2006 WL 2092481

440 motion if the facts giving rise to the motion have been previously addressed by an appellate court or the facts giving rise to the motion appear sufficient on the official record such as to permit adequate review by an appellate court. In the latter case, the claim must be raised on direct appeal. *See* N.Y.Crim. Proc. Law 440.

2    When an appeal involves the excessiveness of a sentence, the Appellate Division, Second Department, permits a defendant to bring his appeal by motion. *See* N.Y. Ct.App. 2nd Dept. R. 670.12(c).

3    It is not clear if the appellate court considered the merits of petitioner's claim that his plea was not knowing or voluntary, as a result of the court's alleged failure to inform petitioner of the post-release supervision term. On direct appeal, the Appellate Division, Second Department affirmed petitioner's sentence without opinion. Moreover, petitioner, on direct appeal, submitted a memorandum of law that only eluded to the subject of post-release supervision in conjunction with the excessiveness of petitioner's sentence (*See* Decision & Order of 2d Dep't (10/12/04); Appellant's Mem. of Law (04/07/04) at 1, 4; Opinion of Hanophy, J. (01/25/05) at 2).

4    The Court of Appeals of New York denied petitioner leave to appeal regarding his direct appeal on November 30, 2004 (Dkt No. 8 (1): Decision & Order (11/30/04)).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2011 WL 1870240
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kevin M. FARRELL, Petitioner,
v.
Theodore [1] A. INSERRA,
Superintendent, Respondent.

No. 9:10–CV–434 (LEK/ATB).
|
April 21, 2011.

**Attorneys and Law Firms**

Kevin M. Farrell, pro se.

Thomas B. Litsky, for Respondent.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

*1 This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). This case was originally assigned to Magistrate Judge George Lowe, but was re-assigned to me on November 2, 2010. (Dkt. No. 14).

**I. Background**

Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a parole determination based on a judgment of conviction rendered in the Broome County Court on June 10, 1982. Petitioner was convicted after a guilty plea to Murder, Second Degree in violation of New York Penal Law § 125.25(1). The Appellate Division, Third Department affirmed without opinion on February 16, 1984. (Resp.'s Ex. G; Dkt. No. 13–7). Petitioner did not seek leave to appeal to the New York Court of Appeals. In November of 1995, petitioner filed a motion to vacate his conviction pursuant to N.Y.Crim. Proc. Law § 440.10. (Resp.'s Ex. H; Dkt. No. 13–8). The Broome County Court denied petitioner's motion on March 27, 1996. (Resp.'s Ex. K; Dkt. No. 13–11). The Appellate Division denied

petitioner's leave to appeal the denial of his motion to vacate. (Resp.'s Ex. M; Dkt. No. 13–13).

Petitioner has appeared before the New York State Board of Parole (Parole Board) a total of five separate times, most recently in 2010. Each time, the Parole Board denied petitioner's release and held him for an additional 24 months. Petitioner has challenged the Parole Board's decision twice by way of New York Article 78 proceedings. On December 24, 2007, the Supreme Court in Albany County denied petitioner's first application, and on March 25, 2010, the Supreme Court in Albany County denied petitioner's second application. (Resp.'s Exs. S, FF; Dkt. No. 13–19, 13–32). It does not appear that petitioner appealed either denial of Article 78 relief.

On June 25, 2009, Petitioner filed a motion to set aside his sentence in the Broome County Court pursuant to New York Criminal Procedure Law § 440.20. (Resp.'s Ex. KK; Dkt. No. 13–37). On July 28, 2009, the Broome County Court Judge denied petitioner's motion. (Resp.'s Ex. OO; Dkt. No. 13–41). The Appellate Division, Third Department denied petitioner's leave to appeal on September 30, 2009. (Resp.'s Ex. SS; Dkt. No. 13–45). The petition in this case is dated April 6, 2010. (Dkt. No. 1).

Respondent has filed an answer, a memorandum of law, and the pertinent state court records. (Dkt.Nos.11–13). The state court records are listed in respondent's answer and have been identified by letters A through SS. (Dkt. No. 13–1–13–45). Respondent has also filed some documents for *in camera* review. Petitioner filed a traverse on November 22, 2010. (Dkt. No. 15).

Petitioner raises one ground for this court's review. Petitioner alleges that the trial judge violated petitioner's plea agreement when he wrote a letter to the Parole Board "sometime between 2002 and 2009." (Pet.¶ 12(A); Dkt. No. 1). Petitioner is not challenging his conviction. Petitioner claims that the judge's letter constitutes a "further recommendation" regarding his sentence in violation of the judge's off-the-record statement that petitioner would be sentenced "without further recommendation." *Id.* Petitioner claims that, because of this letter, he has been improperly incarcerated longer than his twenty year minimum sentence. *Id.*

**\*2** For the following reasons, this court finds that petitioner's claim has no merit and will recommend denial of the petition.

## II. *Relevant Facts*

### A. Criminal Charges
Although petitioner does not challenge his conviction in this action, the court will discuss the facts leading up to the conviction for clarity. The charges against this petitioner arose from an incident that occurred in 1982. Petitioner gave Earl Jones $ 300.00 with which to purchase drugs. Mr. Jones failed to obtain the drugs for petitioner and also failed to return the money that petitioner gave him. Instead, Jones suggested to petitioner that they could get the $ 300.00 back by robbing a third individual.

On February 27, 1982, petitioner and his girlfriend picked Mr. Jones up by car, purportedly to accomplish the robbery of the third individual. At the time, petitioner was armed with a loaded .25 caliber handgun and a twelve gauge shotgun. While the three were driving around, petitioner pulled the car over so that Mr. Jones could relieve himself. When Mr. Jones got back into the car, petitioner shot Mr. Jones five times with the handgun and twice with the shotgun, killing Mr. Jones. Petitioner and two friends then disposed of the body. Petitioner later was arrested and indicted for Second Degree Murder.

Petitioner plead guilty to Second Degree Murder, with the understanding that his sentence would be twenty years to life, rather than the maximum sentence of twenty-five years to life. [2] (Resp.'s Ex. A; Plea Transcript (PT) at 4– 5 [3]; Dkt. No. 13–1). The court carefully described all the rights that petitioner would be waiving by pleading guilty and specifically asked petitioner if anyone had made any promises that the sentence imposed would be any less than twenty years to life. (PT at 3–5). Petitioner stated that there had been no other promises. (PT at 5). Petitioner also provided the court with a statement of the factual basis for the plea. (PT at 6–16). On June 17, 1982, the court imposed the agreed-upon sentence of twenty years to life imprisonment. (Resp.'s Ex. B; Dkt. No. 13–2).

### B. Parole Board Appearances
As stated above, petitioner has appeared before the Parole Board several times, but has been denied parole, each time being held for an additional twenty four

months. Petitioner appeared before the Parole Board for the first time in 2002. At that time, petitioner had been incarcerated for his entire twenty year minimum sentence. Petitioner did not begin challenging the denials until he was denied parole in 2006. After exhausting his administrative appeals, on January 25, 2007, petitioner brought an Article 78 proceeding in the Broome County Supreme Court. [4] In that Article 78 proceeding, petitioner challenged the denial of parole, arguing *inter alia,* that the Parole Board's decision was arbitrary and capricious because there were insufficient reasons to deny parole, and the Parole Board usurped the sentencing court's authority when it effectively "re-sentenced" petitioner to serve more than the minimum sentence. (Resp.'s Ex. N).

**\*3** The court denied petitioner's Article 78 application, holding that parole release decisions are discretionary, and, if made in accordance with New York Executive Law § 259–i, and there is no showing of "irrationality bordering on impropriety," [5] the decisions are not subject to judicial review. (Resp.'s Ex. S at 2). The court concluded that there was no basis to overturn the Parole Board's decision. *Id.*

Petitioner filed a second Article 78 petition in May of 2008 in Broome County Supreme Court, challenging the 2008 denial of parole. (Resp.'s Ex. T). In his second Article 78 application, petitioner argued that the Board failed to consider the proper criteria under the law, and acted arbitrarily. (Resp.'s Ex. T at ¶ 15). Among other claims, petitioner argued that the sentencing judge wanted petitioner to be paroled at the end of his minimum term of 20 years, and that continuing to deny petitioner parole after he had already served his minimum term was "a third party reformation of a contract." (Resp.'s Ex. T at ¶¶ 52, 80).

The New York State Division of Parole filed a response to petitioner's 2008 Article 78 application, and included therein, a letter from the sentencing judge, submitted to the court *in camera* . A copy of the letter has also been filed with this court for *in camera* review. Without having seen the letter, petitioner filed a reply in state court, arguing that *if the sentencing judge had recommended* that petitioner be held for more than the minimum term of twenty years, then the court was in violation of the plea agreement. (Resp.'s Ex. V, ¶ 43; Dkt. No. 13–22) (emphasis added). Petitioner contended that the letter should be disclosed to him. (Resp.'s Ex. V, ¶ 42).

On July 31, 2009, the Broome County Supreme Court Judge transferred the case to Cayuga County. (Resp.'s Ex. Z; Dkt. No. 13–26). While petitioner's Article 78 application was pending, he was afforded his January 19, 2010 appearance before the Parole Board. He was again denied parole, and held for 24 more months. The Parole Board stated that his ability to commit "the most extreme violence" made him "a poor risk for parole supervision." (Resp.'s Ex. GG at 14; Dkt. No. 13–33; Transcript of 1/19/11 Parole Hearing). Petitioner submitted a substantial brief on his administrative appeal of the 2010 denial. [6] (Resp.'s Ex. JJ; Dkt. No. 13–36). He included many educational certificates that he obtained while incarcerated. *Id.* Respondent states that as of October 13, 2010, petitioner's administrative appeal had not been decided by the Board of Parole. (Resp.'s Mem. of Law at 14; Dkt. No. 12).

On March 25, 2010, the Supreme Court in Broome County denied petitioner's second Article 78 application as moot because petitioner had the intervening January 2010 appearance before the Parole Board. (Resp.'s Ex. FF at 2 [7]; Dkt. No. 13–32). Although respondent cites other pages of the Supreme Court's decision that alternatively deal with the merits of petitioner's claims, those pages have been omitted from respondent's exhibits. (Resp.'s Ex. FF). This court finds that the missing pages of the decision are not relevant to this court's determination since the basis of the Supreme Court's decision was mootness.

**\*4** Petitioner also filed a previous motion to set aside his sentence under N.Y.Crim. Proc. Law § 440.20. (Resp.'s Ex. KK; Dkt. No. 13–37). In his motion, petitioner raised the claim that he raises in this petition, that the sentencing judge breached the plea agreement in a recommendation to the Parole Board. *Id.* The Broome County District Attorney filed a letter in opposition to the petitioner's motion. (Resp.'s Ex. LL; Dkt. No. 13–38). Petitioner filed a reply. (Resp.'s Ex. NN; Dkt. No. 13–40). On July 28, 2009, the Broome County Court denied petitioner's motion, holding that a sentence with a minimum term of imprisonment does not mean that the individual will be incarcerated *"no more"* that the minimum term. (Resp.'s Ex. NN at 2) (emphasis in original). The court further held that absent a "record commitment" at the time of sentencing that neither the court nor the District Attorney would make any further recommendations or express opinion as to the petitioner's release to parole supervision,

the petitioner had no right to expect that no further comments would be made. *Id.* at 2–3.

Finally, the court pointed out that under the New York Executive Law, the Parole Board had the "sole power and duty to determine whether and when a defendant will be released to parole supervision, regardless of any recommendation or opinion of the Court." *Id.* at 3 (citations omitted). Petitioner applied for leave to appeal the decision denying his section 440.20 motion, but leave was denied. (Resp.'s Exs. 42–45).

Respondent concedes that the claim made by petitioner in this federal application for habeas corpus relief is timely filed and exhausted. (Resp.'s Mem. of Law at 17–23).

### III. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254

> unless the adjudication ... (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d). *Noble v. Kelly,* 246 F.3d 93, 98 (2d Cir.2001) (quoting 28 U.S.C. § 2254(d)(1)) (alterations in original). [8] Clearly established federal law "means 'the holdings as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Lockyer v. Andrade,* 538 U.S. 63, 71–72 (2003); *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412 (2000)) (alterations in original).

In order to apply this standard under the AEDPA, the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings. 28 U.S.C. § 2254(d)(1). *See also Day v. Taylor,* 459 F.Supp.2d 252, 256 (S.D.N.Y.2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds). Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo. Washington v. Shriver,* 255 F.3d 45, 55 (2d Cir.2001).

**\*5** A decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts," or if the state court identifies the appropriate legal standard, but unreasonably applies it to the facts of the petitioner's case. *Williams,* 529 U.S. at 413. The lower court may not grant the writ if it concludes "in its independent judgment" that the state-court decision applied clearly established federal law erroneously or incorrectly; rather, the application must also be unreasonable. *Id.* at 411. In order for the application to be "unreasonable," there must be "some increment of incorrectness beyond error," but that increment may not be too great, otherwise habeas relief would be limited to those state court decisions that are "so far off the mark as to suggest judicial incompetence." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

## IV. *Parole and Plea Bargain*

Petitioner's basis for relief in this case comes before the court in a slightly unusual way. Petitioner does not appear to challenge the guilty plea itself,[9] rather he claims that the Parole Board acted inappropriately in soliciting a letter from the sentencing judge after that judge had allegedly promised petitioner that there would be no more "recommendations." Petitioner views the alleged statement by the judge as part of his "plea bargain" that was violated when the judge later made a "recommendation" to the Parole Board.

Although the last state court to consider petitioner's claims found that his application was moot because he had been given a new parole hearing, the court that considered petitioner's section 440.20 motion clearly decided the issue on the merits. (Resp.'s Ex. OO). The court simply stated that an indeterminate sentence of 20 years to life was not a guarantee that petitioner would be released after 20 years, and that the Parole Board had the sole discretion to determine when the petitioner would be released "regardless of any recommendation or opinion of the Court." (Resp.'s Ex. OO at 2). The court cited *People v. Saldana,* 221 A.D.2d 239, 633 N.Y.S.2d 960 (1st Dep't 1995) and *People v. Palumbo,* 171 Misc.2d 734, 655 N.Y.S.2d 868 (Kings Cty. Sup.Ct.1997). Because the state court considered petitioner's claim on the merits, this court must apply the deferential AEDPA standard.

### A. Supreme Court Precedent

In *Santobello v. New York,* 404 U.S. 257 (1971), the Supreme Court held that, where the guilty plea is induced by a promise by the prosecutor, that promise must be kept, or the defendant must be given the privilege to withdraw the plea. *Id.* In some cases, the defendant may be re-sentenced before a different judge. *Id.* However, where a plea is "induced" by promises, those promises "must in some way be made known." *Id.* at 261–62. Additionally, the Supreme Court held in *Maybry v. Johnson,* 467 U.S. 504, 505, 511 & n. 11 (1984), that the inability to enforce a prosecutor's offer is not constitutionally significant if it does not impair the voluntariness of the plea. *See also Puckett v. United States,* 129 U.S. 1423, 1430 (2009) (breach of plea agreement does not cause plea to be involuntary, and rescission is not the only possible remedy).

### B. Application

**\*6** In this case, petitioner concedes that there was no promise made on-the-record regarding any "future" recommendations by the court. It is common to state that the plea bargain will stand, and that the judge will take no further "recommendations" regarding the sentence. The "recommendations" to which the judge may have referred were sentencing recommendations, most likely by the prosecutor, not future parole recommendations by either

the prosecutor or the court. Petitioner's "understanding" to the contrary is no basis for habeas corpus relief. [10]

The respondent in this case also argues that the *Santobello* line of cases applies when the **prosecutor** has made a promise that has induced petitioner's guilty plea. There is no Supreme Court precedent that extends this analysis to a "promise" allegedly made by the court with regard to a subject over which the court has no control. New York law is quite clear that the Board of Parole has the exclusive authority over whether an inmate will be released on parole, regardless of any statements or promises by the court. [11] *Palumbo, 171 Misc.2d at 736*. Thus, in this case, the Broome County Court's finding that the "defendant had no right to expect that the Court, or the district attorney would not later recommend or express and opinion as to whether the defendant should or should not be released to parole supervision," is not contrary to well-established Supreme Court precedent.

The court has reviewed the judge's letter to the Parole Board, dated in 1997 and written in response to a 1996 inquiry by a parole officer, which has been submitted as a sealed exhibit by the respondent. (Resp.'s Sealed Ex. EE at Ex. D). [12] Even assuming that the court's alleged statement regarding the plea agreement could have been interpreted as a promise to refrain from further recommendations with respect to petitioner's parole, which the court does not find, there is absolutely no basis for petitioner to argue that any such agreement was violated by the 1997 letter.

Finally, to the extent that the petition can be read to simply challenge the Parole Board's decision denying petitioner parole, the law is quite clear that there is no constitutional right for a convicted person to be conditionally released before the expiration of a valid sentence and no constitutionally protected right to parole. *Barna v. Travis,* 239 F.3d 169 (2d Cir.2001). Some courts have held, however, that substantive due process may be violated if the Parole Board's decision is arbitrary and capricious. *Cartagena v. Connelly,* No. 06 Civ.2047, 2006 WL 2627567, *7 (S.D.N.Y. Sept. 14, 2006) (collecting cases).

In this case, even assuming that petitioner could challenge the Parole Board's decision, a review of that decision shows that it was not "arbitrary and capricious." (Dkt.

No. 13–33; Transcript (T) of 1/19/10 Parole Hearing with Decision). Petitioner appeared before, and was interviewed by, two Parole Board Commissioners, who reviewed the facts of the crime with petitioner. (T. at 3–8). Petitioner's crime was particularly violent. He emptied a pistol into an individual who was sitting in the back seat of petitioner's car because the victim took petitioner's $ 300.00 and did not pay it back. (T. at 7–8). Then he grabbed the shotgun that his girlfriend was holding and shot the victim twice more. (T. at 8).

**\*7** Petitioner recognized that he had an alcohol and drug problem that contributed to his behavior. (T. at 2–3). The Commissioners noted that they considered various letters in support of his release; the programs that he completed while incarcerated; his release plans, both for living and for working; but ultimately decided that petitioner's release at that time would be "incompatible with the welfare and safety of the community." (T. at 9–12, 14). The Parole Commissioners found that releasing plaintiff would "deprecate the seriousness of this crime as to undermine respect for the law." (T. at 14). In making this determination, the Parole Commissioners also stated that petitioner's "ability to commit the most extreme of violence makes you a poor risk for parole supervision." *Id.* The Board's 2010 decision was neither arbitrary nor capricious. Thus, the petition is subject to dismissal under the AEDPA standard, and even if petitioner were challenging the Board's decision itself, the petition would be subject to dismissal.

### V. *Certificate of Appealability*
The court notes that an appeal from a final order in a habeas corpus proceeding under 28 U.S.C. § 2254 may only be taken upon the issuance of a certificate of appealability. 28 U.S.C. § 2253(c)(1) (A). A certificate of appealability may be issued only if the applicant has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2). See *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). Because this court has found that the claims raised by petitioner in this case do not make a substantial showing of the denial of a constitutional right, the court will recommend denial of a certificate of appealability.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the petition be **DENIED and DISMISSED,** and it is further

**RECOMMENDED,** that a certificate of appealability be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN*

*FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v.. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of HHS,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1870240

**Footnotes**

1    The respondent is erroneously listed on the docket as "Theordore," however, it is clear that his name is "Theodore," and the court will refer to the respondent with the proper spelling of his name.

2    New York Penal Law § 70.00.

3    The citations are to the actual pages of the transcript as numbered by the court stenographer.

4    The petitioner's Article 78 application was transferred to the Albany County Supreme Court. (Resp.'s Ex. R).

5    The court notes that the Supreme Court, Albany County misquoted the relevant standard from *Matter of Russo v. New York State Bd. Of Parole,* 50 N.Y.2d 69, 77 (1980). The court stated that in order to overturn the Parole Board's decision there would have to be " 'irrational ability bordering on impropriety.' " (Resp.'s Ex. S at 3; Dkt. No. 13–19). However, this court has cited to the actual standard as cited in *Russo.* The mis-citation does not affect the court's decision in any way.

6    Petitioner's notice of appeal was received on January 22, 2010. (Resp.'s Ex. II; Dkt. No. 13–35; Letter to Petitioner from Division of Parole).

7    This is the page number of the actual decision, found at the bottom of the page.

8    Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane,* 516 U.S. 99, 107–113 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.*

9    In his application, petitioner did not challenge the guilty plea. However, in his traverse (Dkt. No. 15), petitioner asks "[h]ow ... could the guilty plea be 'knowing and voluntary' when the full and exact terms of the contract were not placed on the record by those parties charged with the responsibility of doing so?" (Dkt. No. 15 at 2). Petitioner cannot now change his claim to reflect the claim of involuntary plea that he did not exhaust in state court. This court will consider his claim as he has raised it below, strictly as a claim that the judge violated the plea agreement when he wrote the letter to the Parole Board. However, the court would also point out that petitioner's claim is meritless under either view of the ground.

10    In his traverse, petitioner states that "[i]n 1982, when the plea agreement was vocalized in chambers, petitioner understood that #20–to–life with no further recommendations' meant that the Judge considered parole appropriate after service of 20–years." (Dkt. No. 15 at 1).

11    This standard is logical because, according to the statute governing Parole Board procedures, there are several factors that the Board considers that occur after the petitioner is sentenced, such as his institutional record, performance on temporary release, his release plans, and academic accomplishments while incarcerated. N.Y. Exec. Law § 259–i. Thus, while the Board may consider the statement of the trial court, it is not necessarily determinative of whether the inmate is released. The Parole Board may accord these considerations whatever weight it deems appropriate and need not even discuss the weight given to the factors in its decision. *See Davis v. Thomas,* 256 F.Supp.2d 190, 192 (S.D.N.Y.2003) (citations omitted).

12    This exhibit consists of the confidential documents that were provided to Justice Thomas G. Leone on February 16, 2010, during petitioner's second Article 78 proceeding. The letter to Justice Leone has exhibits attached, and the confidential letter from the sentencing judge is Exhibit D.

**End of Document**                                            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Flores-Mendez v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 357311

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 91 of 201

2018 WL 357311
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Bonifacio FLORES-MENDEZ, Petitioner,
v.
UNITED STATES of America, Respondent.

13-cr-0031 (KBF)
|
17-cv-2767 (KBF)
|
Signed 01/10/2018

**Attorneys and Law Firms**

Rebecca Gabrielle Mermelstein, Amanda Kay Kramer, Jason Wong, U.S. Attorney's Office, New York, NY, for Respondent.


OPINION & ORDER

KATHERINE B. FORREST, United States District Judge

**\*1** Bonifacio Flores-Mendez, currently incarcerated at U.S.P. Hazelton, brings a petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. After pleading guilty on January 8, 2014 to one count of conspiracy to commit sex trafficking by force under 21 U.S.C. § 1594, petitioner was sentenced on May 30, 2014 to lifetime imprisonment. Petitioner now claims that his sentence was the result of ineffective assistance of counsel. For the reasons set forth below, the petition is DENIED.


I. BACKGROUND

Petitioner worked as a sex trafficker and used violence, threats of violence, and other means of coercion to force women to engage in prostitution against their will. (Presentence Investigation Report ("PSR") ¶ 41; 13-cr-0031, ECF No. 390, Sen. Tr. at 25:13–15.) He operated at least four brothels as well as a "door-to-door delivery service," at which men paid $30 in 15-minute intervals to have sex with women, many of whom were victims of sex trafficking and forced prostitution. (PSR ¶ 29; Sen. Tr. at 25:13–15.)

Typically, petitioner and his associates lured women from Mexico to the United States by "engaging them in romantic relationships and promising a better life in New York." (PSR ¶ 23.) Once the women arrived in New York, they were forced to work as prostitutes "against their will under abhorrent conditions. The victims [were] often beaten; threatened with physical harm to themselves and their family members; sexually assaulted; and verbally abused. During a typical day, a Mexican sex trafficking victim in New York will have sexual intercourse with 20 to 30 customers." (Id.) Victims are often moved from brothel to brothel on a weekly basis to "provide customers with variety"; it was "not unusual for victims of New York-based traffickers to work in brothels as far away as Delaware or Massachusetts." (Id. ¶ 25.) Victims were provided with condoms and birth control pills; if a woman was suspected of being pregnant, her "trafficker will typically make [her] take the drug misoprostol ... to induce miscarriage so that [she] can continue working as [a] prostitute[ ]." (Id. ¶ 26.)

Petitioner was arrested on April 30, 2013. (Id. ¶ 67.) On January 8, 2014, he waived his right to proceed by way of indictment and pled guilty pursuant to a plea agreement to one count of conspiracy to commit sex trafficking by force. (ECF No. 217, Plea Tr. at 30:25–31:3.) At that proceeding, petitioner explicitly represented under oath that that no person, including his attorney, had promised him what his sentence would be. (Id. at 24:19–21.) Furthermore, he said that he understood that the count of conspiracy to commit sex trafficking carries a maximum term of life imprisonment, (id. at 16:5–15), that his guidelines range was 360 months to life imprisonment, (id. at 7:7–11), and that in any case, the Court was not bound to remain within that range, (id. at 21:19–24). Additionally, petitioner said he knew that by pleading guilty, he was relinquishing his right to challenge a modification of any sentence that is within or below 360 months to life imprisonment. (Id. at 21:25–22:9.) Specifically, when asked if he understood that "if [the Court] were to sentence [him] to life imprisonment, [he would be] giving up [his] right to appeal that sentence," petitioner said "yes." (Id. at 22:10–13.) On May 30, 2017, this Court sentenced him to life imprisonment.


II. LEGAL PRINCIPLES

**\*2** A Court may dismiss a petition under § 2255 without directing the United States attorney to file a response or holding an evidentiary hearing if "the motion and

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 92 of 201

Flores-Mendez v. United States, Not Reported in Fed. Supp. (2018)

2018 WL 357311

the files and records of the case conclusively show that the prisoner is entitled to no relief." Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (quoting 28 U.S.C. § 2255); Fed. R. Governing Sec. 2255 Proceedings for the U.S.D.C. 4(b) ("If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party."). Here, the petition raises no factual dispute and can thus be resolved without a Government response and/or hearing.

To prevail on a claim of ineffective assistance of counsel, petitioner "must [first] show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688 (1984). In addition, he must demonstrate that counsel's "deficient performance prejudiced the defense," id. at 687, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel. Id. at 688-89. As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

As to the second prong of Strickland, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different. Strickland, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

Under Strickland, "strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. 466 U.S. at 690–91. A defendant's counsel "may properly decide to forego a Fatico hearing as a 'matter of strategy,' and [the Second Circuit] presume[s] that such a strategy is sound absent a strong showing to the contrary." United States v. Santiago, 330 Fed.Appx. 234, 238–39 (2d Cir. 2009) (quoting United States v. Lee, 818 F.2d 1052, 1056 (2d Cir. 1987)). In any case, it may be "wise" to avoid a Fatico hearing "at which [the defendant's] prior violent conduct would have been reviewed in detail for the benefit of the district court." Id. at 239. "[I]n the absence of what evidence, if any, a Fatico hearing might have established, [the Court] cannot conclude that counsel's failure to request one prejudice[s] [a defendant] in any way." United States v. Costa, 423 Fed.Appx. 5, 9 (2d Cir. 2011).

### III. DISCUSSION

**\*3** Petitioner claims that his defense counsel "failed to render reasonably effective assistance given the totality of the circumstances." (Mot. at 4.) Essentially, petitioner: (1) claims his counsel promised him a sentence of no more than ten years; and (2) challenges the veracity of the victim letter read by the Government and referred to by the Court at sentencing. [1]

Petitioner claims that his counsel informed him that he would receive a sentence of no more than ten years. However, at his plea hearing, petitioner explicitly swore under oath that no person had made him a promise regarding a specific sentence. This fact alone is enough to demonstrate that neither his guilty plea nor his sentence were the result of unreasonable action by his counsel, who, according to petitioner's statement to the Court, did not promise a specific sentence. In addition, though, petitioner affirmed under oath that he understood he was pleading to a stipulating sentencing range of 350 months to life imprisonment and that by doing so, he relinquished his right to file a direct or collateral appeal of a sentence within that range. Petitioner's life sentence is within that range; and in any case, the transcript clearly establishes that petitioner knew he could receive such a sentence. As

2018 WL 357311

such, petitioner cannot demonstrate ineffective assistance on either ground raised.

Separately, petitioner claims that a <u>Fatico</u> hearing would have revealed a different story. However, without evidence of what a <u>Fatico</u> hearing might have established, petitioner cannot demonstrate that his attorney's actions were deficient or unreasonable. Simply put, the decision to request—or not request—a <u>Fatico</u> hearing is a strategic one; often, counsel decides against a <u>Fatico</u> hearing to avoid the risk of worsening his or her client's outcome. Here, counsel likely did just that, a reasonable assessment in light of the offense conduct to which defendant pled guilty.

## IV. CONCLUSION

For the reasons set forth above, petitioner's § 2255 motion to vacate, set aside or correct his sentence is DENIED. The Clerk of Court is directed to terminate the petition at 17-cv-2768 ECF No. 1 and 13-cr-31 ECF No. 425 and to terminate 17-cv-2768.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 357311

Footnotes

1    The Court notes that the motion filed by petitioner's counsel does not clearly state this claim. Nevertheless, the Court reads the petition generously for equity's sake.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 119360
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Eddie GOMEZ, Petitioner,
v.
George W. DUNCAN, Superintendent, Great
Meadow Correctional Facility, Respondent.

No. 02 Civ. 0846 LAP AJP.
|
Jan. 27, 2004.

*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.

**\*1** Pro se petitioner Eddie Gomez seeks a writ of habeas corpus from his February 16, 1994 conviction, following a guilty plea in Supreme Court, New York County, of first degree attempted murder and first degree reckless endangerment, and sentence to concurrent terms, the longest of which was fifteen years to life imprisonment. (Dkt. No. 2: Pet. ¶ 1-2.) *See People v. Gomez,* 249 A.D.2d 237, 237, 672 N.Y.S.2d 681, 681 (1st Dep't), *appeal denied,* 92 N.Y.2d 852, 677 N.Y.S.2d 83 (1998); *see also Gomez v. Duncan,* 02 Civ. 0846, 2002 WL 1424584 at \*1 (S.D.N.Y. July 1, 2002) (Peck, M.J.) (denying the State's motion to dismiss the petition as time barred), *report & rec. adopted,* Dkt. No. 22, slip op. (S.D.N.Y. Aug. 29, 2003) (Preska, D.J.).

Gomez's habeas petition raises three grounds: (a) his guilty plea was not knowing and voluntary (Pet. at 28-33); (b) he was denied effective assistance of trial counsel (Pet. at 4-27); and (c) he was denied effective assistance of appellate counsel (Pet. at 34-36).

For the reasons set forth below, Gomez's habeas petition should be *DENIED.*

*FACTS*

Petitioner Eddie Gomez was arrested in the early morning hours of February 22, 1993 after police received reports of gunfire at a restaurant at 174th Street in upper Manhattan. After a shootout with the two police officers who pulled over the car in which Gomez was a passenger, Gomez was taken into police custody. He and the car's driver, George Pena, each were charged with two counts of first degree attempted murder, second degree assault, first degree reckless endangerment, and three counts of criminal possession of a weapon. (*See generally* Dkt. No. 2: Pet. at 4-10.)

*Gomez's Pretrial Suppression Hearing*

On December 2, 1993 and January 6, 1994, the court (Justice James Leff) held a *Wade-Huntley* suppression hearing (Dkt. No. 29: 12/2/93 Suppression Hearing Transcript ["Tr."] ) involving both Gomez and his co-defendant George Pena (Tr. 2).

*The Prosecution Case at the Suppression Hearing*

In the early morning hours of February 22, 1993, New York City Police Detective Israel Larraquente and fellow Detectives Patricia Powers and Evelyn Delgato went to the 43rd Precinct in the Bronx to interview two men whom Bronx police officers had arrested in connection with the shooting of a police officer in Manhattan. (Larraquente: Tr. 6-7; Powers: Tr. 28-29; Delgato: Tr. 19.) Detective Larraquente testified that he, Detective Powers and Detective Delgato observed Emergency Medical Service personnel bandage Gomez's head, after which he was placed in a holding cell. (Larraquente: Tr. 13, 20.) Detective Larraquente escorted Gomez from the holding cell to an interview room in order to question him. (Larraquente: Tr. 18.) Detective Delgato, in the presence of Detectives Larraquente and Powers, read Gomez *Miranda* warnings in Spanish. (Larraquente: Tr. 7-8; Delgato: Tr. 20-21, 26-27.) Gomez answered "yes" in Spanish to each question, indicating that he understood his *Miranda* rights. (Delgato: Tr. 22.) Detective Delgato gave Gomez coffee, towels, and "stuff to clean himself" before Gomez was questioned. (Delgato: Tr. 24-25.) Ten to fifteen minutes later, Detective Larraquente again read Gomez *Miranda* warnings in Spanish. (Larraquente: Tr. 8-9.) Gomez again indicated that he understood his *Miranda* rights and stated that he was willing to answer questions about events earlier that morning. (Larraquente: Tr. 11.)

**\*2** Gomez stated that he had spent the evening of February 21, 1993, drinking with Pena at a restaurant at

174th Street and St. Nicholas Avenue. (Larraquente: Tr. 11-12.) Around midnight, he and Pena left the restaurant and took a taxi to visit Pena's girlfriend, who lived on Rosedale Avenue in the Bronx. (Larraquente: Tr. 12.) Because they had been drinking, Gomez and Pena mistakenly got out of the taxi two blocks away from their destination. (Larraquente: Tr. 12.) As they walked to Pena's girlfriend's house, police officers approached, beat and arrested them. (Larraquente: Tr. 12.)

Detective Larraquente testified that he had noticed that Gomez had "whiskey breath," but Gomez still had responded coherently to all of the questions he was asked. (Larraquente: Tr. 21-22, 27.) Although Gomez's head was bandaged and his clothes were wet, Gomez never indicated that he did not feel well nor did he request medical assistance. (Larraquente: Tr. 14, 20, 22-24; Powers: Tr. 34-35; Delgato: Tr. 25.) Gomez also never requested an attorney. (Larraquente: Tr. 14.) At approximately 5:40 a.m., Detective Larraquente wrote down Gomez's statement and asked him to sign it, but Gomez refused. (Larraquente: Tr. 12-13.)

Detectives Larraquente, Powers and Delgato escorted Pena to the interview room, where Detective Larraquente read him his *Miranda* warnings in Spanish. (Larraquente: Tr. 15, 24; Powers: Tr. 29.) Pena answered "yes" to each question, indicating that he understood his *Miranda* rights. (Larraquente: Tr. 15.) Detective Larraquente interviewed Pena in Spanish, translating his responses into English so Detective Powers, who did not speak Spanish, could record Pena's statement. (Larraquente: Tr. 15-16; Powers: Tr. 29-30.)

Pena stated that shortly after 3:00 p.m. on February 21, 1993, he arrived at Los Compadres Restaurant, where he spent several hours drinking with friends. (Powers: Tr. 30.) Pena left the restaurant, picked up money from a friend, returned to the restaurant and met his friend "Seago," referring to Gomez. (Powers: Tr. 30-31.) Pena and Gomez decided to visit Pena's girlfriend in the Bronx, taking a taxi to 174th Street and Rosedale Avenue, a few blocks from her house. (Powers: Tr. 31.) As they walked towards the house, police officers stopped and arrested them. (Powers: Tr. 31.) Pena's clothes were wet during the interview; Pena told the detectives that they were wet from the morning's snow. (Powers: Tr. 31-33.)

After these interviews were completed, Detective Daniel Rodriguez of the Manhattan North Homicide Squad and Detectives Gennaro Giorgio and Jose Caban of the 34th Precinct Homicide Squad went to the 43rd Precinct to participate in the investigation into the shooting of a police officer in Manhattan. (Caban: Tr. 45-46; Giorgio: Tr. 7-8; Rodriguez: Tr. 28.) Detective Rodriguez, after talking with Detectives Larraquente, Powers and Delgato, interviewed Gomez in the Detective Squad Room in the presence of Detectives Giorgio and Caban. (Rodriguez: Tr. 28-29.)

**\*3** At approximately 9:50 a.m., before questioning Gomez, Detective Rodriguez again read Gomez *Miranda* warnings in Spanish. (Rodriguez: Tr. 29-31, 36.) Gomez again indicated that he understood and was willing to answer questions, and he signed a *Miranda*-waiver form. (Rodriguez: Tr. 29-31.) Detective Rodriguez questioned Gomez in Spanish, recording his answers in Spanish. (Rodriguez: Tr. 31-32.) Gomez told Detective Rodriguez that he drove with three other men, Jorge (co-defendant George Pena), Felix, and Gabby, to a restaurant on 173rd Street and St. Nicholas Avenue at about midnight on February 22, 1993. (Rodriguez: Tr. 32-33.) Gomez slept in the car while Jorge, Felix, and Gabby entered the restaurant. (Rodriguez: Tr. 33.) Gomez's three companions returned to the car about two hours later, then re-entered the restaurant with Gomez because of a dispute over the bill. (*Id.*) As Gomez and his companions turned to leave, Gomez overheard someone say, "[p]ass me the gun" before hearing a shot fired. (*Id.*) Pena told Gomez to retrieve a gun from underneath the passenger-side seat of his car. (*Id.*) Gomez retrieved a 45 caliber pistol and fired a shot in the direction of the restaurant manager, who was holding a gun himself. (*Id.*) Gomez aimed "high" to avoid hitting anyone. (*Id.*) Gomez entered the front passenger-side seat and Pena drove the men to 175th Street and Audobon Avenue, where they picked up a man named Richard. (*Id.*) Richard took Gomez's seat in the front, and Gomez moved to the back seat. (*Id.*) Richard picked up the 45 caliber gun and loaded it. (Rodriguez: Tr. 34.)

Gomez noticed a flashing police light at the intersection of 181st Street and Amsterdam Avenue. (*Id.*) Richard asked, " '[w]hat are we going to do?,' ' but before anyone answered, Richard fired at the police as they got out of their car. (*Id.*) Pena also may have shot at the police. (*Id.*) Pena drove them to the Bronx, where the car broke down. (*Id.*) They got out of the car, and Richard handed Gomez

the 45 caliber gun, which Gomez unloaded, then reloaded after Pena told him to do so. (*Id.*) Pena and Gomez fled in one direction, while Richard ran in another. (*Id*.) Gomez put the gun down next to a wall before being apprehended by the police. (*Id.*) Pena told Gomez that he had dropped a nine millimeter handgun into the Bronx River while crossing the river. (Rodriguez: Tr. 35.)

After Gomez finished describing what had occurred, Detective Rodriguez asked him to review the statement he had written. (Rodriguez: Tr. 31-32, 35.) Gomez reviewed the statement, then signed each page of it. (Rodriguez: Tr. 32, 35.) Detective Rodriguez testified that Gomez did not appear drunk during questioning and never requested medical treatment. (Rodriguez: Tr. 37.)

Meanwhile, Detective Michael Carew of the Police Scuba Team went to 174th Street and the Bronx River to retrieve a gun that was believed to be in the river. (Carew: Tr. 36-37.) After speaking to officers at the scene, Detective Carew and his team entered the river to search for the gun but did not find it. (Carew: Tr. 36-37.) Another officer told Detective Carew that one of the perpetrators would provide the gun's exact location. (Carew: Tr. 37-38.) At around noon on February 22, 1993, Detective Carew went to the 43rd Precinct to interview Gomez in order to learn where the gun could be found. (Carew: Tr. 38.) Upon arriving at the precinct, Detective Carew saw detectives escorting Gomez out the back door in order to drive him to the river. (Carew: Tr. 38, 43.) Detective Carew asked the detectives to wait so Gomez could describe the area to him. (Carew: Tr. 38.) Gomez described the area, and told Detective Carew that he had dropped the gun to the front and left of several abandoned cars in the river. (Carew: Tr. 39.) Detective Carew did not administer *Miranda* warnings to Gomez before speaking with him. (Carew: Tr. 42-43, 44.) After this conversation, detectives escorted Gomez to the Bronx River, where he pointed out the area where he had dropped the gun. (Carew: Tr. 39.) At approximately 12:30 p.m, Detective Carew searched and found a nine millimeter semi-automatic gun in front of an abandoned car in the river. (Carew: Tr. 41.)

**\*4** Meanwhile, at around 6:00 p.m., Detectives Rodriguez and Caban drove Pena to the 34th Precinct in Manhattan, where Detective Giorgio interviewed him. (Caban: Tr. 46.) Pena told Detective Giorgio that he and his friend Eddy (*i.e.,* Gomez) had gone to Los Compadres restaurant on 176th Street and St. Nicholas Avenue, where

they had "more than two" drinks. (Giorgio: Tr. 11.) While at the restaurant, Pena placed a beer bottle on a glass-top table and a piece of the table broke off. (Giorgio: Tr. 12.) The manager asked Pena to pay the bill for the broken table, which Pena testified he did. (*Id.*) After paying, Gomez said, " '[L]et's get out of here," ' and he and Pena left the restaurant. (*Id.*) Pena did not hear any shots or breaking glass as they drove away. (*Id.*) Pena drove north on Amsterdam Avenue, but stopped the car north of 181st Street near the entrance to the Cross-Bronx Expressway when he heard a police siren and saw "police lights." (Giorgio: Tr. 12-13.) Gomez told Pena to "keep going," and as Pena drove onto the on-ramp for the Expressway, Gomez pointed a gun out the window and fired at the officers. (Giorgio: Tr. 13.) Pena stopped the car and Gomez told him to run, but the police apprehended them. (*Id.*) Pena signed a statement to this effect. (Giorgio: Tr. 14-15.)

At 9:40 p.m. on February 22, 1993 at the 34th Precinct, Detective Caban conducted a line-up involving six men, including Gomez. (Caban: Tr. 48-50.) Because Gomez had a bandage on his head, a similar bandage was placed on the head of each of the five other men. (Caban: Tr. 49-50.) Four witnesses viewed the line-up separately; the witnesses were two restaurant workers, a cabdriver who had witnessed the shooting, and Officer Ahearn. (Caban: Tr. 51-52.) Officer Ahearn recognized Gomez from the car he had stopped on 181st Street and Amsterdam Avenue. (Caban: Tr. 53-54.) [1] One of the restaurant workers identified Gomez as one of the men he had seen inside the restaurant the previous evening. (Caban: Tr. 54-55.) The other restaurant worker and the cabdriver did not recognize anyone in the line-up. (Caban: Tr. 54.) Defense counsel did not cross-examine Detective Caban about the lineups. (*See* Caban: Tr. 6.)

*The Defense's Arguments at the Hearing's Conclusion*
Neither Gomez nor Pena called any witnesses at the suppression hearing. (Tr. 40.) In arguments before Justice Leff at the end of the State's evidence at the hearing, Gomez's counsel argued that the gun recovered from the Bronx River should be suppressed under the "fruit of the poisonous tree" doctrine, as Gomez was not read his *Miranda* rights immediately prior to speaking with Detective Carew of the police Scuba Team. (Tr. 42-43) Defense counsel argued that Gomez's written statements should be suppressed because the waiver of his *Miranda*

rights was coerced; Gomez's clothes were soaking wet, he had bruises on his face and he had sustained a head injury, and therefore he must have been in enough physical pain such that he could not make a reasonable determination as to whether he should waive his Fifth Amendment privileges. (Tr. 43-44.) As to the line-up identification evidence, Gomez's counsel merely said he would "rely on the record." (Tr. 44.)

**\*5** The prosecutor responded that Gomez's written statements were given voluntarily because he was twice read his *Miranda* rights and voluntarily waived them. (Tr. 44.) The prosecutor pointed out that Gomez had been read his *Miranda* rights an hour and ten minutes before talking to Detective Carew, such that reading them to him again was unnecessary. (Tr. 45-46.) The prosecutor also argued that although there was some testimony indicating Gomez was injured, there was no suggest that he was in a great amount of pain or too drunk to knowingly waive his *Miranda* rights. (Tr. 46.)

*The Judge's Decision*
Justice Leff concluded that the lineups were not unduly suggestive, as shown by the fact that some of the witnesses did not identify Gomez. (Tr. 54.) Justice Leff refused to suppress Gomez's statements to police, finding that Gomez had been read the *Miranda* warnings and understood his rights. (Tr. 54-55.) Justice Leff also concluded that there was no causal connection between Gomez's injuries sustained at the time of arrest and the statements he made to police hours later. (Tr. 55.) He did, however, grant the defendants' motions to sever their trials and hold two trials. (Tr. 54; *see also* Tr. 49-54.)

*Gomez's Plea Allocution*
On January 27, 1994, after Justice Leff denied Gomez's suppression motion, Gomez pled guilty to one count of first degree reckless endangerment and two counts of first degree attempted murder, with an agreed sentence of fifteen years to life. (Dkt. No. 23: State Ans. & App. Ex. A: 1/27/94 Plea Transcript ["P."] at 12.) At the very beginning of the plea proceeding, after off the record discussion, Justice Leff informed Gomez that he had presided over co-defendant Pena's trial and that if Gomez was convicted at trial, his sentence would be at least as severe as Pena's:
THE COURT: I'm watching [Gomez] and saying, this has to be the stupidest jerk I've seen on the bench. He is charged with shooting a uniformed police officer. *He had*

*a co-defendant, Mr. George Pena. I already heard the case once, so I know what the witnesses are going to testify to.*

*You had a gun.* Pena had a gun. The police officers came along after you shot up the restaurant, and you knew they were police officers. *You had a gun and you shot a New York City police officer.* I don't think whether you hit him or not that that's something you take slightly.

The police officers were on duty. They went to stop the serious felony that you and Pena committed. *Pena already went to trial. So I heard all the testimony* about the Shell station; how you and Pena drove the car to the Bronx; that you got out of the car, that you swam the river; the cops arrested you. And the witnesses all testified there was a white [Oldsmobile] car ...

It had bullet holes in it. *And the jury went out and they convicted Pena. Pena in effect said all he did was drive the car, you did all the shooting....*

**\*6** I'm not going to sentence Pena for another three weeks, but he was convicted of two counts of attempted murder of a police officer; not one police officer, but two police officers....

My own feelings is that *if Pena's sentence* is a consecutive sentence, *15 to life* on each of them that that's not too much of a sentence to give Pena. *And if you're convicted, I intend to give you the same. Why you should get less, I don't know.* But that's what's going to happen. So you're entitled to a trial....

(P. 2-3, emphasis added.) Gomez, speaking through an interpreter, told the judge that he was at the scene of the shootout with police, but he "never shot at the police.... It was somebody else who escaped." (P. 4.) Justice Leff responded, "You tell that to the jury. If they believe your story, you walk out of here and worry about the Bronx case. If they don't buy your story, I figure this is 1994, figure you get 30 years, to life, you'll be out 2023. That's a good thing." (P. 4.)

Gomez tried to convince Justice Leff to give him a more lenient sentence:
MR. GOMEZ: If you give 12 and a half to 25, I will take it right now.

THE COURT: So, that's fine, but I'm not going to give it to you. You want 15 to life, you can have it, I'll give you a bargain. I'll give you concurrent sentences. You take it in the next 10 minutes and if you don't, that's all right too.

MR. GOMEZ: Judge, I take the plea for 15 years if you let me take it back later.

THE COURT: Why would you want to take it back?

MR. GOMEZ: So if it's possible I can serve less time maybe.

THE COURT: Bring in the jury. I'm not going to sit here and coax him.

(P. 4-5.) After Gomez's attorney noted that he needed a few more minutes of discussion with the A.D.A. but that the judge's "help may have resolved an unnecessary trial" (P. 5), Gomez interrupted, telling Justice Leff that, "I'm asking questions to know. That's what I'm doing. It's my right. I want to know and it's my right." (*Id.*) Justice Leff responded:

> THE COURT: Your right is to have a jury trial. That's what we're going to have. When it's over, you're going to listen to the jury decide whether you're guilty of an attempt to shoot two policemen. And if they say you're guilty, you don't tell me what your rights are.... Right now you will have a jury trial. That's what we're going to give you. Bring in a panel.

(P. 5-6.) Immediately following this statement, Gomez's attorney informed Justice Leff that Gomez desired "to withdraw his plea of not guilty previously entered and enter a plea of guilty ... in full satisfaction of the seven counts of the indictment." (P. 6-8.) Justice Leff asked Gomez directly if he understood what his lawyer had just said, to which Gomez responded, "Yes." (P. 8.) Justice Leff stated:

> THE COURT: Now, one thing I want clear, if you give up your right to have a jury trial today on this case and you plead guilty to the first three counts of the indictment, no way can you change your mind after you make that plea. You understand that? You can't say you didn't understand or you didn't want to take the plea or somebody forced you to. No way you can change your mind. You understand that?

**\*7** (P. 8.) Gomez responded that he understood "perfectly well," but that he wanted to make sure he still had the right to appeal (P. 8-9)-presumably from the denial of his suppression motion. Justice Leff told him, "You can appeal. You can appeal. I don't know what you are going to appeal, but you can appeal." (P. 9.) Justice Leff made sure that Gomez understood the terms of his plea:

THE COURT: [W]hen you plead guilty, you are giving up your right to pick a jury of 12 citizens who will sit over there in those seats. They will listen to the witnesses against you. You can help choose those jurors. After the jury is selected, you have a right to hear the witnesses who will testify against you. There was some 15 or 18 witnesses who testified at George Pena's trial, police officers, among others, Ah[ea]rn and Torres, who were the two police officers who were the victims in the second and third counts [of the indictment]. You will hear them.

You would have a right to have your lawyer question those witnesses. You would have a right to testify yourself if you wanted to or if you had any witnesses that you wanted to call, you could call those witnesses. You understand that?

MR. GOMEZ: Yes.

THE COURT: You understand that after the case is heard, it is submitted to the jury. And the jury decides whether you're guilty of these charges against you.

If you plead guilty, there is not going to be a jury that decides this case. And *by pleading guilty, you are admitting to certain facts. You're admitting* as to the first count that on February 22, 1993 under circumstances evincing

2004 WL 119360

a depraved indifference to human life, *you recklessly engaged in conduct that created a grave risk of death to another person by shooting a loaded firearm to [sic] a crowded restaurant.* That's at 1263 St. Nicholas Avenue.

*Did you do that?*

MR. GOMEZ: *Yes.*

THE COURT: The second count charges an attempt to commit the crime of murder in the first degree, and so does the third count. When you plead guilty, you're admitting to those counts; that you're over 18 years of age; that *on February 22, of 1993 with intent to cause the death of Police Officer Patrick Ah[ea]rn and a Police Officer Gonzalo Torres, you attempted to cause their death* and they were police officers as defined in law and at the time that *you fired your weapon at them,* you reasonable [sic] should have known that they were police officers and that they were in the course of performing their official duties.

Specifically, what they were doing was attempting to intersect [sic: intercept] the car that you were in and Pena was in. It was an Oldsmobile that you were driving away from the scene of the St. Nicholas Avenue restaurant and away from the Shell station on 181 Street.

*Did you do that? Did you fire a gun at those police officers?*

MR. GOMEZ: *Do I have to admit it?*

THE COURT: *You certainly do. And if you don't, the jury will decide.*

 **\*8**  MR. GOMEZ: *Yes, I did it.*

THE COURT: I'm sorry.

MR. GOMEZ: Do I have to admit it even if I didn't do it?

THE COURT: If you didn't do it, let the jury hear the witnesses. If you're claiming you didn't do it, go to trial.

MR. GOMEZ: I'm only asking a question to know.

THE COURT: The question I'm asking you is whether or not-I just read what the charge was, attempting to cause the death of Ah[ea]rn and Torres. And *I'm asking*

*you whether you fired a gun knowing that they were police officers.*

MR. GOMEZ: *Yes.*

THE COURT: *No question about that? Is there anything you don't understand that you want to have explained to you?*

MR. GOMEZ: *No.*

THE COURT: Did Mr. Traub tell you that the sentence that you're going to get is 15 years to life on the second count and concurrent which means served at the same time with the third count, and you're going to get a sentence on the first count of two and a third to seven, that's also concurrent?

MR. GOMEZ: Yes.

THE COURT: *Except for that, did anybody promise you anything to make you plead guilty?*

MR. GOMEZ: *No.*

THE COURT: You want to take that plea now?

MR. GOMEZ: Yes.

(P. 9-12, emphasis added). Gomez's counsel (Traub) and Assistant District Attorney Bosco placed on the record the additional terms of Gomez's plea agreement as to sentencing on unrelated cases in the Bronx:

MR. TRAUB: Your Honor, there is some other promises that the People will put on the record as part of the plea agreement that the Court may not be aware of, that Mr. Gomez has two pending indictments in the Bronx. *The People have spoken to the Assistant [District Attorney] in the Bronx and they are prepared to offer concurrent time on the two cases that's [sic] pending in the Bronx.*

Mr. Gomez is also a suspect in a robbery out of the 34th Precinct in Manhattan. I have been contacted by the detectives in reference to that case. The People will cover that as well, and he will not be charged in reference to that case. The People have also indicated that this plea out of New York County will cover all known and unknown cases that might arise against Mr. Gomez as long as someone was not seriously hurt as defined under

the Penal Law, assault in the first degree. Those are the
additional promises the People have made.

THE COURT: You want to respond?

[A.D.A.] BOSCO: Yes, your Honor. What Mr. Traub
states is true. I want to state, Mr. Lima(ph), the ADA
in the Bronx who is handling the defendant's two Bronx
robbery indictments, he and I have agreed that *if the
defendant decided to plead guilty to those cases in the Bronx,
the sentences will run concurrent to this sentence.*

As to the known and unknown robberies, I can only say
that we will cover known an[d] unknown robberies where
there wasn't serious injuries in Manhattan. I personally
cannot speak for what may or may not happen in the
Bronx. I can't do that. I don't have the power to do that.
But other than that, that's the agreement that is being
entered.

*9 (P. 13-14, emphasis added.) Immediately following
this exchange, Gomez's guilty plea was formally entered.
(P. 15.)

*Gomez's Sentencing*

On February 16, 1994, Justice Leff presided over Gomez's
sentencing. (Dkt. No. 23: State Ans. & App. Ex. B: 2/16/94
Sentencing Transcript ["S"].) Gomez's counsel (Traub)
informed Justice Leff that there was a "question about
the honoring" of the terms of Gomez's plea agreement
with respect to the Bronx case. (S.4.) Apparently, the
Bronx A.D.A. had offered Gomez a twenty-to-forty
year sentence to run concurrently with the Manhattan
sentence. (Dkt. No. 2: Pet. at 31; S. 4.) Gomez rejected
this offer, alleging that it violated the Manhattan plea
agreement. (Pet. at 31.) Specifically, Gomez alleged that
the Manhattan A.D.A. had promised him that if he pled
guilty in Manhattan, "any sentence imposed in the Bronx
cases would not be more than 15 years and would run
concurrent with the [Manhattan] sentence." (Pet. at 31.)
The Bronx A.D.A. told Gomez that he had only promised
that, if he pled guilty to the Bronx cases, the sentences
would run concurrently with the Manhattan sentence, and
that he was under no obligation to offer Gomez a sentence
less than the one being offered in Manhattan. (Pet. at 31.)
After being informed of what had transpired in the Bronx,
Justice Leff told Gomez's counsel:

THE COURT: I have no control over the Bronx.

He took a plea here with the understanding he was going
to get fifteen to life on each of two counts and that he was
going to be sentenced on the reckless endangerment count.

I intend to sentence him.

MR. TRAUB: That may be, your Honor, except that part
-

THE COURT: What does he want to do about it? He
wants his plea back? I'll be happy to give him his plea back.
He can start from Square One and go to trial.

I already had a trial with Pena. And it's not really a trial;
it's an inquest.

We can go through the same trial again if he doesn't want
to take the fifteen to life. I assure him he's going to get
more.

MR. TRAUB: He says he wants his plea back.

[A.D.A.] BOSCO: Your Honor, People have no problem
with that.

THE COURT: No problem with that. Very good.

When do you want to try the case?

I'll tell you in no way will he get fifteen to life. No way will
he get fifteen. I don't care what they do in the Bronx. He's
going to get the life sentence anyway.

If he wants the plea back, we'll try this case.

....

I'll tell him right now. I haven't sentenced Pena yet. Pena
went to trial. He's not getting the minimum.

Tell him that right now so it will be no surprise. So that
if he gets tried, I don't care what they do [in the Bronx],
twenty to life will be less than what he's going to get from
me.

He doesn't want it, that's fine. I've dealt with wise guys. I
look at this half-baked jerk sitting here. He's going to go

to state prison. As far as I can see, he's never coming out. And he's telling me what he wants to do.

 **\*10**  He either takes the sentence we agreed upon or he has his plea back and he'll never see the light of day. He's going to die in the state prison. I'll tell him that right now.

(S.4-6.) Justice Leff asked Gomez's counsel and A.D.A. Bosco to suggest dates for trial. (S.7.) Gomez interrupted, telling Justice Leff, "Do whatever you want. I haven't killed anybody...." (S.7.) Justice Leff responded:
THE COURT: You want to impose the original sentence?

I recall very carefully telling him when I started to take the plea that no way was he going to change his mind. I don't [c]are what they do in the Bronx.

(S.7-8.) Justice Leff instructed the clerk to arraign Gomez on the predicate felony, and the prosecutor interjected:
[A.D.A.] BOSCO: Your Honor, let me just state this:

*The original plea was on the condition that he get concurrent time on his Bronx case.*

Obviously you have no control over what happens in the Bronx. Nor do I.

At the time of the ... plea, I put on the record my discussions I had with the Bronx Assistant district attorney. And my understanding at the time was defendant was going to get concurrent time on this case and the Bronx case.

I just wanted to make that clear for the record.

If the Court wants to proceed with the sentencing, People have no objection at this time.

On the other hand, if the Court wants to let the defendant take his plea back, People have no objection.

THE COURT: No, I'm going to proceed. I'm not going to let him dictate the terms of the conditions on which he is going to get sentenced.

(S. 8-9, emphasis added.) Justice Leff had the court clerk arraign Gomez as a predicate violent felony offender for

a prior conviction for second degree attempted robbery. (S.9-10.) [2] Before entering sentence, Justice Leff allowed Gomez's counsel to speak about the terms of the plea bargain:

MR. TRAUB: People are correct in that it was a negotiated plea.
The Assistant did indicate, at the time of the plea, did indicate at the time of the sentencing this was going to run concurrent with two cases that's running in the Bronx.

And that if in fact it doesn't happen, that will give him a right of appeal based upon that factor alone.

And I assume, knowing [A.D.A.] Bosco, he will make all efforts to make the Bronx aware of the fact of what took place down here in Manhattan.

....

Other than that, I would ask the Court to sentence Mr. Gomez in accordance with what he indicated. He did indicate he wanted to withdraw the plea. Court has already ruled on that application.

THE COURT: He's got a right to say anything he wants to now.

Want to say anything?

DEFENDANT: Judge, yes, it's okay. I plead guilty because in fact I didn't do what they're charging me with. But I understand, but I can see, I can face a lot of time in jail if they [the jury] find me guilty.

But they made a deal with me according to my attorney that I wouldn't serve more than fifteen years in jail.

 **\*11**  THE COURT: That's not true.

DEFENDANT: When [sic] I went to the Bronx.

THE COURT: That's not true.

DEFENDANT: Give me my plea so I can go to trial and you can give me a hundred years.

THE COURT: Anything else you want to say?

Case 9:18-cv-00521-GLS-ML Document 23 Filed 06/10/19 Page 102 of 201
Gomez v. Duncan, Not Reported in F.Supp.2d (2004)
2004 WL 119360

(S.12-15.) Justice Leff sentenced Gomez as follows:
THE COURT: Sentence of the Court on Count Number One: two and a third to seven ...

On the Second Count, attempted murder of a policeman, sentence is fifteen to life.

And on the Third Count, attempted murder of a policeman, the sentence is fifteen to life.

I would like some record to be made of the fact that this defendant is going to state prison completely oblivious to the fact he had a loaded, operable gun and shot it at a New York City cop.

And nobody should get out of jail ever who does that.

DEFENDANT: I didn't do that. I haven't shot any police officer or anyone else.

THE COURT: All right. Then you tell that to the Parole Board when you come up for the first time in fifteen years that after fifteen years you are denying that you're guilty. And we can't rehabilitate an innocent man.

....

[There is] nothing that prevents me, when I sentence a defendant to fifteen years to life, prevents me telling the Probation Department that that sentence is a life sentence, not a fifteen-year sentence.

....

The sentences I have indicated, two and a third to seven, fifteen to life, fifteen to life, they are to be concurrent sentences.

....

DEFENDANT: Judge, I don't have anything against the sentence because that was the agreement.

But you have to understand that they are not fulfilling the agreement that they made.

THE COURT: That's your problem.

DEFENDANT: But that's not my problem. That's the agreement I made. Those were the conditions.

I can't do anything. I don't have any power to do anything.

THE COURT: Good. We'll see you.

MR. TRAUB: Actually, I think you have to indicate he hasn't been sentenced yet in the Bronx; that this is to run concurrent.

That was part of the agreement that you can so endorse.

THE COURT: The Bronx Judge can do that.

MR. TRAUB: But that was part of the promise here, that you would run it concurrent with those. That was part of the agreement, Your Honor.

THE COURT: I will indicate that that was on the record at the time of the plea.

The Bronx Judge could take into account that the twenty-year sentence in the Bronx is not going to make any difference because he's not going to get off on this sentence for as long as he lives. He can stay in State prison. It's a life sentence I impose.

So if the Bronx D.A. wants to jerk around, it isn't going to make any difference.

You tell him it would be very appropriate if he not interfere with the carrying out of this sentence.

(S.16-20).

*The Bronx Sentence*
Gomez rejected the plea he was offered in the Bronx and went to trial for those charges. (Dkt. No. 2: Pet. at 33.) After being convicted by a jury, Justice John P. Collins on August 4, 1994 sentenced Gomez to twelve and a half to twenty-five years, to run *consecutively* to the sentence Justice Leff imposed on Gomez in Manhattan. (Dkt. No. 31: 8/4/94 Bx. Sentencing Transcript ["Bx."] at 14.)

 **\*12** During Gomez's sentencing in the Bronx, his lawyer, Alex Sanchez, informed Justice Collins that Gomez was under the impression that the sentence in the Bronx

would run concurrent to the Manhattan sentence. (Bx. at 9-10.) Sanchez told Justice Collins that he "personally investigated that matter [him]self and apparently ... that was the impression that was actually conveyed to Mr. Gomez." (Bx. at 10.) Justice Collins responded: "If that's so, then that's a matter that has to be challenged in New York County." (*Id.*) [3]

*Post-Conviction Proceedings*

*Gomez's First C.P.L. § 440 Motion*
On March 27, 1995, prior to filing his direct appeal, Gomez moved to vacate his sentence in the Manhattan case pursuant to C.P.L. § 440.10, arguing that his guilty plea was involuntary because it had been induced by a broken prosecutorial promise, namely that the Bronx sentence would be imposed concurrently to the Manhattan sentence and that "since [Gomez] was getting such a substantial sentence that there would be no additional time imposed as a result of the Bronx cases." (Dkt. No. 8: A.D.A. Beder 5/16/02 Aff. Ex. A: Gomez § 440 Motion Aff. at 2-3.) Justice Leff denied the motion on May 2, 1995, stating that the Manhattan plea "could not foreclose the Bronx County judge or prosecutor from imposing any sentence in the Bronx the court deemed appropriate." (Dkt. No. 8: Beder 5/16/02 Aff. Ex. B: 5/2/95 Justice Leff Order.) On May 8, 1995, Gomez sought leave to appeal to the First Department from Justice Leff's denial of his § 440 motion. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. C.) The First Department denied leave to appeal on July 13, 1995. *People v.. Gomez,* 1995 N.Y.App. Div. LEXIS 8041 (1st Dep't July 13, 1995).

*Gomez's Direct Appeal*
In August 1997, represented by new appointed appellate counsel (Legal Aid Society), Gomez filed his direct appeal to the First Department. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. F.) Gomez argued that his motion to suppress should have been granted "because the People failed to prove beyond a reasonable doubt that [Gomez's] written statement was not the product of police coercion." (Beder 5/16/02 Aff. Ex. F: Gomez 1st Dep't Br. at 9; *see also id.* at 9-14.) Specifically, Gomez's counsel argued that Gomez had been physically beaten by police officers, was not allowed to change out of his "cold, wet clothes" until he signed a written confession, and was intoxicated at the time he confessed. (Beder 5/16/02 Aff. Ex. F: Gomez 1st Dep't Br. at 11-13.) Gomez's counsel argued that although

any single one of these factors might be insufficient to demonstrate that Gomez's confession was involuntary, in combination they were sufficient to establish that Gomez was "physically coerced" into confessing, in violation of both the New York State and federal Constitutions. (*Id.* at 9-11.)

On April 30, 1998, the First Department unanimously affirmed Gomez's conviction, stating in full:

> **\*13** Defendant's motion to suppress statements was properly denied. The court properly found that, under the totality of the circumstances, defendant's statements were voluntary. Defendant knowingly waived his rights and willingly provided a clear and coherent statement. There is no evidence that defendant was intoxicated or in any distress at the time of his statement, and there was no causal connection between the minor injuries received at the time of arrest and the statement taken hours later. We have considered defendant's remaining contentions and find them to be without merit.

*People v. Gomez,* 249 A.D.2d 237, 237, 672 N.Y.S.2d 681 (1st Dep't 1998) (citations omitted).

On June 23, 1998, the New York Court of Appeals denied leave to appeal. *People v. Gomez,* 92 N.Y.2d 852, 677 N.Y.S.2d 83 (1998).

*Gomez's Second C.P.L. § 440 Motion*
On August 4, 1999, Gomez brought his second C.P.L. § 440.10 motion, arguing that his conviction should be vacated on three grounds. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. J: Gomez 8/4/99 C.P.L. § 440 Motion.) First, he argued that he had received ineffective assistance of trial counsel, because his trial counsel: failed to investigate or pursue suppression of evidence at the suppression hearing; failed to inform him of "favorable" evidence; failed to call Gomez as a witness at the suppression hearing or advise him that he had the right to testify; and,

improperly advised Gomez to plead guilty by overstating the likelihood of his conviction at trial. (Beder 5/16/02 Aff. Ex. J: Gomez 8/4/99 C.P.L. § 440 Aff. ¶ 1(a).) Second, Gomez argued that his guilty plea was procured by "duress, threat, misrepresentation or fraud on the part of the Court" and/or prosecutor, who, Gomez claimed, coerced Gomez to plead guilty through a false promise that he would not receive additional time for the cases pending in the Bronx. (*Id.,* ¶ 1(b).) Gomez further argued that Justice Leff threatened him with a heavier sentence if he did not plead guilty. (*Id.*) Third, Gomez argued that the indictment to which he pled guilty was unconstitutional, because the evidence presented to the Grand Jury was false and/or obtained through a violation of his Due Process rights, and was or should have been known to be false by the prosecutor. (*Id.,* ¶ 1(c).)

On August 6, 1999, the State opposed Gomez's motion, arguing that it was procedurally barred pursuant to C.P.L. § 440.10(2)(c), because Gomez could have raised on direct appeal all the issues he was bringing in the § 440 motion. (Beder 5/16/02 Aff. Ex. K: ADA Gieri Aff. ¶ 9.) The State further argued that, even if Gomez's motion was not procedurally barred, his claims were all without merit. (*Id.,* ¶¶ 10-23.)

On October 1, 1999, Justice Leslie Crocker Snyder of the Supreme Court, New York County, denied Gomez's motion without a hearing "for the reasons set forth by the People in their response." (Beder 5/16/02 Aff. Ex. L: 10/1/99 Order.)

**\*14** On October 19, 1999, Gomez sought leave to appeal Justice Snyder's denial of his second C.P.L. § 440 motion. (Beder 5/16/02 Aff. Ex. M.) On January 18, 2000, the First Department denied leave to appeal. *People v. Gomez,* No. M-7671, 2000 N.Y.App. Div. LEXIS 755 (1st Dep't Jan. 18, 2000). On March 16, 2000, the First Department denied Gomez's motion for reconsideration. *People v. Gomez,* No. M-771, 2000 N.Y.App. Div. LEXIS 3144 (1st Dep't Mar. 16, 2000).

*Gomez's Coram Nobis Petition to the First Department*
On April 7, 2000, Gomez brought a petition for a writ of error coram nobis in the First Department, alleging ineffective assistance of appellate counsel. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. T: Gomez Coram Nobis Petition.) Gomez argued that his appellate counsel was ineffective because she failed to raise two arguments: first, that

Gomez's guilty plea was not knowing and voluntary (*id.* at 26-28), and second, that trial counsel was ineffective for failing to properly explain the sentencing alternatives available under the indictment (*id.* at 28-29).

The First Department denied Gomez's coram nobis petition without opinion on May 8, 2001. *People v. Gomez,* 283 A.D.2d 1035, 726 N.Y.S.2d 43 (1st Dep't 2001). Reconsideration was denied on November 8, 2001. *People v. Gomez,* No. M-3383, 2001 N.Y.App. Div. LEXIS 10802 (1st Dep't Nov. 8, 2001).

*Gomez's Federal Habeas Petition*
On November 23, 2001, Gomez filed his federal habeas corpus petition, raising three grounds: First, he argues that he received ineffective assistance of trial counsel, citing his counsel's failure to investigate and present evidence at the suppression hearing, counsel's failure to call Gomez as a witness at that hearing or inform him of his right to testify, and counsel's failure to inform Gomez of "favorable" evidence that would have dissuaded Gomez from pleading guilty. (Dkt. No. 2: Pet. at 4-27.) Second, Gomez argues that his guilty plea was not knowing and voluntary because the trial court threatened him with a heavier sentence if he was convicted at trial, and because it was induced by a prosecutorial promise that was later broken. (Pet. at 28-33.) Third, Gomez argues that he received ineffective assistance of appellate counsel, due to her failure to argue that the trial court's threat of a heavier sentence, the broken prosecutorial promise, and the trial court's refusal to allow Gomez to withdraw his guilty plea made his guilty plea involuntary. (Pet. at 34-36.)

On July 1, 2002, this Court denied the State's motion to dismiss Gomez's petition as time-barred and ordered the State to respond to its merits. *Gomez v. Duncan,* 02 Civ. 0846, 2002 WL 1424584 (S.D.N.Y. July 1, 2002) (Peck, M.J.), *report & rec. adopted,* Dkt. No. 22: 8/29/03 Order (S.D.N.Y. Aug. 29, 2003) (Preska, D.J.).

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD*[4]
Before the Court can determine whether Gomez is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

**\*15**  In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*28 U.S.C. § 2254(d)(1)-(2).* [5]

The "contrary to" and "unreasonable application" clauses of *§ 2254(d)(1)* have "independent meaning." *Williams v. Taylor,* 529 U.S. at 404-05, 120 S.Ct. at 1519. [6] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523. [7] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord, e.g., DelValle v. Armstrong,* 306 F.3d at 1200.

As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20. [8]

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523. [9] However, "[t]he term 'unreasonable' is ... difficult to define." *Williams v. Taylor,* 529 U.S. at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* [10] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. at 409, 120 S.Ct. at 1521. [11] "Objectively unreasonable" is different from "clear error." *Lockyer v. Andrade,* 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). [12]

**\*16**  Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45. [13]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan v. Kuhlman,* 261 F.3d at 312; *accord Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002) ("In *Sellan,* we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference."). [14] "By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,' not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003) (citations omitted). [15] Of course, "[i]f there is no [state court] adjudication on the merits, then the pre-AEDPA, *de novo* standard of review applies." *Cotto v. Herbert,* 331 F.3d at 230.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.' " *Parsad v. Greiner,* 337 F.3d at 181 (quoting § 2254(e)(1)).

### A. *The Review Standards Applicable to Gomez's Habeas Claims*

Gomez's ineffective assistance of appellate counsel claim, raised in his state coram nobis petition, was denied by the First Department without opinion. (*See* page 26 above.) Thus, AEDPA deference applies. *See, e.g., Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001); *Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002); *see also* cases cited at pages 33-34 n. 14 above.

Determination of whether AEDPA deference applies to Gomez's remaining two habeas claims is not as straightforward. Gomez's federal habeas claims that the trial court coerced his guilty plea with the threat of a heavier sentence and that he received ineffective assistance of trial counsel were first raised in his second C.P.L. § 440 Motion. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. J: Gomez 8/4/99 C.P.L. § 440 Aff. ¶ 1(a), (b).) The State's opposition argued that Gomez's motion was (1) procedurally barred pursuant to C.P.L. § 440.10(2)(c), because Gomez could have raised on direct appeal all the issues he was bringing in the § 440 motion. (Beder 5/16/02 Aff. Ex. K: ADA Gieri Aff. ¶ 9) and (2) even if not procedurally barred, his claims were all without merit (*id.,* ¶¶ 10-23). Because the state court denied Gomez's motion "for the reasons set forth by the People in their response" (Beder 5/16/02 Aff. Ex. L: 10/1/99 Order), this Court cannot determine from the face of the state court's decision whether these claims were denied as procedurally barred or on their merits.

**\*17** The Second Circuit most recently summarized its holdings regarding ambiguous state rulings in *Su v. Filion,* 335 F.3d 119 (2d Cir.2003):

In *Ryan v. Miller,* 303 F.3d 231, 246 (2d Cir.2002), we granted AEDPA deference to a state court that had used the language that a particular claim was "either unpreserved for appellate review or without merit." But we did this, and treated the state decision as on the merits, because the record showed that the petitioner had preserved the disputed claim at every stage, thereby indicating that the Appellate Division had not denied that claim because it was unpreserved. *Id.* at 246 n. 6. Conversely, we have also held that where a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's

decision was on the merits. *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003). And we did so fully aware that we have also "explicitly h[e]ld that when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama,* 235 F.3d at 810.

In other words, *our cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required.* But, to decide the instant case, we need not determine whether that indeed is so.

335 F.3d at 126 n. 3 (emphasis added); *see also, e.g., Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *25 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (discussing and attempting to resolve apparent conflict in Second Circuit decisions on review standard where state court denied claim for reasons given in prosecutor's brief, which raised merits and procedural arguments).

Similar to *Ryan,* the Court concludes that Gomez's ineffective assistance claims were based on facts outside the record and could not have been raised on direct appeal but had to be raised in a C.P.L. § 440 motion; thus the claims were not procedurally barred, and so must have been rejected on the merits. *See, e.g., Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *21 & n. 34 (S.D.N.Y. June 3, 2003) (Peck, M.J.) ("[U]nder New York law, ineffective counsel claims involving matters outside the record ... 'must be pursued by way of a C.P.L. § 440 motion.' ") ( & cases cited therein). Therefore, AEDPA deference should apply. Conversely, the Court concludes that Gomez's coerced plea claim likely was deemed procedurally barred because it involved matters entirely in the plea and sentencing transcript and, therefore, could and should have been raised on direct appeal. Because the state court's ruling as to the coerced plea claim "does not make clear whether a claim was rejected for procedural or substantive reasons and ... the record does not otherwise preclude the possibility that the claim was denied on procedural grounds," the Court will not apply the deferential AEDPA review standard to this habeas claim, and thus review the claim *de novo. See Su v. Filion,* 335 F.3d at 126 n. 3. [16]

II. *GOMEZ'S GUILTY PLEA WAS NOT COERCED*

**\*18** Gomez argues that his guilty plea was not knowing and voluntary because the trial court threatened him with a heavier sentence if he was convicted at trial, and because it was induced by a prosecutorial promise as to his Bronx sentence that was later broken. (Pet. at 28-33.) The Court disagrees.

Constitutional due process requires that a guilty plea be voluntary, knowing and intelligent. *E.g., United States v. Ruiz,* 536 U.S. 622, 629, 122 S.Ct. 2450, 2455 (2002); *Bousley v.. United States,* 523 U.S. 614, 618, 118 S.Ct. 1604, 1609 (1998); *Mabry v. Johnson,* 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-47 (1984); *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469 (1970); *Boykin v. Alabama,* 395 U.S. 238, 242-43 & n. 5, 89 S.Ct. 1709, 1711-12 & n. 5 (1969); *Innes v. Dalsheim,* 864 F.2d 974, 977 (2d Cir.1988), *cert. denied,* 493 U.S. 89, 110 S.Ct. 50 (1989); *Foreman v. Garvin,* 99 Civ. 9078, 2000 WL 631397 at *10 (S.D.N.Y. May 16, 2000) (Peck, M.J.). [17]

"The standard for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " *Urena v. People of the State of New York,* 160 F.Supp.2d 606, 610 (S.D.N.Y.2001) (Weinstein, D.J.) (quoting *Ventura v. Meachum,* 957 F.2d 1048, 1058 (2d Cir.1992)). A plea is involuntary where the defendant did not have " 'knowledge of the nature of the constitutional protections he will forgo by entering his plea.' " *Marcelin v. Garvin,* 1999 WL 977221 at *5 (quoting *Matusiak v. Kelly,* 786 F.2d at 543). [18] "A plea is 'intelligent' and 'voluntary' when a defendant had the advice of counsel, understood the consequences of his plea and the plea was not physically or mentally coerced." *Heron v. People,* 98 Civ. 7941, 1999 WL 1125059 at *5 (S.D.N.Y. Dec. 8, 1999); *accord, e .g., Foreman v. Garvin,* 2000 WL 631397 at *10; *see, e.g., Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.), *cert. denied,* 488 U.S. 890, 109 S.Ct. 224 (1988); *France v. Strack,* No. 99-CV-2510, 2001 WL 135744 at *3 (E.D.N.Y. Jan. 30, 2001) ("Pleading guilty to avoid a more severe sentence does not in itself qualify as involuntary because the plea can nonetheless be the 'product of a free and rational choice, especially where the defendant was represented by competent counsel whose advice was that the plea would be to the defendant's advantage.' "); *Ramirez v. Headley,* 98 Civ. 2603, 1998 WL 788782 at *5 (S.D.N.Y. Nov. 10, 1998); *Martuzas v. Reynolds,* 983 F.Supp. 87, 94 (N.D.N.Y.1997) (Pooler, D.J.); *Phan v. McCoy,* No. 94-CV-1596, 1997 WL 570690

2004 WL 119360

at *6 (N.D.N.Y. Aug. 28, 1997) (Pooler, D.J.) ("The mere fact that a defendant pleaded guilty solely to limit his possible penalty does not make that plea involuntary."); *United States v. Millan-Colon,* 829 F.Supp. 620, 635 (S.D.N.Y.1993), *aff'd,* 17 F.3d 14 (2d Cir.1994). A " 'plea of guilty entered by one fully aware of the direct consequences' of the plea is voluntary in a constitutional sense 'unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper." ' *Bousley v. United States,* 523 U.S. at 619, 118 S.Ct. at 1609 (ellipses omitted) (quoting *Brady v. United States,* 397 U.S. at 744, 90 S.Ct. at 1472)). [19]

**\*19** " 'It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." ' *Bousley v. United States,* 523 U.S. at 621, 118 S.Ct. at 1610 (quoting *Mabry v. Johnson,* 467 U.S. at 508, 104 S.Ct. at 2547-47); *accord, e.g., Foreman v. Garvin,* 2000 WL 631397 at *11; *Marcelin v.. Garvin,* 1999 WL 977221 at *6; *see also, e.g., Ramirez v.. Headley,* 1998 WL 788782 at *5.

"As 'the Supreme Court has noted, statements made at plea allocutions "carry a strong presumption of verity" and "constitute a formidable barrier in any subsequent collateral proceeding." " ' *Marcelin v. Garvin,* 1999 WL 977221 at *7 (quoting *Singh v. Kuhlmann,* 1995 WL 870113 at *7 (quoting *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629 (1977))); *accord, e.g., Foreman v. Garvin,* 2000 WL 631397 at *11; *see, e.g., Adames v. United States,* 171 F .3d 728, 732-33 (2d Cir.1999) (statements at plea allocution " 'carry a strong presumption of verity'... and are generally treated as conclusive in the face of the defendant's later attempt to contradict them," citing cases); *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea."); *United States v. Gonzalez,* 970 F.2d 1095, 1100-01 (2d Cir.1992); *Panuccio v. Kelly,* 927 F.2d 106, 110-11 (2d Cir.1991). [20]

This Court may credit Gomez's statements at the plea allocution-that his guilty plea was voluntary and not the result of any threats or promises (P. 9-12, quoted at pages 12-15 above)-over his later allegations of coercion. *See, e.g., Foreman v. Garvin,* 2000 WL 631397 at *12; *Marcelin v. Garvin,* 1999 WL 977221 at *7; *see also, e.g., United States v. Torres,* 129 F.3d at 715; *United States v. Gonzalez,* 970 F.2d at 1100-01; *Urena v. People of the State of New York,* 160 F.Supp.2d at 611 (Petitioner "stated on the record that he knew that he was giving up the right to trial and the safeguards that accompany that right, that he was not threatened or forced to plead guilty, and that he sold over two ounces of cocaine to an undercover officer. These statements undermine petitioner's claim that his plea was involuntary or that he is innocent of the crime to which he pled guilty.") (citing cases); *France v. Strack,* 2001 WL 135744 at *4 ("Where a petitioner's claims of mistake and coercion find no support in the record and are contradicted by the statements made under oath at the plea proceeding, they do not entitle him to relief ."); *United States v. Hoffenberg,* 169 F.R.D. 267, 275 (S.D.N.Y.1996), *aff'd,* Nos. 97-1159, 97-1166, 164 F.3d 620 (table), 1998 WL 695933 (2d Cir. Sept. 22, 1998); *Singh v. Kuhlmann,* 1995 WL 870113 at *7; *United States v. Caesar,* 1995 WL 312443 at *4 ("This Court is justified in crediting [defendants'] sworn statements at allocution over their later self-serving allegations of coercion."); *United States v. Collado-Gomez,* 674 F.Supp. 426, 428 (E.D.N.Y.1987).

A. *Gomez's Guilty Plea Was Not Coerced By The "Threat of a Heavier Sentence"*

**\*20** Gomez alleges that "[b]efore entering the plea ... the court intimidated and explicitly threatened to give petitioner 30 years to life, two consecutive sentences of 15 years to life, if petitioner rejected the plea offer of two concurrent sentences of 15 years to life and proceeded to trial and got convicted by the jury." (Pet. at 28.)

Justice Leff essentially told Gomez that if he sentenced his co-defendant Pena to two consecutive terms of 15 years to life for the attempted murder counts, [21] he intended to give Gomez the same if he was convicted after trial:

THE COURT: I'm not going to sentence Pena for another three weeks, but he was convicted of two counts of attempted murder of a police officer; not one police officer, but two police officers....
My own feelings is that if Pena's sentence is a consecutive sentence, *15 to life on each of them that that's not too much of a sentence to give Pena. And if you're convicted, I intend to give you the same.* Why you should get less, I don't know. But that's what's going to happen. So you're entitled to a trial....

(P. 2-3.) Justice Leff reiterated his intention at sentencing, when Gomez moved to withdraw his plea:

THE COURT: I'll tell him right now. I haven't sentenced Pena yet. Pena went to trial. He's not getting the minimum.

Tell him that right now so it will be no surprise. So that if gets tried, I don't care what they do [in the Bronx], twenty to life will be less than what he's going to get from me.

He doesn't want it, that's fine. I've dealt with wise guys. I look at this half-baked jerk sitting here. He's going to go to state prison. As far as I can see, he's never coming out. And he's telling me what he wants to do.

He either takes the sentence we agreed upon or he has his plea back and he'll never see the light of day. He's going to die in the state prison. I'll tell him that right now.

(S.4-6.)

As a preliminary matter, the Court notes that under New York law, "state court judges are not prohibited from engaging in plea negotiations." *Williams v. Lacy,* 96 Civ. 0868, 1997 WL 40922 at *2 (S.D.N.Y. Jan. 31, 1997), *aff'd,* No. 97-2572, 152 F.3d 922 (table), 1998 WL 352965 (2d Cir. May 7, 1998); *accord McMahon v. Hodges,* 225 F.Supp.2d 357, 369 (S.D.N.Y.2002) ("In New York, state court judges do participate in plea discussions."); *Schaffner v. Greco,* 458 F.Supp. 202, 206 (S.D.N.Y.1978) ("New York law permits participation by the judge in plea negotiations ...") (collecting 2d Cir. cases); *see also Thomas v. Kuhlman,* No. 99-CV-3737, 2003 WL 21294065 at *7 (E.D.N.Y. Apr. 8, 2003) (Plea bargaining systems that permit judicial involvement are not constitutionally impermissible.). Thus, Justice Leff's participation in the plea discussions is not an issue; the issue is whether his statements at the plea hearing improperly coerced Gomez into pleading guilty.

Every defendant involved in plea negotiations suffers the threat of conviction (often of greater charges or with a greater penalty), and must face such "difficult choices." *E.g., Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'-and permissible-'attribute of any legitimate

system which tolerates and encourages the negotiation of pleas." ') (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 31, 93 S.Ct. 1977, 1985 (1973) (possibility that if defendant "exercises his right to plead innocent and to demand a jury trial, he will receive a higher sentence than would have followed a waiver of those rights ... Although every such circumstance has a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices was upheld [by the Supreme Court] as an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas.")); *Brady v. United States,* 397 U.S. 742, 751-52, 90 S.Ct. 1463, 1470-71 (1970) (guilty plea constitutionally valid even though "motivated by defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged"); *United States v. Cruz,* 156 F.3d 366, 374 (2d Cir.1998); *Foreman v. Garvin,* 99 Civ. 9078, 2000 WL 631397 at *12 (S.D.N.Y. May 16, 2000) (Peck, M.J.); *Carter v. Scully,* 745 F.Supp. 854, 858 (E.D.N.Y.1990); *United States v. Rombom,* 421 F.Supp. 1295, 1299-300 (S.D.N.Y.1976); *see also, e.g., Oyague v. Artuz,* 274 F.Supp.2d 251, 258 (E.D.N.Y.2003) (Weinstein, D.J.) (Guilty plea not coerced where petitioner alleged that in an off-the-record conversation, the trial court told petitioner that if he was convicted after trial "he would spend the rest of his life in prison because he would be facing a likely 65 years to life sentence. Assuming the conversation took place, there is no allegation that the trial court did not believe that its statements were accurate or that the court was motivated by anything but a desire to fully inform petitioner of the consequences of going to trial."); *Phan v. McCoy,* No. 94-CV-1596, 1997 WL 570690 at *6 (N.D.N.Y. Aug. 28, 1997) (Pooler, D .J.) (Where petitioner claimed his guilty plea "was involuntary because withdrawal of that plea would have required him to face the possibility of conviction and sentencing for as many as one hundred and thirty offenses," claim rejected because the only coercion petitioner alleged was from "the inherent risks of going to trial."); *Williams v. Lacy,* 1997 WL 40922 at *2 ("In telling [petitioner] that he could be sentenced as a persistent felony offender if convicted after a trial [rather than as a second violent felony offender under the plea agreement], [the trial judge] was not vindictively threatening petitioner with an enhanced penalty, but merely informing him of one of the benefits of the proposed plea bargain.").

**\*21** Presented with judicial comments similar to those here, a habeas court in *McMahon v. Hodges,* 225 F.Supp.2d 357 (S.D.N.Y.2002), found that the comments were "exceedingly blunt" but "not inappropriate in the context in which they were made, *i.e.,* the plea bargaining process." *Id.* at 369. In *McMahon,* petitioner alleged, *inter alia,* that his due process rights were violated because his trial judge was biased and prejudiced against him. As here, that judge had presided over the co-defendant's trial, which had been severed for trial. *Id.* at 359. "On the eve of trial, at a conference with the parties, the judge tried to negotiate a plea, ... [and] alluded to the 'powerful' evidence he had seen at [co-defendant's] trial that would be admissible against [petitioner] at his trial, and suggested that [petitioner] plead guilty to avoid consecutive sentences for multiple crimes." *Id.* The habeas court found that:

> [t]he trial judge's comments undoubtedly were designed to induce [petitioner] to take a plea, but the state court system permits a judge to participate in such negotiations.... The trial judge was familiar with the evidence; he gave [petitioner] and his lawyer an appraisal of their case, a prediction on the likely outcome of a trial, and an explanation of the risks attendant to going to trial as opposed to pleading guilty. [Petitioner] did not like what he heard, but the trial judge, as an experienced, impartial arbiter, was merely giving his assessment to help the parties evaluate their options, as the state court system contemplates. While the trial judge's statements placed significant pressure on [petitioner] to plead guilty, as a matter of constitutional law, I conclude that [petitioner's] due process rights were not violated.

*Id.* at 369. [22]

Judge Weinstein faced similar facts to those here, although in the context of a claim that the state court had punished

petitioner for moving to withdraw his guilty plea and proceeding to trial. *Smith v. Scully,* Nos. 02-CV-6329, 02-MISC-0066, 2003 WL 22952848 (E.D.N.Y. Oct. 16, 2003) (Weinstein, D.J.). When petitioner moved to withdraw a portion of his guilty plea, "[t]he trial court, obviously frustrated and under the impression that petitioner was 'playing games,' stated to petitioner, 'I'm going to tell you now, if you get convicted by a jury, you're going to get the maximum sentence.... Did you listen to me? You've been playing games with the Court.' " *Id.* at \*5. Judge Weinstein noted that if "[t]aken out of context, this comment could be understood to be coercive and improper, leaving the impression that petitioner would be punished for proceeding to trial." *Id.* The trial court further commented that it had just reviewed petitioner's probation report, which characterized petitioner as "a professional criminal," and his record, which "takes your breath away." *Id.* In light of the trial court's comments about petitioner's extensive record, Judge Weinstein found that "the trial court's remarks to petitioner about the likelihood of receiving a 'maximum sentence' have more of a flavor of notice than threat.... Although the 'maximum sentence' statement could have been prudently worded, petitioner was not denied due process or a fair trial by the court's actions or statements." *Id.*

**\*22** Because the Court must judge the voluntariness of Gomez's plea by federal constitutional standards, it need not determine whether Justice Leff's comments would render the plea involuntary as a matter of New York state law, which holds that " 'a court wrongly burdens the defendant's exercise of his right to trial when it indicates he will receive the maximum sentence, or maximum consecutive sentences, after trial, but a significantly lighter sentence after a plea.' " *People v. Stevens,* 298 A.D.2d 267, 268, 748 N.Y.S.2d 589, 590-91 (1st Dep't 2002) (quoting *People v. Min,* 249 A.D.2d 130, 132, 671 N.Y.S.2d 480, 481 (1st Dep't 1998)), *appeal dismissed,* 99 N.Y.2d 585, 755 N.Y.S.2d 721 (2003); *see also, e.g., People v. Christian,* 139 A.D.2d 896, 896, 527 N.Y.S.2d 1020, 1020 (4th Dep't) ("A defendant may not be induced to plead guilty by the threat of a heavier sentence if he decides to proceed to trial.... 'To capitulate and enter a plea under a threat of an 'or else' can hardly be regarded as the result of the voluntary bargaining process between the defendant and the People sanctioned by propriety and practice.' "), *appeal denied,* 71 N.Y .2d 1024, 530 N.Y.S.2d 559 (1988). New York courts distinguish between a trial judge "impart[ing] a reasonable assessment of the

sentencing prospects in the event of a conviction," which is permissible, [23] and "unequivocally stat[ing] that upon a conviction, the maximum sentence would be imposed," which is coercive. [24] *People v. Stevens,* 298 A.D.2d at 268, 748 N.Y.S.2d at 590.

Here, Justice Leff was familiar with the evidence against Gomez from the suppression hearing and from the co-defendant's trial. Justice Leff also felt (with good reason based on the transcript) that Gomez was being a wise guy. Justice Leff's comments perhaps could have been better expressed, but in context they were not improperly coercive and did not violate Gomez's federal constitutional rights.

Gomez's claim that the trial court's comments coerced his guilty plea should be denied.

 B. *The State Court Conducted a Proper Inquiry to Determine the Voluntariness of Gomez's Guilty Plea*
Gomez also alleges that "[n]otwithstanding the fact that petitioner had twice denied that he had shot at the police officers, and thus denied that he had committed the crime to which he pleaded, the court failed to make any appropriate inquiry of petitioner to ensure that his plea was knowingly, intelligently and voluntarily entered." (Pet. at 30.) Contrary to Gomez's assertions, the trial court conducted a proper allocution:
THE COURT: [W]hen you plead guilty, you are giving up your right to pick a jury of 12 citizens who will sit over there in those seats. They will listen to the witnesses against you. You can help choose those jurors. After the jury is selected, you have a right to hear the witnesses who will testify against you. There was some 15 or 18 witnesses who testified at George Pena's trial, police officers, among others, Ah[ea]rn and Torres, who were the two police officers who were the victims in the second and third counts [of the indictment]. You will hear them.

 **\*23** You would have a right to have your lawyer question those witnesses. You would have a right to testify yourself if you wanted to or if you had any witnesses that you wanted to call, you could call those witnesses. You understand that?

MR. GOMEZ: Yes.

THE COURT: You understand that after the case is heard, it is submitted to the jury. And the jury decides whether you're guilty of these charges against you.

If you plead guilty, there is not going to be a jury that decides this case. And *by pleading guilty, you are admitting to certain facts. You're admitting* as to the first count that on February 22, 1993 under circumstances evincing a depraved indifference to human life, *you recklessly engaged in conduct that created a grave risk of death to another person by shooting a loaded firearm to [sic] a crowded restaurant.* That's at 1263 St. Nicholas Avenue.

*Did you do that?*

MR. GOMEZ: *Yes.*

THE COURT: The second count charges an attempt to commit the crime of murder in the first degree, and so does the third count. When you plead guilty, you're admitting to those counts; that you're over 18 years of age; that *on February 22, of 1993 with intent to cause the death of Police Officer Patrick Ahearn and a Police Officer Gonzalo Torres, you attempted to cause their death* and they were police officers as defined in law and at the time that *you fired your weapon at them,* you reasonable [sic] should have known that they were police officers and that they were in the course of performing their official duties.

Specifically, what they were doing was attempting to intersect [sic: intercept] the car that you were in and Pena was in. It was an Oldsmobile that you were driving away from the scene of the St. Nicholas Avenue restaurant and away from the Shell station on 181 Street.

Did you do that? Did you fire a gun at those police officers?

MR. GOMEZ: *Do I have to admit it?*

THE COURT: You certainly do. And if you don't, the jury will decide.

MR. GOMEZ: *Yes, I did it.*

THE COURT: I'm sorry.

MR. GOMEZ: *Do I have to admit it even if I didn't do it?*

THE COURT: *If you didn't do it, let the jury hear the witnesses. If you're claiming you didn't do it, go to trial.*

MR. GOMEZ: I'm only asking a question to know.

THE COURT: The question I'm asking you is whether or not-I just read what the charge was, attempting to cause the death of Ah[ea]rn and Torres. And *I'm asking you whether you fired a gun knowing that they were police officers.*

MR. GOMEZ: *Yes.*

THE COURT: *No question about that? Is there anything you don't understand that you want to have explained to you?*

MR. GOMEZ: *No.*

(P. 9-12, emphasis added.)

The Supreme Court in *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160 (1970), held that:
a guilty plea may be valid despite the defendant's protestations of innocence if there is strong evidence of guilt that "substantially negate[s][the] claim of innocence and ... further provide[s] a means by which the judge could test whether the plea was being intelligently entered," and held that a defendant's protestation of innocence does not invalidate a guilty plea where "a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt."

**\*24** *Joyner v. Vacco,* No. 00-2200, 23 Fed. Appx. 25, 27-28, 2001 WL 1168326 at \*2 (2d Cir. Sept. 21, 2001) (quoting *North Carolina v. Alford,* 400 U.S. at 38, 91 S.Ct. at 167), *cert. denied,* 535 U.S. 1101, 122 S.Ct. 2304 (2002).

Justice Leff properly determined that Gomez's plea was voluntary despite his equivocal statements of innocence. *Joyner v. Vacco,* 2001 WL 1168326 at \*4 ("From the trial record, it is clear that the state court considered the strength of the prosecution's case and found that it substantially negated [petitioner's] equivocal claims of innocence."). Indeed, Justice Leff knew what the evidence against Gomez would be, from his trial of Gomez's co-defendant, and knew the evidence was strong.

As Gomez concedes, Justice Leff cautioned Gomez that if he was claiming that he did not commit the crime, he should go to trial to allow the jury to decide. (Pet. at 29.) Gomez also concedes that "[w]hen petitioner admitted that he had been at the scene of the police shooting but denied being the shooter, the court told petitioner that he could 'tell that to the jury' and if 'they believe you[r] story, you walk out of here and worry about the Bronx case.' " (Pet. at 29.) Gomez admits that during the plea allocution "[t]he Court advised petitioner to go to trial and let the jury hear the witnesses if he didn't commit the crime or was claiming that he didn't do it." (Pet. at 30; *see also* P. 11.) [25] Justice Leff asked again if Gomez fired a gun at the officers knowing they were officers, Gomez responded "yes," and Justice Leff asked if there was any question about that or anything Gomez wanted explained, and Gomez said "no." (P. 12, quoted at page 14 above.) Thus, following Justice Leff's advice that he should go to trial if he wanted to maintain his claim of innocence, Gomez nevertheless freely allocuted to shooting at the police officers. (*See* page 14 above.)

Gomez's habeas claim that the court failed to conduct a proper inquiry into his guilt or innocence should be denied.

*C. Gomez's Guilty Plea Was Not Coerced by a Broken Prosecutorial Promise Since the Promise as to Bronx Sentencing Was Complied With*

Gomez alleges that his guilty plea was coerced by a broken prosecutorial promise as to sentencing in unrelated Bronx cases. (Pet. at 30-33.)

The Second Circuit " 'review[s] interpretations of plea agreements ... in accordance with principles of contract law.' " *United States v. Palladino,* 347 F.3d 29, 32 (2d Cir.2003) (quoting *United States v. Riera,* 298 F.3d 128, 133 (2d Cir.2002)); *see also, e.g., Guzman v. Couture,* 99 Civ. 11316, 2003 WL 165746 at \*16 (S.D.N.Y. Jan. 22, 2003) (" 'Principles of contract law and special due process concerns for fairness govern our interpretation of plea agreements.' ") (quoting *Spence v. Superintendent, Great Meadow Corr. Facility,* 219 F.3d 162, 167-68 (2d Cir.2000); *White v. Keane,* 00 Civ. 6202, 2001 WL 699053 at \*3 (S.D.N.Y. June 21, 2001) ("Plea agreements are to be interpreted according to the principles of contract law."). "A sentence imposed pursuant to a plea agreement 'must follow the reasonable understandings and expectations of

Gomez v. Duncan, Not Reported in F.Supp.2d (2004)

2004 WL 119360

the defendant with respect to the bargained-for sentence." ' *United States v. Palladino,* 347 F.3d at 33. Furthermore, " '[b]ecause the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." ' *United States v. Palladino,* 347 F.3d at 33 (quoting *United States v. Riera,* 298 F.3d at 133); *see also, e.g., Guzman v. Couture,* 2003 WL 165746 at *16 (" 'In construing the promises made in return for the plea, a court must look to what the parties reasonably understood the terms to mean, and resolve any ambiguity in the agreement in favor of the defendant." ') (citing cases). Nevertheless, the Second Circuit has cautioned that in the habeas context, the courts must also apply the deferential AEDPA review standard to claims of breaches of a plea agreement. *See Mask v. McGinnis,* 252 F.3d 85, 89-91 & n. 2 (2d Cir.2001).

**\*25** "The first step in deciding whether petitioner's plea agreement has been violated is to determine what the terms of the agreement are." *Guzman v. Couture,* 2003 WL 165746 at *16 (citing cases). During Gomez's plea proceeding, Justice Leff, defense counsel and the prosecutor stated the plea's terms on the record:

THE COURT: Did Mr. Traub tell you that the sentence that you're going to get is 15 years to life on the second count and concurrent which means served at the same time with the third count, and you're going to get a sentence on the first count of two and a third to seven, that's also concurrent?

MR. GOMEZ: Yes.

THE COURT: Except for that, did anybody promise you anything to make you plead guilty?

MR. GOMEZ: No.

THE COURT: You want to take that plea now?

MR. GOMEZ: Yes.

MR. TRAUB: Your Honor, there is some other promises that the People will put on the record as part of the plea agreement that the Court may not be aware of, that Mr. Gomez has two pending indictments in the Bronx. *The People have spoken to the Assistant [District Attorney] in the Bronx and they are prepared to offer concurrent time on the two cases that's [sic] pending in the Bronx.*

Mr. Gomez is also a suspect in a robbery out of the 34th Precinct in Manhattan. I have been contacted by the detectives in reference to that case. The People will cover that as well, and he will not be charged in reference to that case. The People have also indicated that this plea out of New York County will cover all known and unknown cases that might arise against Mr. Gomez as long as someone was not seriously hurt as defined under the Penal Law, assault in the first degree. *Those are the additional promises the People have made.*

THE COURT: You want to respond?

[A.D.A.] BOSCO: Yes, your Honor. What Mr. Traub states is true. I want to state, Mr. Lima(ph), the ADA in the Bronx who is handling the defendant's two Bronx robbery indictments, he and I have agreed that *if the defendant decided to plead guilty to those cases in the Bronx, the sentences will run concurrent to this sentence.*

As to the known and unknown robberies, I can only say that we will cover known an[d] unknown robberies where there wasn't serious injuries in Manhattan. I personally cannot speak for what may or may not happen in the Bronx. I can't do that. I don't have the power to do that. But other than that, that's the agreement that is being entered.

(P. 12-14, emphasis added.)

Gomez's petition states that "[a]t the time petitioner's plea was entered, several promises were made to petitioner in exchange for his guilty plea," specifically:

> The court promised to give petitioner 15 years to life. (P. 3). The State District Attorney promised to have this sentence run concurrent with two Bronx robbery cases that were pending against petitioner at that time (P. 13, 14). The prosecutor stated that he and the Assistan[t] District Attorney who was handling petitioner's Bronx cases had agreed that if petitioner decided to ple [ad] guilty to the Bronx cases, the sentence will run concurrent with this sentence. (P. 14). The District Attorney also promised that petitioner's plea

2004 WL 119360

in this case would cover all known and unknown Robberies cases where there wasn't any serious injuries in Manhattan. (P. 14).

**\*26**  (Pet. at 30.)

Gomez also states that when he appeared in court in the Bronx after his Manhattan plea "he informed the court that the New York County District Attorney had promised him that if he pleaded guilty in the New York case, any sentence imposed in the Bronx case would not be more than 15 years and would run concurrent with the New York sentence." (Pet. at 31.) Gomez "further informed the Bronx court that if the court and the prosecutor were going to honor that plea agreement, he wishes to plea guilty, as long as the sentence didn't exceed the 15 years sentence imposed on him in New York and runs concurrent with the New York sentence." (Id.) In response, the Bronx "prosecutor stated that he had not made such agreement with the New York District Attorney, that he had agreed with the New York prosecutor that if petitioner decided to plea[d] guilty to these cases, the sentence would run concurrent, but not that there wouldn't be any additional time imposed in th [ese] cases." (Id.) The Bronx District Attorney offered petitioner twenty to forty years to run concurrently with the New York sentence, but Gomez "rejected this offer, because it added 5 years to his New York sentence, thereby breaching the New York plea agreement." (Id.)

The Court finds nothing in the New York plea transcript to support Gomez's allegation that he was promised that "any sentence in the Bronx cases would not be more than 15 years." (Pet. at 31.) At no time did any party-Gomez, his counsel, the prosecutor, or Justice Leff-state that the Bronx District Attorney promised that his Bronx sentence would not exceed fifteen years or would not exceed the Manhattan sentence. Neither counsel nor Gomez (who clearly was willing to speak out during the plea allocution) referred to a fifteen-year maximum sentence in the Bronx, even when asked by Justice Leff if any other promises had been made to Gomez. (P. 12.) In fact, Gomez does not even contend now that he was promised a maximum term of fifteen years in the Bronx at the time of his Manhattan plea.[26] The Manhattan plea minutes clearly show that the explicit promise was that the Bronx sentence would be "concurrent," and only if Gomez also pled guilty in the Bronx. (P. 12-14.)

Even if Gomez subjectively misunderstood "concurrent sentence" in the Bronx to mean "lasting for the same amount of time," no habeas relief is warranted. "Since an objective reading of the plea bargain was susceptible to but one interpretation, the defendant's misunderstanding of the agreement or disappointment with his sentence does not suffice as a reason for vacating his guilty plea." *People v. Davis,* 161 A.D.2d 787, 787-88, 556 N.Y.S.2d 664, 664-65 (2d Dep't) ("A review of the plea minutes discloses that no promise was made by the court that the defendant's sentence would run concurrently with any discharged parole time. Any off-the-record promise of a concurrent sentence is belied by the defendant's acknowledgment during the plea allocution that no other promises had been made to induce his guilty plea. No inquiry was ever made by the defendant or his attorney as to whether the sentence would run consecutively with the undischarged sentence."), *appeal denied,* 76 N.Y.2d 939, 563 N.Y.S.2d 68 (1990); *see also, e.g., Mask v. McGinnis,* 252 F.3d 85 at 90 ("[T]he words of the plea agreement control, and their meaning is measured by objective, not subjective, standards.") (internal quotations omitted); *Marcelin v. Garvin,* 97 Civ. 2996, 1999 WL 977221 at *6-7 (S.D.N.Y. Oct. 26, 1999) (Peck, M.J.) (Petitioner's "contention that the court 'reneged' on a sentencing promise is contradicted by the record of the guilty plea proceedings" where the Judge advised petitioner of the plea agreement's terms and ascertained that no additional promises had been made. "[T]his Court is justified in crediting [petitioner's] statements at his plea allocution over his later self-serving allegations of coercion and violation of a plea deal.").

**\*27**  Here, Gomez was promised a concurrent sentence in the Bronx if he also pled guilty there. That promise was fulfilled with the offer in the Bronx of a concurrent sentence, albeit with a minimum of twenty years. Gomez rejected that offer and went to trial in the Bronx; his Manhattan plea agreement to a concurrent sentence in the Bronx was conditional on Gomez pleading guilty in the Bronx, which he did not. Thus, there was no violation of the New York plea agreement.

## III. *GOMEZ'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED*

Case 9:18-cv-00521-GLS-ML Document 23 Filed 06/10/19 Page 115 of 201
Gomez v. Duncan, Not Reported in F.Supp.2d (2004)
2004 WL 119360

A. *The Strickland v. Washington Standard On Ineffective Assistance of Counsel* [27]

1. *Strickland and Trial Counsel*

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003). This performance is to be judged by an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064. [28]

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). [29]

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. [30]

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of

reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

**\*28** Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.' " *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. at 695-96, 104 S.Ct. at 2069); *accord, e.g., Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991).

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069. [31]

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690-91, 104 S.Ct. at 2066. [32]

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d at 199.

2. Strickland *Applies to Ineffective Assistance Claims Arising Out of A Guilty Plea*

The *Strickland* standard also applies to ineffective assistance claims arising out of a guilty plea. *See Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 370 (1985); *United States v. Thomas,* No. 01-1070, 74 Fed. Appx. 113, 115, 2003 WL 22055169 at \*2 (2d Cir. Sept. 4, 2003); *United States v. Couto,* 311 F.3d 179, 187 (2d Cir.2003); *Moore v. United States,* 00 Civ. 4560, 98 Cr. 833, 2001 WL 253432 \*11 & n. 11 (S.D.N.Y.Mar.15, 2001) (Peck, M.J.) ( & cases cited therein); *Yeung v. Artuz,* 97 Civ. 3288, 2000 WL 145103 at \*8 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.)

(citing cases); *People v. McDonald,* 1 N.Y.3d 109, 2003 N.Y. Slip Op. 18777 at *4, 2003 WL 22764237 (N.Y. Nov. 24, 2003). "In the context of a guilty plea, the prejudice requirement 'focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." ' *Moore v. United States,* 2001 WL 253432 at *11 (quoting *Hill v. Lockhart,* 474 U.S. at 59, 106 S.Ct. at 370); *People v.. McDonald,* 2003 N.Y. Slip Op. 18777 at *4) (same).

### 3. *Strickland and Appellate Counsel*[33]

**\*29** The *Strickland* test applies to appellate as well as trial counsel. *See, e.g., Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 764 (2000).[34] A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonable in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. *E.g., Smith v. Robbins,* 528 U.S. at 285, 120 S.Ct. at 764; *Aparicio v. Artuz,* 269 F.3d at 95; *Mayo v. Henderson,* 13 F.3d at 533-34; *see also Larrea v. Bennett,* 2002 WL 1173564 at *18 n. 30 (discussing the issue of whether a federal or state standard should apply).

Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins,* 528 U.S. at 288, 120 S.Ct. at 765 (citing *Jones v. Barnes,* 463 U.S. 745, 750-54, 103 S.Ct. 3308, 3312-14 (1983)).[35] Reviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues.

*Lugo v. Kuhlmann,* 68 F.Supp.2d at 371-72.[36] Thus, a petitioner may establish constitutionally inadequate performance only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson,* 13 F .3d at 533; *see also, e.g., Jackson v. Leonardo,* 162 F.3d at 85.

### 4. *Strickland and the AEDPA Review Standard*

For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States." ' *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)).[37] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established." ' *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone,* 535 U.S. at 698-99, 122 S.Ct. at 1852; *see also Yarborough v. Gentry,* 124 S.Ct. 1, 4 (2003).

### B. *Gomez's Claims of Ineffective Trial Counsel Should Be Denied*

#### 1. *Gomez's Claim That Counsel Failed to Investigate, Call Witnesses, and Present Evidence at the Suppression Hearing*

**\*30** Gomez alleges that his trial counsel "failed to investigate the circumstances surrounding petitioner's statements to the police and under which petitioner's line-up identification became [sic] about, to call any witness or gather or present any evidence at the hearing to show that petitioner's statements were coerced by police brutality, and that the line-up identification procedure employed by the police was impermissibly suggestive." (Pet. at 24.)

Gomez's claims that trial counsel was ineffective for failing to investigate are conclusory and give no indication as to what exculpatory evidence a proper investigation would have revealed, or how such evidence would have benefitted Gomez's case.[38] Since "[s]uch speculation satisfies neither *Strickland'* s deficient performance nor prejudice prongs," Gomez's claim must be denied. *McPherson v. Greiner,* 02 Civ. 2726, 2003 WL 22405449 at *25 (S.D .N.Y. Oct. 22, 2003) (Peck, M.J.); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *33 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) ( & cases cited therein); *see, e.g., Vasquez v. United States,* 96 Civ. 2104, 91 Cr. 153, 1997 WL 148812 at *2 (S.D.N.Y. Mar. 28,

1997) (§ 2225 case; "[P]etitioner's allegations with regard to alleged counsel errors in pre-trial preparation and investigation and trial advocacy are 'vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source,' and, accordingly, ... '[t]he vague and unsubstantiated nature of the claims' defeated petitioner's claim of ineffective assistance of counsel....'"); *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir.1990) ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial. Moreover, if potential trial witnesses are not called to testify at a postconviction review hearing, the petitioner ordinarily should explain their absence and 'demonstrate, with some precision, the content of the testimony they would have given at trial.' ') (citations omitted); *Lamberti v. United States,* 95 Civ. 1557, 1998 WL 118172 at *2 (S.D.N.Y. Mar. 13, 1998) (Leval, C.J .) ("The allegations of failure to investigate or to communicate are vague and conclusory. They do not identify counsel's asserted failings with any specificity or show how any different conduct might have changed the result."), *aff'd,* No. 98-2875, 201 F.3d 430 (table), 1999 WL 1212654 (2d Cir. Dec. 10, 1999); *Madarikan v. United States,* No. 95 CV 2052, 1997 WL 597085 at *1 (E.D.N.Y. Sept. 24, 1997) (denying ineffective assistance claim based on failure to investigate or interview witnesses; petitioner's "allegations of ineffective assistance are conclusory, and give no indication as to what exculpatory evidence may have been revealed by an investigation"); *Matura v. United States,* 875 F.Supp. 235, 238 (S.D.N.Y.1995) ("Petitioner has not stated why his counsel's investigation was inadequate, what his counsel should have investigated, what this investigation would have produced, or how the fruits of this investigation would have aided petitioner's case."). [39]

 **\*31** Similarly, Gomez's claim that trial counsel was ineffective for not calling any witnesses should be denied. Gomez fails to name any witness that counsel should have called, much less whether they would have been willing to testify, what their testimony would have been, or how their testimony would have affected the outcome of the suppression hearing.

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision

of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357 (1987); *accord, e.g., Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *25 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *37 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *see, e.g., United States v. DeJesus,* No. 01-1479, 57 Fed. Appx. 474, 478, 2003 WL 193736 at *3 (2d Cir. Jan. 28, 2003) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999). Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." Counsel's decision not to call a character witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses ."), *cert. denied,* 123 S.Ct. 2110 (2003). [40]

More importantly, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation.... [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed ...,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." *Jones v. Hollins,* 884 F.Supp. 758, 765-66 (W.D.N.Y.1995) (citations omitted), *aff'd,* No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); *accord, e.g., Montalvo v. Annetts,* 2003 WL 22962504 at *26 (& cases cited therein); *Skinner v. Duncan,* 2003 WL 21386032 at *37; *see, e.g., United States v. Vegas,* 27 F.3d 773, 777-78 (2d Cir.), *cert. denied,* 513 U.S. 911, 115 S.Ct. 284 (1994).

Moreover, a petitioner may not merely allege that certain witnesses might have supplied relevant testimony, but must state exactly what testimony they would have supplied and how such testimony would have changed the result. *See, e.g., Lawrence v. Armontrout,* 900 F.2d at 130 ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial."); *Montalvo v. Annetts,* 2003 WL22962504 at *26; *Skinner v. Duncan,* 2003 WL

21386032 at *38; *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *33 & n. 59 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *24 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Greenidge v. United States,* No. 01 CV 4143, 2002 WL 720677 at *2 (E.D.N.Y. Mar. 27, 2002) (§ 2255 case; petitioner's ineffective assistance of counsel claim has no merit where petitioner "nowhere specifies how the testimony of those witnesses [counsel purportedly failed to call] would have been helpful to his defense."). [41]

 **\*32** As this Court has previously held, "[t]he decision of whether to call or bypass a particular witness is a question of trial strategy which courts will practically never second-guess.... In the instant case, the testimony of any of these witnesses may have as likely exposed inconsistencies and weaknesses in defendant's case as have lent support to Petitioner's defense. Additionally, a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice." ' *Cromwell v. Keane,* 2002 WL 929536 at *24 (quoting *Ozuru v. United States,* No. 95 CV 2241, 1997 WL 124212 at *4 (E.D.N.Y. Mar. 11, 1997), *aff'd,* 152 F.3d 920 (2d Cir.1998), *cert. denied,* 525 U.S. 1083, 119 S.Ct. 828 (1999)); *accord, e.g., Montalvo v. Annetts,* 2003 WL 22962504 at *27; *Skinner v. Duncan,* 2003 WL 21386032 at *40.

As for trial counsel's alleged failure to "gather or present any evidence at the hearing" (Pet. at 24), Gomez does not even suggest what evidence counsel could or should have presented or how that evidence might have affected the hearing's outcome. As such, Gomez's assertions about counsel's shortcomings are far too conclusory and vague to support a claim for habeas corpus relief. *See, e.g., Montalvo v. Annetts,* 2003 WL 22962504 at *24 n. 39; *McPherson v. Greiner,* 2003 WL 22405449 at *25 & n. 56 ( & cases cited therein); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *36 & n. 91 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 22681429 (S.D.N.Y. Nov. 13, 2003) (Kaplan, D.J.).

Gomez's first ineffective assistance of trial counsel claim should be denied.

### 2. *Gomez's Claim That Counsel Failed to Inform Gomez of "Favorable" Evidence*

Gomez claims counsel was ineffective because he failed to "inform petitioner of available favorable evidence which had petitioner known of he would have not pleaded guilty and would have proceeded to trial." (Pet. at 4; *id.* at 27.) According to Gomez, "counsel told petitioner that there [were] no witnesses that would testify on his behalf at trial, and failed to inform him of what kind of evidence was produced at Pena's trial that would work against or in favor of petitioner's case." (Pet. at 27.) Gomez's belief that counsel withheld "favorable" evidence appears to be based solely on a conversation with "his co-defendant George Pena in Downstate Correctional Facility mess hall [who] informed petitioner that all the civilian witnesses that testified at his trial said that they did not see petitioner shooting at the police, and that the only ones that testified that they saw petitioner shooting at the police were the police witnesses." (Pet. at 27.) The claim that counsel "failed to inform" Gomez of this evidence is specious. At the suppression hearing, Detective Caban testified that of the two restaurant workers, a cabdriver, and Officer Ahearn who viewed the line-up, one restaurant worker identified Gomez as someone he had seen in the restaurant, the second restaurant worker and the cabdriver did not recognize anyone in the line-up, and Officer Ahearn recognized Gomez from the car he stopped. (*See* page 8 above.) Gomez cannot claim that counsel failed to inform him of evidence that came out during his own suppression hearing. Based on the suppression hearing testimony, it should have been obvious to Gomez, at the time he decided to plead guilty, that the witnesses who would testify to his shooting at the police most likely would be police officers. There is no reason to believe that this information would have influenced Gomez's decision whether to plead guilty or go to trial.

 **\*33** Gomez's second ineffective assistance of trial counsel claim should be denied under both *Strickland* prongs.

### 3. *Counsel's Failure to Call Gomez to Testify at the Suppression Hearing*

Gomez claims that although he told counsel he wished to testify at the suppression hearing, counsel did not allow him to testify and did not inform him that he had the right to decide whether to testify:

> During the hearing, at the defense table, petitioner informed his counsel

that he wanted to testify on his own behalf to appraise the hearing court of the true facts surrounding the conditions of how his statements to the police were made and how the police had displayed him to the witness(es) alone in the line-up room, prior to the line-up being conducted. Notwithstanding the fact that he knew that petitioner's testimony may have affected the outcome of the hearing, defense counsel simply told petitioner that he could not testify at the hearing, and failed to inform petitioner that he had the right to testify in his own behalf, that the right to ultimately decide whether or not to testify belonged personally to petitioner and could [not] be waived by counsel.

(Pet. at 24.)

"A defendant in a criminal case has the constitutional right to testify on his own behalf, *see Rock v. Arkansas,* 483 U.S. 44, 49-51, 107 S.Ct. 2704 (1987), and [the Second Circuit has] held that a 'trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right.' ' *Rega v. United States,* 263 F.3d 18, 21 (2d Cir.2001) (quoting *Brown v. Artuz,* 124 F.3d 73, 78-79 (2d Cir.1997), *aff'g,* 95 Civ. 2740, 1996 WL 511558 (S.D.N.Y. June 10, 1996) (Haight, D.J. & Peck, M.J.), *cert. denied,* 522 U.S. 1128, 118 S.Ct. 1077 (1998)), *cert. denied,* 534 U.S. 1096, 122 S. Ct 847 (2002); *accord, e.g., United States v. Garcia,* No. 02-1049, 51 Fed. Appx. 325, 328, 2002 WL 31309247 at *2 (2d Cir. Oct. 11, 2002); *Chang v. United States,* 250 F.3d 79, 82-83 (2d Cir.2001); *Ruiz v. United States,* 94 Cr. 392, 98 Civ. 6399, 2000 WL 1010828 at *4 (S.D.N.Y. July 21, 2000) (Preska, D.J.). In *Brown v. Artuz,* the Second Circuit also held that:

Although counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

124 F.3d at 79; *accord, e.g., Chang v. United States,* 250 F.3d at 83; *Brown v. Rick,* 01 Civ. 4310, 2003 WL 22801397 at *7 (S.D.N.Y. Nov. 25, 2003).

The Supreme Court (and Second Circuit) decisions cited above, however, only dealt with the defendant's personal right to testify at *trial.* The Supreme Court has not decided whether that personal right also extends to pretrial proceedings such as a suppression hearing. Several district court decisions, in this district and elsewhere, have expressed the opinion that a defendant does not have a Constitutional right to testify at a pretrial proceeding. [42] This Court need not decide whether a criminal defendant has an absolute and personal right to testify at a suppression hearing. It suffices that the Supreme Court has not decided that such a right exists. As such, the state court's denial of Gomez's ineffective assistance claim - which is premised on the existence of such a right and counsel's failure to advise Gomez of that right - cannot be said to be contrary to or an unreasonable application of Supreme Court caselaw. Under the AEDPA, therefore, the Court should deny Gomez's claim.

**\*34** The Court also notes that Gomez's claim that counsel told him he could not testify is self-serving and was not supported in state court by any affidavit from counsel (although counsel did supply Gomez with an affidavit for his first C.P.L. § 440 motion asserting the broken prosecutorial promise as to the Bronx sentence). [43] Moreover, counsel could well have believed that Gomez's version of events was not credible - for example, Gomez claims that he (and co-defendant Pena) were repeatedly and badly beaten by the police, such that both of their clothes were covered in blood. (Dkt. No. 8: Beder 5/16/02 Aff. Ex. J: Gomez 8/4/99 C.P.L. § 440 Aff. ¶ 7 ("My clothes were all covered with my own blood."); *id.* ¶ 14 ("There I saw Pena lying on the floor, his face and clothes covered with blood ..."); *id.* ¶ 24 ("My face and my wet clothing were all covered with blood once again.").) But at the suppression hearing, the prosecution introduced the photos of Gomez's and Pena's line-ups. (*See* Tr. 50-51, 56.) Surely, if Gomez and Pena's clothes were as bloody as Gomez claims, the line-up pictures would have shown the blood. Defense counsel could reasonably have found Gomez's version of events too suspect to put Gomez on the witness stand at the suppression hearing -especially since he would have admitted certain of the charged crimes,

*e.g.,* reckless endangerment, assault and gun possession, while denying that he shot at police (utilizing the "some other dude did it" defense - last name unknown, who was not seen by any witness - to the attempted murder of a police officer charge). *See, e.g., United States v. Olney,* No. 89-50071, 892 F.2d 84 (table), 1989 WL 154238 at *1 (9th Cir. Dec. 18, 1989) (referring to the "commonly used 'phantom' or 'some other dude did it' defense"); Ellen Yankiver Suni, "Who Stole the Cookie from the Cookie Jar?: The Law and Ethics of Shifting Blame in Criminal Cases," 68 Fordham L.Rev. 1643, 1693 n. 5 (2000) ( "This defense is sometimes called to SODDI defense, which 'is popularly known in the trade as the "Some Other Dude Did It." ' "). The Court need not further analyze Gomez's factual claims (which contain other inconsistencies), since, as noted above, the Supreme Court has not held that a defendant's absolute right to decide to testify at trial also applies to pretrial hearings.

Under the AEDPA, the state court's denial of this aspect of Gomez's ineffective assistance claim is not contrary to or an unreasonable application of Supreme Court precedent and therefore the claim should be denied.

### C. *Gomez's Claim of Ineffective Appellate Counsel Should Be Denied*

Gomez alleges that appellate counsel should have raised on appeal the trial court's threat of a heavier sentence, the broken prosecutorial promise, and the trial court's refusal to allow Gomez to withdraw his guilty plea because of the broken promise. (Pet. at 35.) This Court already has rejected on the merits Gomez's federal habeas claims that his guilty plea was coerced by the court's threat of a heavier sentence and by a broken prosecutorial promise. (*See* Points II.A & B above.) It is well-settled that appellate counsel cannot be faulted for failing to raise a meritless claim. *See, e.g., Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *28 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v.. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *41 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.) ( & cases cited therein.) Accordingly, Gomez's claim of ineffective appellate counsel should be denied.

***35** It also could be ineffective for appellate counsel to fail to raise a valid state law claim, even if that claim itself would not be cognizable on federal habeas review.[44] As discussed at pages 46-48 & n. 23 above, it is a closer call as to whether Justice Leff's plea colloquy with Gomez

was defective under New York state decisional law. But even assuming *arguendo* that it was, appellate counsel was not ineffective for failing to raise that on appeal because the issue was not preserved for appeal. No objection was made at the time of Gomez's guilty plea, and at sentencing the request to withdraw Gomez's plea was based only on the Bronx sentence, not on any alleged coercion of the plea. (S. 4, 8, 12-14; *see* pages 16-22 above.) Thus, any state law sentence coercion claim was not preserved for appeal and, if raised by appellate counsel, could have been denied by the First Department on that basis. *See, e.g., People v. Gambaccini,* 2003 N.Y. Slip. Op. 19594, 2003 WL 22965480 at *1 (3d Dep't Dec. 18, 2003) (Defendant's "failure to make a motion to withdraw her plea or to vacate the judgment of conviction on this ground renders this claim unpreserved for our review."); *People v. Hopeton,* 256 A.D.2d 81, 81, 681 N.Y.S.2d 753, 753 (1st Dep't 1998) ("Defendant did not preserve his current claim that he was coerced by the court into entering the guilty plea, since his motion to withdraw the plea was made on other grounds."); *People v. Newman,* 231 A.D.2d 875, 875, 648 N.Y.S.2d 62, 62 (4th Dep't 1996) (Defendant "failed to preserve for [appellate] review his contention that the pleas were coerced."), *appeal denied,* 89 N.Y.2d 944, 655 N.Y.S.2d 895 (1997); *People v. Crafton,* 159 A.D.2d 271, 271, 552 N.Y.S.2d 273, 274 (1st Dep't 1990) ("Defendant failed to raise the issue of the court's alleged coerciveness during the plea in his motion to withdraw his guilty plea. This constitutes a waiver of the claim."). Thus, appellate counsel cannot be faulted, and Gomez cannot show prejudice, from any failure to raise a state law claim that, even assuming arguendo it otherwise had merit, was not preserved for appeal.

### *CONCLUSION*

For the reasons set forth above, Gomez's habeas petition should be *DENIED,* and a certificate of appealability should not be issued except as to the ineffective assistance/ right to testify at the suppression hearing claim, since whether such a right exists has not been addressed by the Second Circuit. *See, e.g., Miller-El v. Cockrell,* 537 U.S. 322, 336-37, 123 S.Ct. 1029, 1039 (2003) (" § 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.' ' The statute "does not require a showing that the appeal will succeed. Accordingly, a court ... should not decline the application for a

COA merely because it believes the applicant will not demonstrate an entitlement to relief."); *Slack v. McDaniel,* 529 U.S. 473, 475, 120 S.Ct. 1595, 1599 (2000) (Certificate of appealability should issue where "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' "); *Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.) (Certificate of appealability should issue "if the issues involved in a petition are debatable among jurists of reason, could be resolved in a different manner, or are adequate to deserve encouragement to proceed further."), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175 (2000).

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**\*36** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and

any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Loretta A. Preska, 500 Pearl Street, Room 1320, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Preska. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 119360

---

**Footnotes**

1  One of the fillers in the line-up was a police officer assigned to the 34th Precinct, to which Officer Ahearn also was assigned. (Caban: Tr. 51-52.) Detective Caban testified that after the lineup was completed, he asked Officer Ahearn whether he had recognized this police officer, and Officer Ahearn responded that he had not. (Caban: Tr. 52.)

2  The predicate violent offender felony conviction would have increased the minimum sentence for the reckless endangerment count from two-and-a-third to three-and-a-half years. (S.11.) Justice Leff decided, however, not to honor the predicate felony sentence because it was not brought up until after Gomez's plea. (S.15-16.)

3  Gomez made several outbursts before and after sentence was imposed in the Bronx case. When the judge directed the A.D.A. to address sentencing, Gomez chimed in: "How they going to accuse me of some fuckin' burial [sic; probably brawl] when I wasn't fighting on the street." (Bx. at 8.) When the judge asked Gomez whether he wished to make a statement as to sentencing, Gomez said: "I ain't got nothing to say. Thank you. Do what you gotta do. You want me in jail, do what you gotta do." (Bx. at 13.) Finally, after sentence was imposed, Gomez's counsel asked to be relieved from having to represent Gomez in a related case since Gomez had "threatened to physically assault" him. (Bx. at 16.) After the judge relieved counsel, Gomez's last words on the matter were "Asshole. Motherfucker asshole." (Bx. at 17.)

4  For additional decisions by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see Montalvo v.. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *12-14 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *15-17 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *McPherson v. Greiner,* 02 Civ. 2726, 2003 WL 22405449 at *12-14 (S.D.N.Y. Oct. 22, 2003) (Peck, M.J.); *Wilder v. Herbert,* 03 Civ. 0397, 2003 WL 22219929 at *4-6 (S.D.N.Y. Sept. 26, 2003) (Peck, M.J .); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *14 (S.D.N .Y. Sept. 10, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 22681429 (S.D.N.Y. Nov. 13, 2003) (Kaplan, D.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *7-9 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 *11-13 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *Ouinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *16-18 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Wilson v. Senkowski,* 02 Civ. 0231, 2003 WL 21031975 at *5-6 (S.D.N.Y. May 7, 2003) (Peck, M.J.); *Naranjo v.. Filion,* 02 Civ. 5449, 2003 WL 1900867 at *5-7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *8-10 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Dickens v.. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *6-8

(S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at *5-6 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *6-8 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at *12-14 (S.D.N.Y. Aug. 2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at *6-7 (S.D.N.Y. July 24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at *9-11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at *10-11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *8-9 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12-13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8-9 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at *4-5 (S.D.N.Y. Jan. 9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at *7 (S.D.N.Y. Dec. 21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *6 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at *16 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411, 417 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1353 (2003); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd, No.* 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003).

5    *See also, e.g., Dallio v. Spitzer,* 343 F.3d 553, 559-60 (2d Cir.2003), *petition for cert. filed,* No. 03-7760, ___ U.S.L.W. ___ (U.S. Dec. 3, 2003); *Eze v. Senkowski,* 321 F.3d 110, 120 (2d Cir.2003) ( "AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners." ') (quoting *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611 (2002)); *Christie v. Hollins,* 01 Civ. 11605, 2003 WL 22299216 at *2 (S.D.N.Y. Oct. 7, 2003) (Mukasey, D.J.) ("As Magistrate Judge Peck explained, the 'unreasonable application' clause, and AEDPA more generally, imposes a heavy burden on habeas petitioners.").

6    *Accord, e.g., Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003), *cert. denied,* 124 S.Ct. 962 (2003); *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,* 531 U.S. 1116, 121 S.Ct. 865 (2001).

7    *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2534 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1172 (2003) ( "Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." '); *Tueros v. Greiner,* 343 F.3d 587, 591 (2d Cir.2003); *Parsad v. Greiner,* 337 F.3d at 181; *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 537 U.S. 909, 123 S.Ct. 251 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

8    *Accord, e.g., Price v. Vincent,* 538 U.S. 634, 123 S.Ct. 1848, 1853 (2003); *Lockyer v. Andrade,* 123 S.Ct. at 1173-74; *Tueros v. Greiner,* 343 F.3d at 591; *DelValle v. Armstrong,* 306 F.3d at 1200; *Yung v. Walker,* 296 F.3d at 135; *Kennaugh v. Miller,* 289 F.3d at 42; *Loliscio v. Goord,* 263 F .3d at 184; *Lurie v. Wittner,* 228 F.3d at 127-28.

9    *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2534-35; *Parsad v. Greiner,* 337 F.3d at 181.

10    *See also, e.g., Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853 ("As we have explained, 'a federal habeas court may not issue the writ simply because that court concludes that the state-court applied [a Supreme Court case] incorrectly." ') (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 360 (2002)); *Lockyer v. Andrade,* 123 S.Ct. at 1175; *Eze v. Senkowski,* 321 F.3d at 124-25; *DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

11    *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853; *Lockyer v. Andrade,* 123 S.Ct. at 1174-75; *Woodford v. Visciotti,* 537 U.S. at 25-27, 123 S.Ct. at 360-61; *Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 128-29.

12    *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Christie v. Hollins,* 2003 WL 22299216 at *3.

Gomez v. Duncan, Not Reported in F.Supp.2d (2004)
Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 123 of 201
2004 WL 119360

13    *Accord, e.g., Tueros v. Greiner,* 343 F.3d at 591; *Yung v. Walker,* 296 F.3d at 135.

14    *Accord, e.g., Dallio v. Spitzer,* 343 F.3d at 559-60; *Parsad v. Greiner,* 337 F.3d at 180-81; *Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003); *Eze v. Senkowski,* 321 F.3d at 121; *Ryan v. Miller,* 303 F.3d at 245; *Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 694 (2002); *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001).

       The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." *Sellan v. Kuhlman,* 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

       We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999). *Sellan v. Kuhlman,* 261 F.3d at 314; *accord, e.g., Cotto v. Herbert,* 331 F.3d at 230; *Eze v. Senkowski,* 321 F.3d at 121-22; *Norde v. Keane,* 294 F.3d at 410; *Aparicio v. Artuz,* 269 F.3d at 93; *see also Dallio v. Spitzer,* 343 F.3d at 560.

15    The Second Circuit in *Miranda v. Bennett* continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or' procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." *Id.* at 178.

16    Nevertheless, because, as discussed below, Gomez's plea coercion claim should be dismissed under the *de novo* standard, the claim also would be denied if the deferential AEDPA review standard applied. *See, e.g., Rosario v. Bennett,* 2002 WL 31852827 at *25 ( & cases cited therein); *see also, e.g., Smith v. Scully,* Nos. 02-CV-6329, 03-MISC-0066, 2003 WL 22952848 at *4 (E.D.N.Y. Oct. 16, 2003) (Weinstein, D.J.).

17    *See also, e.g., Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.), *cert. dismissed,* 479 U.S. 805, 107 S.Ct. 248 (1986); *Marcelin, v. Garvin,* 97 Civ. 2996, 1999 WL 977221 at *5 (S.D.N.Y. Oct. 26, 1999) (Peck, M.J.); *James v. Greiner,* 97 Civ. 2652, 1999 WL 619636 at *4 (S.D.N.Y. Aug. 16, 1999); *Charnock v. Herbert,* 60 F.Supp.2d 91, 99-100 (W.D.N.Y.1999); *Ramirez v.. Headley,* 98 Civ. 2603, 1998 WL 788782 at *5 (S.D.N.Y. Nov. 10, 1998); *Thomas v. Senkowski,* 968 F.Supp. 953, 955 (S.D.N.Y.1997); *Singh v. Kuhlmann,* 94 Civ. 2213, 1995 WL 870113 at *5 (S.D.N.Y. Aug. 25, 1995) (Cote, D.J. & Peck, M.J.), *report & rec. adopted,* 1996 WL 337283 (S.D.N.Y. June 19, 1996) (Cote, D.J.).

18    *Accord, e.g., Foreman v. Garvin,* 2000 WL 631397 at *10; *Sanchez v. Senkowski,* No. 93-CV-4385, 1996 WL 1057150 at *3 (E.D.N.Y. June 19, 1996); *Singh v. Kuhlmann,* 1995 WL 870113 at *5; *Wax v. Keane,* 89 Civ. 7843, 1991 WL 220962 at *3 (S.D.N.Y. Oct. 17, 1991).

19    *Accord, e.g., Mabry v. Johnson,* 467 U.S. at 59, 104 S.Ct. at 2547; *United States v. Rossillo,* 853 F.2d 1062, 1064 (2d Cir.1988); *Foreman v. Garvin,* 2000 WL 631397 at *10; *Marcelin v. Garvin,* 1999 WL 977221 at *5; *Smylis v. City of New York,* 25 F.Supp.2d 461, 465 (S.D.N.Y.1998); *see also, e.g., Willbright v. Smith,* 745 F.2d 779, 780-81 (2d Cir.1984).

20    *See also, e.g., Santobello v. United States,* 94 Cr. 119, 97 Civ. 4404, 1998 WL 113950 at *2-3 (S.D.N.Y. March 13, 1998); *United States v. Caesar,* 94 Cr. 59, 1995 WL 312443 at *3 (S.D.N.Y. May 23, 1995) ("The Court notes that statements made during a plea allocution carry a strong presumption of verity. Such statements are conclusive absent credible reason justifying departure from their apparent truth.") (citations & internal quotation marks omitted); *United States v. Napolitano,* 212 F.Supp. 743, 747 (S.D.N.Y.1963) ("The defendant's admissions ... [at guilty plea] are solemn declarations; they are not to be lightly disregarded in favor of his present self-serving assertion ...").

21    Gomez's co-defendant, George Pena, was convicted of first degree reckless endangerment, two counts of first degree attempted murder, two counts of second degree criminal possession of a weapon, third degree criminal possession of a weapon, and second degree assault. *People v. Penna,* 254 A.D.2d 227, 227, 678 N.Y.S.2d 894, 894 (1st Dep't 1998). Pena was sentenced "as a second felony offender to a term of 3 1/2 to 7 years on the reckless endangerment conviction, to run consecutively to concurrent terms of 20 years to life, 20 years to life, 7 1/2 to 15 years, 7 1/2 to 15 years, 3 1/2 to 7 years, 3 1/2 to 7 years on the remaining convictions, respectively." *Id.*

22    Because McMahon did *not* ultimately plead guilty, the habeas court did not decide whether the comments would have rendered a plea following those comments involuntary. The habeas court determined only that the trial court's decision to deny recusal did not merit habeas relief. *Id.* at 370.

Gomez v. Duncan, Not Reported in F.Supp.2d (2004)
Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 124 of 201
2004 WL 119360

23    *See, e.g., People v. Villone,* 302 A.D.2d 866, 866, 753 N.Y.S.2d 778, 778-79 (4th Dep't 2003) (Guilty plea not coerced where court "advised him of the possible sentences that could be imposed if he were convicted of the charges in the indictment." Court found that the trial "court's remarks served to 'impress upon the defendant the strength of the People's case, the potential sentence to which defendant was exposed under the indictment, and the favorableness of the plea bargain.' The fact that defendant may have pleaded guilty to avoid receiving a harsher sentence does not render his plea coerced.") (quoting *People v. Campbell,* 236 A.D .2d 877, 878, 653 N.Y.S.2d 758, 758 (4th Dep't 1997)); *Britt v. State,* 260 A.D.2d 6, 12-13 699 N.Y.S.2d 323, 328 (1st Dep't 1999) (Guilty plea not coerced where judge did not threaten to impose the maximum sentence, but "merely advised the claimant that, in view of his four prior felony convictions, he 'would not be getting closer to the minimum, but closer to the maximum.'.... [I]t is not coercive for a court to remark that 'if the defendant were to be convicted after trial, it would impose a sentence close to the maximum allowable under the law.' "), *appeal denied,* 95 N.Y.2d 753, 711 N.Y.S.2d 155 (2000); *People v. Jackson,* 262 A.D.2d 169, 170, 692 N.Y.S.2d 60, 61 (1st Dep't) ("The court's comments on possible sentences in the event of a conviction after trial, however impermissible, did not rise to the level of being coercive."), *appeal denied,* 93 N.Y.2d 972, 695 N.Y.S.2d 58 (1999); *People v.. Hopeton,* 256 A.D.2d 81, 81-82, 681 N.Y.S.2d 753, 753 (1st Dep't 1998) (Guilty plea not coerced where "the court properly noted that the negotiated plea was very favorable to defendant, in light of the sentencing range that would apply if defendant were found guilty, after trial, of the charge in the indictment."); *People v. Cornelio,* 227 A.D.2d 248, 248, 642 N.Y.S.2d 648, 648 (1st Dep't) (Guilty plea not coerced even though "court advised defendant that he faced a possible 100 years in prison which, based on the facts known to it, it would not hesitate to impose, do not demonstrate coercion."), *appeal denied,* 88 N.Y.2d 982, 649 N.Y.S.2d 389 (1996); *People v. Crafton,* 159 A.D.2d 271, 271-72, 552 N.Y.S.2d 273, 274 (1st Dep't) (Guilty plea not coerced where trial court "impress[ed] upon the defendant the strength of the People's case, the potential sentence to which defendant was exposed under the indictment, and the favorableness of the plea bargain."), *appeal denied,* 76 N.Y.2d 733, 558 N.Y.S.2d 895 (1990); *see also, e.g., People v. French,* 292 A.D.2d 813, 813-14, 738 N.Y.S.2d 925, 925 (4th Dep't) ("The fact that the plea was induced by the threat of a longer sentence does not render the plea involuntary.") (citing *People v. Hale,* 93 N.Y.2d 454, 463-64, 692 N.Y.S.2d 649 (1999) (New York Court of Appeals "recognize[d] that negotiated sentences by their very nature involve inducements, relinquishments, and constraints, and are routinely characterized not only as voluntary but also as knowing and intelligent.")), *appeal denied,* 98 N.Y.2d 675, 746 N.Y.S.2d 464 (2002); *People v. Newman,* 231 A.D.2d 875, 875, 648 N.Y.S.2d 62, 62 (4th Dep't 1996) ("[D]efendant's fear that a harsher sentence would be imposed if defendant were convicted after trial does not constitute coercion.").

24    *See, e.g., People v. Stevens,* 298 A.D.2d at 268, 748 N.Y.S.2d at 590 (During plea negotiations, judge trial judge stated: " '[O]nce we go forward, there will be no turning back. If you're convicted after trial, given the circumstances of this case under which you were apprehended and the nature of your record, 25 to life, that's what you're going to get.' ' Defendant's plea was coerced "by the court's assertion that if he declined the offered plea and was convicted at trial, the judge would sentence him to the maximum term possible."); *People v. Min,* 249 A.D.2d at 131-32, 671 N.Y.S.2d at 481 (Guilty plea coerced where judge erroneously informed defendant of the "mandatory" sentence he would receive after trial, which was in fact the maximum consecutive sentence); *People v. Wilson,* 245 A.D.2d 161, 162-63, 666 N.Y.S.2d 164, 165-66 (1st Dep't 1997) (Guilty plea coerced where judge did not merely threaten to impose heavier sentence or inform the defendant that he "could" receive a greater sentence if convicted after trial. Rather, judge "virtually promised" to impose sentence almost four times greater than the plea offer, stating that it was the court's "policy" to sentence predicate felons convicted of a drug crime "to the high end of the sentencing chart."), *appeal denied,* 91 N.Y.2d 946, 671 N.Y.S.2d 726 (1998); *People v. Fanini,* 222 A.D.2d 1111, 1111, 635 N.Y.S.2d 896, 897 (4th Dep't 1995) (Guilty plea coerced where prior to plea, court told defendant: " 'Eight to life ... What you would receive in the event of a conviction would be twenty-five." '); *People v. Beverly,* 139 A.D.2d 971, 971, 528 N.Y.S.2d 450, 450 (4th Dep't 1988) (Guilty plea coerced where prior to plea, court told defendant: " 'if we have to go to trial and work' the court probably would sentence him to ... the maximum sentence, 'on top of' the sentence for another crime."); *People v. Griffith,* 80 A.D.2d 590, 590, 435 N.Y.S.2d 767, 768 (2d Dep't 1981) (Guilty plea coerced by the trial court's "explicit threat of a heavier sentence should he choose to proceed to trial.").

25    It is not at all clear that Gomez was saying that he did not shoot at the officers. While he asked whether he had to admit that even if he did not do it, he also explained to Justice Leff that he was "only asking a question to know." (P. 11.)

26    Gomez's claim likely would fail even if he alleged the promise of a fifteen-year maximum was off the record, as "off-the-record [plea] negotiations may not serve as the basis for federal habeas review." *Armstrong v. Duncan,* 03 Civ. 930, 03 Civ. 1442, 2003 WL 22339490 at *9 (S.D.N.Y. Oct 14, 2003) (Rejecting claim that state breached an initial plea agreement for a fifteen-year term when the formal agreement on the record was for a twenty-year term.); *White v. Keane,* 2001 WL 699053 at *3 ("On the record, [petitioner] stated, and his attorney further clarified, that the only promise he received in exchange for his plea was that the District Attorney would give a recommendation statement to the parole board."

2004 WL 119360

Both defense counsel and the prosecutor agreed on the record that the plea transcript, which included the bargained-for statement, would be forwarded to the parole board. "In contrast, nowhere in the record before [the habeas court] is there any indication that the A.D.A. agreed to provide another, future, recommendation directly to the parole board. Therefore, we find that the ... government met its obligation under the plea agreement as stated on the record. As to any off-record promises that the prosecutor may have made, it is well settled in this Circuit that federal due process does not require a state prosecutor to honor an off-record promise made in exchange for a plea.") (citing *United States v. United States Currency in the Amount of $228,536.00,* 895 F.2d 908, 914 (2d Cir.), *cert. denied,* 495 U.S. 958, 110 S.Ct. 2564 (1990), & *Siegel v. State of New York,* 691 F.2d 620 (2d Cir.1982), *cert. denied,* 459 U.S. 1209, 1035 S .Ct. 1201 (1983)); *but see Williams v. Spitzer,* 246 F.Supp.2d 368, 382-83 & n. 12 (S.D.N.Y. Feb. 28, 2003) (holding that "the New York courts' policy of refusing to enforce off-the-record prosecutorial promises is not permissible under the Supreme Court's decision in *Santobello" v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499 (1971) ( " '[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.")). Gomez, however, does not rely on any off-the-record plea negotiations.

27   For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *22-24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J .); *Maldonado v. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *26-28 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *32-34 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *9-12 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *33-35 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *18-19 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *14-16 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *26-28 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *13-14 (S.D .N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *9-11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *9-11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *15-17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Ennis v. Walker,* 00 Civ. 2875, 2001 WL 409530 at *15-16 (S.D.N.Y. Apr. 6, 2001) (Peck, M.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S .D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Santos v. Greiner,* 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept. 24, 1999) (Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133-34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M .J.).

28   *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2535; *Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 1850 (2002).

29   *Accord, e.g., Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

30   *See also, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542; *Bell v. Cone,* 535 U.S. at 695, 122 S.Ct. at 1850; *Aparicio v. Artuz,* 269 F.3d at 95; *Sellan v. Kuhlman,* 261 F.3d at 315; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene,* 527 U.S. 263, 289-91, 119 S.Ct. 1936, 1952-53 (1999); *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565-66 (1995); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland" );Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." *Strickler v. Greene,* 527 U.S. at 291, 119 S.Ct. at

1953; *cf. id.* at 297-301, 119 S.Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

31  *Accord, e.g., Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14 (2000).

32  *See also, e.g., Yarborough v. Gentry,* 124 S.Ct. 1, 5-6 (2003); *Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982) ( "We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81 (1994).

33  For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel, in language substantially similar to this section of this Report & Recommendation, *see Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *22-24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *28 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *32-34 (S.D.N.Y. Sept. 10, 2003) (eck, M.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *9-12 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J .); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133-34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Ehinger v. Miller,* 942 F.Supp. 925, 932 (S.D.N.Y.1996) (Mukasey, D.J. & Peck, M.J.); *Benn v. Stinson,* 917 F.Supp. 202, 205 (S.D.N.Y.1995) (Stein, D.J. & Peck, M.J.).

34  *Accord, e.g., Evitts v. Lucey,* 469 U.S. 387, 396-97, 105 S.Ct. 830, 836-37 (1985); *Frederick v. Warden, Lewisburg Corr. Facility,* 308 F.3d 192, 197 (2d Cir.2002), *cert. denied,* 537 U.S. 1146, 123 S.Ct. 946 (2003); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 319 (2d Cir.2001); *McKee v. United States,* 167 F.3d 103, 106 (2d Cir.1999); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.), *cert. denied,* 513 U.S. 520, 115 S.Ct. 81 (1994); *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2347 (1993); *Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990); *Ortiz v. United States,* 01 Civ. 9990, 2002 WL 31427356 at *4 (S.D.N.Y. Oct. 30, 2002); *Senor v. Greiner,* No. 00-CV-5673, 2002 WL 31102612 at *8 (E.D.N.Y. Sept. 18, 2002); *King v. Greiner,* 210 F.Supp.2d 177, 182-83 (E.D.N.Y.2002).

35  *Accord, e.g., Sellan v. Kuhlman,* 261 F.3d at 317 ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998); *Mayo v. Henderson,* 13 F.3d at 533.

36  *Accord, e.g., Jones v. Barnes,* 463 U.S. at 754, 103 S.Ct. at 3314; *Tsirizotakis v. LeFevre,* 736 F.2d 57, 65 (2d Cir.), *cert. denied,* 469 U.S. 869, 105 S.Ct. 216 (1984).

37  *See also, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003); *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 1852 (2002); *Sellan v. Kuhlman,* 261 F.3d at 315.

38  To the extent that Gomez supplies any information, it is that he told his attorney that, in essence, the police beat his confession out of him and had the line-up witnesses view him alone first to taint the lineup. (*See, e.g.,* Pet. at 24.) The issue thus largely overlaps with Gomez's claim that counsel was ineffective for not telling Gomez that Gomez could testify at the suppression hearing. That issue is addressed in Point III.B.3 below.

39  *See also, e.g., Polanco v. United States,* 99 Civ. 5739, 94 F.R. 453, 2000 WL 1072303 at *10 (S.D.N.Y. Aug. 3, 2000) (denying claim of failure to investigate, because petitioner "does not say precisely what counsel would have learned or how counsel would have learned it"); *Muhammad v. Bennett,* 96 Civ. 8430, 1998 WL 214884 at *1 (S.D.N.Y. Apr. 29, 1998) ("petitioner's speculative claim about the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial counsel); *United States v. Vargas,* 871 F.Supp. 623, 624 (S.D.N.Y.1994) (Rejecting ineffective assistance claim based on failure to investigate, since "[t]here is no evidence that avenues suggested by the client which might have altered the outcome were ignored."); *Gossett v. Henderson,* 87 Civ. 5878, 1991 WL 135601 at *7 (S.D.N.Y. July 18,

Gomez v. Duncan, Not Reported in F.Supp.2d (2004)
Case 9:18-cv-00521-GLS-ML   Document 23   Filed 06/10/19   Page 127 of 201
2004 WL 119360

1991) (denying claim of ineffective assistance for failure to investigate and develop an alibi defense based on entirely conclusory allegations which failed to show that any omission was prejudicial), *aff'd,* No. 91-2468, 978 F.2d 705 (table) (2d Cir. Aug. 12, 1992), *cert. denied,* 510 U.S. 997, 114 S.Ct. 564 (1993); *Croney v. Scully,* CV-86-4335, 1988 WL 69766 at *2 (E.D.N.Y. June 13, 1988) ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial."), *aff'd,* No. 88-2337, 880 F.2d 1318 (table) (2d Cir. June 29, 1989).

40    *See also, e.g., United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied,* 123 S.Ct. 1494 (2003); *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998), *cert. denied,* 526 U.S. 1164, 119 S.Ct. 2059 (1999); *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,* 522 U.S. 846, 118 S.Ct. 130 (1997); *Nieves v. Kelly,* 990 F.Supp. 255, 263-64 (S.D.N.Y.1997) (Cote, D.J. & Peck, M.J.); *Rodriguez v. Mitchell,* 92 Civ.2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

41    *See also, e.g., Lou v. Mantello,* No. 98-CV-5542, 2001 WL 1152817 at *10 (E.D.N.Y. Sept. 25, 2001) ("Habeas claims based on 'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative." ') (citations omitted); *Muhammad v. Bennett,* 1998 WL 214884 at *1 ("petitioner's speculative claim about the testimony of an uncalled witness" is insufficient to show ineffective assistance of trial counsel); *Burke v. United States,* 91 Civ. 468, 1992 WL 183752 at *2 (S.D.N .Y. July 22, 1992) (petitioner's "contention that he was denied effective assistance of counsel" where "his attorney failed to subpoena several witnesses who would have aided his defense is wholly insufficient given [petitioner]'s failure to set forth who the specific witnesses are or their relevant testimony."); *Croney v. Scully,* 1988 WL 69766 at *2 ("Petitioner's contention that assignment of an investigator would have been helpful to his defense is conclusory and speculative. Petitioner must show not only that the testimony would have been favorable, but also that the witness would have testified at trial.").

42    *See, e.g., Narvaez v. United States,* 97 Civ. 8745, 1998 WL 255429 at *5 n. 6 (S.D.N.Y. May 19, 1998) (Sotomayor, D.J.) ("While it is well-established that a defendant has a constitutional right, personal to him and not waivable by counsel, to testify at *trial,* it is not clear that this extends to pretrial hearings.... It seems likely to this Court that the decision to put the defendant on the stand in a pretrial evidentiary hearing has no special constitutional status beyond the right to present evidence on one's own behalf and is thus committed, as are all decisions about which witnesses to call or not call, to trial counsel's professional judgment. The distinction is important because if the defendant has a personal right to testify, the question under the performance prong of *Strickland* is whether counsel informed the defendant of that right, whereas if there is no such personal right the question becomes the more difficult standard of whether the decision not to call the defendant was within the range of sound professional judgment. Given the disposition of this issue on the prejudice prong, the Court need not decide the issue.") (citation omitted); *Hemingway v. Henderson,* 754 F.Supp. 296, 302 (E.D.N.Y. Jan. 8, 1991) ("If a strategic decision by defense counsel not to seek to suppress a confession may constitute a waiver of the claim that the confession was erroneously admitted, it would seem to follow that a strategic decision not to call the defendant as a witness at a suppression hearing, even when not made in full consultation with the defendant, should have a similar effect.... There is a difference between testifying at trial that involves a determination of guilt or innocence and testifying at a preliminary hearing the purpose of which is to keep evidence from 'the trier of guilt or innocence for reasons wholly apart from enhancing the reliability of verdicts.'.... Accordingly, where a defendant did not testify at a suppression hearing because he relied on the advice of counsel, the issue is best approached in terms of whether the advice was reasonable and whether, if the advice had been different, it would have affected the outcome of the hearing."); *see also, e.g., United States v. Stewart,* 51 F.Supp.2d 1147, 1158 n. 4 (D.Kan.1999) ("Like the court in *Narvaez [v. United States* ], this court expresses no opinion on the issue of whether the defendant or his counsel controls the decision to testify at a pretrial hearing ..."), *aff'd,* Nos. 99-3159, 99-3270, 215 F.3d 1338 (table) (10th Cir. June 2, 2000).

43    *See, e.g., White v. United States,* 99 Civ. 11809, 2000 WL 546426 at *5 (S.D.N.Y. May 4, 2000) (Where petitioner asserted that he told his counsel that he wanted to testify, but counsel rested the defenses case without calling petitioner, court found that petitioner's affidavit "fail [ed] to substantiate his allegation that trial counsel's performance was deficient." " '[T]he defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand." ') (quoting *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir.), *cert. denied,* 513 U.S. 829, 115 S.Ct. 101 (1994)); *see also, e.g., Jeffries v. United States,* No. 99-3692, 234 F.3d 1268 (table), 2000 WL 1679447 at *1 (6th Cir. Oct. 31, 2000) (Petitioner "has not shown that counsel's performance was deficient as he merely made conclusory, self-serving allegations that

2004 WL 119360

his attorney refused to let him take the stand."); *Torres v. Stinson,* No. 97-CV-5310, 2000 WL 1919916 at *5 (E.D.N.Y. Dec. 29, 2000) ("A barebones assertion by a defendant that his counsel failed to inform him of his rights is insufficient to establish an ineffective assistance of counsel claim under *Strickland.*") (internal quotation omitted).

44    *See Sellan v. Kuhlman,* 261 F.3d 303, 309-10 (2d Cir.2001) (petitioner may claim ineffective assistance of appellate counsel based on counsel's failure to raise state law claim on appeal); *Mayo v. Henderson,* 13 F.3d 528, 533-36 (2d Cir.1994) ("The claim whose omission forms the basis of an ineffective assistance claim may be either a federal-law or a state-law claim...."); *Claudio v. Scully,* 982 F.2d 798, 803-05 & n. 5 (2d Cir.1992) ("The federal constitutional right to effective assistance of counsel may be violated by an attorney's failure to raise a meritorious state law claim or defense."), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2347 (1993); *Hoffman v. Kuhlmann,* Nos. 98-CV-3528, 03-MISC-0066, 2003 WL 22964466 at *7 (E.D.N.Y. Dec. 1, 2003) (Weinstein, D.J.) ("Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim ..."); *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *44 n. 71 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *19 n. 34 (S.D.N.Y. May 31, 2002) (Peck, M.J.) (Petitioner "could prevail if he proved that counsel's performance was objectively unreasonable in failing to preserve a meritorious federal *or* state claim."); *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2000) (Scheindlin, D.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *12 (S.D.N.Y. May 25, 2000) (Peck, M.J.) (trial counsel was not ineffective for failing to object to Allen charge, because charge was correct under both federal and state law), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003).

---

End of Document    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 2003210
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Gregory HARVEY, Petitioner.

v.

Leonard PORTUONDO, Superintendent,
Shawangunk Correctional Facility, Respondent.

No. 98–CV–7371(JG).
|
Aug. 5, 2002.

**Synopsis**
Defendant was convicted of two counts of second-degree
felony murder, one count of first-degree arson, and one
count of third-degree arson, affirmed at 224 A.D.2d 713,
638 N.Y.S.2d 963. Following denial of his application for
coram nobis relief, 247 A.D.2d 407, defendant petitioned
for a writ of habeas corpus. The District Court, Gleeson,
J., held that: (1) claim that admission of defendant's
written statement at trial violated his right not to be
convicted based on a coerced confession was unexhausted
and procedurally barred; (2) any violation of federal law in
the use of a defendant's written confession was harmless;
(3) evidence that defendant had previously broken his
wife's jaw during an argument and threatened to burn
down the house was admissible; and (4) defendant was
procedurally barred from raising a claim of ineffective
assistance of trial counsel.

Petition denied.

West Headnotes (5)

[1]     **Habeas Corpus**
        👉 Coram nobis, post-conviction motion, or
        similar collateral proceedings
        **Habeas Corpus**
        👉 Direct review;appeal or error

        Petitioner failed to exhaust state remedies
        as to claim that admission of his written
        statement at trial violated his Fifth and
        Fourteenth Amendment right not to be
        convicted based on a coerced confession, and
        thus, he was procedurally barred from raising

the claim in a federal habeas proceeding,
absent a showing of cause and prejudice;
claim of a coerced confession was not
raised in petitioner's state appellate brief, his
application for leave to appeal to the state's
highest court, in his coram nobis petition,
or in his motion for postconviction relief. 28
U.S.C.A. § 2254(d)(1).

5 Cases that cite this headnote

[2]     **Habeas Corpus**
        👉 Questions of local law

        Claim asserting a violation of state law is not
        cognizable in a petition seeking federal habeas
        relief. 28 U.S.C.A. § 2254(d)(1).

        2 Cases that cite this headnote

[3]     **Habeas Corpus**
        👉 Confessions, declarations, and
        admissions

        Any violation of federal law in the use of a
        defendant's written confession was harmless
        beyond a reasonable doubt in prosecution for
        murder and arson,and thus did not warrant
        federal habeas relief; defendant confessed to a
        detective even before he exercised his *Miranda*
        rights, and other evidence contributed to
        findings of guilt and absence of insanity.

        Cases that cite this headnote

[4]     **Criminal Law**
        👉 Homicide, mayhem, and assault with
        intent to kill
        **Homicide**
        👉 Previous hostile acts or conduct of
        accused
        **Homicide**
        👉 Discord between spouses or cohabitants

        Evidence that defendant had previously
        broken his wife's jaw during an argument
        and threatened to burn down the house was
        admissible in a prosecution charging him with
        murdering his wife by burning down the
        house, to prove his motive and intention to
        commit the crime.

1 Cases that cite this headnote

**[5]    Habeas Corpus**

👉 Direct review;appeal or error

Habeas petitioner was procedurally barred
from raising a claim of ineffective assistance
of trial counsel where he failed to pursue that
claim on direct appeal; his claim was based
in facts that were part of the trial record,
and available to him at the time of his direct
appeal. 28 U.S.C.A. § 2254(d)(1).

6 Cases that cite this headnote

**Attorneys and Law Firms**

Gregory Harvey, Shawangunk Correction Facility,
Wallkill, New York, Petitioner pro se.

Richard A. Brown, District Attorney, Queens County,
Kew Gardens, New York, By: John M. Castellano,
Robin A. Forshaw, Assistant District Attorneys, for
Respondent.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1** Gregory Harvey has petitioned for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254. For the reasons set
forth below, the petition is denied.

*BACKGROUND*

A. *The Facts*

During the early morning hours of March 5, 1990,
petitioner intentionally set fire to his mother-in-law's
home in Queens County, New York, where he had been
living with his pregnant wife, Theresa Harvey, and their
two-year-old son, Julian. Theresa and Julian, who were
asleep in the house, were both killed in the fire.

Petitioner fled the burning building and called a friend.
Wilbert Gray, telling Gray that he had set the fire in
order to commit suicide, but that he had changed his mind

and escaped. Petitioner asked Gray to take him to the
hospital, where Detective Erroll Garner arrested him that
evening. Petitioner waived his constitutional rights and
told Garner that he had set the fire in an effort to commit
suicide, but had decided instead to escape from a window.
Petitioner then invoked his right to counsel, and Garner
stopped questioning him. A few minutes later petitioner
told Garner that he was willing to speak without an
attorney. Petitioner then said nothing, but upon Garner's
saying "okay," petitioner was removed from his cell and
gave a detailed statement. Again he admitted that he had
set the fire in order to commit suicide (because of various
marital and family problems with his wife and mother-in-
law), but that he had decided to escape. He added that he did
not know that his wife and baby were in the house. The
confession was reduced to writing, which petitioner signed
and dated.

B. *The Procedural History*

Petitioner was subsequently charged with six counts
of Murder in the Second Degree (two counts each of
intentional murder, depraved indifference murder, and
felony murder), one count of Arson in the First Degree,
one count of Arson in the Third Degree, and one count
of Reckless Endangerment in the First Degree (Queens
County Indictment Number 1370/90).

Petitioner was initially found unfit to proceed to trial, but
upon a second examination he was found competent to
stand trial. He then moved to suppress his statements to
the police on the ground that he was mentally incapable of
making them knowingly and voluntarily. After a hearing,
the New York State Supreme Court, Queens County
(Berkowitz, J.), denied his motion, holding that petitioner
had knowingly and voluntarily waived his constitutional
rights.

Petitioner waived his right to a jury trial and proceeded
to a bench trial before Justice Thomas A. Demakos of the
New York State Supreme Court, Queens County. [1] He did
not deny setting the fire, but instead asserted an insanity
defense. In a written verdict dated August 12, 1993, the
court found that petitioner had failed to meet his burden
of proving his insanity defense by a preponderance of the
evidence, and found him guilty of two counts of second-
degree felony murder, one count of first-degree arson,
and one count of third-degree arson. The court acquitted

petitioner of the intentional and depraved indifference murder counts, and of the reckless endangerment count.

**\*2** On November 9, 1993, the court sentenced petitioner to concurrent prison terms of twenty-five years to life on each of the murder counts and arson in the first degree, and five to fifteen years on the third-degree arson count. In June of 1995, petitioner perfected his direct appeal to the New York State Supreme Court, Appellate Division, Second Department ("Appellate Division"). He contended that the statements he made after invoking his right to counsel were erroneously admitted at trial under New York's "indelible right to counsel" because his waiver of counsel was made in the absence of counsel, *see People v. Cunningham,* 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980), and because Garner "encouraged" petitioner to make his statement by saying "okay" after petitioner, without prompting, said that he was willing to speak without an attorney.

On February 26, 1996, the Appellate Division affirmed the conviction, concluding that petitioner's right to counsel had been violated, but the error was harmless. The court held that the statements petitioner made after invoking his right to counsel should have been suppressed because they were not "spontaneous" under New York law. *See People v. Harvey,* 224 A.D.2d 713, 638 N.Y.S.2d 963 (2d Dept.1996) (citing, *inter alia, People v. Lucas,* 53 N.Y.2d 678, 439 N.Y.S.2d 99, 421 N.E.2d 494 (1981)). The court held the error to be harmless beyond a reasonable doubt, because of the other evidence proving petitioner's guilt and disproving his insanity. *See id.* at 713–14, 638 N.Y.S.2d 963. It noted that it was undisputed, "especially through the defendant's oral admission made before he requested counsel," that petitioner had deliberately set the fire. *See id.* at 713–14, 638 N.Y.S.2d 963. The evidence also showed that petitioner was aware that people were present in the house when he set the fire because he had jumped from a window on the second floor, where Theresa and Julian Harvey were sleeping and were later found dead in their beds. In addition, petitioner had admitted to one of his psychiatrists that he ran through all the floors of the house after he set the fire. *See id.* Even though the trial court had partially relied on the written statement to reject petitioner's insanity defense, the Appellate Division found that the testimony of an examining psychiatrist (that petitioner did not lack substantial capacity to know that (a) he was setting a fire; (b) the fire could injure

anyone in the building; and (c) that conduct was wrong) established that petitioner was not insane when he set the fire. The court also noted the trial court's reliance on petitioner's failure to mention his alleged hallucinations and delusions to his friend Wilbert Gray, whom he had called immediately after the fire, to the doctors at the hospitals where he was treated after the fire, or to Garner in any of his statements. Rather, petitioner first claimed that he had hallucinations and delusions more than a year and a half after the fire, when he was preparing for trial. The court concluded that, "even without resort to the statements which he made subsequent to requesting counsel, the defendant failed to prove by a preponderance of the evidence that he lacked criminal responsibility for his acts by reason of mental disease or defect." *Id.* at 714, 638 N.Y.S.2d 963 (citations omitted).

**\*3** In letters dated March 12, 1996, and April 8, 1996, petitioner applied for leave to appeal to the New York State Court of Appeals, arguing that harmless error analysis should not be applied when evidence is erroneously admitted at a bench trial and the trial court relies on that evidence in its written verdict. On May 13, 1996, Judge Richard D. Simons denied petitioner's application for leave to appeal. *See People v. Harvey,* 88 N.Y.2d 879, 645 N.Y.S.2d 454, 668 N.E.2d 425 (1996). Petitioner sought a writ of certiorari from the United States Supreme Court. On March 17, 1997, the Supreme Court denied the petition. *See Harvey v. New York,* 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997).

In October of 1997, petitioner filed a motion for a writ of error *coram nobis* in the Appellate Division, claiming that he had received ineffective assistance of appellate counsel [2] because there were a number of issues that appellate counsel had failed to address on petitioner's direct appeal. First, petitioner claimed that counsel should have raised a federal constitutional claim with respect to petitioner's written confession, and the failure to do so resulted in (a) the Appellate Division's determination that any error was harmless; (b) the New York Court of Appeals' decision to deny leave to appeal; and (c) the United States Supreme Court's decision to deny certiorari. Second, petitioner alleged that appellate counsel erred in not challenging the admission of uncharged crimes evidence at trial without the benefit of a hearing under *People v. Ventimiglia,* 52 N.Y.2d 350, 438 N.Y.S.2d 261, 420 N.E.2d 59 (1981). Third, he claimed that appellate counsel unreasonably failed to

challenge the admissibility of opinion testimony of the People's expert psychiatric witness, Dr. Lawrence Siegel. Fourth, petitioner argued that appellate counsel should have challenged the admission of Dr. Siegel's testimony on hearsay grounds.

In a decision and order dated February 2, 1998, the Appellate Division denied petitioner's application for *coram nobis* relief. *See People v. Harvey,* 247 A.D.2d 407 (2d Dept.1998). Citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the court held that petitioner had failed to establish that he was denied the effective assistance of appellate counsel.

Next, petitioner filed a motion to vacate his judgment of conviction pursuant to N.Y. CPL § 440.10, dated March 17, 1998, in which he claimed that he received ineffective assistance of counsel at trial. [3] In support of his claim, petitioner argued that trial counsel did not (a) request a *Ventimiglia* hearing with respect to evidence of certain uncharged crimes or bad acts (specifically, that petitioner had broken his wife's jaw and had threatened to burn down the house) introduced on the People's direct case; (b) object to Dr. Siegel's rebuttal testimony that petitioner gave unreliable and inconsistent accounts of the events surrounding the fire; (c) object to Dr. Siegel's reliance on hearsay in forming his expert opinions; and (d) present a claim to the trial court that petitioner's confession was inadmissible because it had been obtained after petitioner invoked his right to counsel.

**\*4** In a memorandum decision dated May 28, 1998, Justice Demakos denied the motion. The court found that petitioner's claims were procedurally barred from review as a result of petitioner's failure to raise them on direct appeal, and that they were without merit. Petitioner sought leave to appeal to the Appellate Division, which was denied on September 9, 1998.

C. *The Instant Petition*
In the instant petition, Harvey raises the following four claims: (a) that his conviction was obtained by the use of his involuntary confession; (b) that the use of those statements cannot be deemed harmless error in a bench trial in which the trial judge's written decision identified these statements as the best evidence for the verdict; (c) that he was denied the effective assistance of appellate

counsel; and (d) that he was denied the effective assistance of trial counsel.

## DISCUSSION

A. *The Standard of Review*
When a habeas court is considering a claim that was decided on the merits in a state court proceeding, it may grant relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). [4] The two clauses of this provision have independent meaning. *Williams,* 529 U.S. at 404–05. Under the first clause, a state court decision will be considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* at 405–06.

Under the second clause, a habeas petitioner may win relief if the state court decision "identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. The habeas court's determination that the state court wrongly decided the case is a necessary, but not a sufficient, condition to relief under this provision. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also id.* at 412 (explaining that "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law"); *id.* at 409 (holding that the standard is one of "objective[ ]" reasonableness). Interpreting *Williams,* the Second Circuit has added that although "[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (citing *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted.). This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether it

2002 WL 2003210

has alluded to federal law in its decision. *See Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir.2001).

## B. *Petitioner's Confession*

**\*5** Petitioner argues (1) that the admission of his written statement at trial violated his Fifth and Fourteenth Amendment right not to be convicted based on a coerced confession, and (2) that the trial court's error was not a harmless one. I will address each in turn.

### 1. *The Exhaustion Requirement*

**[1]** Petitioner's federal constitutional claim—that the admission of his statement violated his right against self-incrimination—is procedurally barred because it has not been exhausted in state court. Before a federal court can grant a petition for a writ of habeas corpus, the petitioner must exhaust all available state judicial remedies. *See* 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims.") (citing *Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886)). In order to exhaust state remedies, a petitioner must fairly present his federal constitutional claims to the highest state court. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). This exhaustion requirement ensures, as matter of comity, that state courts have an opportunity to correct any violations of the federal constitutional rights of prisoners within their jurisdiction before the claims are reviewed by federal courts. *See id.* at 844; *Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). [5]

To exhaust federal constitutional claims, a prisoner must fairly present to the state court the same federal constitutional claims, legally and factually, as he raises in his petition to the federal court. *See O'Sullivan,* 526 U.S. at 845–47; *Daye,* 696 F.2d at 191. Even if a petitioner raises precisely the same legal claim in state and federal proceedings, reliance in the two proceedings upon different factual grounds that "fundamentally alter the legal claim already considered by the state courts" will foreclose a conclusion that the claim is exhausted. *Vasquez v. Hillery,* 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

The exhaustion doctrine "requires only that a petitioner present his claim once on direct or collateral review." *Sanford v. Senkowski,* 791 F.Supp. 66, 69 (E.D.N.Y.1992); *See also Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir.1977). Therefore, even if a claim is not raised at trial or on direct appeal, a claim pursued throughout a full round of state post-conviction proceedings is exhausted. *See* 2 J. Liebman & R. Hertz, *Federal Habeas Corpus Practice and Procedure* § 23.3b, at 671 (1994) (citing *Castille v. Peoples,* 489 U.S. 346, 350–51, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)).

Here, neither petitioner's Appellate Division brief nor his application for leave to appeal to the New York Court of Appeals raised his claim of a coerced confession. In both courts, petitioner alleged only that the admission of his statements violated the state law. Similarly, in his *coram nobis* petition and his § 440 motion, petitioner failed to raise this federal constitutional claim. Indeed, in his *coram nobis* petition, he argued that appellate counsel was ineffective for failing to raise the claim on direct appeal, essentially conceding that the claim was unexhausted at that time. Likewise, in his § 440 motion, petitioner contended that trial counsel was ineffective for failing to preserve the claim at the suppression hearing. Under the standard set forth in *Dave,* petitioner did not present his Fifth Amendment claim to the state courts, and therefore he has failed to exhaust his claims.

**\*6** There are currently no means by which petitioner can present this unexhausted claim to the state's highest court because (1) "sufficient facts appear on the record of the proceedings underlying the judgment" to have permitted petitioner to raise these claims on direct appeal, N.Y. CPL § 440.10(2)(c); and (2) petitioner has "already made the one request for leave to appeal to which he is entitled." *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (citing N.Y. Court Rules § 500.10(a)). Since the New York courts would find these unexhausted claims procedurally barred from review, they are deemed exhausted here. *See id.* (citing *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state would hold the claim procedurally barred.")).

Under these circumstances, a federal court may review the procedurally defaulted claims on their merits only if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the court's refusal to consider the claims would result in a miscarriage of justice. *See Coleman,* 501 U.S. at 750; *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997). The petitioner can prove "cause" by demonstrating that "some objective factors external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *see also Coleman,* 501 U.S. at 752–53. A showing that "the factual or legal basis for a claim was not reasonably available to counsel," for example, or that "some interference by state officials made compliance impracticable," may demonstrate cause. *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994) (citing *Murray,* 477 U.S. at 488), *cert. denied,* 514 U.S.1954 (1995). To meet the prejudice requirement, the petitioner "must show 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Murray,* 477 U.S. at 494 (alteration in original) (quoting *United States v. Frady,* 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

Petitioner has not alleged the existence of factors that constitute cause. Moreover, the reason this coerced confession claim was never raised in state court is obvious from the petitioner's own statements. He never asserted facts that could amount to coercion. As he put it in his letter to counsel dated April 12, 1995 (attached as Exhibit A to the 63–page memorandum submitted in support of the petition),

> My statement to police should have been suppressed at the Huntley hearing because I requested an attorney —thus invoking my Right to Counsel—before the statement was made. While I was locked in the cell—handcuffed and barefoot on the cold floor—the police were typing up their reports formally charging me with Murder 2 et al. They were engaged in a conversation on these charges, which they wanted me to hear. It was these conversations which led me to believe that they were not going to "scrupulously honor" my request for an attorney. After 20 minutes of hearing this conversation—and seeing that no attempt was being made to contact an attorney for me—I called out and said, "I'll tell you what you want to hear." I was suffering from Major Depression at the time; and

since the police did not scrupulously honor my request for an attorney—my statement was neither voluntary nor spontaneous, and therefore should have been suppressed (See: People v. Cunningham, 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360; People v. Grant, 45 N.Y.2d 366, 408 N.Y.S.2d 429, 380 N.E.2d 257; People v. Ringer, 1988, 140 A.D.2d 642, 528 N.Y.S.2d 674).

**\*7** Because I was in the least (sic) suffering from "extreme emotional disturbance" at the time of making the inculpatory statement, I am not sure how much of the statement is truth and how much of it is assumption, conjecture and indoctrination based on the conversations of the police which I had overhead. Still to this day, I am not 100% sure if my accounts of what happened are what really happened if they are the accounts of other people's assumptions and interpretations which have related to me and I accepted this as truth and related them as such.

As pointed out by appellate counsel's letter to petitioner dated July 2, 1996, which is attached as Exhibit B to the same memorandum, no federal claim was made because the facts would not support one. The mere fact that petitioner had not seen a lawyer for 20 minutes after invoking his *Miranda* rights does not mean that he was coerced when he "called out and said, 'I'll tell you what you want to hear.' " Rather than pursue a baseless federal claim of a coerced confession, appellate counsel pursued the New York State right to counsel claim. This was astute advocacy, as the Appellate Division found that claim to have merit, although it further found the error to be harmless.

Not only was there no cause for the default, there was no prejudice either. The federal claim had no merit; there was not even a hint of coercion in the procurement of the written confession. Even if there were, the state court's finding that the use of the confession was harmless beyond a reasonable doubt was clearly correct. Petitioner confessed to Garner even before he exercised his *Miranda* rights. Moreover, as the Appellate Division noted, other evidence contributed to the court's finding of petitioner's guilt and absence of insanity. *See Harvey,* 224 A.D.2d at 714, 638 N.Y.S.2d 963.

**B. *The "Harmless Error" Claim***
Petitioner claims in Point II of his memorandum that the improper use of involuntary statements can never be

harmless error in a bench trial where the fact-finding judge explicitly relies on the challenged statements. This claim has no merit.

[2]    First, as discussed above, this case does not involve "involuntary" statements. The only right of which petitioner was deprived was the New York State "indelible" right to counsel. A claim asserting a violation of state law is not cognizable in a petition seeking federal habeas relief.

[3]    Second, even if the use of the written confession violated federal law, the state court found that the use of that evidence (which, it found, violated *state* law) was harmless beyond a reasonable doubt. I agree with that conclusion. At the very least, it cannot reasonably be characterized as an unreasonable application of that standard.

## C. *Ineffective Assistance of Appellate Counsel*
Petitioner claims that his appellate counsel was ineffective because he failed (1) to challenge the admission of petitioner's confession on Fifth Amendment grounds; (2) to argue that uncharged crimes evidence was improperly admitted in the absence of a *Ventimiglia* hearing; (3) to argue that the People's psychiatric expert gave improper opinion testimony; and (4) to challenge the admission of the psychiatric expert's testimony, which was based in part on hearsay.

 *8  [4]    Petitioner's claim fails because the state appellate court determined that petitioner's counsel was effective, and that determination was neither contrary to nor an unreasonable application of federal law. Indeed, I agree with it entirely. *See Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). To the extent the claim is based on counsel's failure to raise the Fifth Amendment claim, it fails because, as set forth above, there was no Fifth Amendment violation. Appellate counsel's failure to seek reversal on the groung that a *Ventimiglia* hearing should have been held is simply absurd. Petitioner was charged with murdering his wife by burning down the house. The evidence at issue was that he had previously (1) broken his wife's jaw during an argument; and (2) threatened to burn down the house. A motion to preclude such evidence, which plainly was admissible to prove petitioner's motive and intention to commit the crime, would have been frivolous.

Finally, appellate counsel's decision not to press unfounded challenges to unobjectionable expert testimony did not deprive petitioner of his right to effective counsel.

## D. *Ineffective Assistance of Trial Counsel Claim*
Following the Appellate Division's denial of petitioner's writ of error *coram nobis,* petitioner filed a motion to vacate his judgment of conviction pursuant to N.Y. CPL § 440.10, asking that his judgment be set aside on account of his having been denied the effective assistance of trial counsel. Petitioner claimed that his counsel (1) had not requested a *Ventimiglia* hearing or objected to the admission of uncharged crimes evidence; (2) had not objected to Dr. Siegel's rebuttal testimony; and (3) had failed to raise a claim during trial that petitioner's confession was taken in violation of his right to counsel and was therefore, inadmissible. That motion was denied on May 28, 1998. Petitioner now raises the same ineffective assistance of trial counsel claim in this habeas petition.

[5]    Petitioner is procedurally barred from raising a claim of ineffective assistance of trial counsel because he failed to pursue that claim on direct appeal. *See supra* (discussing petitioner's Fifth Amendment claim). As noted by the Appellate Division in its decision, petitioner's claim is based in facts that were part of the trial record, and available to him at the time of his direct appeal. *See* May 28, 1998, Appellate Division Decision; *see generally Daye,* 696 F.2d at 190 n. 3 (stating that an applicant "shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section [2254(b) and (c) ], if he has the right under the law of the State to raise, by any available procedure, the question presented"). Petitioner has not shown cause for his procedural default or that prejudice or a fundamental miscarriage of justice would result, and he is therefore unable overcome the procedural bar. *See Murray,* 477 U.S. at 492. Nor can petitioner succeed on the merits of his claim, as he has not shown that the trial counsel's conduct was ineffective. The decision not to seek a *Ventimiglia* hearing was sound, as stated above. The decision not to assert that the written confession was involuntary was compelled by petitioner's own version of the facts. The failure to make evidentiary challenges to the psychiatric testimony no doubt reflects trial counsel's correct judgment that those challenges would have had no merit.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 136 of 201
Harvey v. Portuondo, Not Reported in F.Supp.2d (2002)
2002 WL 2003210

CONCLUSION

**\*9** For the foregoing reasons, the petition is denied. Because the petitioner fails to make a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 2003210

Footnotes

1    A full discussion of the trial evidence is included in the People's Appellate Division brief and in the People's brief in opposition to the petition for a writ certiorari, and is not repeated here.

2    Petitioner was represented on appeal by Frank J. Loss of the Legal Aid Society.

3    Petitioner was represented at trial by Michael W. Warren.

4    This provision, added to the habeas statute by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), governs review of this petition, since it was filed after AEDPA's enactment. *See Williams v. Taylor,* 529 U.S. 362, 402–03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

5    Although a petition containing an unexhausted claim may not be granted, it may be denied on the merits notwithstanding the failure to exhaust. *See* 28 U.S.C. § 2254(b)(2). Unexhausted claims that are not denied on the merits require either the dismissal of the petition without prejudice (to renewal after the claim has been exhausted or dropped) or a stay of further proceedings pending exhaustion of state remedies. *See Zarvela v. Artuz,* 254 F.3d 374 (2d Cir.2001).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 6449138
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Guy McQUEEN, Petitioner,
v.
SUPERINTENDENT, FRANKLIN
CORRECTIONAL FACILITY, Respondent.

No. 9:15–cv–00077–JKS.
|
Signed Oct. 23, 2015.

**Attorneys and Law Firms**

Guy McQueen, Malone, NY, pro se.

Lisa E. Fleischmann, New York State Attorney General, New York, NY, for Respondent.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., Senior District Judge.

**\*1** Guy McQueen, a New York state prisoner proceeding *pro se,* filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. McQueen is currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and is incarcerated at Franklin Correctional Facility. On August 28, 2006, McQueen was convicted upon his guilty plea of the crime of attempted assault in the first degree. *People v. McQueen,* 57 A.D.3d 1103, 868 N.Y.S.2d 421, 422 (N.Y.App.Div.2008). He was sentenced as a second felony offender to a determinate imprisonment term of 6 years and 3 months, plus 5 years of post-release supervision. *Id.* In June 2011, he was released to parole supervision. *In re McQueen v. N.Y. State Bd. of Parole,* 118 A.D.3d 1238, 989 N.Y.S.2d 150, 150 (N.Y.App.Div.2014). In May 2012, however, he was arrested for assaulting a female with whom he was having a romantic relationship and charged with violating the conditions of his parole. *Id.* In his Petition before this Court, McQueen does not contest his underlying judgment of conviction but rather challenges the determination of an administrative law judge ("ALJ")

revoking his parole. Respondent has answered, and McQueen has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

Upon complaint by McQueen's girlfriend, Donielle Laughlin, McQueen was charged with violating the conditions of his release. Specifically, he was charged with striking Laughlin in the head (charge no. 2), choking her (charge no. 3), and forcibly removing her clothing and threatening to kill her (charge no. 4). [1] On August 22, 2012, and September 19, 2012, a final parole revocation hearing was held before an ALJ, where McQueen was represented by appointed counsel. The Board called three witnesses: Laughlin, and Sergeant Keeler and Officer Kelley of the Troy Police Department.

At the hearing, Laughlin recanted her statement implicating McQueen in the assault. She acknowledged that she spent the evening of May 18, 2012, at McQueen's apartment but denied that he had assaulted her. She testified that she went to the emergency room at Samaritan Hospital the following day for injuries she sustained "[b]ecause [she] was highly intoxicated, ... had flip flops on and ... fell." Although she claimed at the hearing that she told hospital staff that she "got into a fight with a friend," hospital records from her visit listed domestic abuse as the cause of her injuries. After she was discharged from the hospital, Laughlin went with her husband to the police station and reported to the officer on duty, Sergeant Keeler, that McQueen had assaulted and threatened her. Laughlin verified that she had signed Keeler's written statement, which said that McQueen hit her on the left side of her face, instructed her to remove her clothes and ripped off her shirt, pulled her hair and choked her, and threatened to kill her. According to Laughlin, it was her husband's idea that she file criminal charges against McQueen, but she did not contend that he forced her to do so, nor did she contend that he instructed her to make false statements to the police. Several weeks after the incident, McLaughlin gave a statement dated June 7, 2012, to an investigator working on McQueen's behalf indicating that she had falsely accused McQueen.

**\*2** Sergeant Keeler testified that Laughlin did not appear to be under the influence of alcohol at the time she made her complaint, and he spoke with Laughlin privately, out of her husband's earshot. He directed Laughlin to tell the

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 138 of 201

McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...

2015 WL 6449138

truth and asked her to read and sign the statement to verify its accuracy. He noted that, while Laughlin was at the police station, McQueen sent her a text message, which Keeler personally read, indicating that McQueen knew she was at the police station.

Officer Kelley described the photographs she took of Laughlin's injuries, which included a bruise on her arm, a scratch mark on the left side of her neck, and a bruise or laceration on her right ear. Kelley also photographed the text message that McQueen sent Laughlin, which read: "At Troy Police right now. Are you with him?" Kelley further testified that Laughlin told her that the injuries were caused by McQueen.

On McQueen's case in chief, he recalled Laughlin to testify on his behalf. Laughlin reiterated that her complaint was false, and testified that she returned to Samaritan Hospital five days after her initial visit to obtain treatment for depression, which she told hospital staff was caused by her distress over filing a false report against McQueen.

McQueen also testified on his own behalf. He stated that, on the night in question, Laughlin arrived by taxi at his apartment, but he had to report to work at midnight and told Laughlin to go to sleep shortly after her arrival. McQueen noticed her injuries, which he said Laughlin attributed to an altercation with "some guy." The following day, McQueen said he saw Laughlin's husband's car at the police precinct and texted her to ask if she was at the station with her husband. McQueen denied that he caused any injury to Laughlin or that he forced her to recant.

By written decision, the ALJ sustained the charges against McQueen. In his decision, he noted that McQueen is a recidivist with several state convictions, the special conditions of his release included orders of protection against four different women, and, in the 11 months he had been on release before the current incident, McQueen had been placed on GPS watch because he had tried to a contact a female instructor at a correctional facility. The ALJ further found credible Laughlin's initial statement to the police as well as the officers' testimony regarding her complaint. He determined that it was sufficiently corroborated by photographic evidence as well as her hospital medical record, which indicated "domestic abuse" as the cause of her injuries. The ALJ acknowledged that Laughlin subsequently recanted her

testimony and McQueen denied any wrongdoing, but he nonetheless found McQueen guilty and recommended a hold to the maximum expiration of McQueen's sentence, noting that McQueen was likely to assault Laughlin or another girlfriend in the future.

Through counsel, McQueen filed an administrative appeal, arguing that the ALJ's determination was not supported by a preponderance of the evidence, it was against the weight of the evidence, it was in violation of "lawful procedure," and was arbitrary and capricious. After the appeal was not adjudicated within four months, McQueen also raised those claims in a *pro se* Article 78 petition in county court. [2] Because McQueen raised a question of "substantial evidence," the county court transferred the Article 78 petition to the Appellate Division. In his *pro se* brief to the appellate court, McQueen briefed the issues raised in his administrative appeal and also argued that the ALJ erred in admitting Laughlin's statement to the police. In support, he attached two letters from Laughlin: the first was a letter to the Commissioner of the Division of Parole in which she explained that she recanted her statement; the second was a letter to an unidentified individual in which she complained that McQueen's parole office had spoken to her negatively about McQueen. On June 26, 2014, the Appellate Division unanimously affirmed the ALJ's determination in a reasoned opinion. *In re McQueen,* 989 N.Y.S.2d at 150. Again proceeding *pro se,* McQueen sought leave to appeal in the New York Court of Appeals. In his leave application, McQueen again challenged the sufficiency of the evidence supporting the ALJ's determination. He also argued that the ALJ was biased against him because the ALJ was well-acquainted with Laughlin's husband, who was a corrections officer. The Court of Appeals summarily denied leave on October 21, 2014. *In re McQueen v. N. Y. State Bd. of Parole,* 20 N.E.3d 662 (N.Y.2014).

**\*3** McQueen timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on February 13, 2015.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, McQueen challenges the ALJ's determination revoking his parole on the grounds that the determination was not supported by substantial evidence and the ALJ was biased against him.

McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...

2015 WL 6449138

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke,* 562 U.S. 216, 131 S.Ct. 859, 863, 178 L.Ed.2d 732 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker,* 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir.2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello,* 552 F.3d 236, 239–40 (2d Cir.2009) (citing *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)); *cf. Wiggins v. Smith,* 539 U.S. 510, 530–31, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson,* 501 U.S. 722, 740, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Jimenez v. Walker,* 458 F.3d 130, 140 (2d Cir.2006) (explaining the *Harris–Coleman* interplay); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810–11 (2d Cir.2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 784–85, 178 L.Ed.2d 624 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez,* 458 F.3d at 145–46.

## IV. DISCUSSION

### A. *Sufficiency of the Evidence*

**\*4** McQueen first argues that the evidence submitted at the final parole revocation hearing was insufficient to sustain the parole violations by a preponderance of the evidence.

As an initial matter, Respondent argues that McQueen has not exhausted his insufficiency of the evidence claim before the state courts. This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citing cases). Exhaustion of state remedies requires the petition to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365–66. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings,

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 140 of 201

McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...

2015 WL 6449138

irrespective of the label used. *Jackson v. Edwards,* 404 F.3d 612, 619 (2d Cir.2005). To be deemed exhausted, a claim must also have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005). Like petitions challenging criminal convictions, habeas petitions addressing parole revocations are subject to the aforementioned exhaustion requirements. *McCullough v. N.Y. State Div. of Parole,* No. 9:11–CV–1112, 2015 WL 2340784, at *4 (N.D.N.Y. Apr.15, 2015); *Scales v. N.Y. State Div. of Parole,* 396 F.Supp.2d 423, 428 (S.D.N.Y.2005).

In this case, McQueen argued on direct appeal that the ALJ's determination was against the weight of the evidence and cited state case law in support. However, "[a] weight of the evidence argument is a pure state law claim grounded in [CPL] § 470.15(5) which empowers New York state intermediate appellate court[s] to make weight of the evidence determinations." *Garrett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (citation and internal quotation marks omitted). In his Petition, McQueen therefore does not contend that the determination was against the weight of the evidence, but rather argues that the determination was not supported by legally sufficient evidence. A sufficiency of the evidence claim is based on federal constitutional principles and thus proper on federal habeas review. *Id.*

Respondent nonetheless argues that McQueen cannot raise his insufficiency of the evidence claim here because he did not properly assert that claim before the state courts. The record indicates that, on direct appeal, McQueen stated that "[t]he ALJ's decision is not supported by substantial evidence," but the cases he cited in support were all state law cases relating to the New York requirement under N.Y. EXEC. LAW § 259–i(3)(f) (viii) that parole revocation decisions be supported by a preponderance of the evidence. It therefore appears that he did not present on federal constitutional terms his challenge to the sufficiency of evidence on direct appeal.

**\*5** However, as mentioned, McQueen also argued that the determination was against the weight of the evidence,

and at least some federal courts in this Circuit have concluded that presenting a weight of the evidence claim without more also raises a federal sufficiency of the evidence claim for purposes of habeas exhaustion. *See, e.g., Williams v. LaValley,* No. 9:12–cv–01141, 2014 WL 1572890, at *3 (N.D.N.Y. Apr.17, 2014); *Martin v. Brown,* No. 08–CV–0316, 2010 WL 1740432, at *7–8 (E.D.N.Y. Apr. 29, 2010). Indeed, the Second Circuit has suggested in dicta that a petitioner who raises a state law weight of the evidence claim on direct appeal has both raised and exhausted a constitutional sufficiency of the evidence claim for federal habeas purposes. *See Liberta v. Kelly,* 839 F.2d 77, 80 n. 1 (2d Cir.1988); *see also Wilson v. Heath,* 938 F.Supp.2d 278, 290 (N.D.N.Y.2013) (noting that "the Second Circuit [in *Liberta* ] has suggested that a petitioner who raises a state law weight of the evidence claim on direct appeal has exhausted a constitutional sufficiency of the evidence claim for federal habeas purposes"). In an abundance of caution, this Court will assume that the Second Circuit will ultimately clearly hold that, for exhaustion purposes, the presentation of a weight of the evidence claim is sufficient to exhaust a federal sufficiency of the evidence claim and address the merits of the claim.

As previously mentioned, a parole revocation decision must be supported by a preponderance of the evidence. N.Y. EXEC. LAW § 259–i(3)(f) (viii); *see also Torres v. Berbary,* 340 F.3d 63, 69–71 (2d Cir.2003). "The standard for challenging the sufficiency of the evidence for a parole revocation is the same as for a criminal conviction; in both cases, the habeas petitioner 'bears a very heavy burden.' " *Suce v. Taylor,* 572 F.Supp.2d 325, 340 (S.D.N.Y.2008) (quotation omitted); *see also United States v. Pierce,* 224 F.3d 158, 164 (2d Cir.2000). When challenging the sufficiency of the evidence supporting a parole revocation under state law, " 'to withstand judicial review, there need only be some factual basis for the Board's determination that the parolee did violate the terms and conditions of his parole.' " *Suce,* 572 F.Supp.2d at 340 (citing *McNeil v. Schubin,* 353 F.Supp. 166, 167 (S.D.N.Y.1973)).

The petitioner's burden is even more onerous on federal habeas review. As articulated by the Supreme Court in *Jackson,* the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [violation] beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 141 of 201

McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...

2015 WL 6449138

in the original); *see McDaniel v. Brown,* 558 U.S. 120, 132–33, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010) (reaffirming this standard). In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson,* 443 U .S. at 318–19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

**\*6** In this case, a review of the record demonstrates ample proof from which the ALJ could find by a preponderance of the evidence that McQueen violated the conditions of his release. As the Appellate Division reasonably concluded on direct appeal:

> Here, the testimony of the police officers involved in the case, the police report containing the victim's statement and the victim's own testimony, in which she admitted to implicating [McQueen] in the assault, provide ample evidence supporting the conclusion that [McQueen] assaulted the victim in the manner alleged and that he was guilty of the charges at issue. The victim's recantation of her statement and [McQueen's] testimony that he did not assault her presented a credibility issue for [the ALJ] to resolve.

*In re McQueen,* 989 N.Y.S.2d at 150 (citations omitted).

McQueen's arguments in state court and in his Petition merely attack the credibility determinations made by the ALJ as factfinder, which, as discussed, are entitled to a substantial amount of deference on habeas review. *See Billiteri v. United States Bd. of Parole,* 541 F.2d 938, 945–46 (2d Cir.1976) (habeas court must defer to the underlying factual findings concerning the adequacy of evidence as a federal court lacks the power to "substitute its own discretion" for that of the factfinder). The proper

weight to be accorded to the evidence and the credibility of the witnesses are determinations for the factfinder and are not grounds for reversal, even on direct appeal. *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). This Court must presume on federal habeas review that such credibility determinations were correct. 28 U.S.C. § 2254(e) (1); *see also Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003). McQueen has not offered any evidence, much less the "clear and convincing" evidence required by § 2254(e)(1), to rebut the presumption of correctness accorded to the ALJ's credibility determination. *See Suce,* 572 F.Supp. at 340. Because there was legally sufficient evidence to support the ALJ's parole revocation decision, McQueen is not entitled to relief on this ground.

B. *Judicial Bias*

McQueen also challenges the ALJ's decision on the ground that the ALJ was biased against him because the ALJ was "a personal acquaintance of [Laughlin's] husband."

Respondent correctly contends that McQueen has failed to exhaust his judicial bias claim. McQueen raised this claim for the first time in his leave application to the New York Court of Appeals. Under New York law, consideration before the Court of Appeals of leave applications related to decisions by the Appellate Division is discretionary. N.Y. C.P.L. § 450.90(1) (stating that a "certificate granting leave" is required to appeal an order of an intermediate appellate court). As Respondent notes, "[r]aising a federal claim for the first time in an application for discretionary review" is insufficient to exhaust the claim unless discretionary review is granted and the claim is addressed on the merits. *St. Helen v. Senkowski,* 374 F.3d 181, 183 (2d Cir.2004) (citing *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000). Here, the Court of Appeals summarily denied McQueen's leave application. *In re McQueen,* 20 N.E.3d at 662. Therefore, this claim remains unexhausted and is denied on that ground.

**\*7** Even if McQueen had exhausted his claim, however, he would not be entitled to relief on it. In order to prevail on a claim of judicial bias, a petitioner must show that he was denied a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing." *Ungar v. Sarafite,* 376 U.S. 575, 584, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). Here,

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 142 of 201

McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...

2015 WL 6449138

McQueen provides no support for his assertion that the ALJ was "a personal acquaintance of [Laughlin's] husband." In his leave application to the Court of Appeals, McQueen purported to quote from an affidavit when he stated that the ALJ and Laughlin's husband, a corrections officer, were "acquaintances at the building where the hearing took place and have worked at the same location for many years and are familiar with each other." However, there appears to be no such quote in any affidavit contained in the record, which indeed contains no evidence whatsoever of any relationship between the two men. As such, McQueen's claim that the ALJ was biased against McQueen due to his alleged relationship with the victim's husband is based on pure speculation with no record support, and the claim cannot provide a basis for habeas releif. *See Wood v. Bartholomew,* 516 U.S. 1, 8, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support"); *Youngblood v. Conway,* 426 F.Supp.2d 107, 127 (W.D.N.Y.2006) (because petitioner's claim was "based on nothing more than mere speculation, it cannot provide a basis for habeas relief").

In his Traverse, McQueen does not contend that record support exists for his assertion that the ALJ was a personal acquaintance of Laughlin's husband, but nonetheless argues that the record evinces the ALJ's antagonism. Specifically, he asserts that the ALJ called him a "bully" and stated that McQueen was "very likely to do this again, to Laughlin or a new catch." According to McQueen, the ALJ's language throughout the hearing "paints a very manipulative picture ." But a state court judge is required to recuse himself for bias only if he has demonstrated "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *McMahon v. Hodges,* 382 F.3d 284, 290 (2d Cir.2004) (holding that judge's statement that defendant would likely be convicted given evidence at co-defendant's trial did not require recusal); *see also LoCascio v. United States,* 473 F.3d 493, 496–97 (2d Cir.2007) (recusal properly denied where rulings did not

evidence deep-seated antagonism). A review of the record fails to reveal such deep-seated antagonism. Rather, any instances where McQueen may have felt that the ALJ was hostile towards him appear to be insignificant offhand comments or examples of "stern and short-tempered ... efforts at courtroom administration." *See Litesky,* 510 at 556. Nor does the ALJ's ultimate determination against McQueen show bias; "adverse 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.' " *Lipin v. Sawyer,* 395 F. App'x 800, 802 (2d Cir.2010) (quoting *Liteky,* 510 U.S. at 555). [3] Accordingly, McQueen cannot prevail on his judicial bias claim either.

## V. CONCLUSION

**\*8** McQueen is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " (quoting *Miller–El,* 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R.APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 6449138

---

Footnotes

1   The Board of Parole ("Board") later dropped the first charge.

2   An inmate challenging a denial of parole pursuant to New York's parole scheme must first file an administrative appeal with the Division of Parole's Appeals Unit. *See Scales v. New York State Div. of Parole,* 396 F.Supp.2d 423, 428 (S.D.N.Y.2005); *see also* N.Y. C.P.L.R. ("CPLR") § 7801; N.Y. COMP.CODES. R. & REGS . tit. 9, § 8006.1. If the Appeals

**McQueen v. Superintendent, Franklin Correctional Facility, Not Reported in F.Supp.3d...**

2015 WL 6449138

Unit does not issue a decision within four months of the date the appeal is perfected, "the appellant may deem this administrative remedy to have been exhausted, and thereupon seek judicial review of the underlying determination from which the appeal was taken." N.Y. COMP.CODES. R. & REGS. tit. 9, § 8006.4(c).

3      Cited for persuasive value pursuant to Second Circuit Rule 32.1 .1.

---

**End of Document**                                            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 2711803
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Felipe MERCEDES, Petitioner,
v.
SUPERINTENDENT, Respondent.

No. 9:12–CV–0687 (DNH).
|
Signed June 16, 2014.

**Attorneys and Law Firms**

Felipe Mercedes, Bronx, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Thomas B. Litsky, Ass't Attorney General, of
Counsel, New York, NY.

**DECISION and ORDER**

DAVID N. HURD, Senior District Judge.

**I. INTRODUCTION**

 **\*1** Currently pending is petitioner's petition for a writ of
habeas corpus, pursuant to 28 U.S.C. § 2254. Dkt. No. 1
("Pet."). Petitioner argues in his petition that he received
ineffective assistance of counsel because (1) counsel failed
to file a notice of appeal; (2) counsel failed to pursue
a defense that the county court lacked jurisdiction; and
(3) counsel failed to advise petitioner of the immigration
consequences of his guilty plea. Pet.'s Mem. of L. at 11–20,
Dkt. No. 1–1. Respondent opposes the petition. Resp.'s
Mem. of Law in Opp'n to the Pet. for a Writ of Habeas
Corpus, Dkt. No. 16. For the reasons below, the petition
will be denied and dismissed.

**II. Effect of Petitioner's Release from Custody**

According to publicly available records maintained
by the New York State Department of Corrections
and Community Supervision ("DOCCS"), and in
petitioner's letter updating his address, petitioner
was released from state custody on this conviction
on February 28, 2014. See Dkt. No. 23; http://
nysdoccslookup.doccs.ny.gov. Petitioner's post-release
supervision is set to expire on or about February 28, 2019.

See http://nysdoccslookup.doccs.ny.gov. Regardless of a
petitioner's subsequent release, it is within the jurisdiction
of a federal court to issue a writ of habeas corpus if the
petitioner was "in custody" when his petition was filed.
Carafas v. LaVallee, 391 U.S. 234, 237–38 (1968). Since
petitioner was in custody when he filed his petition, the
court retains jurisdiction over the petition.

Subject matter jurisdiction, however, is limited by Article
III, Section 2 of the United States Constitution to cases
that present a "case or controversy." Spencer v. Kemna,
523 U.S. 1, 7 (1998); Baur v. Veneman, 352 F.3d 625,
631–32 (2d Cir.2003). Habeas petitioners no longer in
custody must demonstrate the existence of a "concrete
and continuing injury" or some " 'collateral consequence'
of the conviction" in order for a petition to be granted.
Spencer, 523 U.S. at 7.

The Supreme Court has stated that a challenge to an
underlying conviction itself carries the presumption that
a collateral, adverse consequences exists. Spencer, 523
U.S. at 12 ("[I]t is an 'obvious fact of life' that most
criminal convictions do in fact entail adverse collateral
legal consequences.' ") (quoting Sibron v. New York, 392
U.S. 40, 55 (1968)); see Evitts v. Lucey, 469 U.S. 387, 391
n. 4 (1985). Accordingly, this petition does not appear
to have been rendered moot by petitioner's release from
prison, and thus it will be addressed. Cobos v. Unger,
534 F.Supp.2d 400, 403 (W.D.N.Y. Feb. 14, 2008) (citing
Sibron, 392 U .S. at 54–56).

**III. RELEVANT BACKGROUND**

In a 112 count sealed indictment naming twenty-one
individuals, petitioner was charged with one count of
conspiracy in the second degree (Count 1); two counts of
criminal sale of a controlled substance in the first degree
(Counts 72 and 104); two counts of criminal possession
of a controlled substance in the first degree (Counts
70 and 102); and two counts of criminal possession of
a controlled substance in the third degree (Counts 71
and 103). See County Court Decision Denying Pet.'s
§ 440.10 Motion at 1, Dkt. No 1–2. The indictment
was the result of a lengthy investigation by the New
York Statewide Organized Crime Task Force, with the
assistance of several law enforcement agencies, and alleged
that petitioner, along with other defendants, conspired
to possess and sell large amounts of cocaine in several
counties throughout New York State. Id. On August 5,
2010, petitioner was convicted, upon a negotiated guilty

plea, of an amended count of criminal possession of a controlled substance in the second degree (Count 102) in full satisfaction of the charges naming him in the indictment. *Id; see also* August 5, 2010 Plea Tr., Dkt. No. 17–9. On November 17, 2010, he was sentenced to a determinate term of imprisonment of six years and five years of post-release supervision. *Id; see also* November 17, 2010 Sent. Tr., Dkt. No. 17–9. As a condition of the plea, petitioner waived his right to appeal. *Id.* After the expiration of his time to file a Notice of Appeal, petitioner sought permission from the Appellate Division, Fourth Department to file a late notice of appeal. *Id.* That motion, and his subsequent motion to reconsider, were denied. *Id.*

**\*2** Petitioner filed a motion to vacate the judgment of conviction pursuant to N.Y. C.P.L. § 440.10 ("440.10 Motion"), which alleged that the Cayuga County Court lacked jurisdiction and that petitioner received ineffective assistance of counsel. *See* Pet.'s 440.10 Motion, Dkt. No. 17–8; County Court Decision Denying Pet.'s 440.10 Motion, Dkt. No. 17–10. On November 4, 2011, the motion was denied. The Appellate Division denied petitioner's motion for leave to appeal the denial of petitioner's 440.10 Motion on March 7, 2012. App. Div. Decision Denying Pet.'s Motion for Leave to Appeal, Dkt. No. 17–14. This action followed.

### IV. DISCUSSION

#### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster,* ─── U.S. ───, 131 S.Ct. 1388, 1398, 1400 (2011); *Premo v. Moore,* ─── U.S. ───, 131 S.Ct. 733, 739 (2011); *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson,* ─── U.S. ───, 131 S.Ct. 1305, 1307 (2011) (per curiam) (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.' " *Nevada v. Jackson,* ─── U.S. ───, 133 S.Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter,* ─── U.S. ───, 131 S.Ct. 770, 786 (2011)); *see also Metrish v. Lancaster,* ─── U.S. ───, 133 S.Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' ") (quoting *Richter,* 131 S.Ct. at 786–87)).

Additionally, the AEDPA foreclosed " 'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.' " *Parker v. Matthews,* ─── U.S. ───, 132 S.Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d) (2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen,* 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro,* 550 U.S. at 473. Finally, federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with " 'clear and convincing evidence.' " *Schriro,* 550 U.S. at 473–74 (quoting § 2254(e)(1)).

#### B. Ineffective Assistance of Counsel

**\*3** To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different, and as a result, petitioner suffered prejudice. *Premo,* 131 S.Ct. at 739; *Strickland v. Washington,* 466 U.S. 668, 694 (1984). A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689 (quoting *Michel v. Louisiana,* 350 U.S. 91,

Case 9:18-cv-00521-GLS-ML   Document 23   Filed 06/10/19   Page 146 of 201
Mercedes v. Superintendent, Not Reported in F.Supp.3d (2014)
2014 WL 2711803

101 (1955)). Even if petitioner can establish that counsel was deficient, he still must show that he suffered prejudice. *Id.* at 693–94.

Meeting this burden is "never an easy task ... [and] establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." *Premo,* 131 S.Ct. at 739–40 (citations and internal quotation marks omitted). When reviewing a state court's decision under § 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009) (internal quotation marks and citation omitted). Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable." *Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 788 (2011). Instead, "the question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

**1. Failure to File a Notice of Appeal**
Plaintiff first claims that trial counsel was ineffective for failing to file a notice of appeal. Pet. at 4. Specifically, he alleges that he "explicitly instructed counsel Brenner to file a notice of appeal. He did so as of the time of the sentencing proceeding, immediately following the court's pronouncement of judgment." Pet.'s Mem. of L. at 12, Dkt. No. 1–1. The Appellate Division's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent. An attorney who fails to file a notice of appeal after being instructed to do so is per se ineffective. *Roe v. Flores–Ortega,* 528 U.S. 470, 478 (2000). However, absent instruction, it is not unreasonable for counsel to forego such filing. *Id.* ("Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal."); *see also Campusano v. United States,* 442 F.3d 770 (2d Cir.2006). Moreover, an attorney is required to consult with his client regarding an appeal only if: (1) a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) the particular defendant reasonably demonstrated to counsel that he was interested in appealing and there is a reasonable probability that, but for counsel's deficient

failure to consult with him about an appeal, defendant would have timely appealed. *Galviz Zapata v. U.S.,* 431 F.3d 395, 397 (2d Cir.2005) (citations omitted).

**\*4** When petitioner entered his plea on August 5, 2010, the court discussed with him the implications of pleading guilty. Plea Tr. at 10, Dkt. No. 17–9. Petitioner stated that he was in possession of more than four ounces of cocaine on the date in question, and petitioner stated that he was pleading guilty voluntarily and upon his own free will. *Id.* Petitioner also stated that he was satisfied with the services of his attorney. *Id.*

At sentencing on November 17, 2010, plaintiff and his attorney completed a Notice of Right to Appeal form, and each signed his name beneath a checked box that reads, "I do not want to appeal." [1] *See* Dkt. No. 17–3 at 8. This form indicated that petitioner had a right to appeal his conviction and that a notice of appeal would need to be filed within thirty days of the sentence. *Id.* At sentencing, the trial court informed petitioner that even though he waived his right to appeal, petitioner still had a right to appeal by filing a notice of appeal within thirty days. Sent. Tr. at 9, Dkt. No. 17–12.

Several months later, petitioner filed a motion for leave to file a late notice of appeal on April 14, 2011. Dkt. No. 17–1. Petitioner alleged that counsel failed to follow his instruction to file a notice of appeal, and did not properly advise him regarding the procedure to file a notice pro se. *Id.* The People's response to petitioner's application to file a late notice of appeal included an affidavit from trial counsel. Dkt. No. 17–2. Trial counsel "strenuously den[ied]" petitioner's allegations that he had instructed trial counsel to file a notice of appeal, and affirmed that petitioner "entered a guilty plea knowingly [sic], intelligently, and voluntarily, and was aware of the sentence he would receive as a result of that plea." *Id.* at 3–4.

Petitioner's sworn statements on the record at sentencing, the Notice of Right to Appeal form, and counsel's sworn statement all support the conclusion that petitioner did not instruct counsel to file a notice of appeal. Petitioner's current conclusory allegations to the contrary are insufficient to establish that counsel was ineffective for failing to file a notice of appeal. Additionally, the Appellate Division denial of application was not contrary

to or an unreasonable application of Supreme Court precedent.

Petitioner's claim based on counsel's failure to file a notice of appeal will be dismissed.

### 2. Failure to Pursue a Jurisdictional Defense

Petitioner next claims that trial counsel was ineffective for failing to "contest the Cayuga County Court's jurisdiction" because if trial counsel had "advanced such claim prior to the plea proceeding, the matter would have had to be dismissed." Pet.'s Mem. of L. at 16–17, Dkt. No. 1–1.

Petitioner raised this claim in his 440.10 Motion. *See* Dkt. No. 17–8 at 3–7. The County Court denied petitioner's 440.10 Motion, finding that his contentions were contained on the record, and holding that because petitioner had failed to perfect a timely appeal, his claims were procedurally barred by N.Y. C.P.L. § 440.10(2)(c). [2] *See* Dkt. No. 17–10 at 4. The state court's rejection of Petitioner's claims pursuant to C.P.L. § 440.10(2)(c) rests upon an independent and adequate state ground and federal review of the claim is thus barred. *Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008); *Sweet v. Bennett,* 353 F.3d 135, 140 (2d Cir.2003); *Aparicio v. Artuz,* 269 F.3d 78, 92–93 (2d Cir.2001). That is true even though the state court also rejected the claims on other grounds in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

**\*5** Petitioner's claim is procedurally defaulted absent a showing of cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice. *House v. Bell,* 547 U.S. 518, 536–39 (2006); *Schlup v.. Delo,* 513 U.S. 298, 327 (1995). To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Maples v. Thomas,* — U.S. ——, 132 S.Ct. 912, 922 (2012); *Coleman v. Thompson,* 501 U.S. 722, 753 (1991) (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)).

Petitioner has failed to allege or establish cause for his failure to raise this claim on direct appeal. Since

petitioner has not established cause for his procedural default, it need not be decided whether he suffered actual prejudice. *Murray,* 477 U.S. at 488 (referring to "cause-and-prejudice standard"); *Stepney,* 760 F.2d at 45. Petitioner has also not presented any new evidence that he is "actually innocent" of the crimes for which he was convicted. *See Schlup,* 513 U.S. at 327. The procedural default bars federal review of petitioner's claim.

Based on the foregoing, petitioner's claim based on the alleged failure to raise a jurisdictional defense is procedurally defaulted and therefore will be dismissed.

### 3. Failure to Advise Petitioner of Immigration Consequences

Petitioner's final claim is that trial counsel was ineffective because he failed to properly advise petitioner of the potential immigration consequences of his guilty plea. Pet.'s Mem. of L. at 14–17, Dkt. No. 1–1. Specifically, petitioner claims that counsel affirmatively misrepresented "the immigration consequences" of his plea because counsel informed him that he would not be deported as a result of the plea. Traverse at 6, Dkt. No. 19,. These arguments are unexhausted and without merit.

Petitioner raised this claim for the first time in his application for leave to appeal the denial of his 440.10 Motion, in which he argued that counsel was ineffective for failing to correctly advise him, or to advise him at all, "regarding the specific immigration consequences of his guilty plea." Dkt. No. 17–11 at 4–5. Under New York law, consideration before the Appellate Division of leave applications related to the denial of 440.10 motions is discretionary. N.Y. C.P.L. § 450.15(1) (stating that a "certificate granting leave" is required to appeal an order denying a 440.10 motion). Unfortunately for petitioner, "[r]aising a federal claim for the first time in an application for discretionary review" is insufficient to exhaust the claim unless discretionary review is granted and the claim is addressed on the merits. *St. Helen v. Senkowski,* 374 F.3d 181, 183 (2d Cir.2004) (citing *Castille v. Peoples,* 489 U.S. 346, 351 (1989)); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000). Here, the Appellate Division denied petitioner's leave application, finding that "there is no question of law or fact which ought to be reviewed by this Court[.]" Dkt. No. 17–14. Therefore, this claim remains unexhausted.

**\*6** Petitioner could still exhaust his claim by filing a successive 440.10 motion. There is no time limit within which an individual must bring a § 440.10 motion, and the statute does not prohibit successive applications. *See* N.Y. C.P.L. § 440.10(1) (stating that a motion to vacate may be made "[a]t any time after the entry of a judgment."). District courts, however, have the discretion to dismiss unexhausted claims on the merits if the claims are "plainly meritless," *Rhines v. Weber,* 544 U.S. 269, 277 (2005), or "patently frivolous," *McFadden v. Senkowski,* 421 F.Supp.2d 619, 621 (W.D.N.Y.2006). *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Here, petitioner's claim does not warrant habeas relief under either standard.

To establish ineffective assistance of counsel in the context of a guilty plea, a petitioner must show that counsel's performance was deficient and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would not have pleaded guilty and would instead have gone to trial. *Lafler v. Cooper,* —— U.S. ——, 132 S.Ct. 1376, 1384 (2012); *Missouri v. Frye,* —— U.S. ——, 132 S.Ct. 1399, 1409 (2012); *Hill v. Lockhart,* 474 U.S. 52, 59 (1985). When a guilty plea implicates immigration consequences, counsel must so advise the defendant. *Padilla v. Kentucky,* 559 U.S. 356, 369 (2010). If the potential "deportation consequences of a particular plea are unclear or uncertain, ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* Even if a petitioner can establish that counsel was deficient, he must convince the court that a decision to reject a plea offer would have been rational under the circumstances. *Padilla,* 559 U.S. at 372; *see Francis v. United States,* No. 1:12–CV–1362, 2013 WL 673868, at \*4 (S.D.N.Y. Feb. 25, 2013) ("In the immigration context, a petitioner must affirmatively prove prejudice by putting forth credible evidence that he would actually have insisted on going to trial had he known of the precise immigration consequences of his conviction."), *appeal dismissed* —— F. App'x ——, 2014 WL 1258360 (2d Cir. Mar. 28, 2014).

Here, petitioner presented no evidence in support of his claim either that counsel failed to advise him, or incorrectly advised him, of the specific immigration consequences of his plea. His conclusory allegations,

without more, are insufficient. Pet. at 18.[3] In any event, even assuming counsel's performance was deficient, petitioner has not shown that rejecting the plea agreement in this case would have been rational. *Padilla,* 559 U .S. at 372. Nor has he offered any "objective evidence that going to trial would not have resulted in deportation." *Contant v. Sabol,* No. 1:10–CV–3434, 2013 WL 6425006, at \*9 (S.D.N.Y. Dec. 6, 2013).

**\*7** Petitioner admitted that on August 14, 2009, he possessed greater than four ounces of cocaine and that the cocaine was in a vehicle he turned over to a co-conspirator. Plea Tr. at 6–7, Dkt. No. 17–9. Although petitioner claims that his role in the conspiracy was minimal, and his culpability was less than others charged in the indictment, he does not argue that he lied under oath, and his statements during the plea colloquy are properly considered as evidence of his guilt. *See Blackledge v. Allison,* 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *Doe v. Menefee,* 391 F.3d 147, 168 (2d Cir.2004) ("[T]he district court's discounting of Doe's admission of guilt at his plea allocution was clearly erroneous" where there was no evidence that Doe lied under oath). Petitioner's argument that there is a "reasonable probability" he would have been acquitted because Cayuga County Court lacked jurisdiction is without merit for the reasons discussed in this decision. Finally, petitioner understood that by pleading guilty, he avoided a possible fourteen year sentence if convicted after a trial. Plea Tr. at 8, Dkt. No. 17–9. The sentence imposed in exchange for his plea was six years in prison followed by five years post-release supervision-less than half of the sentence he faced. Petitioner has "offered no evidence demonstrating why he would have foregone the substantial benefit resulting from his plea and risked a harsher sentence at trial." *Contant,* 2013 WL 6425006, at \*7 (S.D.N.Y. Dec. 6, 2013) (quoting *Francis,* 2013 WL 673868, at \*5) (internal quotation marks omitted).

In sum, petitioner has failed to "affirmatively prove prejudice." *Strickland,* 466 U.S. at 693; *see Contant,* 2013 WL 6425006, at \*9 ("[G]iven the strength of the evidence against [the petitioner], and given his failure even now to assert his innocence or to identify any way in which he could have succeeded at trial, Petitioner

'cannot demonstrate that the case against him could have resulted in anything but eventual deportation, regardless of his decision to plead guilty or to proceed to trial.' ") (quoting *Francis,* 2013 WL 673868, at *4). This portion of petitioner's ineffective assistance of counsel claim will therefore be denied and dismissed.

**V. CONCLUSION**

Therefore, it is

ORDERED that

1. The petition, Dkt. No. 1, is **DISMISSED;**

2. No certificate of appealability ("COA") shall issue in this case because petitioner has failed to make a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2);[4] and

3. The Clerk serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2711803

Footnotes

1    The form also states that petitioner had a right to appeal his conviction and that if he wanted to appeal, a Notice of Appeal must be filed within thirty days of the date of sentence. Dkt. No. 17–3 at 8.

2    The County Court also held in the alternative that petitioner's claims "lack merit. Cayuga County is a proper venue by reason of the conspiracy exception provided in CPL § 20.40(2)(d). Inasmuch as [petitioner's] jurisdictional claims are without merit, his claim of ineffective assistance of counsel based on that ground is moot." Dkt. No. 17–10 at 4. This holding is not contrary to *Strickland,* 466 U.S. 668.

3    It is worth noting that at sentencing, counsel explained to the court petitioner's education in the Dominican Republic, and petitioner's intention to continue his education while in prison. Sent. Tr. at 5–6, Dkt. No. 17–12. Counsel stated that doing so would be important "if he's able to stay in this country, and I believe that he might be able to [.]" *Id.* at 6; *see Padilla,* 559 U.S. at 372.

4    *See Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003) ( "[Section] 2253 permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right' "); *Richardson v. Greene,* 497 F.3d 212, 217 (2d Cir.2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation") (citation omitted)).

**End of Document**                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 13745077
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Allen MORRIS, Petitioner,
v.
Brandon SMITH, Respondent.

Civ. No. 9:13-CV-1441 (GLS/RFT)
|
Signed 07/29/2015

**Attorneys and Law Firms**

ALLEN MORRIS, Pro se Petitioner, 4411505097, BRC - Hope Health Home, 146 Clay Street, Brooklyn, NY 11222.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: THOMAS B. LITSKY, ESQ., Assistant Attorney General, 120 Broadway, New York, NY 10271, Attorney for Respondent.

**REPORT-RECOMMENDATION and ORDER**

RANDOLPH F. TREECE, United States Magistrate Judge

**\*1** *Pro se* Petitioner Allen Morris seeks a Writ of *Habeas Corpus*, pursuant to 28 U.S.C. § 2254, on the grounds that 1) his conviction violates his right against double jeopardy; 2) Counsel provided ineffective assistance; and 3) the evidence obtained was pursuant to an unlawful arrest. Dkt. No. 1, Pet., at pp. 5-6.

**I. Background**

**A. Petitioner's Crime**

Petitioner's criminal charges stem from an incident that occurred while he was incarcerated at Cape Vincent Correctional Facility. Dkt. No. 9-2, State R. Part 2 at p. SR 458, Inmate Misbehavior Rep., dated July 26, 2009. On July 25, 2009, the Facility placed Petitioner on "drug watch" as he was suspected of placing an object in his rectum. *Id.* On July 26, 2009, a correctional officer, who

was assigned to perform the "special drug watch," found a "blue object" in Petitioner's feces. *Id.* Upon examination by the Watch Commander's Office, it was revealed that the object consisted of three layers of balloons, with the last layer containing nine glassine bags labeled "magic." *Id.* According to the July 26, 2009 Inmate Misbehavior Report, one of the bags was tested with a "NIK test 'A,' " that indicated the bag contained heroin because the "result was a color purple." *Id.*

The next morning, on July 27, 2009, another blue balloon was discovered in Petitioner's feces. State R. Part 2 at p. SR 312, Inmate Misbehavior Rep., dated July 27, 2009. That balloon contained two more balloons, with the last layer holding ten packets labeled "magic." The Facility weighed the packets and determined that the packets weighed 3.4 grams in total. *Id.* According to the July 27 Inmate Misbehavior Report, "one packet was opened" and tested with "NIK Test 'B,' " which indicated the packet contained heroin because the "result was a yellow to green color." *Id.*

Shortly thereafter, a Tier III Disciplinary Hearing was conducted, and Petitioner was found guilty of Drug Possession and Smuggling. Dkt. No. 9-1, State R. Part 1 at p. SR 222, Superintendent Hr'g Disposition Rendered, dated Aug. 6, 2009. Plaintiff appealed the disciplinary determination to Norman Bezio, the Director of Special Housing and Inmate Discipline. State R. Part 1 at p. SR 224, Bezio Mem., dated Sept. 11, 2009. Bezio issued a decision [hereinafter "Disciplinary Appeal Decision"] dismissing the charges against Petitioner because "[t]he drug testing evidence provided [did] not support a positive finding for opiates." *Id.* Bezio did not provide any reasons for his finding. *Id.*

On February 4, 2010, Petitioner was indicted, in New York State County Court, Jefferson County, for Criminal Possession of a Controlled Substance in the Third Degree and Promoting Prison Contraband in the First Degree. State R. Part 1 at p. SR 076, Indict., dated Feb. 4, 2010. On April 12, 2010, Petitioner's Counsel filed a Omnibus Pretrial Motion seeking, *inter alia*, 1) "Dismissal of Indictment because there is no controlled substance at issue"; 2) review of the grand jury proceeding for insufficiency of the evidence and other defects; 3) dismissal of the Indictment "because the defendant was previously prosecuted for the same conduct"; 4) suppression of "any alleged statements made in this matter"; 5) further

discovery; and 6) that the People be barred from presenting evidence of a controlled substance. State R. Part 1 at p. SR 081, Omnibus Pretrial Mot., dated Apr. 12, 2010.

**\*2** On May 3, 2010, the County Court Judge denied the Omnibus Pretrial Motion. *See generally* State R. Part 1 at pp. SR 101-09, Cnty. Ct. Dec.-Order, dated May 3, 2010. Counsel then made a demand for a judicial subpoena *duces tecum* for "any and all records" related to Petitioner's Tier III Disciplinary Hearing, including "any drug testing evidence." *See* State R. Part 1 at pp. SR 159 & SR 162, Resp. to Mot. to Dismiss, dated July 28, 2010. That subpoena was issued and signed by the County Court Judge on June 11, 2010. State R. Part 1 at p. SR 170, Judicial Subpoena *Duces Tecum*, dated June 11, 2010. On July 22, 2010, Petitioner's Counsel filed a Motion to Dismiss the Indictment on the ground that the packets did not contain "controlled substances." State R. Part 1 at pp. SR 138-39, Affirm. in Supp. of Mot. to Dismiss, undated. To support his position, Counsel submitted a copy of the Disciplinary Appeal Decision. *Id.* at p. SR 139. On July 30, 2010, the County Court Judge denied the Motion to Dismiss the Indictment. *See generally* State R. Part 1 at pp. SR 184-86, Cnty. Ct. Dec-Order, dated July 30, 2010. That decision noted that although the Petitioner was provided with additional time to investigate the circumstances of the Disciplinary Appeal Decision, he did not attempt to explain the basis for Bezio's determination that the evidence produced at the Disciplinary Hearing did not support a positive finding. The County Court also explained that Bezio's determination "may have been the result of insufficient evidence or the failure to submit any evidence at all that the substance allegedly secreted by [Petitioner] was heroin ... [or] a failure to comply with testing procedures set for[th] in the Rules and Regulations of the Department of Correctional Services [ ]." *Id.* at p. 186. Thus, the County Court found that the Disciplinary Appeal Decision "in no way proves that the substance was not, in fact heroin." *Id.*

On August 3, 2010, Petitioner pled guilty to Criminal Possession of a Controlled Substance in the Third Degree and agreed to a waiver of appeal. State R. Part 1 at p. SR 005, Plea Tr., dated Aug. 3, 2010. The County Court Judge advised Petitioner that a guilty plea

> is the same thing as if the DA proved [Petitioner] guilty of this one count beyond a reasonable doubt, the same thing as if we had 12 people as jurors that sat here and listened to all the evidence, they took a vote and unanimously found you guilty of this one count[.]

*Id.* at p. SR 009.

The County Court Judge further advised Petitioner that he was waiving his right to an appeal, but reserved his "right for jurisdictional appeal." *Id.* at p. SR 005. Petitioner's Counsel expanded on that statement by stating,

> whether the sentence was legal, jurisdiction, whether I screwed up, and whether you knowingly and voluntarily entered into your plea; those are the four things you always keep. But anything other than those four things, you don't have the right to appeal, you are giving up your right to appeal. That's what was just explained.

*Id.*

In addition, prior to entering a guilty plea, Petitioner acknowledged that he understood and, when asked his educational level, he stated that he graduated from SUNY New Paltz with a Bachelor's Degree in social science. *Id.* at p. SR 010.

On October 4, 2010, Petitioner was sentenced to a determinate term of two years, followed by one year and a half of post-release supervision. State R. Part 1 at p. SR 026, Sentencing Tr., dated Oct. 4, 2010.

## II. STATE COURT REVIEW

## A. Direct Appeal

Petitioner's Appellate Attorney, Matthew Brooks, filed a brief, with the Appellate Division, Fourth Department, dated November 16, 2011, in which he argued that 1) the Petitioner did not enter a plea knowingly and voluntarily because he was misled by the trial court as to nature of the actual sentence imposed; 2) he received ineffective assistance because Counsel failed to file adequate motions to dismiss the Indictment and did not apprise him of a direct consequence of entering a guilty plea; 3) the trial court failed to investigate whether Petitioner's request for substitute counsel had a genuine basis; 4) he should have not been indicted because the New York State Department of Corrections and Community Supervision ("DOCCS") had previously dismissed the prison disciplinary charges because the evidence showed that the packets did not contain opiates. Therefore, the criminal charges were barred by the doctrines of *res judicata* and/or administrative collateral estoppel and, as a result, the Indictment "violates his constitutional rights by illegally placing him in double jeopardy"; and 5) he requested that the Appellate Division construe the County Court's "lack of formal decision as a denial" because Petitioner had not yet received a determination to his March 7, 2011 § 440.10 Motion. *See generally* State R. Part 1 at pp. SR 028-65, Pet'r's Appellate Div. Br., Nov. 16, 2011.

**\*3** On April 20, 2012, the Appellate Division, Fourth Department, unanimously affirmed Petitioner's Judgment of Conviction. State R. Part 2 at p. SR 266, Appellate Div. Mem. & Order, dated Apr. 20, 2012. The Fourth Department found that 1) Petitioner's contention that the County Court Judge abused its discretion in denying Petitioner's motion to withdraw his guilty plea on the ground that he was misinformed with respect to the negotiated sentence was "without merit" because the record shows that the County Court Judge informed the Petitioner that his sentence would run consecutively; 2) the County Court Judge did not fail to make an appropriate inquiry into his two requests for substitution of counsel; [1]  3) Petitioner's assertion that he was denied effective assistance of counsel does not survive his guilty plea, or the waiver of the right to appeal, because he fails to demonstrate that the ineffective assistance infected the plea bargaining process or that Petitioner entered a guilty plea because of Counsel's poor performance; 4)

Petitioner's contention that the County Court Judge erred in denying the part of his Omnibus Motion that sought to dismiss the Indictment does not survive his "valid waiver of the right to appeal" nor "his guilty plea"; and 5) his request regarding his § 440 Motion was not properly before the Department. *See generally id.* at pp. SR 266-68.

On April 27, 2012, Petitioner's Appellate Attorney submitted an Application for Leave to Appeal to the New York State Court of Appeals. State R. Part 2 at p. SR 269, Pet'r's Appl. for Leave to Appeal, dated Apr. 27, 2012. Petitioner also submitted a *pro se* submission in support of his Application. State R. Part 2 at p. SR 284, Pet'r's Submission in Supp. for Leave to Appeal, dated May 22, 2012. In his Application for Leave to Appeal, Petitioner argued that 1) Jefferson County did not have jurisdiction to charge him with a crime because DOCCS previously dismissed the disciplinary charges against him after determining that the packets did not contain a controlled substance; 2) Jefferson County should have been barred from proceeding against him based on the doctrine of *res judicata* and collateral estoppel; and 3) that his Counsel provided ineffective assistance because he failed to move to dismiss the Indictment. On July 17, 2012, the New York Court of Appeals denied Petitioner leave to appeal. *People v. Morris*, 19 N.Y.3d 976 (2012).

## B. Collateral Appeal

On March 7, 2011, Petitioner filed a *pro se* motion to vacate the judgment and set aside his sentence, pursuant to N.Y. CRIM. PROC. LAW §§ 440.10 and 440.20. State R. Part 2 at p. SR 299, Pet'r's § 440 Mot., dated Mar. 7, 2011. Therein, Petitioner argued that 1) his Counsel provided him with ineffective assistance because he didn't prepare a "defense" or move to dismiss the Indictment; 2) the NIK B drug test and correctional officer's testimony was unreliable and barred by the doctrines of *res judicata*, collateral estoppel, and administrative collateral estoppel; 3) his conviction is barred by administrative collateral estoppel and *res judicata*; and 4) the May 13, 2010 chemical analysis conducted by the New York State Police Forensic Investigation Center violated N.Y. CRIM. PROC. LAW § 715.50 because it was not performed within forty-five days. State R. Part 2 at pp. SR 302 & SR 304, Pet'r's Aff. in Supp. of § 440 Mot., dated Mar. 7, 2011.

2015 WL 13745077

On November 15, 2012, Attorney Edward Land informed the County Court that he was recently retained by the Petitioner to represent him in connection with his pending § 440.10 Motion, and was enclosing an Amended § 440 Motion "based upon actual innocence." State R. Part 2 at p. SR 406, Land Lt., dated Nov. 15, 2012. Attorney Land further advised that he was withdrawing "the argument regarding consecutive sentence" and "any more collateral estoppel arguments as the Court of Appeals rejected them many years ago." *Id.* In the Amended § 440 Motion, Petitioner argued that 1) he was actually innocent because the Disciplinary Appeal Decision stated that there was no evidence of opiates; 2) the State failed to prove that the substance at issue was in fact a controlled substance; and 3) his Counsel rendered ineffective assistance as he submitted a pretrial motion to dismiss his charges based on collateral estoppel, "a doomed argument," and he failed to advise Petitioner of a direct consequence of pleading guilty. State R. Part 2 at pp. SR 409, SR 412, & SR 420-21, Affirm. in Supp. of Am.§ 440.10 Mot., dated Nov. 15, 2012 & SR 434-35, Suppl. Affirm. in Supp. of Am. § 440.10 Mot., Nov. 20, 2012.

**\*4** On March 22, 2013, the County Court Judge denied Petitioner's § 440 motion because 1) his ineffective assistance claim was already decided on the merits on direct appeal; 2) N.Y. CRIM. PROC. LAW § 715.50 specifically states that failure to conduct a chemical analysis within forty-five days does not bar prosecution; 3) Petitioner's contention that the Disciplinary Appeal Decision bars the State from asserting that Petitioner possessed opiates was correctly withdrawn as it has nomerit; 4) Petitioner's contention that he is actually innocent, based on the Disciplinary Appeal Decision's finding that there was no opiates in his feces, was denied because i) he could have raised the issue on direct appeal, ii) that Decision "does not establish that there were no opiates present," and iii) a formal chemical analysis was subsequently conducted by the New York State Police Forensic Investigation Center, which "established the presence of heroin in one glassine bag recovered from the Defendant's feces." *See generally* State R. Part 2 at pp. SR 470-75, Cnty. Ct. Dec.-Order, dated Mar. 22, 2013. With respect to Petitioner's argument that the State could not prove the element of "intent to sell" because only one glassine bag was tested and that bag only contained 0.04 grams of heroin, the County Court Judge held it could not consider this argument because it could have been raised on appeal. *Id.* at p. SR 475.

## III. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

The petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234697, at \*3 (S.D.N.Y. Aug. 28, 2003). The AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001) (quoting § 2254(e)(1) ) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied

2015 WL 13745077

upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362 (2000) and *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000) ).

### B. Exhaustion

Prior to seeking federal *habeas* relief, a petitioner must exhaust available state remedies, or demonstrate that there is either an absence of available state remedies or that such remedies cannot adequately protect petitioner's rights. [2] *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1) ); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994). This exhaustion requirement recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Id.* "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Glover v. Bennett*, 1998 WL 278272, at *1 (N.D.N.Y. May 21, 1998) (quoting *Daye v. Attorney Gen. of New York*, 696 F.2d at 192). [3]

*5 This exhaustion requirement is satisfied if the federal claim has been "fairly presented" to the state courts. *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) ). A claim has been "fairly presented" if the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye v. Attorney Gen. of New York*, 696 F.2d at 191; *Morales v. Miller*, 41 F. Supp. 2d 364, 374 (E.D.N.Y. 1999). "Although the petitioner need not have cited 'book and verse on the federal constitution,' he must have articulated 'the substantial equivalent' of the federal habeas claim." *Colon v. Artuz*, 174 F. Supp. 2d 108, 114 (S.D.N.Y. 2001) (quoting *Picard v. Connor*, 404 U.S. at 278); *see also Daye v. Attorney Gen. of New York*, 696 F.2d at 194. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye v. Attorney Gen. of New York*, 696 F.2d at 192; *Morales v. Miller*, 41 F. Supp. 2d at 374. In addition, in order for a petitioner to properly exhaust his or her claim, he or she "must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"; this includes presenting "both the factual and legal premise of the federal claims ultimately asserted in the [federal] habeas petition" to the New York Court of Appeals. *Galdemez v. Keane*, 394 F.3d 68 (2d Cir. 2005) (emphasis in original) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ).

Here, it is undisputed that Petitioner exhausted his ineffective assistance claim as he raised the issue to the Appellate Division and New York State Court of Appeals. It is also undisputed that Petitioner exhausted his double jeopardy claim as he raised it in his Appellate Division brief [4] and referred to this argument in his New York Court of Appeals Application for Leave to Appeal.

### C. Claims

#### 1. Ineffective Assistance

Turning to the merits of this claim, the Appellate Division concluded that Petitioner's ineffective assistance claim did not survive his valid guilty plea nor his waiver of the right to appeal as he failed to show "that the plea bargaining process was infected by the allegedly ineffective assistance or that the defendant entered the plea because of defense counsel's allegedly poor performance." State R. Part 2 at p. SR 267, Appellate Div. Mem. & Order.

The Appellate Division's finding was not contrary to, or an unreasonable application of, clearly established Supreme Court Law. The Supreme Court has stated that "a guilty plea represents a break in the chain of events

which has preceded it in the criminal process," and a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Because Petitioner is raising issues with Counsel's failure to dismiss the Indictment, this claim is waived by his guilty plea. *Parisi v. United States*, 529 F.3d 134, 138 (2d Cir. 2008) (holding that an ineffective assistance claim based on an attorney's failure to dismiss an indictment does not relate to the plea bargaining process, thus, such an argument does not survive a guilty plea or an appeal waiver); [5] *Belle v. Superintendent*, 2013 WL 992663, at *7 (N.D.N.Y. Mar. 13, 2013) ("[P]etitioner is precluded from obtaining habeas relief on claims arising out of matters that occurred prior to the plea.") (citing *Tollett v. Henderson*, 411 U.S. at 267). Thus, because Plaintiff does not attack the voluntary and intelligent character of his guilty plea, this Court recommends **denying** the Petition with respect to his ineffective assistance claim. *See United States v. Blocker*, 269 F. App'x 117, 120 (2d Cir. 2008).

### 2. Double Jeopardy

**\*6** The Court will also address Petitioner's double jeopardy claim on the merits. [6] The Fifth Amendment's Double Jeopardy Clause, applicable to the states through the Fourteenth Amendment, proclaims that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend XV. The Fifth Amendment's prohibition on double jeopardy "protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *Boyd v. Meachum*, 77 F.3d 60, 63 (2d Cir. 1996) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969) ). In cases where multiple punishments have been imposed for a single offense, it is the responsibility of the courts to ensure that "the total punishment did not exceed that authorized by the legislature." *Daniels v. Bronson*, 932 F.2d 102, 106 (2d Cir. 1991) (quoting *Jones v. Thomas*, 491 U.S. 376, 381 (1989) ). However, the "Second Circuit has held that, because New York prison disciplinary proceedings are civil in nature, the Double Jeopardy Clause is not implicated when a prisoner is subjected to both disciplinary sanctions and a criminal conviction arising out of the same conduct." *H'Shaka v. Ricks*, 2010 WL 1689440, at *3 (N.D.N.Y.

Apr. 27, 2010) (citing *Porter v. Coughlin*, 421 F.3d 141,146-149 (2d Cir. 2005) ); *see Porter v. Coughlin*, 421 F.3d at 146-149 (applying *Hudson v. United States*, 522 U.S. 93 (1997) and *Kennedy v. Mendoza-Powers*, 372 U.S. 144 (1963) ). Thus, Petitioner is not entitled to *habeas* relief under this ground. As a result, the Court recommends **denying** the Petition with respect to Petitioner's double jeopardy claim.

### D. Unexhausted Claim

### 1. Evidence Obtained Pursuant to an Unlawful Arrest

Petitioner also seeks *habeas* relief on the ground that his "conviction was based upon evidence obtained pursuant to an unlawful arrest." Pet. at. p. 6. To support this argument, Petitioner states that the "drug testing evidence did not provide a positive finding for opiates. Therefore, it was not [ ] ... Petitioner was convicted on a felonious charge/false evidence." *Id.* However, this claim is unexhausted and procedurally defaulted because Petitioner is barred from presenting this issue to the Court of Appeals and is barred from seeking collateral review because he could have raised this issue on direct review. *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (citing to N.Y. Ct. Rules § 500.10 [7] for the proposition that a petitioner's failure to raise issues before the Court of Appeals precludes further consideration in the New York courts when that petitioner already made the one request for leave to appeal to which he is entitled); N.Y. CRIM. PROC. LAW§ 440.10(2)(c) (barring collateral review if a claim could have been raised on direct review but was not). To deem a claim exhausted is a "cold comfort to most petitioners because it has been held that when 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' federal habeas courts also must deem the claim procedurally defaulted." *Aparicio v. Artuz*, 269 F.3d at 90 (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) ). A court's review of the substance of a procedurally defaulted claim is conditioned upon a petitioner demonstrating cause for the default and resulting prejudice, or presenting evidence to show that he is "actually innocent" of the crime of which he was found guilty. [8] *Coleman v. Thompson*, 501 U.S. at 748; *Ramirez v. Att'y Gen. of State of New York*,

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 156 of 201

280 F.3d 87, 94 (2d Cir. 2001); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (citing *Coleman* ); *King v. Greiner*, 210 F. Supp. 2d 177, 182 (E.D.N.Y. 2002) (stating the court is precluded from considering unexhausted claims "unless petitioner can establish cause to excuse the default and prejudice, or actual innocence").

**\*7** To establish legal cause for a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with New York's procedural rules. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999). Examples of external factors include interference by officials, ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial nor on direct appeal. *Murray v. Carrier*, 477 U.S. at 488. Attorney ignorance or inadvertence is not cause, however, since the attorney is considered the petitioner's agent when acting, or failing to act, in furtherance of the litigation, the petitioner must "bear the risk of attorney error." *Coleman v. Thompson*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. at 488).

Here, Petitioner has not stated a reason for the procedural default. Since he has not establish cause for the procedural default, this Court need not decide whether she also suffered actual prejudice because federal *habeas* relief is unavailable for a procedurally defaulted claim, unless both cause and prejudice are demonstrated. *See, e.g., Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y. 1997) (Kahn, J.) (citing *Stepney* ). In addition, since Petitioner has not established that he is actually innocent of any of the crimes of which he was convicted of, the Court recommends that the Petition be **denied** with respect to this claim.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition (Dkt. No. 1) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 6 36(b)(1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Slip Copy, 2015 WL 13745077

---

Footnotes

1    Specifically, the Fourth Department found that Petitioner's first request for substitution of counsel failed to list any reasons for the motion; Petitioner did not repeat that request or raise any complaints concerning his representation at subsequent court appearances; and Petitioner implicitly abandoned that request when he pled guilty while still being represented by the same attorney. The Department further concluded that the County Court Judge "made a sufficient inquiry" with respect to Petitioner's second request for substitution of counsel. Dkt. No. 9-2, State R. Part 2 at p. SR 267, Appellate Div. Mem. & Order, dated Apr. 20, 2012.

2    28 U.S.C. § 2254(b) and (c) provide, in part, as follows:
      (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that: (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant....
      (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

3  Since AEDPA's restriction on federal habeas power was premised upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver*, 255 F.3d 45, 62 (2d Cir. 2001).

4  Specifically, Petitioner stated that "the filing of the Indictment [ ], subsequent to the dismissal of the aforesaid administrative charges, violate[d] his constitutional rights by illegally placing him in double jeopardy, and [ ] that the People should be estopped and precluded from advancing the issue of the alleged existence of heroin, the key issue relative to the criminal charges contained in the [ ] Indictment." Dkt. No. 90-1, State R. Part 1 at p. SR 061, Appellate Div. Br., dated Nov. 16, 2011. We find that reference to the Double Jeopardy Clause is sufficient to alert the Appellate Division to the constitutional dimension of Petitioner's claim. *See Jones v. Vacco*, 126 F.3d 408, 413-14 (2d Cir. 1997) ("Citing a specific constitutional provision or relying on federal constitutional precedents alerts state courts of the nature of the claim.") (citation omitted).

5  In *Parisi*, the Second Circuit stated that it declined the "invitation" to discuss petitioner's ineffective assistance claim "based on the theory that an effective lawyer would have changed [petitioner's] strategic bargaining position preplea." *Parisi v. United States*, 529 F.3d 134, 138 (2d Cir. 2008). Nevertheless, the Second Court found that the petitioner's claim survived the appeal waiver because his *pro se* submissions could be read as "raising the claim that his attorney was ineffective in advising him to accept the plea agreement rather than advising him to dismiss the indictment with prejudice based on alleged Speedy Trial Act violations." *Id.* at 139. The Second Circuit explained, that when read in this light, the claim "survives the appeal waiver because, by focusing on the advice [petitioner] received from his attorney, it connects the alleged ineffectiveness of [petitioner's] attorney with the voluntary nature of his plea." *Id.* To be sure, this Court, despite reading Petitioner's submissions broadly, does not find that Petitioner is contesting the plea bargaining process.

6  Petitioner's guilty plea is not a bar to his double jeopardy claim. *United States v. Gregg*, 463 F.3d 160, 165 (2d Cir. 2006).

7  It should be noted that this section is typically cited as § 500.10(a) in various cases.

8  This final exception, however, is intended for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see also Lebron v. Mann*, 40 F.3d 561, 564 (2d Cir. 1994).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Morris v. Smith, Not Reported in Fed. Supp. (2016)

2016 WL 4532160

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 158 of 201

2016 WL 4532160
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Allen MORRIS, Petitioner,
v.
Brandon SMITH, Respondent.

9:13-cv-1441 (GLS/DJS)
|
Signed 08/30/2016

**Attorneys and Law Firms**

Allen Morris, Altona, NY, pro se.

Thomas B. Litsky, New York State Attorney General - New York Office, New York, NY, for Respondent.

## SUMMARY ORDER

Gary L. Sharpe, U.S. District Judge

 **\*1** Petitioner *pro se* Allen Morris commenced this proceeding pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus, on the grounds that: his conviction violates his right against double jeopardy; his counsel provided ineffective assistance subsequent to his arraignment; and certain evidence obtained was pursuant to an unlawful arrest. (Pet. ¶ 12, Dkt. No. 1.) In a Report-Recommendation and Order (R&R) dated July 29, 2015, then-Magistrate Judge Randolph Treece recommended that Morris's petition be denied. (Dkt. No. 19.) Pending are Morris's objections to the R&R. (Dkt. No. 26.) For the reasons that follow, the R&R is adopted in its entirety.[1]

Before entering final judgment, this court reviews report and recommendation orders in cases that it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge,

this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*4-5.

Morris specifically objects to the R&R on the ground that his claim, raised for the first time in his objections, regarding his attempt to withdraw his guilty plea was not addressed. (Dkt. No. 26 at 4-5.) Because the petition controls the claims, and this claim was not raised in the petition, (Pet. ¶ 12), it was not before Judge Treece. Therefore, the failure to address it was not an abuse of discretion. *See Davis v. Herbert*, No. 00-CV-6691, 2008 WL 495316, at \*1 (S.D.N.Y. Feb. 25, 2008) ("[U]pon review of a habeas petitioner's objections to a magistrate judge's report and recommendation, the [c]ourt may not consider claims raised for the first time in the petitioner's objections-that is, claims not asserted in the petitioner's original and/or supplemental habeas petitions.") Furthermore, at this late stage, this court will not grant Morris permission to amend the petition.

Morris also specifically objects to Judge Treece's recommendation regarding his claim that evidence was obtained pursuant to an unlawful arrest. (Dkt. No. 26 at 4-5.) Judge Treece found that this claim was unexhausted and, thus, procedurally defaulted. (Dkt. No. 19 at 18.) In addition, Judge Treece determined that Morris did not show any legal cause for the default, nor did he allege that he is actually innocent, such that he can overcome the default. (Dkt. No. 19 at 19-20.) In his petition, Morris failed to identify any objective external factor that would be sufficient legal cause. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 2000). Thus, Judge Treece did not err by concluding that Morris failed to overcome his procedural default. Morris also failed to argue actual innocence in his petition, and the court declines to evaluate that argument for the first time now. *See Davis v. Herbert*, 00-CV-6691 at \*1.

 **\*2** Morris's remaining arguments do not properly object to a specific element of the R&R, and thus are general objections and reviewed only for clear error. Finding no clear error in the R&R, the court adopts Judge Treece's R&R in its entirety.

Accordingly, it is hereby

**ORDERED** that Magistrate Judge Randolph Treece's July 29, 2015 Report and Recommendation (Dkt. No. 19) is **ADOPTED** in its entirety; and it is further

**Morris v. Smith, Not Reported in Fed. Supp. (2016)**
Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 159 of 201

2016 WL 4532160

**ORDERED** that Morris's petition (Dkt. No. 1) is **DENIED** and **DISMISSED**; and it is further

**ORDERED** that, because Morris has failed to make a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue pursuant to 28 U.S.C. § 2253(c); and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4532160

Footnotes

1    A recitation of the relevant facts, which are fully set forth in the R&R, (Dkt. No. 19 at 2-1), is omitted, given the parties' familiarity with them.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5750151
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Christopher MORRISHAW, Petitioner,
v.
David ROCK, Superintendent, Upstate
Correctional Facility, Respondent.

No. 9:12–cv–00748 (MAD/DEP).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Christopher Morrishaw, of Counsel, Malone, NY, pro se.

Office of the New York, State Attorney General, Priscilla I. Steward, AAG, New York, NY, for Respondent.

Hon. Eric T. Schneiderman, New York State Attorney General, Priscilla I. Steward, Esq., Assistant Attorney General, New York, NY, for Respondent.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1 Christopher Morrishaw ("Petitioner"), currently incarcerated at Upstate Correctional Facility in Malone, New York, brings this action as a *pro se* litigant seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. *See* Dkt. No. 1. Magistrate Judge David E. Peebles issued a Report and Recommendation, recommending that the Petitioner's writ of habeas corpus be denied and dismissed on the grounds that the issues presented were without merit. *See* Dkt. No. 21 at 24–25. Petitioner has filed his objections to the Report and Recommendations. *See* Dkt. No. 24.

**II. BACKGROUND**

Petitioner was convicted of a single count of murder in the second degree, pursuant to his plea of guilty,

in the New York State Supreme Court of Schenectady County ("state court"). *See* Dkt. Nos. 1, 11–1 at 13. Petitioner appealed this January 17, 2007 conviction to the New York State Appellate Division, Third Department ("Third Department"). *See People v. Morrishaw,* 56 A.D.3d 895 (3rd Dep't 2008). Petitioner argued that he did not knowingly, voluntarily, and intelligently enter a guilty plea or waive the right to appeal, among other things, but the Court, after reviewing his plea allocution, upheld his conviction. *See id.* His leave to appeal to the New York State Court of Appeals was denied. *See People v. Morrishaw,* 12 N.Y.3d 761 (2009). Petitioner also moved the state court to vacated the judgment of conviction against him pursuant to New York Criminal Procedure Law § 440.10 arguing, among other things, that he did not receive effective assistance of counsel. *See* Dkt. No. 11–8. The motion was denied on November 28, 2011. *See* Dkt. No. 11–10. The state court found that Petitioner received meaningful representation. *See id.* His application for permission to appeal that order was denied by the Third Department. *See id.* at 11–13.

In his petition for writ of habeas corpus, Petitioner raises four primary grounds for review: (1) Petitioner's plea and waiver of his right to appeal were not knowing, voluntary, or intelligent; (2) Petitioner was denied the effective assistance of trial counsel; (3) the state court erred in failing to dismiss the "twin count" indictment against defendant as defective; and (4) his signature was not properly obtained on the waiver of appeal. *See* Dkt. No. 1 at 4–5, 7–9. Pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y, 72 .3(c), this Court referred this matter to Magistrate Judge Peebles. On August 14, 2015, Magistrate Judge Peebles issued a Report and Recommendation, recommending that the Petitioner's writ of habeas corpus be denied and dismissed on the grounds that the issues presented were without merit. *See* Dkt. No. 21 at 24–25. On September 11, 2015, Petitioner filed his objections to Magistrate Judge Peebles' Report and Recommendation. *See* Dkt. No. 24. Currently before the Court are Petitioner's objections. *See* Dkt. No. 24.

**II. DISCUSSION**

**A. Standard of Review**
*2 When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the

report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N . D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)).

## B. AEDPA

The enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA") brought about significant new limitations on the power of a federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254. In discussing this deferential standard, the Second Circuit noted in *Rodriguez v. Miller,* 439 F.3d 68 (2d Cir.2006), *cert. granted, judgment vacated and cases remanded on other grounds by,* 549 U.S. 1163 (2007), that

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005) (quotation omitted); *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has observed that

> a state court's decision is "contrary to" clearly established federal law if it contradicts Supreme Court precedent on the application of a legal rule, or addresses a set of facts "materially indistinguishable" from a Supreme Court decision but nevertheless comes to a different conclusion than the Court did. [*Williams v. Taylor,* 529 U.S. 362] at 405–406, 120 S.Ct. 1495 [ (2000) ]; *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001).... [A] state court's decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts" of the case before it. *Williams,* 529 U.S. at 413, 120 S.Ct. 1495.

**\*3** *Thibodeau v. Portuondo,* 486 F.3d 61, 65 (2d Cir.2007); *see also Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Francis S. v. Stone,* 221 F.3d 100, 108–09 (2d Cir.2000)).

Significantly, a federal court engaged in habeas review is not charged with determining whether a state court's determination was merely incorrect or erroneous, but instead whether such determination was "objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409 (2009); *see also Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001) (citation omitted). Courts have interpreted "objectively unreasonable" in this context to mean that "some increment of incorrectness beyond error" is required for the habeas court to grant the application. *Earley v. Murray,* 451 F.3d 71, 74 (2d Cir.2006) (quotation omitted).

As the Second Circuit has further instructed, the necessary predicate for a federal habeas court's deferential review is that a petitioner's federal claim has been 'adjudicated on the merits' by the state court. *Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003). "If a state court has not adjudicated the claim 'on the merits,' " the federal habeas court applies the pre-AEDPA standards, and reviews de

*novo* the state court disposition of the petitioner's federal claims. *Id.* (quoting *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001)). "[A] state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment.' " *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001)). To determine whether a state court has disposed of a claim on the merits, a court will consider: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Aparicio,* 269 F.3d at 93 (quoting *Sellan,* 261 F.3d at 314).

**C. Exhaustion**

A petitioner in custody pursuant to a judgment of a state court is entitled to federal habeas relief only if he has exhausted all available state-court remedies. *See* 28 U.S.C. § 2254(b)-(c). A claim has been exhausted if it was fairly presented in the state courts, thereby giving the state the "opportunity to pass upon and correct" alleged violations of federal rights. *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509 (1971)). A petitioner need not have cited "book and verse on the federal Constitution" in his claim in state court for the claim to have been exhausted. *Picard,* 404 U.S. at 278 (quotation omitted). Rather, a petitioner may have fairly presented his claim to the state courts through

> **\*4** (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegations of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of the State of N.Y.,* 696 F.2d 186, 194 (2d Cir.1982).

As the Second Circuit has held, "to invoke 'one complete round of the State's established appellate review process', a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Smith v. Duncan,* 411 F.3d 340, 345 (2d Cir.2005) (quoting *Galdamez v. Keane,* 394 F.3d 68, 74 (2d Cir.2005)) (internal citation omitted). Applicants for leave to appeal must submit legal briefs and other documents to the New York State Court of Appeals, identifying the issues upon which the application is based, and must focus upon identifying problems of reviewability and preservation of error. *See id.* (quotations omitted).

**III. ANALYSIS**

**A. Report and Recommendation**

First, Magistrate Judge Peebles addressed Petitioner's contention that the "twin count" indictment was defective. *See* Dkt. No. 21 at 8. He found that Petitioner did not preserve or properly present this issue in the first instance to the state courts, and, therefore, Petitioner did not exhaust the available state remedies on this issue. *See* Dkt. No. 21 at 8. The Report and Recommendation sets forth that the federal courts may not engaged in habeas review of Petitioner's defective indictment issue unless he demonstrates (1) good cause for, and actual prejudice resulting from, the procedural default or (2) that he was actually innocent. *See id.* at 11. Magistrate Judge Peebles analyzed Petitioner's contention under this standard and found that Petitioner has not offered any good cause for his procedural default on the defective indictment issue and Petitioner does not argue that he was actually innocent.

Magistrate Judge Peebles also concluded that Petitioner also failed to set forth facts demonstrating that the denial of habeas relief on this ground would leave unremedied a fundamental miscarriage of justice. *See id.* In the event that Magistrate Judge Peebles were to reach the merits of this issue, he found that Petitioner's guilty plea was knowing, voluntary, and intelligent. *See id.* Petitioner was thereby precluded from raising any independent claim of constitutional violations that occurred prior to the entry of the guilty plea. *See id.* at 12.

Next, Magistrate Judge Peebles reviewed that the standard governing the acceptance of guilty pleas requires that a valid guilty plea is made voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences. *See id.* at 15. Magistrate Judge Peebles set forth the four factors used to determine whether a guilty plea was knowing, intelligent, and voluntary, before he determined that the evidence fully supported the Third Department's finding that Petitioner's guilty plea is valid. *See id.* at 15–16. Magistrate Judge Peebles found that Petitioner "(1) was fully advised of his rights, (2) denied being threatened or coerced into pleading guilty, (3) indicated that he had thoroughly discussed the case and his plea with counsel, and (4) was satisfied with his attorney's representation." *Id.* at 16. Based upon the record, Magistrate Judge Peebles recommended that the Third Department's conclusion was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See id.*

**\*5** With regard to Petitioner's contention that the waiver of appeal was not valid because he did not sign his full name, Magistrate Judge Peebles stated that there is no constitutional requirement that a waiver of appeal be provided in writing where the Petitioner relinquished the right voluntarily, intelligently, and knowingly. *See id.* a 17. In his Report and Recommendation, Magistrate Judge Peebles reviewed the transcript of Petitioner's discussion with the court about the waiver of his right to appeal and, after careful review, determined that the waiver was valid. *See id.* Accordingly, this contention is not cognizable on federal habeas review. *See id.*

Magistrate Judge Peebles set out Petitioner's arguments, which included ineffective assistance of counsel because Petitioner's attorney failed to explore his psychological issues and counseled him to accept the plea bargain. *See id.* at 19. This issue was addressed and review by the state court in Plaintiff's motion to vacate brought under New York Criminal Procedure Law § 440.10. *See* Dkt. No. 11–12. In addressing this contention, Magistrate Judge Peebles correctly stated the standard governing the ineffective assistance of counsel claims, *see* Dkt. No. 21 at 19, and, applying the standard, Magistrate Judge Peebles reviewed the Petitioner's motion to vacate under New York Criminal Procedure Law § 440.10. *See* Dkt. Nos. 11–8, 11–9, 11–10. He noted that Petitioner's counsel made appropriate pretrial motions and negotiated a favorable plea bargain. The state court concluded that

Petitioner's representation by counsel in totality afforded him effective assistance of counsel. *See* Dkt. No. 11–10. Magistrate Judge Peebles then examined this conclusion to determine whether it was either contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See id.* Magistrate Judge Peebles found that the plea bargain offered was not unreasonable in view of the strength of the evidence against Petitioner and the sentence if convicted at trial. *See id.* After his review of the entire record and, in particular, the transcript of the plea allocution, which described that Petitioner's counsel took actions concerning Petitioner's potential mental health issues. *See id.* Magistrate Judge Peebles concluded that Petitioner's counsel explored these mental health issues prior to the plea hearing and during the course of the plea allocution. *See id.*

Finally, Magistrate Judge Peebles recommends that a certificate of appealability should not be issued in this case because Petitioner has not made a substantial showing of the denial of a constitutional right. *See id.* at 24.

### F. Petitioner's Objections

In his objections, Petitioner argues that his plea of guilty was not made knowingly or intelligently. *See id.* Petitioner also argues that he had ineffective assistance of counsel because his appointed counsel did not conduct an investigation and his counsel did not make an effort to know that Plaintiff was receiving "mental health" treatment while in the county jail. *See id.* Initially, it should be noted that Petitioner did not raise any objections to the Report and Recommendations findings that relate to his claim that the indictment was defective or his claim that he did not sign the waive of appeal with his full name. The Court, having reviewed Magistrate Judge Peebles' Report and Recommendation together with the record, finds that there is no clear error with regard to these two issues.

**\*6** The Court finds that Magistrate Judge Peebles stated correctly that any defect in the indictment was not properly presented to the state court and, therefore, Plaintiff did not exhaust the available state remedies on this issue. Further, the Court finds that the record supports Magistrate Judge Peebles finding that Petitioner has not established good cause for this procedural default, and Petitioner has not presented any evidence in the record that he is actually innocent. Accordingly, the Court adopts Magistrate Judge Peebles recommendation that

the Court may not engage in a habeas review of this issue. Further, the Court finds that there is no clear error in Magistrate Judge Peebles' analysis of the waiver of appeal issue presented by Petitioner. The Court agrees and adopts Magistrate Judge Peebles' recommendation that Petitioner knowingly, voluntarily, and intelligently agreed to waive his right to appeal as a part of his plea allocution, and it is of no constitutional moment whether Petitioner signed his full name on the written waiver of appeal.

Addressing the objections filed, the Court finds that Petitioner has made general objections to the Report and Recommendation, merely rearguing the same contentions that he made to Magistrate Judge Peebles. Accordingly, the Court has also reviewed those portions of the Report and Recommendation for clear error. Upon review of the appellate record, *see* Dkt. Nos. 11–1, 11–2, 11–3, 11–4, the Court finds that the evidence fully supported the Third Department's opinion and order that Petitioner's guilty plea to murder in the second degree and the waiver of appeal was knowing, intelligent, and voluntary. *See People v. Morrishaw,* 56 A.D.3d 895.

The Court has also reviewed Petitioner's motion to vacate under New York Criminal Procedure Law § 440.10, *see* Dkt. Nos. 11–8, 11–9, and finds that the state court decision should also be upheld. To show ineffective assistance of counsel,

the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Wash.,* 466 U.S. 668, 687 (1984). The attorney's conduct must fall "outside the wide range of professionally competent assistance." *Id.* at 690. Here, the evidence submitted on Petitioner's motion demonstrates

that his counsel met the *Strickland* standard and Petitioner received effective assistance of counsel.

## IV. CONCLUSION

After carefully considering Magistrate Judge Peebles' Report and Recommendation, Petitioner's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' Report and Recommendation is **ADOPTED** in its entirety; and the Court further

**\*7 ORDERS** that Petitioner's petition for a writ of habeas corpus is **DENIED** and **DISMISSED;** and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of Petitioner's claims; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Respondent's favor and close this case.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Pro se petitioner Christopher Morrishaw, a New York State prison inmate, has commenced this proceeding pursuant to 28 U.S.C. § 2254 requesting federal habeas intervention following his murder conviction from 2007 in Schenectady County based on a plea of guilty. In his petition, Morrishaw argues that his guilty plea and waiver of appeal were not knowing, voluntary, and intelligent and that he received ineffective assistance of counsel in connection with the proceedings before the trial court. Petitioner also contends that the trial court erred in failing to dismiss the indictment against him as defective and that his appeal waiver was not properly

signed by him. Respondent opposes Morrishaw's petition, arguing that certain of his claims are unexhausted but now procedurally forfeited, and, in any event, all of his claims lack merit.

Having considered Morrishaw's petition and applying the requisite deferential standard to the determinations made by the state courts regarding the grounds asserted by Morrishaw, I recommend that the petition be denied.

### I. *BACKGROUND*

Petitioner's murder conviction stems from the shooting of Jason French, an acquaintance of Morrishaw, on December 29, 2005, in a convenience store located in Schenectady, New York. *Dkt. No. 11–1 at 80.* As a result of the incident, which occurred while two other individuals were standing in close proximity to the victim, plaintiff was accused in Schenectady County Indictment No. B–106–18 of two counts of murder in the second degree and two counts of first degree reckless endangerment. *Dkt. No. 11–2 at 19–21.* On August 1, 2006, accompanied by his assigned attorney, petitioner appeared before Schenectady County Court Judge Karen A. Drago and, pursuant to a negotiated plea agreement, entered a plea of guilty to a single count of second degree murder in full satisfaction of the charges set forth in the indictment. *Dkt. No. 11–1 at 69–83; Dkt. No. 11–2 at 38–51.*

Prior to sentencing, represented by new counsel, petitioner moved to withdraw his guilty plea, arguing that (1) the plea was the product of pressure exerted by his former counsel and he was not afforded adequate time to consider the consequences of his plea; (2) prior counsel spoke to petitioner only about resolving the case with a plea bargain but did not discuss possible trial strategies; (3) petitioner was afraid to ask questions of his attorney; (4) his psychological evaluation was inadequate; (5) petitioner did not understand the legal process; and (6) he did not understand the appeal waiver. *Dkt. No. 11–1 at 68.* At a hearing regarding petitioner's motion, held on December 4, 2006, the trial court stated that "[t]he plea minutes disclosed that [the] Court adequately apprised [petitioner] of the ramifications of pleading guilty including the rights that he would be relinquishing thereby." *Dkt. No. 11–2 at 58; 11–9 at 72.* The court further observed that during his plea allocution, Morrishaw stated that he had discussed the case thoroughly with his attorney—with whose services he was satisfied—he understood the consequences of the

plea, and he was not coerced or threatened when the plea was entered. *Dkt. No. 11–2 at 58–59.* The court thus concluded that the plea was entered knowingly, voluntarily, and intelligently, and the application to withdraw it was therefore denied. *Dkt. No. 11–2 at 59.* Petitioner was thereafter sentenced on January 17, 2007, pursuant to the plea agreement, to an indeterminate term of incarceration of between fifteen years and life, with an additional requirement that he pay $5,970 in restitution to the family of the victim. *Dkt. No. 11–2 at 61; Dkt. No. 11–9 at 74; Dkt. No. 12 at 56–57.*

**\*8** Once again represented by counsel, petitioner appealed his conviction to the New York Supreme Court Appellate Division, Third Department, arguing that (1) his guilty plea and waiver of appeal were not knowing, voluntary, and intelligent because he felt pressure by his trial attorney to accept the plea offer and the trial court failed to consider his mental health issues to determine whether he had the requisite capacity to enter a lawful plea; and (2) the trial court improperly failed to dismiss the "twin count" indictment, which charged him with both intentional and depraved indifference murder. *Dkt. No. 11–2 at 2–14.* On November 13, 2008, a five-judge panel of the Third Department unanimously affirmed the judgment of conviction. *People v. Morrishaw,* 56 A.D.3d 895 (3d Dep't 2008). In its decision, the appellate court reviewed the record and concluded that both petitioner's plea and his waiver of appeal were knowing, intelligent, and voluntary. *Morrishaw,* 56 A.D.3d at 896. The Third Department summarily disposed of petitioner's second argument, stating that "[d]efendant's remaining contentions, to the extent they are properly before us, have been examined and found to be lacking in merit." *Id.* at 897. Morrishaw's petition for leave to appeal that determination to the New York Court of Appeals was denied on February 24, 2009. *People v. Morrishaw,* 12 N.Y.3d 761 (2009).

On or about February 19, 2010, proceeding *pro se,* petitioner moved to vacate the judgment of conviction against him pursuant to New York Criminal Procedure Law ("CPL") § 440.10. *Dkt. No. 11–8 .* Petitioner argued that the judgment should be vacated on the grounds that (1) his trial attorney was ineffective for various reasons, including because counsel failed to request a mental health examination to determine whether petitioner was competent; (2) petitioner's plea was not knowing, voluntary, and intelligent; and (3) petitioner

did not sign the waiver of appeal. *See generally id.* According to respondent's brief, that motion was denied on November 28, 2011. Dkt. 11–10 at 2–3; *Dkt. No. 11– 11 at 16–17,* and leave to appeal was denied by the Third Department on March 28, 2012. *Dkt. No. 11–13.*

## II. *PROCEDURAL HISTORY*

Petitioner commenced this proceeding on May 4, 2012, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 7. Appropriately named as the respondent in Morrishaw's petition is David Rock, the superintendent of the prison facility in which he was housed at the time of filing. In his petition, Morrishaw raises four grounds for granting habeas relief, asserting that (1) his plea and waiver of appeal were not knowing, voluntary, or intelligent; (2) he received ineffective assistance of counsel leading up to and in connection with the entry of his plea; (3) the trial court improperly denied his motion to dismiss the indictment; and (4) his signature on the appeal waiver was insufficient and ineffective as a waiver. *Dkt. No. 1 at 3–4,* 7–9. Respondent Rock, represented by the New York State Attorney General, answered the petition on September 28, 2012, and on that same date submitted the relevant state court records associated with petitioner's conviction and subsequent proceedings. Dkt. Nos. 10–12. Although petitioner requested and was granted an extension of time to file a reply to respondent's opposition, none was received by the court.

**\*9** This matter, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Exhaustion of Remedies/Procedural Default*
As a threshold matter, respondent maintains that the court need not reach the merits of petitioner's third claim related to the trial court's failure to dismiss the indictment against him. *Dkt. No. 10–1 at 16.* In support of that contention, the respondent notes that, in his appeal to the Third Department, plaintiff relied solely upon state statutory and case law concerning this point and did not raise any federal claims in support of that argument. *Id.* Accordingly, he argues, any federal claim associated with

the argument regarding the trial court's failure to dismiss the indictment against him was not preserved and properly presented in the first instance to state courts. *Id.*

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies or establish either an absence of available state remedies or that such remedies cannot adequately protect his rights. *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir.2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir.1994), *cert. denied,* 515 U.S. 1118, 115 S.Ct. 2269 (1995). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of N.Y.,* 696 F.2d 186, 191 (2d Cir.1982); *see also Galdamez v. Keane,* 394 F.3d 68, 72 (2d Cir.2005) ("Comity concerns lie at the core of the exhaustion requirement."). Though both federal and state courts are charged with securing a state criminal defendants' federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Galdamez,* 394 F.3d at 72 (citing *O'Sullivan v. Boerckel,* 526 U.S. 838, 844–45 (1999)). "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye,* 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been " 'fairly present[ed]' " to the state court. *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" if the state court was apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye,* 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

When a claim has never been presented to a state court, a federal court may find that there is an absence of available state corrective process under section 2254(b) "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." *Aparicio,* 269 F.3d at 90 (citing *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997)); *Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000) (federal court may address merits of a habeas petition containing unexhausted claims where there is no further state proceeding for petitioner

to pursue or where further pursuit would be futile). In this instance, petitioner did not present his federal claim regarding the indictment to any state court. *See generally Dkt. No. 11–2 at 2–14; Dkt. No. 11–5 at 3–13; Dkt. No. 11–8 at 2–13; Dkt. No. 11–11 at 6–14.* I must therefore determine whether it would be futile for him to present it at this time.

**\*10** Petitioner cannot now file an appeal with the New York State Appellate Division in order to advance his claim regarding the indictment because, in New York, a defendant is "entitled to one (and only one) appeal to the Appellate Division." *Aparicio,* 269 F.3d at 91. Moreover, because "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," *id.* (citing CPL § 440.10(2)(c)), petitioner could not now properly raise this claim, which is based upon the record, in an Article 440 motion. *Aparicio,* 269 F.3d at 91; *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994). This claim is therefore "deemed exhausted" for purposes of petitioner's habeas application. *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 170 (2d Cir.2000); *Senor v. Greiner,* No. 00–CV–5673, 2002 WL 31102612, at \*10 (E.D.N.Y. Sept. 18, 2002). [1]

Petitioner's failure to raise his federal law claims before the state court constitutes a potentially fatal default. This court may not engage in habeas review of his procedurally defaulted claim unless he demonstrates either (1) good cause for and actual prejudice resulting from his procedural default, or (2) that "he is actually innocent." [2] *Bousley v. United* States, 523 U.S. 614, 622 (1998); *accord, Clark v. Perez,* 510 F.3d 382, 393 (2d Cir.2008). To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule. *Coleman v. Thompson,* 501 U.S. 722, 753 (1991) (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). Examples of such external mitigating circumstances can include ineffective assistance of counsel, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." [3] *Murray,* 477 U.S. at 488 (quotation marks and citations omitted); *Coleman,* 501 U.S. at 753. When a petitioner has failed to establish adequate cause for his procedural default, the court need not proceed to examine the issue of prejudice

because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985); *accord, Long v. Lord,* No. 03–CV– 0461, 2006 WL 1977435, at \*6 (N.D.N.Y. March 21, 2006) (McCurn, J.).

In this instance the petitioner has not offered good cause for his procedurally default with respect to this "twin count" indictment claim. Accordingly, the court need not address the question of actual prejudice. In addition, petitioner has failed to set forth facts demonstrating that the denial of habeas relief on this ground would leave unremedied a fundamental miscarriage of justice. I therefore recommend that petitioner's third ground be rejected on this procedural basis, without reaching its merits. [4]

### B. *Standard of Review on the Merits*

**\*11** Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the adjudication of the claim (1) was contrary to, or involved an unreasonable application, of clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Cullen v. Pinholster,* — U.S. —, 131 S.Ct. 1388, 1398, 1400 (2011) (citing 28 U.S.C. § 2254(d)); *Premo v. Moore,* —U.S. —, 131 S.Ct. 733, 739 (2011); *Thibodeau v. Portuondo,* 486 F.3d 61 (2d Cir.2007) (Sotomayor, J.). The AEDPA " 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.' " *Felkner v. Jackson,* — U.S. —, 131 S.Ct. 1305, 1307 (2011) (*per curiam* ) (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010)); *accord, Cullen,* 131 S.Ct. at 1398. Federal habeas courts must presume that the state court's factual findings are correct "unless applicants rebut this presumption with 'clear and convincing evidence.' " *Schriro v. Landrigan,* 550 U.S. 465, 473–74 (2007) (quoting § 2254(e)(1)); *see also Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher

threshold." *Schriro,* 550 U .S. at 473 (citing *Williams v. Taylor,* 529 U.S. 362, 410 (2000)).

As required by section 2254, on federal habeas review, a court may only consider claims that have been adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d); *Cullen,* 131 S.Ct. at 1398; *Wash. v. Schriver,* 255 F.3d 45, 52–55 (2d Cir.2001). The Second Circuit has held that, when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001).

## C. *Petitioner's Guilty Plea and Waiver of Appeal Claim*

To varying degrees, grounds one, two, and four of Morrishaw's petition depend upon whether the entry of his guilty plea and waiver of appeal were voluntary, knowing, and intelligent. *See generally* Dkt. No. 1. Respondent argues that the Appellate Division's decision, in which it rejected petitioner's claim, *Morrishaw,* 56 A.D.3d 95, 896–97, is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *Dkt. No. 10–1 at 21–26.*

### 1. *Clearly Established Supreme Court Precedent*

**\*12** The standard governing the acceptance of guilty pleas is neither recently evolved nor controversial. "A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.' " *Bradshaw v. Stumpf,* 545 U.S. 175, 183 (2005) (quoting *Brady v. United States,* 397 U.S. 742, 748 (1970)); *see also Hill v. Lockhart,* 474 U.S. 52, 56 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " (quoting *N.C. v. Alford,* 400 U .S. 25, 31 (1970)). The court may determine whether a defendant's guilty plea was knowing, intelligent, and voluntary by examining the relevant record for whether the defendant (1) was competent to proceed, (2) was made aware of the nature of the charges against him, (3) had a rational and factual understanding of the proceedings against him, and (4) was cognizant of the constitutional

protections relinquished by entering a guilty plea. *Oyague v. Artuz,* 393 F.3d 99, 106 (2d Cir.2004) (citing cases). Although the question of whether a defendant's guilty plea was voluntarily is ultimately a legal one that "merit[s] independent consideration in a federal habeas proceeding," the "components of voluntariness have been held to constitute, or at least depend on, questions of fact the state court determinations of which are subject to the requirements of [28 U.S.C. §] 2254(d)." *Matusiak v. Kelly,* 786 F.2d 536, 543, 544 (2d Cir.1986); *accord, Oyague,* 393 F.3d at 104.

### 2. *Contrary to or Unreasonable Application of Clearly Established Supreme Court Precedent*

The evidence in this case is fully supportive of the Third Department's finding that the petitioner's guilty plea to a felony charge was knowing, voluntary, and intelligent. As a result of plea negotiations, petitioner was permitted to plead guilty to a single count of second-degree murder for which it was agreed he would be sentenced to a minimum of fifteen years to life, thereby avoiding a possible prison sentence of up to twenty-five years to life. *Dkt. No. 11–1 at 70–71; Dkt. No. 11–2 at 39–40.* The record before the court reflects that the evidence against the petitioner was strong, and included two witnesses to the crime and petitioner's confession. *Dkt. No. 11–1 at 25,* 28, 93, 96–101, 102–04. During the plea allocution, as the Third Department noted, petitioner, *inter alia,* (1) was fully advised of his rights, (2) denied being threatened or coerced into pleading guilty, (3) indicated that he had thoroughly discussed the case and his plea with counsel, and (4) was satisfied with his attorney's representation. *Dkt. No. 11–1 at 69–83; Dkt. No. 11–2 at 38–52.* With respect to plaintiff's contention that his waiver of his right to appeal was invalid because he did not sign his full name, *Dkt. No. 1 at 4,* this claim is not cognizable on federal habeas review because, where the defendant relinquishes the right voluntarily, intelligently, and knowingly on the record as part of a plea allocution, there is no constitutional requirement that a waiver of the right to appeal be provided in writing. In this case, during the plea hearing, the following exchange occurred regarding petitioner's waiver of his right to appeal:

> **\*13** THE COURT: Do you understand that as part of this plea bargain, you're being asked to waive or give up your right to appeal?

> THE DEFENDANT: Yes.

THE COURT: Do you do so willingly and voluntarily?

THE DEFENDANT: Yes.

THE COURT: Could you please execute that.

MR. CARUSO: Can I just have a moment, Judge.

(Pause in the proceedings.)

MR. CARUSO: Your Honor, I have gone over the Waiver of Right to Appeal document with Mr. Morrishaw. I went over it in depth with him yesterday at the jail. I have a conformed copy and I told him we would have to sign it in open court. I advised him with regard to his appellate rights. I believe he understands that and he agrees to be bound by the document and he did just sign that here in open court today.

THE COURT: Thank you. Let the record reflect that the defendant has signed his name 'Christopher M.' I witnessed it. It's been signed by his attorney, Mr. Caruso. It's been dated.

Do you have any questions about this Waiver of Right to Appeal, sir?

THE DEFENDANT: No.

THE COURT: Then I will file the Waiver of Right to Appeal with the clerk of the court and ask that it be made part of the court's files.

*Dkt. No. 11–1 at 77–79; Dkt. No. 11–2 at 46–48.*

Based upon the foregoing, and the entire record now before, which I have carefully reviewed, I recommend a finding that the Third Department's determination that defendant's plea and waiver of appeal were valid was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

### D. *Petitioner's Ineffective Assistance of Counsel Claim*
In ground two of his petition, Morrishaw argues that he received ineffective assistance of counsel based on allegations that his attorney failed to explore his psychological issues and adequately counsel him concerning the plea bargain offered by the prosecution. *Dkt. No. 1 at 4,* 8. Respondent maintains that the trial court's determination, on petitioner's CPL § 440.10 motion, that petitioner received effective

assistance of counsel was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *Dkt. No. 10–1 at 21.*

### 1. *Clearly Established Supreme Court Precedent*
Under the well-established standard governing ineffective assistance of counsel claims,

> the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Wash.,* 466 U.S. 668, 687 (1984); *accord, Murden v. Artuz,* 497 F.3d 178, 198 (2d Cir.2007).

To be constitutionally deficient, the attorney's conduct must fall "outside the wide range of professionally competent assistance ." *Strickland,* 466 U.S. at 690; *accord, Rivas v. Fischer,* 780 F.3d 529, 547 (2d Cir.2015). An attorney's performance is judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort made to "eliminate the distorting effects of hindsight [.]" *Strickland,* 466 U.S. at 689; *see also Rivas,* 780 F.3d at 547 (noting the court's "scrutiny of counsel's performance must be 'highly deferential' " (quoting *Strickland,* 466 U.S. at 689)).

**\*14** Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that, but for the attorney's deficient conduct, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *see also Murden,* 497 F.3d at 198 ("Under *Strickland,* a defendant must show that ... there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." (quotation marks omitted)).

### 2. *Contrary to or Unreasonable Application of Clearly Established Supreme Court Precedent*

In its decision denying petitioner's CPL § 440.10 motion, the trial court noted that Morrishaw's attorney made appropriate pretrial motions and negotiated a favorable plea bargain, and concluded that, "in reviewing defendant's representation in totality ... [,] he was afforded effective assistance of counsel ." *Dkt. No. 11–10 at 2. Dkt. No. 11–11 at 16.* The court must examine that decision to determine whether it was either contrary to or an unreasonable application of clearly established Supreme Court precedent.

Petitioner principally argues that his attorney, Mark J. Caruso, Esq., deprived him of meaningful representation by counseling him to accept the plea bargain offered to him. *Dkt. No. 1 at 4, 8.* As was previously noted, however, the plea bargain was not unreasonable, particularly given the strength of the evidence against petitioner and the sentence he faced if convicted at trial. It is true that petitioner apparently suffers from psychological impairments that, in theory, could have interfered with his ability to understand the proceedings against him and enter a knowing, voluntary, and intelligent plea. *See, e.g., id.* at 4 ("Defendant's assigned counsel was aware that defendant suffered with [sic] mental disorders from his very young childhood and was in and out of mental institutions[.]"). That issue, however, was explored by plaintiff's counsel prior to petitioner's plea hearings and, during the course of the plea allocution, the following exchange occurred:

> THE COURT: Do you claim to have any mental health issues?

> THE DEFENDANT: Yes.

> THE COURT: And do you know what they are, if any?

> MR. CARUSO: Judge, as we discussed at the bench, there was an issue early on in this case that was presented to me that caused me to look into Mr. Morrishaw's psychiatric history, and I can tell the Court that from an early age, I believe ages five to 18, Mr. Morrishaw has been in multiple psychiatric hospitals and care facilities until he signed himself out at age 18 from an institute called

Linden Hall. Throughout the course of my review of these documents, I have seen a couple of different diagnoses. One of them talked about conduct disorder. Another report talked about ADHD.

> I did not see any other illnesses or ailments that are common in the DSM–IV, but again, based upon this, I did have him looked at by Dr. Thalmann, in hopes of trying to see if there would be a psychiatric defense that was available. Unfortunately, or fortunately, depending on how you look at it, Dr. Thalmann had indicated there was no psychosis there and we could not make out a psychiatric defense on his behalf. So, that would be what I would say about the issues of mental health that [petitioner] has exhibited throughout his life.

**\*15** *Dkt. No. 11–1 at 73–74;* Dkt. No. 42–43. Based on this representation from petitioner's counsel, and having thoroughly reviewed the entire record in this case, I am unable to discern any aspect in which counsel's performance on petitioner's behalf failed to meet the *Strickland* standard. I therefore recommend a finding that the trial court's determination that plaintiff was not denied effective assistance of counsel be upheld as neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

### E. *Certificate of Appealability*

To appeal a final order denying a request by a state prisoner for habeas relief, a petitioner must obtain from the court a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A); *see also* Fed. R.App. P. 22(b)(1) ( "[T]he applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). In the absence of a COA, a federal court of appeals lacks jurisdiction to entertain an appeal from the denial of a habeas petition. *Hoffler v. Bezio,* 726 F.3d 144, 152 (2d Cir.2013). A COA may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Hoffler,* 726 F.3d at 154. A petitioner may demonstrate a "substantial showing" if "the issues are debatable among jurists of reason; ... a court could resolve the issues in a different manner; or ... the questions are adequate to deserve encouragement to proceed further." [5] *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4 (1983) (quotation marks omitted). In this instance, I conclude that the petitioner has not made a substantial showing

of the denial of a constitutional right and therefore recommend against the issuance of a COA.

IV. *SUMMARY AND RECOMMENDATION*

Petitioner's claim that the trial court in this case improperly refused to dismiss the indictment against him based upon the inclusion of two murder counts was not fully exhausted by the petitioner, and, in any event, is without merit in light of his intervening guilty plea. In addition, based on my review of the state court record, I find that the Appellate Division's conclusion that the guilty plea and waiver of appeal were voluntary, knowing, and intelligent was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Similarly, I conclude that the trial court's determination that petitioner received constitutionally mandated effective assistance of counsel was also neither contrary to nor unreasonable application of clearly established Supreme Court precedent.

Based upon the foregoing, it is therefore hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it further hereby

RECOMMENDED, based upon my finding that Morrishaw has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not be issued with respect to any of the claims set forth in his petition.

**\*16** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Aug. 14, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5750151

Footnotes

1    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

2    Because petitioner in this case has not claimed actual innocence, and there is nothing before me to suggest that this exception applies, I have not addressed it in this report. *See Clark*, 510 F.3d at 393 (addressing cause and prejudice because "actual innocence [was] not in issue").

3    It should be noted, however, that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error .' " *Coleman*, 501 U.S. at 753 (quoting *Murray*, 477 U.S. at 488).

4    Were the court to reach the merits of this ground, I would nonetheless still recommend that it be rejected in light of my finding, discussed below, that petitioner entered his guilty plea knowingly, voluntarily, and intelligently. The entry of a guilty plea precludes "any independent claim relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea," so long as the guilty plea was knowing, voluntary, and intelligent. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *see also United States v. Garcia*, 339 F.3d 116, 117 (2d Cir.2003) ("It is well settled that a defendant who knowingly and voluntarily enters a plea waives all non-jurisdictional defects in the prior proceedings."); *United States v. Coffin*, 76 F.3d 494, 497 (2d Cir.1996) ("A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of a guilty plea.")

5    A similar standard applies when a COA is sought to challenge the denial of a habeas petition on a procedural basis. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000) ("[A] COA should issue ... if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.").

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    12

2015 WL 5750151

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

1998 WL 812648
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Abdullah Y. SALAHUDDIN, Petitioner,

v.

Wayne L. STRACK, Superintendent,
Fishkill Correctional Facility, Respondent.

No. 97–CV–5789.
|
Aug. 12, 1998.

**Attorneys and Law Firms**

Abdullah V. Salahuddin, Fishkill Correctional Facility,
Beacon, for Petitioner Pro Se.

Charles J. Hynes, District Attorney, Kings County,
Brooklyn, By Camille O'Hara Gillespie, Assistant District
Attorney, for Respondent.

MEMORANDUM AND ORDER

GLEESON, District J.

 **\*1** Abdullah Y. Salahuddin, also known as James
Murph, petitions this Court for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254. For the reasons set forth
below, the petition is denied.

FACTS

On July 4, 1976, at approximately 9:30 p.m., Victoria
Sostre and Celiano Perez were working at a grocery store
owned by Rudolfo Montoya at 99 Fourth Avenue in
Brooklyn when petitioner and a male companion entered
the store. Petitioner placed a gun at the back of Perez's
head and announced a holdup. When Montoya entered
the store from the back room, petitioner pointed the gun
at him, at which point Perez attempted to seize the gun
from petitioner. The two men struggled, moving out of the
store and into the street. When Montoya came out of the
store, petitioner fired the gun and fatally shot Montoya in
the head.

Petitioner was charged with two counts of Murder in
the Second Degree (New York Penal Law 125.25[1],[3] ),
and one count of Criminal Possession of a Weapon in
the Second Degree (New York Penal Law 265.03). On
September 19, 1977, pursuant to petitioner's motion to
suppress identification testimony, a *Wade* hearing was
held in the New York Supreme Court, Kings County,
before Justice Rinaldi. Perez, Sostre, and two others
testified as prosecution witnesses. On or about September
30, 1977, at the conclusion of the hearing, the court
denied the motion to suppress the identification testimony
of Perez and Sostre, ruling that the lineup from which
Perez had identified petitioner was proper and that Perez
and Sostre had an independent source for their in-court
identifications of petitioner.

At petitioner's trial, on October 3, 1977, the third count
of the indictment, Criminal Possession of a Weapon,
was dismissed by Justice Rinaldi shortly before the jury
was charged. On October 24, 1977, the jury began
deliberations. On the following day, the jury requested
a readback of various portions of the testimony. As the
requested material was being located, the jury informed
a court officer that it no longer wanted the information
and soon thereafter sent a note stating that it was divided.
The court gave the jury an *Allen* charge and the jury
retired for further deliberations. Shortly thereafter, the
forelady announced that the jury remained irreconcilably
divided and that further deliberations would be fruitless.
Thereafter, over defense objection, the court declared a
mistrial.

On October 27, 1977, petitioner instituted an "Article 78"
proceeding in the Appellate Division, Second Department
for a writ of prohibition forbidding a retrial on double
jeopardy grounds. In the same application, petitioner
sought a writ of habeas corpus. On November 23, 1977,
the Appellate Division denied both applications. *Matter
of Murph v. Justices of the Supreme Court, Kings County,*
No. 5725 (2d Dep't 1977).

A second jury trial was held on January 12, 1978, before
Justice Kooper. In addition to Perez and Sostre, the
prosecution presented the testimony of Robert Akers.
Akers testified that on the night of the shooting, petitioner
confessed to him that he had just held up a store
and shot a person. Also testifying as a prosecution
witness was Jose Perez, to whom petitioner made various
incriminating statements, including an account of the

crime, while he and Perez both prisoners at the Brooklyn House of Detention.[1] On January 26, 1978, the jury returned a verdict acquitting petitioner of intentional murder and First Degree Manslaughter and finding him guilty of Murder in the Second Degree (felony murder) and Manslaughter in the Second Degree. On March 21, 1978, Justice Kooper sentenced petitioner as a second felony offender to concurrent terms of imprisonment of twenty-five years to life for the felony murder count and seven and one-half to fifteen years for the second degree manslaughter count. Petitioner is presently incarcerated pursuant to these convictions.

## Procedural History

**\*2** On March 23, 1978, petitioner filed a notice of appeal. On October 17, 1978, petitioner moved *pro se,* pursuant to New York Criminal Procedure Law (N.Y.C.P.L.) §§ 440.10 and 440.20, to vacate his judgement of conviction and sentence on the grounds that (1) misconduct by Justice Rinaldi during the *Wade* hearing tainted the identification of him at trial; (2) misconduct by Justice Kooper during the second trial denied him a fair trial; (3) the People procured his conviction by duress, misrepresentation, and fraud; (4) newly discovered evidence would have resulted in a more favorable verdict had it been presented; and (5) his sentence was illegal.

On or about December 4, 1978, petitioner's motion was denied. On March 7, 1979, the Appellate Division, Second Department, denied petitioner's application for leave to appeal the order denying his motion. On March 26, 1979, the Court of Appeals denied petitioner's application for leave to appeal from the Appellate Division's order.

On June 25, 1982, petitioner appealed his conviction to the Appellate Division, Second Judicial Department, presenting the following six claims: (1) the court acted without manifest necessity and in derogation of New York law when it declared a mistrial; (2) Victoria Sostre's in-court identification of petitioner should have been suppressed because her prior viewing of two photographs of him was impermissibly suggestive; (3) the court deprived petitioner of a fair trial and his right to confront witnesses when it undermined and denigrated defense counsel's efforts to cross-examine the prosecution witnesses; (4) the prosecutor deprived petitioner of due process and a fair trial when he argued on summation that

the defense was an illusion created by defense counsel; (5) the case should be remanded for a hearing to determine whether introduction of the testimony of his fellow inmate, Jose Perez, violated petitioner's right to counsel under the New York Constitution; and (6) his sentence was excessive. On October 4, 1982, the Appellate Division unanimously affirmed the judgment of conviction without opinion. *People v. Murph,* 90 A.D.2d 695, 454 N.Y.S.2d 567 (2d Dep't 1982).

By letters dated October 18, 1982 and January 14, 1983, petitioner applied for permission to appeal to the New York Court of Appeals. In his application, petitioner raised four issues: (1) the trial court acted without manifest necessity and in derogation of New York law when it declared a mistrial; (2) Sostre's in-court identification of petitioner should have been suppressed; (3) the trial court deprived petitioner of a fair trial and his right to confront witnesses when it undermined and denigrated defense counsel's efforts to cross-examine prosecution witnesses; and (4) the case should be remanded for a hearing to determine whether admission of Jose Perez's testimony violated petitioner's state constitutional right to counsel. By certificate dated April 8, 1983, petitioner was denied permission to further appeal. *People v. Murph,* 59 N.Y.2d 678, 463 N.Y.S.2d 1037, 450 N.E.2d 261 (1983).

**\*3** Twelve years later, on February 1, 1995, petitioner filed a *pro se* motion pursuant to N.Y.C.P.L. § 440.20 in New York Supreme Court, Kings County, seeking to set aside his sentence on the ground that it was imposed in violation of his state and federal constitutional rights because the sentencing court allegedly relied upon false and inaccurate information contained in the pre-sentence report. By order dated May 15, 1995, the New York Supreme Court, Kings County, denied petitioner's motion. *People v. Salahudder* [sic], Ind. No. 597/77. Petitioner's application for leave to appeal to the Appellate Division was denied on July 6, 1995. *People v. Salahuddin,* Ind. No. 95–05234.

By petition dated August 22, 1995, petitioner sought a writ of habeas corpus in the United States District Court for the Southern District of New York. By order dated November 20, 1995, the Honorable Chief Judge Thomas P. Griesa transferred the petition to this Court. Petitioner alleged that he was entitled to habeas relief because (1) his conviction violated Fifth and Fourteenth Amendment protections against double

jeopardy when the court, without manifest necessity, declared a mistrial over defense objection and without honoring five outstanding jury requests; (2) Victoria Sostre's in-court identification of petitioner was tainted by a suggestive pre-trial photo display in violation of the Fourteenth Amendment; (3) his conviction violated the Sixth and Fourteenth Amendments because the state court deprived him of a fair trial and the right to confront witnesses when it undermined and denigrated defense counsel's efforts to cross-examine prosecution witnesses; (4) his conviction violated due process under the Fourteenth Amendment in that the prosecutor argued on summation that the defense was an illusion; (5) his conviction was obtained in violation of his right to counsel under the Sixth and Fourteenth Amendments because at trial the prosecution introduced testimony of Jose Perez in violation of that right; and (6) his sentence violated the Fourteenth Amendment in that the sentencing court imposed a maximum sentence based upon false, fabricated and inaccurate information contained in his pre-sentence report. By order dated July 17, 1996, this Court, adopting the report and recommendation dated May 8, 1996 by Magistrate Judge John L. Caden, dismissed petitioner's application for writ of habeas corpus without prejudice because it included unexhausted claims. *Salahuddin v. Keane,* No. 95–CV–4978.

On September 30, 1996, petitioner moved *pro se* in the New York Supreme Court, Kings County, to vacate his conviction and set aside his sentence pursuant to N.Y.C.P.L. § 440.10 on the grounds that (1) the introduction of Jose Perez's testimony concerning petitioner's statements made to Perez violated petitioner's federal and state constitutional right to counsel; and (2) the prosecutor's statements on summation deprived petitioner of due process and a fair trial. By a supplemental motion made on January 19, 1997, petitioner sought to include the additional claim that he was denied effective representation at trial. By decision and order dated May 15, 1997, the New York Supreme Court, Kings County, denied defendant's motion as amended, finding all claims procedurally barred and the latter claim unsupported by the record, presenting no reasonable possibility that the allegations were true. *People v. Salahuddin,* Ind. No. 597/77.

**\*4** On June 5, 1997, petitioner submitted an application for certificate granting leave to appeal to the Appellate Division from the denial of his motion to vacate

the judgment. Petitioner's application was denied on September 10, 1997. *People v. Salahuddin,* No. 97–07379.

The present petition for writ of habeas corpus was filed on October 6, 1997. Petitioner advances the following seven claims for habeas review: (1) his conviction violated the Fifth and Fourteenth Amendment protections against double jeopardy in that the trial court, without manifest necessity, declared a mistrial over defense objection and without honoring five outstanding jury requests; (2) Victoria Sostre's in-court identification of petitioner should have been suppressed; (3) he was deprived of a fair trial and the right to confront witnesses when the court undermined and denigrated defense counsel's attempts to cross-examine prosecution witnesses; (4) the prosecutor deprived him of due process by arguing on summation that the jury should disregard the defense because it was an illusion created by defense counsel, who did not believe in petitioner's innocence; (5) he was denied his right to counsel by the introduction of the testimony of Jose Perez; (6) he was denied a fair trial under the Fifth, Sixth and Fourteenth Amendments because the trial court failed to disclose a cooperation agreement made with Jose Perez for his testimony against defendant; and (7) his sentence violated the Fourteenth Amendment in that the sentencing court imposed a sentence based upon false, fabricated, and inaccurate information.

## DISCUSSION

### A. *The Exhaustion Requirement*

Before a federal court may consider a petitioner's application for a writ of habeas corpus, the petitioner must have exhausted all available state judicial remedies. 28 U.S.C. § 2254(b); *Picard v. Conner,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Taylor v. Mitchell,* 939 F.Supp. 249, 253 (S.D.N.Y.1996). The Second Circuit has established a two-pronged test to determine whether a petitioner has exhausted all available state remedies. First, he must have "fairly presented" his federal constitutional claims to the highest state court. *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992); *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). A petitioner fairly presents a claim when he informs the state court of both "the factual and the legal premise of the claim he asserts in federal court." *Lebron v. Mann,* 40 F.3d 561, 567 (2d Cir.1994) (quoting *Daye,* 696 F.2d at 191).

The second prong generally requires the petitioner to utilize all avenues of appellate review within the state court system before proceeding to federal court. *Daye.* 696 F.2d at 190; *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (quoting *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990), *cert. denied,* 514 U.S. 1054 (1995)); *Levine v. Commissioner of Correctional Services,* 44 F.3d 121, 124 (2d Cir.1995).

 **\*5** The exhaustion doctrine "requires only that a petitioner present his claim once on direct or collateral review." *Sanford v. Senkowski,* 791 F.Supp. 66, 69 (E.D.N.Y.1992) (citing *Udzinski v. Kelly,* 734 F.Supp. 76, 81 n. 4 (E.D.N.Y.1990)); *Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir.1977). Therefore, even if a claim is not raised at trial or on direct appeal, a claim pursued throughout a full round of state post-conviction proceedings is exhausted. 2 J. Liebman & R. Hertz, *Federal Habeas Corpus Practice and Procedure* § 23.3b, at 671 (1994) (citing *Castille v. Peoples,* 489 U.S. 346, 350–51, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989)).

Previously, if a petition contained both exhausted and unexhausted claims the petition was dismissed. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal district court now has discretion to deny a petition that contains both exhausted and unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2).

B. *The Procedural Default Jurisprudence*
Apart from the exhaustion requirement, a federal court generally will be precluded from reviewing any claim for which "a state court rests its judgment on an adequate and independent state ground, including a state procedural bar." *Reid v. Senkowski,* 961 F.2d 374, 377 (2d Cir.1992). A petitioner's failure to meet the state's procedural requirements for presenting his federal claims "deprives the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). However, when a petitioner defaults his federal claims in state court, he meets the technical requirements for exhaustion because there are no longer any state remedies "available" to him. *Id.* at 732; 28 U.S.C. § 2254(b). Therefore, a federal court does not need to require that a federal claim be presented in state court if it is clear that the state court would hold the claim to be procedurally barred. *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (citing *Harris v.*

*Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).

If a claim is procedurally barred, a federal court may review the claim only if the petitioner can show "cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 749–50 (quoting *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)); *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 2, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Cause exists if "the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray,* 477 U.S. at 488 (1986); *see Armadeo v. Zant,* 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). For example, cause may be demonstrated by showing that (1) "the factual or legal basis for a claim was not reasonably available to counsel"; or that (2) "some interference by state officials made compliance impracticable"; or that (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett,* 41 F.3d at 829 (quoting *Murray,* 477 U.S. at 488 (1986)). Prejudice exists if the outcome of the case would likely have been different absent the complained of constitutional violation. *See Reed v. Ross,* 468 U.S. 1, 12, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

 **\*6** Respondent does not dispute that petitioner has exhausted his claims with respect to grounds one, two, and three or five. However, respondent contends that petitioner's (1) fourth claim that the prosecutor deprived him of his rights by arguing on summation that the defense was an illusion; (2) his fifth claim that the admission of Perez's testimony violated his right to counsel; (3) sixth claim that the prosecutor's failure to disclose a cooperation agreement with Perez deprived him of a fair trial; and (4) seventh claim that he was improperly sentenced because of false information in his presentence report are procedurally barred. Furthermore, respondent argues that petitioner has not and cannot show cause or prejudice for his default.

C. *The Declaration of a Mistrial*
Petitioner asserts that a mistrial was declared in his first trial without manifest necessity, and this his second trial violated his double jeopardy rights. [2] A retrial following a mistrial violates double jeopardy protections only if the

mistrial was declared without "manifest necessity." *Illinois v. Somerville,* 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). However, nothing in the record suggests that the mistrial was declared improperly, and so habeas relief is not warranted on this ground.

The jury in petitioner's first trial reported, without prompting from the court, that it was deadlocked in its deliberations. The trial court then issued an *Allen* charge, which the jury considered before reiterating its inability to arrive at a verdict. It thus appears that the trial court had little choice but to declare a mistrial. A jury's declaration that it cannot arrive at a verdict is the "prototypical example" of a situation in which the declaration of a mistrial becomes a manifest necessity. *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The trial court's declaration of a mistrial was justified by the circumstances, and the retrial did not constitute a double jeopardy violation.

Petitioner's claim is based in part on the fact that the jury made requests for readbacks prior to reporting its deadlock. However, the unanswered requests do not compel the conclusion that the mistrial, and subsequent second trial, occurred in violation of petitioner's constitutional rights. *See United States v. Young,* 140 F.3d 453, 456 (2d Cir.1998). The jury's outstanding requests for testimony do not suggest that further deliberations should have been forced by the court; the record indicates that those requests had been withdrawn and that the members of the jury felt that no amount of discussion or information would have resolved the deadlock.

Likewise, the fact that the defense objected to the declaration of a mistrial does not render the decision improper. A trial court may declare a mistrial if "the ends of justice cannot be attained" otherwise. *Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *U.S. v. Millan,* 17 F.3d 14, 19 (2d Cir.1993); *United States v. Pavloyianis,* 996 F.2d 1467, 1472 (2d Cir.1993). Petitioner has failed to establish that the mistrial declaration was not manifestly necessary, given the jury's impasse. Habeas relief on this ground is thus denied.

### D. *The Suppression of Sostre's Testimony*

**\*7** Petitioner's second ground for habeas relief is that Victoria Sostre's testimony was admitted in violation of the Fifth and Fourteenth Amendments. Petitioner

contends that the pre-trial display of two photographs of him to Sostre rendered her later in-court identification unreliable.

Prior to the first trial, a *Wade* hearing was conducted with respect to this issue, and the court determined that Sostre's testimony would be allowed because she had an independent source for her identification. The federal habeas statute precludes federal courts from granting habeas relief on a claim that has been considered in the state system unless the state's rulings were contrary to or an unreasonable application of federal law or involved an unreasonable finding of fact. 28 U.S.C. § 2254(d). Without such a showing, I cannot grant habeas relief on this ground.

Even where a witness has been subjected to a suggestive pre-trial photographic identification procedure, federal law maintains that convictions based on eyewitness identifications at trial "will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a 'very substantial likelihood of irreparable misidentification.' ' *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Whether a due process violation has occurred is determined after a consideration of the entirety of the circumstances surrounding the identification. Thus, even if Sostre had been shown photographs in a suggestive manner, her in-court identification of petitioner would still be admissible under federal law provided that the totality of the circumstances could establish the reliability of her testimony. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The evidence before the trial court [3] established that Sostre's in-court identification rested on her observations during the crime and not on any suggestive pre-trial identification. During the trial Sostre testified that she was working in the store on July 4, 1976, when, between seven and seven-thirty p.m., two men, one light-skinned man and the other dark-skinned, entered the front door of the store. She identified the darker-skinned man as the petitioner. The two men passed Sostre, who was standing at a "very short distance" from the front door. Both men walked down an aisle, approximately five or six feet from Sostre to a refrigerator in the rear of the store. The petitioner argued with Celiano Perez over the price

of frankfurters. Then the petitioner and the other man walked to the other side of the store, and the other man took a bag of potato chips and threw it down. The two men then left the store. The incident took approximately five minutes.

Later that same evening, around nine p.m., Sostre observed the two men re-enter the store. From a distance of approximately six feet away, Sostre observed the petitioner display a revolver, place it against Celiano Perez's back, and heard petitioner announce a hold-up. Sostre saw Perez struggle with petitioner, and Rudolfo Montoya join the struggle. The struggle then moved outside, and Sostre heard what sounded like several shots. Sostre saw Perez return to the store and observed Montoya on the ground.

**\*8** Sostre's testimony was sufficient to permit the court to conclude reasonably that an independent source existed for her in-court identification of the petitioner, even assuming, arguendo, that she was improperly shown two isolated photographs of the petitioner. *See Neil v. Biggers,* 409 U.S. at 199. Certainly such a finding is not an unreasonable determination in view of the facts available to the lower court, and was not contrary to or an unreasonable application of federal law.

Finally, even if Sostre's testimony were irreparably tainted by the allegedly suggestive photograph display, inclusion of her testimony was harmless in light of the overwhelming evidence of petitioner's guilt. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Meadows v. Kuhlman,* 812 F.2d 72, 76–77 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Sostre was not the only eyewitness who identified petitioner; the prosecution also presented the testimony of Celiano Perez, who grappled with petitioner moments before the shooting observing Montoya's. Accordingly, even if the admission of Sostre's testimony was error, there is no basis for federal habeas relief.

## E. *Right to Cross Examine Witnesses*

Petitioner contends that the trial court violated his Sixth and Fourteenth Amendment rights when it undermined and denigrated defense counsel's attempts to cross-examine witnesses. The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." This right applies to state as well as federal prosecutions via the due process clause of the Fourteenth Amendment, and federal law holds that "the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Pointer v.. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Both the Appellate Division and Court of Appeals concluded that petitioner's contention that he was denied a fair trial was meritless, and I find that neither decision presents either an unreasonable application of Federal law or unreasonable determination of the facts available.

Defendants are entitled to a fair trial, not a perfect one. Only judicial misconduct that renders the trial so fundamentally unfair as to violate federal due process under the Constitution requires habeas relief. *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981); *Gayle v. Scully,* 779 F.2d 802, 806 (2d Cir.1985), *cert. denied,* 479 U.S. 838, 107 S.Ct. 139, 93 L.Ed.2d 82 (1986). More specifically, habeas relief on the ground of judicial misconduct at the state trial level is warranted only if the federal court determines that the alleged improprieties, taken in the context of the total trial, undermined fundamental fairness to the defendant. *Daye,* 712 F.2d at 1572.

A review of the trial record indicates that the court's conduct never approached the level of impropriety that would constitute a deprivation of petitioner's right to fundamental fairness. The court's commentary presented nothing other than ordinary attempts to guide the course of the proceedings and keep them moving at an acceptable pace. Rulings did not disproportionally advantage one side over the other, but were routinely made in favor of either side, often over the objection of the other, and represented perfectly acceptable exercises of judicial discretion. Even if viewed in a highly critical light, none of the court's conduct would have tainted the trial to such an extent that petitioner's right to a fair trial was denied. Accordingly, this claim is insufficient to support habeas relief for the petitioner.

## F. *The Prosecutor's Summation*

**\*9** Petitioner's fourth ground for habeas relief is that the prosecutor's summation, arguing that the defense counsel did not believe in petitioner's innocence, deprived petitioner of his rights to a fair trial under the Sixth and Fourteenth Amendments. Specifically, the portions of the

closing that petitioner points to include: [4] (1) Mr. Scotto [the defense attorney] "turne[ed] the evidence in a way that did not really reflect what occurred in this trial [or] on the 4th of July ...." Tr. 1113; (2) "I submit to you that Mr. Scotto was trying, in the course of his summation, to create for you an illusion, faced with the overwhelming evidence against his client ...." Tr. 1113; (3) "So, you see, again we have an illusion trying to be created in front of you." Tr. 1115; (4) "But this is just something that Mr. Scotto is throwing in here, smoke to distract your attention and take your attention away from what the real issues are in this case." Tr. 1116; (5) "Render a verdict which speaks the truth in this case—- not based upon any illusions ...." Tr. 1146.

Unlike the first three claims of the petition, this ground was not raised in petitioner's application to the Court of Appeals. Accordingly, the claim is deemed exhausted but procedurally barred, and may only be reviewed on the merits if petitioner can show cause and prejudice for his procedural default. *Coleman,* 501 U.S. at 749–50; *Bossett,* 41 F.3d at 829.

The fact that this claim was included in petitioner's application for leave to appeal to the Appellate Division, but not in the application for leave to appeal to the Court of Appeals, suggests that no factor external to the defense prevented the claim from being properly exhausted. Petitioner offers no explanation for, and alleges no prejudice resulting from his default. I conclude, therefore, that there was no "objective factor external to the defense" which impaired petitioner's "efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. at 488.

Furthermore, petitioner's claim is meritless. While the state court standards for determining prosecutorial misconduct may differ, a prosecutor's remarks on summation raise a federal question only if they so infect the trial proceedings with unfairness that they deprive a defendant of due process. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. DeChristophoro,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986). In this case, the prosecutor's comments constituted a permissible rebuttal to a defense argument which impugns the government's integrity or the integrity of its case. *United States v. Rivera,* 22 F.3d 430, 438 (2d Cir.1994) (prosecutor's comments evaluated in context of trial as a whole because government is allowed to respond to argument which impugns the integrity of its case); *United States v. Thai,* 29 F.3d 785, 807 (2d Cir.), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364, *and cert. denied,* 513 U.S. 993, 115 S.Ct. 496, 130 L.Ed.2d 406 (1994). In his summation, defense counsel labeled the prosecution "not really the whole truth," but rather a fabrication, prepared in the course of several prior proceedings. He claimed that the prosecution witness, Celiano Perez's story was incredible and that prosecution witnesses Akers and Jose Perez were both liars. In short, the defense summation constituted an attack on the prosecution's case to which the government was entitled to respond. *See United States v. Perry,* 643 F.2d 38, 51 (2d Cir.) (in light of defense counsel's attack on credibility and honesty of government's case in closing arguments, government's statements describing defendant's attack as a desperate, struggling tactic were permissible), *cert. denied,* 454 U.S. 835 (1981). Viewed in this context, the prosecutor's closing arguments did not so infect the proceedings with unfairness that petitioner was denied a constitutional right.

**\*10** Finally, any error occasioned by the prosecutor's summation was harmless in light of the overwhelming evidence of defendant's guilt. The weight of the evidence presented to the jury would have compelled a verdict of guilty even absent the prosecutor's comments to which petitioner objects. Accordingly, habeas relief on this ground is denied.

## G. *Right to Counsel*
Petitioner's fifth claim is that the introduction at trial of testimony of petitioner's fellow inmate, Jose Perez, concerning statements made by petitioner in the absence of counsel, violated his right to counsel afforded by the Fifth, Sixth, and Fourteenth Amendments. [5]

### 1. *Procedural Default*
Petitioner's right to counsel claim, as advanced in his September 1996 motion to vacate, was denied on the basis of a procedural default, which constitutes an independent and adequate state ground. This procedural default acts as a bar to federal habeas review unless petitioner can show cause and prejudice for his default, or that a failure to consider his claims now would result in a fundamental miscarriage of justice. Again, petitioner has been unable

to satisfy these conditions to permit review of the merits his claim.

### 2. *The Merits*

In any event, the claim is meritless. The statements petitioner made to Perez in jail were not protected by the federal constitution. The Sixth Amendment right to counsel attaches only after adversary judicial criminal proceedings have commenced. *McNeil v. Wisconsin,* 501 U.S. 171, 175 (1991); *Neighbor v. Covert,* 68 F.3d 1508, 1511 (2d Cir.1995), *cert. denied,* 516 U.S. 1174 (1996). Perez testified to statements made to him by petitioner in the latter part of 1976, before petitioner was charged or even arrested in connection with Montoya's murder. Thus, his federal right to counsel had not yet attached with respect to those statements.

Furthermore, conversations between suspects and undercover agents, when the suspect is unaware of the other's status as a police agent, do not implicate the concerns underlying *Miranda. Illinois v. Perkins,* 496 U.S. 294, 296 (1990). The Court in *Perkins* held that "[t]he essential ingredients of 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate .... *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." *Id.* at 296–97. Therefore, even if Perez is seen as an undercover government agent, a proposition in support of which petitioner has only been able to offer mere allegations, and petitioner did not receive *Miranda* warnings before making statements to Perez, the statements were admissible under federal constitutional law. *See also Alexander v. Connecticut,* 917 F.2d 747, 751 (2d Cir.1990), *cert. denied,* 501 U.S. 1219, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991).

Because petitioner's incriminating statements were not collected in violation of petitioner's right to counsel, Perez's testimony was properly admitted at trial. Thus, even if petitioner's fifth claim were not barred from habeas review on the merits, it advances insufficient grounds upon which to provide habeas relief.

### H. *The Alleged Violation Of Brady v. Maryland*

Petitioner next claims that the prosecutor failed to disclose a cooperation agreement between Jose Perez and the state, thereby depriving petitioner a fair trial. Petitioner contends that had such an agreement been presented to the jury, the trial would have had a more favorable outcome for him.

Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1983), the prosecution has the duty to disclose to a defendant any information in its possession which is favorable to the accused and material either to guilt or punishment. This obligation is ongoing and extends to impeachment evidence as well. *United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996). The state court found in its January 1997 ruling on petitioner's N.Y.C.P.L. § 440 motion that prosecutors had fulfilled their *Brady* obligations in this matter, and I find no reason to disturb that determination today. Petitioner points to the trial record, in which Perez's criminal history and the effect of his cooperative testimony on the disposition of other criminal matters pending against him at the time were discussed at length, both in and outside of the jury's presence. [6] Petitioner sought an order for "discovery" of additional documents which would reveal a formal cooperation agreement between Perez and the State, if any existed, in connection with his 1996 motion to vacate. In dismissing the melange of motions, amendments, and a reply submitted by petitioner, the court rejected the discovery motion on procedural grounds, citing petitioner's failure to raise the issue in the previous nineteen years and holding the claim barred by N.Y.C.P.L. § 440.10(3)(a). [7]

**\*11** Petitioner is now seeking habeas relief on the basis of the very transcript which was at his disposal in lodging his initial appeal, and has been unable to demonstrate cause for his default.

Furthermore, any prejudice which petitioner contends he suffered as a result of this default is negligible. The cause and prejudice standard requires more than just the "*possibility* of prejudice;" as noted above, it requires actual disadvantage to the petitioner. *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). The jury was well aware of the consideration Perez received as a result of his testimony, and there is no reason to believe that, if petitioner had been made aware of and been allowed to present additional evidence concerning a more elaborate cooperation agreement between Perez and the state, the verdict would have been affected. Without a showing of

cause for the default and actual prejudice suffered as a result, this court is precluded from considering the claim on the merits.

In any event, petitioner's claim is meritless. Petitioner has not demonstrated that the state has withheld any information which details an arrangement other than the promises disclosed prior to and during trial. The decision dismissing petitioner's 1996 motion to vacate noted that there was no basis on which to assume such a cooperation agreement existed. There is no basis for disturbing that finding.

I. *The Challenge To The Pre–Sentence Report*

Petitioner's final ground for habeas relief is that his sentence was determined on the basis of false, fabricated, erroneous, and inaccurate information, in violation of the Fifth and Fourteenth Amendments. He presented this issue to the state court in February of 1995 in a motion to vacate his sentence pursuant to N.Y.C.P.L. § 440.20.

Petitioner has not articulated what, precisely, in the pre-sentence report in this case constituted false, fabricated, erroneous, and inaccurate information. It is not even clear that petitioner is referring to the pre-sentence report used in this case .[8] In any event, none of the information in the challenged pre-sentence report is erroneous. Petitioner appears to claim that the reference

to a 1969 incident should not have appeared on the report because he was given a youthful offender adjudication instead of criminal conviction.[9] Inasmuch as the pre-sentence report reflected the disposition of that matter, and all other criminal incidents (even when charges were later dropped or dismissed), it reflects information which is entirely truthful and accurate. Because the pre-sentence report did not contain any false, fabricated, erroneous, or inaccurate information, and because petitioner's criminal record played little role in the sentencing decision, petitioner's final claim does not warrant habeas relief.

CONCLUSION

For the foregoing reasons, Salahuddin's petition for writ of habeas corpus is denied. In addition, I hereby refuse to issue a certificate of appealability, since petitioner has not presented a "substantial showing of the denial of a constitutional right." *See Reyes v. Keane,* 90 F.3d 676, 680 (2d. Cir.1996) (quoting Section 102 of the Antiterrorism and Effective Death Penalty Act).

**\*12**  So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 812648

---

Footnotes

1    Jose Perez also apparently testified against petitioner in the first trial. No transcripts of the first trial have been found.

2    To the extent that petitioner alleges a breach of state law, he has not presented a federal issue capable of habeas review.

3    As stated earlier, respondent has been unable to obtain the transcript from petitioner's first trial, including the transcript of the *Wade* hearing. Respondent, therefore, relies on citations to the *Wade* hearing transcript contained in the People's brief to the Appellate Division. Respondent states that Sostre testified that she was working behind the counter at Rudolfo Montoya's store when two men entered the premises and she observed the men in the store from a distance of fourteen to fifteen feet while they attempted to rob the store.

4    Petitioner does not make reference to specific portions of the transcript, however, his brief to the Appellate Division, with the assistance of counsel, referred to the following portions.

5    Respondent argues that this claim is partially unexhausted because petitioner advances the Fifth Amendment as legal support for his claim for the first time in this petition. Petitioner's presentation of this claim to the state courts relied on the New York state constitutional right to counsel and the federal right to counsel under the Sixth and Fourteenth Amendments. For habeas purposes, a petitioner has fairly presented his claims in state court when he sets forth "the factual and legal premise of the claim he asserts in federal court." *Dave,* 696 F.2d at 191. The fair presentation requirement is satisfied "if the legal basis of the claim made in state court was the 'substantial equivalent' of the habeas claim." *Id.* at 192. I conclude that petitioner sufficiently alerted the New York Supreme Court of the federal constitutional nature of his claim.

6    Transcripts reveal that the consideration Perez was shown in exchange for his testimony was discussed prior to the retrial, with counsel for both the petitioner and the witness present. The prosecutor offered a detailed description of the plea

1998 WL 812648

adjustments and sentencing promises made to Perez (on unrelated pending charges) for his testimony. Furthermore, the trial court permitted defense counsel to examine Perez at length before the jury concerning his criminal history, pending sentences, and any arrangement made between him and the state concerning his cooperative testimony against petitioner. Perez's answers corroborated the prosecutor's earlier statements to the court. Defense counsel was even permitted to question Perez at trial about consideration for his testimony of which he may not have been aware.

7    Petitioner has advanced an explanation for his failure to have raised this issue previously. His application to the Appellate Division for leave to appeal asserted that petitioner had been unaware of evidence (all contained within the trial transcripts) which he thought bolstered his claims of an undisclosed cooperation agreement. He happened to have found in a stack of papers which had been left in the corner of his cell portions of the trial transcript which prompted him to amend his pending motion to vacate and seek further documentation from the state regarding Perez's testimony. However, this amount of bad housekeeping does not constitute cause for procedural default of a claim in the New York state criminal justice system. Merely being unaware that portions of the trial transcript (which sow the seeds of suspicion concerning a prosecution witness) are lying in the corner of the room, does not excuse failure to properly raise a claim in state court. Nor does it constitute "an objective factor external to the defense" which impeded petitioner or his counsel from complying with the state's procedural rules. *Murray v. Carrier,* 477 U.S. at 488.

8    Exhibit 1 to petitioner's February 1995 motion to vacate, described as the pre-sentence report used by the sentencing court in this matter, appears in fact to be a report prepared in connection with petitioner's indictment for an August 1975 armed robbery, a charge which was later dismissed. The pre-sentence report prepared for this case notes both that indictment and its later dismissal for lack of prosecution.

9    Petitioner argued in support of his February 1995 motion to vacate that he had believed the records were sealed with respect to the 1969 incident. He notes that at the time of sentencing for this matter, the court stated it was "looking at his criminal history dating back to 1969," and concludes that information about that incident was available to the sentencing court.

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1397139
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David M. TENACE, Petitioner,

v.

Dale ARTUS, Superintendent, Clinton
Correctional Facility, Respondent.

No. 04-CV-29.
|
May 27, 2005.

**Attorneys and Law Firms**

David M. Tenace, No. 02-A-2798, Clinton Correctional Facility Annex, Dannemora, New York, Petitioner pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, The Capitol, Albany, New York, for Respondent.

Nelson Sheingold, Assistant Attorney General, of counsel.

REPORT-RECOMMENDATION AND ORDER[1]

HOMER, Magistrate J.

**\*1** Petitioner David M. Tenace ("Tenace") is currently an inmate in the custody of the New York State Department of Correctional Services (DOCS) at Clinton Correctional Facility. Tenace pleaded guilty on May 18, 2002 to burglary in the second degree in Schenectady County Court, was sentenced to a determinate term of seven and one-half years imprisonment, and is currently serving that sentence. Tenace now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that the trial court lacked jurisdiction to prosecute and that the trial court's misinterpretation of New York law violated his due process rights. For the reasons which follow, it is recommended that the petition be denied.

### I. Background

On May 2, 2001, Tenace entered a dwelling at 1230 Strafford Road in Schenectady, New York and removed

property that did not belong to him. SR. 8.[2] On August 3, 2001, Tenace pleaded guilty to burglary in the second degree in full satisfaction of all charges listed in a superior court information. SR. 1-5. As part of the plea agreement, Tenace waived his right to be indicted by the grand jury and waived his right to appeal the conviction and sentence. SR. 4-9, 68-72.

On May 12, 2003, Tenace moved to vacate the conviction pursuant to New York Criminal Procedure Law § 440.10. SR. 16-45. This motion was denied on August 20, 2003. SR. 73-77. On September 3, 2003, Tenace moved for re-argument and reconsideration of the August 20 decision. SR. 78-82. On November 19, 2003, the court agreed to reconsider its decision and declined to overturn the decision denying Tenace's motion. SR. 78-82. Tenace's application for leave to appeal to the Appellate Division was denied on October 29, 2003. SR. 83-91. This action followed.

### II. Discussion

#### A. Legal Standards

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104-132, 110 Stat. 1214, restricts review of habeas petitions. In order for a petitioner to be granted relief under the AEDPA, it is necessary to show that a claim adjudicated on the merits by a state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir.2001). Clearly established federal law refers to the "holdings, as opposed to the dicta, of [the Court's] decisions as of the time of the relevant state-court decision." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.2002).

To adjudicate a claim on the merits, the state court need not mention the argument raised, cite relevant case law, explain its reasoning process, or address the claim in detail. Ryan v. Miller, 303 F.3d 231, 245-46 (2d Cir.2002). "Rather, a state court adjudicates a claim on its merits by (1) dispos[ing] of the claim on the merits, and (2) reduc[ing] its disposition to judgment." Howard v. Walker, 406 F.3d 114, 122-23 (2nd Cir.2005) (quoting Norde v. Keane, 294 F.3d 401, 410 (2d Cir.2002)). No explanation of the court's

Tenace v. Artus, Not Reported in F.Supp.2d (2005)
2005 WL 1397139

reasoning process is necessary. *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001).

**\*2** "A state-court decision is 'contrary to' [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Early v. Packer,* 537 U.S. 3, 8 (2002) (internal quotation marks omitted) (*citing Williams v. Taylor,* 529 U.S. 362, 405 (2000)). Under the "unreasonable application" clause, "a federal habeas court ... should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. "[A]n unreasonable application of federal law is different from an incorrect application." *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000).

### B. Exhaustion

As a threshold matter, respondent contends that Tenace has failed to exhaust his state court remedies.[3] A habeas petitioner must exhaust all state court remedies before seeking federal habeas corpus relief. *Duckworth v. Serrano,* 454 U.S. 1, 3 (1981); *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994); 28 U.S.C. § 2254(b), (c). Exhaustion requires that a petitioner both "fairly present" federal constitutional claims to the highest state court and utilize all available avenues of appellate review within the state before proceeding to federal court. *Dorsey v. Kelly,* 112 F .3d 50, 52 n. 1 (2d Cir.1997); *Bossett,* 41 F.3d at 828. To have fairly presented a claim, "the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney Gen.,* 696 F.2d 186, 191 (2d Cir.1982). A petitioner may fairly present claims by

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye,* 696 F.2d at 194; *see also Gray v. Netherland,* 518 U.S. 152, 153 (1996); *Jones v. Vacco,* 126 F.3d 408, 413

(2d Cir.1997). The exhaustion doctrine requirement is "that a petitioner must have presented his [or her] claim to the state courts at least once, on direct or collateral review." *Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir.1977); *Figueroa v. Portuondo,* 96 F.Supp.2d 256, 276 (S.D.N.Y.1999).

Here, Tenace did not make a direct appeal of these claims but presented these claims on collateral review. SR. 16-45. The county court denied the motion on the merits and again on reconsideration. SR. 73-82. Tenace's appeal of his application was denied. SR. 83-91. There is no appeal allowed from the denial of an application. *People v. Corso,* 85 N.Y.2d 883 (1995). Therefore, the state court had an opportunity to address Tenace's claims and Tenace pursued all avenues of appeal.[4]

**\*3** Therefore, respondent's argument on this ground should be rejected.

### C. Merits

Tenace contends in his two claims that his waiver of indictment was not valid and that the superior court information was jurisdictionally defective because it did not indicate that violence was an element of second degree burglary. Respondent contends that his claim lacks merit.

"A defendant may waive indictment and consent to be prosecuted by superior court information." N.Y.Crim. Proc. Law § 195.10. Where the defendant waives indictment by a grand jury, the prosecution proceeds by superior court information. *See* N.Y.Crim. Proc. L. § 195.10(2)(b); *Hogan v. Ward,* 998 F.Supp. 290, 295 (W.D.N.Y.1998). In order for such a waiver to take effect, the defendant must execute a waiver of indictment that meets the requirements of § 195.20. Failure to conform to this section is treated as a jurisdictional defect under New York law. *People v. Boston,* 75 N.Y.2d 585 (1990). A waiver of indictment must be in writing and must include any offense for which the defendant was held for action of a grand jury. N.Y.Crim. Proc. Law § 195.20. Tenace contends that the waiver did not describe the offense as including a violent act and therefore did not comply with § 195.20.

This claim raises a question of state law alone and is not cognizable on federal habeas review. "Federal habeas

corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67 (1991). In any event, the county court concluded that Tenace's waiver complied with New York Criminal Procedure Law and a state court's determination under state law is not reviewable through a federal petition for habeas corpus. *Melendez v. Garvin,* 256 F.Supp.2d 183, 185 (S.D.N.Y.2003). In addition, this claim is not reviewable because it is antecedent to and independent of Tenace's guilty plea. *Tollett v. Henderson,* 411 U .S. 258, 267,(1973); *Tucker v. McCoy,* No. 97-B-2410, 2004 WL 1698334, at *6 (W.D.N.Y. July 29, 2004).

Tenace's contention in ground two that the state court's intrepretation of N.Y. Penal Law § 70.02 as a classification statute violates due process is clearly without merit. Section 70.02 classified second degree burglary as defined in N.Y. Penal Law § 140 .25 as a class C violent felony. It does not add an element to the crime but plainly prescribes mandatory sentencing based on the nature of the crime. [5] N.Y. Penal Law § 70.02(2)(a). Therefore, Tenace's claims that classification of second degree burglary as a violent felony offense adds an element of violence to the crime are meritless. As discussed, this section does not add an element of violence to the crime of second degree burglary but merely sets the sentencing range based on conviction of the crime as described in § 140.25.There are no aggravating or enhancing factors and therefore *Apprendi v. New Jersey,* 530 U.S. 466 (2000), is not applicable. [6] The record is clear that the crime charged in both the superior court information and waiver of indictment defined second degree burglary as a class C violent felony. SR. 68-71.

*4 In addition, the county court ruled on this issue on the merits and that decision was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1).

The petition on its merits should be denied.

### III. Conclusion

For the reasons stated above, it is hereby

RECOMMENDED that the petition for a writ of habeas corpus be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS.* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2005 WL 1397139

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

2   "SR." followed by a number refers to the pages of the state court records filed by respondent with his answer. Docket No. 6.

3   Respondent also contends that Tenace waived the present claims by entering a guilty plea. Resp't Mem. of Law (Docket No. 6) at 3. However, a jurisdictional challenge survives a guilty plea. *Hayle v. United States,* 815 F.2d 879, 881 (2d Cir.1987). Tenace's claims, viewed liberally, present a jurisdictional challenge and therefore survive his guilty plea.

4   Tenace apparently believed that a direct appeal was not available to him. *See* Traverse (Docket No. 8) at 5-6.

5   Respondent submits legislative history for § 70.02 which further supports the plain meaning of this statute as a sentencing statute and not a substantive statute. *See* Resp't Mem. of Law at Ex A.

6   In *Apprendi,* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

**Tenace v. Artus, Not Reported in F.Supp.2d (2005)**

2005 WL 1397139

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

United States v. Doumanis, Not Reported in Fed. Supp. (2018)
2018 WL 623551

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 187 of 201

2018 WL 623551
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF America,
v.
George DOUMANIS et al., Defendant.

17-cr-00087 (ALC)
|
Signed 01/29/2018

**Attorneys and Law Firms**

Christine Ingrid Magdo, Rebecca Gabrielle Mermelstein, United States Attorney's Office, New York, NY, for United States of America.

### OPINION AND ORDER

ANDREW L. CARTER, JR., United States District Judge

*1 Before this Court are Defendant's motions to dismiss the indictment and to preclude evidence derived from Defendant's conversations with Government officials. For the reasons that follow, Defendant's motions are DENIED.

### BACKGROUND

On February 7, 2017, a Grand Jury issued an indictment charging Defendant Danny Pratte, along with George Doumanis and Emanuel Panetalkis, with (1) conspiracy to commit securities fraud, (2) securities fraud, (3) conspiracy to commit wire and mail fraud, and (4) wire fraud. The indictment alleges that the defendants perpetrated a scheme to defraud investors to purchase shares of Terminus Energy, Inc., a company founded by Defendant.

Both parties agree that Defendant spoke with Government agents during the course of their investigation. First, beginning around May 28, 2014, Defendant voluntarily spoke with FBI agents. During these conversations, he waived his right to counsel. Second, beginning around February 24, 2015, Defendant and his attorney met with federal prosecutors. During the

meetings with prosecutors, Defendant and his attorney signed proffer agreements.

On November 29, 2017, Defendant filed a motion to prevent the Government from using information obtained through proffer sessions against him. ECF No. 29 ("Def Proffer Motion").

On November 30, 2017, Defendant filed a motion to dismiss the indictment based on an implicit Non-Prosecution Agreement and Outrageous Government Conduct. ECF Nos. 30-31 ("Motion to Dismiss").

The Government responded to Defendant's motions in one filing on December 13, 2017. ECF No. 34 ("Gov Mem"). Defendant filed a reply brief on December 21, 2017. ECF No. 35. Accordingly, the Court considers these motions fully briefed.

### DISCUSSION

### I. Motion to Dismiss

**A. Non-Prosecution Agreement**
Defendant alleges that the indictment must be dismissed because the Government implicitly entered into an oral Non-Prosecution Agreement, or "NPA," with him.

Courts interpret agreements for various levels of immunity from prosecution "according to principles of contract law." United States v. Aleman, 286 F.3d 86, 89 (2d Cir. 2002). While courts have "considered unwritten immunity agreements," such agreements are discouraged. Id. at 90. This is because "[a]n oral agreement greatly increases the potential for disputes such as this [case] presents, a failure to agree on the existence, let alone the terms, of the deal." Id. Thus with oral agreements, a court "must consider the possibility that immunity discussions ... never progressed to a meeting of the minds and formation of an enforceable bargain." Id.

Nonetheless, "even if no actual agreement is determined to exist, according to principles of promissory estoppel, the Government can be held to any clear and unambiguous promise of immunity it makes to a defendant, upon which the defendant reasonably relied to his or her detriment." United States v. Sattar, No. 02-395, 2003 WL 22510398, at *2 (S.D.N.Y. Nov. 5, 2003). Defendant bears the burden

United States v. Doumanis, Not Reported in Fed. Supp. (2018)
2018 WL 623551

of proving the existence of any such agreement. *See United States v. Rosario*, 237 F. Supp. 2d 242, 245 (E.D.N.Y. 2002) (collecting cases).

**\*2** Here, Defendant engaged in two types of conversations with Government officials. The alleged facts do not support the existence of a NPA in either context.

First, beginning around May 28, 2014 Defendant spoke with FBI agents upon waiving his right to counsel. As an initial matter, it is unclear whether FBI agents even have the power to enter into binding agreements not to prosecute. *See Arriaga v. United States*, No. 08-4388, 2009 WL 890652, at \*1 (E.D.N.Y. Feb. 26, 2009) (collecting cases from other jurisdictions). Regardless, Defendant provides no affidavits that attest to the formation of an agreement not to prosecute. All Defendant produces are four undated, unattributed statements that Defendant "had no skin in this game;" "was a victim, too;" "had nothing to worry about;" and that there was no "criminal intent" on his part. Motion to Dismiss at 4. Defendant does not provide context for these alleged statements nor explain how these comments, if true, give rise to an inference of an agreement not to prosecute.

Second, in February 2015 Defendant retained counsel. Beginning around February 24, 2015, Defendant and his attorney entered into discussions with federal prosecutors. Defendant submits no affidavits that attest to the formation of an agreement not to prosecute during these conversations. To the contrary, at each such meeting, Defendant and his attorney signed a Proffer Agreement that explicitly stated, "THIS IS NOT A COOPERATION AGREEMENT." *See* ECF No. 34-2, Gov. Exh. B ("Proffer Agreement").

Accordingly, Defendant's motion to dismiss on the basis of an implied NPA is DENIED.

#### B. Outrageous Government Conduct

Defendant next contends that the indictment must be dismissed due to outrageous government conduct.

"Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011); *see also United States v. Russell*, 411 U.S. 423, 431–

32 (1973). Claims of outrageous government conduct are "taken seriously because ensuring that the government does not trample in an unconscionable manner on individual dignity is a bed-rock duty of judicial officers." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997).

However, "the burden of establishing outrageous investigatory conduct is very heavy." *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999). The defendant "must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.' " *Al Kassar*, 660 F.3d at 121 (quoting *Schmidt*, 105 F.3d at 91). Generally, "the government's involvement in a crime must involve either coercion or a violation of the defendant's person." *Id.* "It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive." *Id.*

Here, Defendant essentially argues that the Government engaged in outrageous conduct by insinuating that Defendant was not at risk of prosecution and then leading him to provide the evidence that led to his indictment. As discussed above, Defendant has not shown the existence of any agreement not to prosecute. Further, the alleged Government tactics here do not "shock the conscience" or violate fundamental fairness. *See United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013); *United States v. Colon*, 71 F. Supp. 3d 269, 275 (D. Conn. 2014).

**\*3** Accordingly, Defendant's motion to dismiss for outrageous government conduct is DENIED.

## II. Motion to Determine Extent of Proffer and Motion in Limine

Defendant argues that evidence obtained while he was aiding the Government must be excluded because it is inadmissible either (1) under Federal Rule of Evidence 410, (2) as part of the proffer process, or (3) under *Miranda v. Arizona*.

### A. Federal Rule of Evidence 410

Under Federal Rule of Evidence 410, "a statement made during plea discussions with an attorney for the prosecuting authority" is "not admissible against the defendant who ... participated in the plea discussions."

**United States v. Doumanis, Not Reported in Fed. Supp. (2018)**

2018 WL 623551

Here, Rule 410 is inapplicable. First, Rule 410 does not bar conversations with FBI agents in the course of an investigation. Defendant has provided no factual basis to determine that FBI agents were acting as "prosecuting authorities" or that statements were made in the course of plea discussions.

Second, Rule 410 does not bar statements that Defendant made to federal prosecutors during proffer sessions. As discussed further below, Defendant and his attorney signed a proffer agreement providing that Defendant "shall assert no claim under ...Rule 410 of the Federal Rules of Evidence ... that such statements or any leads therefrom should be suppressed." Proffer Agreement ¶ 5.

### B. Proffer

"Ordinarily, statements made by a defendant during plea negotiations, including proffer sessions, are inadmissible at trial." *United States v. Velez*, 354 F.3d 190, 194 (2d Cir. 2004) (citing Fed. R. Evid. 410). However, a defendant can waive the protections of Rule 410 "as long as there is no 'affirmative indication that the agreement [to waive] was entered into unknowingly or involuntarily.' " *Id.* at 195 (quoting *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995)).

Here, Defendant and his attorney signed a Proffer Agreement waiving Defendant's rights to raise claims under Rule 410. *See* Proffer Agreement ¶ 5. There is no affirmative indication that Defendant's waiver of his Rule 410 rights was involuntary or unknowing. Further,

insofar as Defendant contests the use of his statements in the Government's case-in-chief or in connection with sentencing proceedings, the Agreement limits such use. *See id.* ¶ 2.

### C. *Miranda v. Arizona*

*Miranda v. Arizona*'s warning requirements only apply during "custodial interrogation." *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). Defendant does not present factual allegations supporting a finding that he was subjected to custodial interrogation. Nevertheless, the Government asserts that Defendant was informed of his right to counsel and that he waived this right. Gov. Mem. at 10. Defendant does not contest this assertion.

For the foregoing reasons, Defendant's motion to dismiss, motion to determine the extent of the proffer, and motion in limine are DENIED. The clerk of court is respectfully requested to terminate the motions at ECF Nos. 29 and 30.

### *4  SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 623551

---

**End of Document**                               © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00521-GLS-ML   Document 23   Filed 06/10/19   Page 190 of 201

United States v. Kourani, Not Reported in Fed. Supp. (2018)
2018 WL 1989583

2018 WL 1989583
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES of America,
v.
Ali KOURANI, Defendant.

17 Cr. 417 (AKH)
|
Signed 04/26/2018

**Attorneys and Law Firms**

Amanda Leigh Houle, United States Attorney's Office, New York, NY, for United States of America.

Peggy Cross-Goldenberg, Federal Defenders of New York Inc., New York, NY, for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND FOR A BILL OF PARTICULARS

ALVIN K. HELLERSTEIN, United States District Judge

**\*1** On June 28, 2017, defendant Ali Kourani ("Defendant" or "Kourani") was indicted of a number of terrorism-related offenses. *See* 18 U.S.C. 2339B. The core allegation linking all of the charges is that Kourani was a member of, and offered material support to, Hizballah, a designated foreign terrorist organization. The indictment is largely based on a series of non-custodial interviews between Kourani and two FBI agents, Joseph Costello and Keri Shannon. Kourani's then-lawyer, Mark Denbeaux, was present at each of the meetings. Through a series of motions filed on January 1, 2018, Kourani claims that the agents offered him immunity or otherwise indicated that his statements would not be used against him, thereby rendering his statements involuntary. The government claims that no such offer of immunity was given, and any references to "confidentiality" before and during the interviews referred only to keeping the fact of Kourani's cooperation from reaching members of Hizballah, in Lebanon, where members of his extended family resided, and in the United States, where he lived. Kourani had told the agents that

Hizballah already suspected that he had been cooperating, had engaged in various acts of intimidation against his family, and threatened to do more.

The Court held an evidentiary hearing on March 26-28, 2018. For the reasons stated on the record and supplemented herein, I find that no such offer of immunity or non-prosecution was made, and that the totality of the circumstances indicate that Kourani's statements were voluntary. The motion is denied.

## Background

The defendant, Ali Kourani, was born in Lebanon in 1984. He came to the United States in 2003, obtained a Bachelor of Science in biomedical engineering in 2009, and a Masters of Business Administration in 2013. He became a naturalized citizen of the United States in 2009.

Between 2012 and 2016, FBI agents questioned Kourani a number of times on suspicion of being affiliated with Hizballah, the foreign terrorist organization. After their first meeting, Kourani testified that agents provided him with a burner phone in the hopes of convincing him to cooperate. *See* Trans. at 235:11-12. Kourani met with agents in New York City and Chicago numerous times during this period, but the agents came to believe that Kourani was not being completely forthcoming, and communication between the parties ceased by September 2016.

In their testimony, agents Costello and Shannon described two meetings with Kourani that are particularly relevant to the disposition of defendant's motion. First, in August 2016, Agent Joseph Costello met with Kourani at the United States embassy in Beirut, Lebanon.[1] Kourani told Agent Costello that he had been involved in a child custody dispute the previous month that escalated into a dangerous altercation between himself and members of his wife's family, many of whom were affiliated with Hizballah. As a result of the altercation and ensuing attack, his wife and children fled to Canada. But Kourani denied having any personal involvement with Hizballah, and Agent Costello told Kourani that unless he was willing to cooperate fully, the FBI would not assist him with his family dispute. The parties reached an impasse, and the interview was terminated. Second, upon his return to the United States in September 2016, Agent Shannon

Case 9:18-cv-00521-GLS-ML Document 23 Filed 06/10/19 Page 191 of 201
United States v. Kourani, Not Reported in Fed. Supp. (2018)
2018 WL 1989583

met with Kourani at Newark International Airport and questioned him about his involvement in Hizballah. Agent Shannon told Kourani that this was his last chance to cooperate, but Kourani continued to deny having any affiliation with Hizballah. Kourani testified that he cut off all communication with the FBI at that time.

**\*2** When he returned to the United States in the fall of 2016, Kourani's family situation began to deteriorate. He was fearful that he could not remove his children from Canada, where they lived with their mother, and would not receive visitation rights. He was also fearful that his family in Lebanon was vulnerable, for they had been attacked by members of Hizballah at least once. As a result of his worsening family situation, and believing that the FBI alone could help him, Kourani decided to arrange a meeting with the FBI. To facilitate his cooperation, Kourani was introduced through a mutual acquaintance to Mark Denbeaux, an experienced criminal defense lawyer and law professor at Seton Hall Law School, who agreed to represent him. Kourani was attracted to Denbeaux because he had experience working with the FBI,[2] even though he had no experience in immigration or family law, the subjects touching upon his needs. Kourani believed that, using Denbeaux's skillset with the FBI, he could trade his knowledge of Hizballah agents and plans for effective assistance in moving his family from Lebanon to the United States, and improve his chances of custody, or at least visitation, regarding his children in Canada.

Denbeaux contacted Agent Shannon on February 28, 2017, identified Kourani as his client, and told the agents that his client "wish[ed] to speak with the FBI." Declaration of Mark Denbeaux, ECF 28, at ¶ 2. The parties apparently had difficulty setting a date for the interview, and the next substantive discussion came during a March 22, 2017 call between Denbeaux and Agents Costello and Shannon. On the call, Denbeaux explained to the agents that Kourani "was very nervous about his and his family's physical safety should anyone find out that he was talking to the FBI." *Id.* In response, the agents told Denbeaux that any meetings between Kourani and the FBI would "remain confidential." *Id.* The meaning of the term "confidential" has since been disputed, but the agents, Denbeaux, and Kourani all testified that the promise of confidentiality related *solely* to keeping Kourani's cooperation from leaking to the Lebanese community, both in the U.S. and abroad.

More generalized confidentiality, or immunity, was never discussed.

After the initial conversation between Denbeaux and the agents on March 22, 2017, Kourani participated in five non-custodial interviews with the FBI on March 23, April 3, April 5, April 14, and April 26. All meetings took place at Seton Hall Law School where, it was thought, there was less chance of arousing the suspicion of Hizballah.[3] It is undisputed that before, during, and after each of these meetings, the agents explained to Kourani that they were not authorized to make any promises or guarantees about potential benefits for Kourani's cooperation. This understanding was confirmed by Denbeaux through a text message, which stated "I understand that you can't promise or guarantee." Gov't Ex. 301.[4] Consistent with this representation, the agents testified that they never promised Kourani any of the benefits he sought. For instance, while the agents told Kourani that they would use their best efforts to secure certain immigration benefits for his family, including bringing his children from Canada to the United States by the end of the summer of 2017, the agents and Denbeaux credibly testified that the agents told Kourani that they could not make any specific promises about the success of any of their efforts.

Much of the dispute in this case centers on a memorandum drafted by Denbeaux and handed to Agents Costello and Shannon immediately before the second interview began on April 3, 2017. The document stated in relevant part: "[Kourani] is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no prosecution." Gov't Ex. 703. After receiving this document from Denbeaux, agents Costello and Shannon stepped out into the hall to confer. They reviewed the documented briefly, determined that it did not accurately capture the understanding of the parties, returned the document to Denbeaux without comment, and proceeded to interview Kourani.

**\*3** As the meetings went on, the agents again became convinced that Kourani was holding back vital information. The meetings were ended, and Kourani was arrested on June 1, 2017, charged with providing material support to a foreign terrorist organization. Kourani's statements were important to the government's case. Kourani now makes this motion, challenging the admissibility of his inculpatory statements.

## Discussion

### A. Specific Enforcement

Kourani first attempts to specifically enforce the alleged offer of immunity as a matter of contract law. Even if such an offer of immunity had been made—and I find that it was not—Kourani cannot specifically enforce it.

"It is well settled that the government may in its discretion make agreements in which it exchanges various levels of immunity from prosecution for the defendant's cooperation." *United States v. Aleman,* 286 F.3d 86, 89 (2d Cir. 2002). Courts interpret such agreements "according to the principles of contract law," and "construe [them] strictly against the government in recognition of its superior bargaining power." *Id.* at 90. It is also clear that immunity agreements may be made orally, *see id.* at 89, but the defendant bears the burden of proving the existence of such an agreement, *see United States v. Rosario,* 237 F. Supp. 2d 242, 245 (E.D.N.Y. 2002) (collecting cases).

To specifically enforce a promise made by the government, a defendant must show (1) "that the promisor had actual authority to make the particular promise," and (2) "that he (the defendant) detrimentally relied on it." *United States v. Rudaj,* No. 04 CR. 1110 (DLC), 2005 WL 2508404, at *2 (S.D.N.Y. Oct. 11, 2005) (internal quotation marks omitted) (quoting *United States v. Flemmi,* 225 F.3d 78, 84 (1st Cir. 2000) ). "If either part of this showing fails, the promise is unenforceable." *Id.* (internal quotation marks omitted) (quoting *Flemmi,* 225 F.3d at 84). As the Second Circuit has explained in a related context, "it is axiomatic that the United States is not bound by the unauthorized acts of its agents," and "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *See Doe v. Civiletti,* 635 F.2d 88, 96 (2d Cir. 1980).

Applied here, it is undisputed that Agents Costello and Shannon lacked actual authority to make an offer of immunity, and they made that clear to Kourani and Denbeaux. Such offers can be conferred only by the Department of Justice, and Denbeaux testified that he never met with anyone other than Agents Costello and Shannon, nor did he understand that the agents had secured authorization to offer Kourani immunity from the U.S. Attorney's Office at any time during the series of interviews. Because the agents lacked authority to make an offer of immunity, Kourani cannot specifically enforce it.

### B. Voluntariness

Kourani's primary argument is that the conduct of the FBI agents in this case rendered his statements involuntary under the Due Process Clause of the Fifth Amendment. For the reasons that follow, I find that his statements were voluntary, and the defendant's motion to suppress is denied.

"When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue before the court is whether the statements were voluntary, *i.e.,* the 'product of an essentially free and unconstrained choice by [their] maker,' or coerced by police activity in violation of constitutional rights not to incriminate oneself and due process." *United States v. Haak,* 884 F.3d 400, 409 (2d Cir. 2018) (internal citations omitted) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973) ).

**\*4** "While 'coercive police activity' is a 'necessary predicate' to holding a confession constitutionally involuntary, a finding that police conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *Id.* (first quoting *Colorado v. Conelly,* 479 U.S. 157, 167 (1986), and then quoting *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991) ). The core question is whether, in "the totality of the surrounding circumstances ... the defendant's will was overborne by the" agents' conduct. *Id.* In reviewing the surrounding circumstances, I must consider "(1) the accused's characteristics, (2) the conditions of the interrogation, and (3) the conduct of the police." *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir. 2003). To prevail on a claim of "trickery and deception," as Kourani has raised here, it must be shown "that the [FBI] agents affirmatively misled [him] as to the true nature of [their] investigation." *United States v. Mitchell,* 966 F.2d 92, 100 (2d Cir. 1992) (internal quotation marks omitted) (quoting *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir. 1987) ).

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 193 of 201

United States v. Kourani, Not Reported in Fed. Supp. (2018)

2018 WL 1989583

The Second Circuit's recent decision on this issue in *United States v. Haak* is instructive. In *Haak,* the defendant was charged with possession with intent to distribute a controlled substance resulting in death, in violation of federal narcotics laws. *Haak,* 884 F.3d at 402-03. The charges were based largely on the defendant's statements in a non-custodial, video-recorded interview at the police station. *Id.* During the interview, the officers "were dressed in casual street clothes with no weapons visible," and the defendant "was not handcuffed or otherwise restrained." *Id.* at 403. After the defendant admitted that he had sold the victim the drugs that killed him, the detective pushed him to reveal his drug supplier, telling him: "I'm not looking to mess with you, I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you." *Id.* at 405. The officer went on, warning the defendant, "Either you can get on board, put the team jersey on here, play for this team, or you can be on the losing team." *Id.* The district court found that the detective's comments created an offer of immunity, rendering the defendant's statements involuntary and therefore inadmissible. *Id.* at 407-08. But the Second Circuit reversed, holding that "neither the words spoken by [the detective] nor the context in which he spoke them communicated a *clear and unmistakable promise of immunity in return for cooperation.*" *Id.* at 413 (emphasis added). Without the alleged offer of immunity, the Court held that the totality of the circumstances did not warrant suppression. *Id.* at 414-16.

### 1. Characteristics of the Accused

Applying the framework outlined above, I must first consider the characteristics of the accused. Ali Kourani is 33 years old and has an advanced educational background, having obtained a Bachelor of Science in biomedical engineering in 2009 and a Masters of Business Administration in 2013. He is intelligent and well educated, which cuts against a finding that his statements were involuntary. *See United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir. 1995) (holding that statements voluntary where, "there [was] nothing in the record to indicate that [defendant] lacks maturity, education or intelligence" and considering the defendant's "familiarity with police questioning").

Kourani understood the situation he faced and had some level of familiarity with the FBI. He had previously been offered (and rejected) a written confidentiality agreement

in 2016, indicating that he was at least aware that he could obtain a formal agreement from the agents. He behaved strategically, seeking a meeting with FBI agents when his situation made doing so in his best interest, and he sought out Denbeaux knowing that he had no expertise in immigration or family law and could help him only insofar that he wanted the FBI's help to resolve his immigration problems. There is nothing in the record to indicate that Kourani was particularly susceptible to coercion.

### 2. Conditions of the Interviews

**\*5** Second, in assessing the voluntariness of Kourani's statements I must consider the conditions of the interviews. This factor also cuts against defendant's motion. It is undisputed that Kourani was not in custody during the interviews, which took place in a conference room at Seton Hall Law School, rather than at an FBI facility. Kourani was assisted by a smart, experienced counsel, with a deep background of representing controversial defendants and negotiating with the FBI and prosecutors. Kourani was unrestrained throughout the interviews, *see Parsad v. Greiner,* 337 F.3d at 184; *Green v. Scully,* 850 F.2d 894, 902-03 (2d Cir. 1988), and the agents were dressed in business attire and never displayed their firearms, *see Haak,* 884 F.3d at 415. And it was Kourani who reached out to the FBI to set up the interviews, which took place over the course of several weeks, giving his attorney ample time to withdraw Kourani from the process. The conditions of the interview could hardly be deemed coercive, and I find that this factor also weighs against a finding of involuntariness.

### 3. Conduct of the Officers

Finally, I must consider the conduct of the law enforcement officers. Kourani claims that the FBI agents offered him immunity or otherwise indicated, either to him or to his lawyer, that his statements would not be used against him. Based on the testimony given at the evidentiary hearing and the sworn affidavits submitted by Kourani and Denbeaux, I find that no such offer of immunity or non-prosecution was made, and Kourani's statements were voluntary.

Kourani's motion is based on two related arguments, neither of which has merit. The first is an attempt to transform the agent's promise of "confidentiality" into an offer of immunity or non-prosecution. As a legal matter, at least one court in this district has held that generalized

United States v. Kourani, Not Reported in Fed. Supp. (2018)

2018 WL 1989583

promises of confidentiality are of a different character than offers of immunity. *See Rudaj,* 2005 WL 2508404, at *3 (noting that the First Circuit had observed in *Flemmi* that "[a] promise of confidentiality and a promise of use immunity are separate and distinct assurances" (internal quotation marks omitted) (quoting *Flemmi,* 225 F.3d at 88) ). The Ninth and Eleventh Circuits, however, have indicated in passing that *generalized* promises of confidentiality can render a defendant's statements involuntary. *See Valenzuela v. United States,* 286 F.3d 1223, 1230 (11th Cir. 2002) (stating that the Court would not "countenance the Government's conduct"); *United States v. Brooklier,* 685 F.2d 1208, 1217 (9th Cir. 1982) (stating in dicta that "[s]tatements made in confidence are not immune absent an unconditional promise of confidentiality"). The Second Circuit has not written on the issue.

I need not resolve this dispute. As I have already explained, the only plausible interpretation of the agents' promise of "confidentiality" is that it related *only* to keeping Kourani's cooperation from reaching members of the Lebanese community, in the U.S. and abroad. It was not intended as an offer of immunity or non-prosecution, nor was it understood as such by Kourani or by his lawyer. [5] Kourani's argument that the agent's promise of confidentiality renders his statements involuntary fails.

 **\*6** Although Kourani attempts to weave the alleged promise of confidentiality throughout his claim, his motion ultimately relies on a document drafted by Denbeaux and provided to the agents at the start of their second meeting on April 3, 2017. That document, identified here as Government Exhibit 703, [6] purports to be Denbeaux's "status report," outlining the progress of the first meeting and identifying areas of concern moving forward. As explained below, Kourani relies heavily on paragraph 2 of the memorandum, which states in substance that Kourani was not seeking immunity because it had already been agreed amongst the parties that he was not the subject of the FBI's investigation.

So what to make of Denbeaux's memorandum? Much of it confirms the testimony of the agents, Denbeaux, and Kourani himself. Paragraphs 3 and 4 of the document explain that Kourani was "cooperating with his country because" the agents "believe that he possesses important and valuable information and he is willing to share." Gov't Ex. 703, at ¶¶ 3-4. But to do so, Kourani wanted protection

for his family—he wanted assistance moving his father and sister from Lebanon to the United States, and he wanted to obtain custody of his children in the United States. *Id.* at ¶ 4.

The memorandum also outlines "[t]he dilemma," as Denbeaux calls it. *Id.* at ¶ 5. Denbeaux writes that "the government wants his information before making any commitment and he wants the protection of a commitment with someone in authority that his family interests will be protected before he provides all his information." *Id.* Meaning, in essence, that Kourani was holding back vital pieces of information in order to secure the benefits he sought. Denbeaux goes on to say that the "government wants him to break down various 'walls' with important information," and that Kourani "is willing to do so." *Id.* at ¶ 5(b). But, writes Denbeaux, Kourani is frustrated that he is similarly "facing 'walls' when talking to" the agents that "need to be broken down as well." *Id.* at ¶ 5(c). Specifically, Denbeaux writes that Kourani is frustrated that those interviewing him "require approval from higher ups," and that the parties had a divergent perspective of the power of the FBI. *Id.* at ¶¶ 6-7. [7] Finally, Denbeaux goes on to say that, "If it is true that our agency [cannot] help with important considerations because of lack of power or lack of will[,] the motivation to continue talking fades." *Id.* at ¶ 8. These paragraphs of Denbeaux's memorandum largely confirm the testimony adduced at the evidentiary hearing. Denbeaux was trying to work around the proposition that Kourani was holding back vital information, waiting to exchange it for a firmer commitment that his family could immigrate to the United States and he could establish a relationship with his children. But he wanted the government to commit itself before he committed himself, and when these issues were not resolved, the meetings broke down and Kourani's arrest followed.

Kourani's motion to suppress is largely based on the first two paragraphs of Denbeaux's memorandum. The first states that "[t]his is not a plea negotiations [sic] nor is it a proffer of any sort." *Id.* at ¶ 1. Based on his testimony, it is clear that Denbeaux knew how a proffer session worked, and he did not believe he was seeking immunity from the U.S. Attorney's office. *See* Trans. at 212:22-214:10. In paragraph 2, on which Kourani relies most heavily, Denbeaux writes that Kourani "is not seeking any kind of immunity or protection, because as it has already been agreed, he has committed no crime and faces no

Case 9:18-cv-00521-GLS-ML    Document 23    Filed 06/10/19    Page 195 of 201

United States v. Kourani, Not Reported in Fed. Supp. (2018)
2018 WL 1989583

prosecution." Gov't Ex. 703, at ¶ 2. Denbeaux testified that this statement was based on a "premise," laid out at the beginning of Kourani's cooperation, that "nothing [Kourani] said [would] be used in any way against him because he wasn't a target and there was no criminal risk at stake." Trans. at 188. As explained above, Denbeaux handed this memorandum to the agents at the beginning of the second meeting. The agents reviewed the document outside of the interview room, and despite believing that it did not accurately characterize the parties' understanding, they decided to return the document without comment. Kourani argues that the Court should imply from this document and the agent's silence that he was effectively offered immunity, making any subsequent statements he made involuntary.

**\*7** I find it implausible that paragraph 2 of Denbeaux's memorandum was an accurate representation of the parties' understanding, and I decline to read it as a conferral of immunity. In paragraph 2, Denbeaux writes that Kourani "is not seeking any kind of immunity or protection." Gov't Ex. 703, at 2. This is a telling proposition. Kourani was not seeking any kind of immunity because he knew he could not get it. The agents had made it clear that specific benefits or promises were off the table until Kourani cooperated fully. Denbeaux next writes that Kourani was not seeking immunity "because as it has already been agreed, he has committed no crime and faces no prosecution." *Id.* But how could Denbeaux know this? Denbeaux admitted during his testimony that the agents never told him or his client that Kourani was not the target of the FBI's investigation. I find that this portion of the memorandum was an assertion by Denbeaux intended to "boot-strap" his effort to obtain some level of protection for Kourani in relation to his desperate efforts somehow to bring his endangered family to the United States. He knew that he had to reveal inculpatory information to the FBI, for the FBI, he believed, presented the only viable way to help his family. Denbeaux testified that he knew that Kourani was a member of Hizballah, a terrorist organization, before the meetings began. And in the March 23 meeting, the first of five, Kourani admitted to being a member of Hizballah and to receiving military training by the terrorist wing of Hizballah in Lebanon. To then state that "it has already been agreed ... that he has committed no crime and faces no prosecution" reflects not a promise, but a skilled lawyer's effort to color the event. *Id.*

Agents Costello and Shannon made it clear throughout the interviews that they could not promise to meet any of Kourani's demands.[8] The agents reiterated numerous times that they could not make any specific promises or guarantees because they would have to obtain the approval of their superiors and the assistance of other administrative agencies—namely the immigration authorities—to meet Kourani's demands. And Denbeaux acknowledged as much in writing via text message. *See* Gov't Ex. 301 (stating "I understand that you can't promise or guarantee"). The agents never offered immunity, and both Denbeaux and Kourani knew that they lacked the authority to offer immunity. These facts are undisputed, and they undermine Kourani's claim that he could have reasonably believed he was offered immunity or non-prosecution.

Even if the Court were to take Denbeaux's memorandum on its face, the document and the conduct of the agents is a far cry from the "clear and unmistakable promise of immunity in return for cooperation" required by the Second Circuit. *Haak,* 884 F.3d at 413. The memorandum explicitly states that Kourani was "not seeking any kind of immunity or protection." Gov't Ex. 703, at ¶ 2. The crux of Kourani's motion hinges on the notion that he was not seeking immunity because it had already been agreed that Kourani was not the subject of the FBI's investigation. But neither Denbeaux nor Kourani could identify any *specific* statements made by the agents that could reasonably have been understood as such an agreement. Neither Denbeaux's memorandum, nor the agent's silence after reading it, reflects a clear and unmistakable offer of immunity attributable to law enforcement officers.

I find that the totality of the circumstances indicate that Kourani's non-custodial statements were voluntarily made. As the Second Circuit held in *Haak,* "[i]n the absence of a false promise of immunity, there is no ... support in the totality of circumstances for [a] suppression order." *Haak,* 884 F.3d at 414. The same is true here. Kourani, a well-educated and sophisticated actor, initiated the meetings with the FBI, and the agents' conduct does not rise to such a level that the defendant's will was overborne, *see Anderson,* 929 F.2d at 99, nor did the agents "communicate[ ] a clear and unmistakable promise of immunity in return for cooperation." *Haak,* 884 F.3d at 413. The motion to suppress is denied.

Case 9:18-cv-00521-GLS-ML Document 23 Filed 06/10/19 Page 196 of 201

United States v. Kourani, Not Reported in Fed. Supp. (2018)

2018 WL 1989583

### C. Discovery Disputes

Kourani also seeks a bill of particulars from the government under Federal Rule of Criminal Procedure 7(f). Under Rule 7(f), a district court may require the government to file a bill of particulars when it is necessary to explain the nature of the charges against the defendant, to allow him to prepare for trial, and to prevent unfair surprise. *See Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987). The decision to grant a request for a bill of particulars is within my discretion. *Id.* Generally, no bill of particulars is required where the information sought by the defendant is provided in the indictment or in some other acceptable form, and it is well-settled that a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Gibson,* 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001).

**\*8** The government has already provided substantial pretrial disclosure, including a detailed 21-page complaint, judicial applications for search warrants, and other narrative descriptions of evidence not set forth in the complaint. *See* Declaration of Emil Bove, ECF 31, Exs. D, F, G. The government has also produced 30 reports prepared by FBI agents relating to the investigation. This is sufficient. Because the "[a]cquisition of evidentiary detail is not the function of the bill of particulars," *United States Torres,* 901 F.2d 205, 234 (2d Cir. 1990), defendant's motion is denied.

Kourani also moved the Court to require the Government to reveal the identity of any informants in the case. As I stated on the record, this issue will be addressed at the Final Pretrial Conference.

### Conclusion

For the reasons stated on the record and supplemented herein, defendant's motion to suppress his statements is denied. The clerk is instructed to terminate the motions (ECF 19, 20, 22, 25).

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2018 WL 1989583

### Footnotes

1    The parties dispute how this meeting came about. Agent Costello testified that he went to Beirut after Kourani entered a United States embassy and asked to speak with someone from the U.S. government. *See* Trans. at 11:3-6. Kourani testified that he went to the U.S. embassy to seek aid after a conflict with his extended family, and when he arrived consular officials confiscated his passport and asked him to return the following week to collect it. Kourani claims that when he returned, he was questioned by Agent Costello and two other agents about his involvement in Hizballah. Eventually, Kourani claims, his passport was returned and he was allowed to fly back to the U.S. *See* Trans. at 246:11-249:18.

2    Denbeaux had represented detainees held at Guantanamo Bay Detention Camp. Previously he had represented black panthers. Kourani hoped that Denbeaux's experience in representing controversial clients in negotiations with the FBI could be utilized to resolve his immigration and child custody disputes.

3    Agents Costello and Shannon also had a number of phone conversations with Denbeaux during this time, largely to coordinate future in-person meetings.

4    While this affirmation related primarily to immigration benefits, the larger implication—that the agents could not make any specific promises or guarantees—was reiterated dozens of times and was intended to apply broadly to any benefit that Kourani might seek.

5    The testimony of the agents, Denbeaux, and Kourani confirm that "confidentiality" in this context had a more restricted meaning than Kourani now advances. Agents Costello and Shannon testified credibly that this promise related only to confidentiality from the Lebanese community. *See, e.g.,* Trans. at 77:16-19, 88:16-89:2. Denbeaux confirmed that Kourani requested confidentiality because he was concerned for his family's safety "[i]f he cooperated with the FBI." *Id.* at 218:7-13. And Kourani testified that he wanted "strict confidentiality" because he did not want members of the Muslim community to see him with FBI agents. *Id.* at 257:15-22. Kourani also testified that confidentiality was important in ensuring his safety because he had "already seen what those militias are capable of." *Id.* at 277:3-9. Moreover, during the series of interviews that followed, the agents made clear that in order to seek the immigration benefits Kourani demanded in exchange for his cooperation, they would have to reveal the fact of his cooperation with other government entities. In

2018 WL 1989583

sum, it is clear that all parties understood the term "confidentiality" to refer only to keeping the fact of his cooperation confidential from the Lebanese community.

6    Denbeaux's memorandum was introduced twice during the evidentiary hearing as Gov't Ex. 402 and 703. For consistency, I refer to the document as Exhibit 703.

7    According to Denbeaux's memorandum, Kourani believed that "the agency [had] a great deal of power," while "the agency suggest[ed] that it [had] very little power." *Id.* at ¶ 7.

8    Kourani made a number of demands during the interviews, including immigration benefits for his father and sister, assistance with a child custody dispute, and help finding a high-paying job.

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Lopez v. Ercole, S.D.N.Y., April 21, 2010

2001 WL 699053

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Phillip WHITE, Petitioner,

v.

John KEANE, Respondent.

No. 00Civ.6202(NRB).
|
June 21, 2001.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** Petitioner Phillip White ("White"), currently incarcerated at Woodbourne Correctional Facility in Woodbourne, New York, has brought this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Supreme Court, Bronx County, for murder in the second degree, New York Penal Law § 125.25[1].

White contends that the District Attorney breached his plea agreement by failing to recommend parole for White when asked by the parole board, thereby violating his due process rights under the Fifth and Fourteenth Amendments. For the reasons discussed below, the petition is denied.

*BACKGROUND*

In 1986, White was convicted of two counts of murder in the second degree and sentenced to consecutive indeterminate prison terms of fifteen years to life. [1] The Appellate Division affirmed his conviction, *People v. White,* 131 A.D.2d 983 (1 st Dept.1987), and the New York State Court of Appeals denied him leave to appeal. *People v. White,* 70 N.Y.2d 878 (1987). In 1992, White moved to vacate his conviction on *Brady* and *Rosario* grounds. While the Supreme Court, Bronx County, denied his motion, the Appellate Division reversed, vacating

White's conviction and remanding for a new trial. *People v. White,* 200 A.D.2d 351 (1st Dept.1994).

In 1996, pursuant to a plea bargain, White pled guilty to a single count of murder in the second degree and received a sentence of imprisonment for fifteen years to life. During the plea proceeding, White testified that he had been induced to plead guilty because the Assistant District Attorney ("A.D.A.") promised, in exchange for the plea, to give a statement recommending that White receive the minimum term and be eligible for parole at the earliest possible point. The following exchange ensued:

THE COURT: Anyone made any promises, that is your attorney, the District Attorney or anyone else as to what the sentence of the Court will be in order to induce you to plead guilty other than the promise you'll be sentenced to a minimum term of 15 years, maximum term of life?

THE DEFENDANT: Yeah.

THE COURT: Anyone make any other promises?

THE DEFENDANT: Any other promises other than the fact the D.A. would give me a statement there was no other promise.

[DEFENSE COUNSEL]: There will be a statement on the record.

[A.D.A.]: I make the statement now that I'm authorized to recommend to the Court the minimum term that the Parole Commission consider allowing him eligibility at the earliest point after his 15 to life sentence and that these minutes of course at the time of sentence will be incorporated into the sentence and go up with him. (Exhibit 7 of Govt. Brief).

At sentencing, both the petitioner and the respondent reiterated their request that the plea record be forwarded to the parole board:

[DEFENSE COUNSEL]: I join in [the A.D.A.'s] application, your Honor, because the particular point that was made by [the A.D.A.] with respect to Mr. White's future parole status is obviously very important to him,

so, of course, I'd ask those minutes
be adjoined with the sentencing
minutes and forwarded with his
file. (Exhibit 8).

**\*2** On July 1, 1999, White moved, pursuant to N.Y.Crim.
Pro. § 440.10, to vacate his conviction, claiming that
the District Attorney's office breached the plea bargain
when it did not respond to a 1997 parole board inquiry.
The respondent argued that White's motion should be
dismissed on three grounds: 1) White failed to raise
the issue in a timely appeal; 2) White's claim was not
substantiated by appropriate affidavits as required by
N.Y.Crim. Pro. Law § 440.30(4)(b); and 3) White's claim
was meritless because the government kept its promise
to make a statement. Exhibit 2, p 4–5. The Supreme
Court denied White's motion in a one sentence ruling:
"Upon the foregoing papers this Motion is DENIED. *See*
Affirmation in Opposition." Exhibit 3. On December 29,
1999, the Appellate Division denied White's application
for leave to appeal. Exhibit 6. From the record before us,
it does not appear that White sought leave to appeal to the
New York Court of Appeals.

*DISCUSSION*

A. Standard of Review
In 1996, Congress passed the Antiterrorism and Effective
Death Penalty Act ("AEDPA"), P.L. No. 104–32, 110
Stat. 1214, which restricted the ability of federal courts to
grant writs of habeas corpus to state prisoners and granted
greater deference to state court determinations of both
law and fact. The relevant portion, 28 U.S.C. § 2254(d),
provides that:

An application for a writ of habeas corpus on behalf of
a person in custody pursuant to the judgment of a State
court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings
unless the adjudication of the claim—

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

The Second Circuit has left unanswered the question of
whether the great deference Congress accorded state court
decisions through 28 U.S.C. 2254(d) is applicable to
summary orders, i.e. orders with effectively no reasoning
to which to defer. *See Washington v. Schriver,* No. 00–2195
(2d Cir. June 15, 2001). In *Washington,* the Second Circuit
recognized that other Circuits have split over whether
to accord summary orders deference under 28 U.S.C.
2254(d) or to apply pre-AEDPA standards under which
questions of law and mixed questions of law and fact
are reviewed *de novo. Id.* However, it deferred addressing
the issue because it found that Washington's petition was
without merit under either standard of review. *Id.* Because
we find that White's petition, likewise, is without merit
under either the AEDPA or pre-AEDPA standards of
review, we do not reach the issue of which controls.

B. Procedural Issues
We find no merit in the government's arguments that
petitioner's claim is procedurally barred on "independent
and adequate" state grounds. *See Lambrix v. Singletary,*
520 U.S. 518 (1997). First, the government argues that
White "unjustifiably failed to raise [this issue] in a
direct appeal" and, therefore, the claim is barred because
the time to appeal has expired. *See* N.Y.Crim. Proc.
Law § 460.10(1)(a) (requiring a party to file an appeal
within 30 days of sentencing); N.Y. Crim Proc Law §
440.10(2)(c) (requiring a court to deny a motion to vacate
if the defendant unjustifiably failed to appeal within
the proscribed period). This argument strains reason.
Clearly, White's claim, whatever its merit, could not have
accrued until the government failed to respond to the
parole board's inquiry. If we were to find otherwise, the
government would be free to violate any plea agreement
30 days after a defendant's guilty plea with no fear of
consequences. Second, the government claims that White's
failure to support his claim with an affidavit from his
attorney violates N.Y.Crim. Proc. Law § 440.30(4)(b) and
constitutes an independent and adequate state ground
for denying the petition. While respondent is correct that
a violation of this statute would create a procedural
bar, *see Roberts v. Scully,* 875 F.Supp. 182, 193 n. 7
(S.D.N.Y.), *aff'd* 71 F.3d 406 (2d Cir.1995), it is clear
that no such violation has occurred. Section 440.30 states

that "such sworn allegations may be based upon *personal knowledge of the affiant* or upon information and belief, provided that in the latter event the affiant must state the sources of such information and the grounds of such belief." (emphasis added). White's sworn affidavit satisfies the New York statute. *See* Exhibit 4.

**\*3** Although it is unclear whether White sought leave to appeal to the New York Court of Appeals, a step necessary to exhaust his state court remedies, it is of no moment. Pursuant to 28 U.S.C. § 2254(b)(2) "an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Thus we are not procedurally barred from reaching the merits of petitioner's claim.

C. Due Process

Turning to the merits, we find that the government's argument in the State Supreme Court was correct: the District Attorney plainly fulfilled the terms of the plea bargain by placing an appropriate statement on the plea record and forwarding it to the parole board. Plea agreements are to be interpreted according to principles of contract law. *U.S. v. Salcido–Contreras,* 990 F.2d 51 (2d Cir.1993). On the record, White stated, and his attorney further clarified, that the only promise he received in exchange for his plea was that the District Attorney would give a recommendation statement to the parole board.

> THE DEFENDANT: Any other promises other than the fact the D.A. would give me a statement there was no other promise.

> [DEFENSE COUNSEL]: There will be a statement on the record. (Exhibit 7).

The prosecutor immediately made the bargained-for statement:

> I make the statement now that I'm authorized to recommend to the Court the minimum term that

> the Parole Commission consider allowing him eligibility at the earliest point after his 15 to life sentence and that these minutes of course at the time of sentence will be incorporated into the sentence and go up with him. *Id.*

Consistent with these statements, the A.D.A. and petitioner's counsel agreed, at both the plea hearing and later sentencing, that the transcript of the plea hearing with the statement would be forwarded to the parole board. In contrast, nowhere in the record before us is there any indication that the A.D.A. agreed to provide another, future, recommendation directly to the parole board. Therefore, we find that the agreement government met its obligation under the plea agreement as stated on the record.

As to any off-record promises that the prosecutor may have made, it is well settled in this Circuit that federal due process does not require a state prosecutor to honor an off-record promise made in exchange for a plea. *See U.S. v. U.S. Currency in the Amount of $228,536.00,* 895 F.2d 908, 914 (2d Cir.1990); *Siegel v. State of New York,* 691 F.2d 620 (2d Cir.1982). Because the government fulfilled its record obligation to make a statement recommending that White receive the minimum sentence, White has failed to prove that his constitutional rights were violated. Accordingly, his petition for a writ of habeas corpus must be denied.

*CONCLUSION*

For the reasons given above, Phillip White's petition for a writ of habeas corpus is hereby denied.

**\*4** IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 699053

Footnotes

1    Unless otherwise stated, all facts are drawn from the record below.

2001 WL 699053

---

**End of Document**                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---